### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

SOFTWARE FOR MOVING, INC., a New York Corporation,

                  **Plaintiff,**

         **v.**

LA ROSA NEW YORK DEL MONTE EXPRESS, INC., a New York Corporation, and LA ROSA NEW YORK DEL MONTE EXPRESS (CHICAGO), LLC, an Illinois Limited Liability Company,

                  **Defendants.**

-------------------------------------------------------------x

**CASE NUMBER:  08-cv-00986 (JGK)**

**Assigned Judge: John Koeltl**

**Designated Magistrate Judge: Douglas Eaton**

**DECLARATION OF KEVIN J. HARRINGTON IN SUPPORT OF DEFENDANTS' MOTION FOR RECONSIDERATION AND RELIEF**

          **ECF CASE**

I, Kevin J. Harrington, the undersigned, declare under penalty of perjury under the laws of the United States that the following is true and correct, and that this Affirmation was executed on February 21, 2008 in White Plains, New York.

1.    I am a partner at the law firm of Harrington, Ocko & Monk, LLP, counsel for Defendants, LA ROSA NEW YORK DEL MONTE EXPRESS, INC. ("La Rosa New York") and LA ROSA NEW YORK DEL MONTE EXPRESS (CHICAGO), LLC ("La Rosa Chicago" together with La Rosa New York "Defendants"), in the above-captioned matter.  I make this Affirmation in support of Defendants' motion for reconsideration of certain rulings contained in Judge Gotschall's December 7, 2007 Order pursuant to Federal Rule of Civil Procedure 60(b).  I know all of the following facts of my personal knowledge, or through discussion with other attorneys in my firm, or through review of relevant documents pertaining to this matter.

2.    La Rosa New York entered into not one, but two (2), written agreements with Plaintiff, SOFTWARE FOR MOVING, INC. ("SFM") regarding the development of new software

by SFM for La Rosa New York's use in its moving business. Under those agreements, SFM was required to arbitrate any dispute with La Rosa New York arising from or relating to those agreements. SFM accepted more than $245,000 in payment from La Rosa New York pursuant to these two (2) written agreements, but did not provide La Rosa New York with fully functioning software in a timely manner.

3.    On or about February 12, 2007, La Rosa New York brought a Demand for Arbitration against SFM before the American Arbitration Association ("AAA") in New York pursuant to the arbitration provisions in the two (2) written agreements. SFM engaged in such Arbitration and agreed to a discovery schedule.

4.    This forum-shopping action was then commenced by SFM in April 2007 for copyright infringement and related claims in the United States District Court for the Northern District of Illinois. Plaintiff did not disclose in its original pleading that there was a pending Arbitration between SFM and La Rosa New York.

5.    Defendants filed motions to dismiss this action for lack of subject matter jurisdiction, or in the alternative to stay this action pending the ongoing New York Arbitration between La Rosa New York and SFM, or transfer this action to the Southern District New York. SFM then belatedly cross-moved to stay the New York Arbitration pursuant to the Federal Arbitration Act. These various motions and cross-motions filed by the parties in this action are fully described below.

6.    While these motions and cross-motions were pending before the Federal Court, in September 2007, SFM brought a petition before Judge Feinman of the New York Supreme Court to stay the New York Arbitration. La Rosa New York then cross-moved to compel arbitration, and require SFM to arbitrate this dispute in New York before Arbitrator Mandel in the ongoing Arbitration.

7.      On December 5, 2007, Judge Feinman granted La Rosa's cross-motion to compel arbitration, denied SFM's motion to stay the New York Arbitration, and directed the parties to arbitrate their dispute.

8.      On December 7, 2007, Judge Gotschall of the Northern District of Illinois granted Defendants' motion to transfer this case to the Southern District of New York.  Judge Gotschall's Order also granted SFM's request that the Court stay the pending New York Arbitration between the parties until a hearing on the issue of arbitrability could be held.  Judge Gotschall was not aware of Judge Feinman's Order.

9.      Pursuant to Rule 60(b), the Court should reconsider and vacate that aspect of Judge Gotschall's December 7, 2007 Order staying the New York arbitration, and requiring that the parties conduct a hearing on the issue of arbitrability.  Such reconsideration is appropriate in light of the fact that:

(1)      Judge Feinman of New York Supreme Court already issued an Order on December 5, 2007 directing La Rosa New York and SFM to arbitrate their dispute, although such fact was not known to Judge Gotschall when she issued her later Order;

(2)      The FAA does not apply to this dispute as it is now clear based upon the self-serving disclosure by SFM in the New York Action (but not known to Judge Gotschall) that SFM is a New York Corporation with its only place of business in New York, La Rosa New York is a New York corporation with its principle place of business in New York City (the Bronx), the agreements and software at issue originated in New York City at La Rosa's offices, and therefore, this dispute does not impact interstate commerce;

(3)    SFM willingly and knowingly hid from the Court and Defendants the fact that its only place of business is New York City, in order to cause the Court to misapply the FAA to this action; and

(4)    As a result of Judge Feinman's December 5, 2007 Order, a hearing on the issue of arbitrability is no longer necessary as SFM has already been heard by Judge Feinman on that issue, and Judge Feinman directed the parties to arbitrate their dispute pursuant to the two (2) written agreements.

## SFM EXECUTES TWO SOFTWARE AGREEMENTS
## WITH BROAD ARBITRATION PROVISIONS

10.    Attached as Exhibit "A" is a true and correct copy of the Declaration of Hiram Rodriguez ("Rodriguez Dec."), President of Defendant La Rosa New York, filed with the District Court for the Northern District of Illinois and dated July 19, 2007.  The Declaration filed herewith does not contain the exhibits to the Declaration as those exhibits are represented in the subsequent exhibits attached hereto.  As outlined in Mr. Rodriguez's Declaration, in or about November or December 2004, La Rosa New York entered into discussions with Plaintiff, SOFTWARE FOR MOVING, INC. ("SFM"), to engage SFM to develop and maintain a web-based version of SFM's Moving Manager Software for use by La Rosa New York.  *Id.*, at ¶3.  Mr. Shlomo Kogos is President of SFM.

11.    SFM is a New York corporation.  Mr. Kogos was also apparently President of Safeguard Computer Services, Inc. ("Safeguard"), also a New York corporation with its principal place of business in new York City.  La Rosa New York and Safeguard had a prior contractual relationship that required Safeguard to develop and maintain for La Rosa New York a windows-based version of software known as "Moving Manager".  The work for this software was done in

New York, and was installed on La Rosa New York's computer system in New York. Neither Safeguard nor SFM has or had a contractual relationship with La Rosa Chicago.

12.    In or about March 2005, La Rosa New York and SFM executed the 2005 Software & License Agreement ("2005 Software Agreement") as well as the 2005 Maintenance Agreement (together with the 2005 Software Agreement, the "2005 Software Agreements"). Rodriguez Dec., at ¶4.

13.    Attached hereto as Exhibit "B" is a true and correct copy of the February 12, 2007 Demand for Arbitration by La Rosa New York against Plaintiff SFM (the "Demand"). Attached as Exhibit "B" to the Demand is a copy of the 2005 Software Agreement. The terms of the 2005 Software Agreement provide that SFM is to receive $190,000.00 for the development and delivery of the web-based Moving Manager Software, and a $105,000.00 license fee for La Rosa New York's use of such software. Exhibit "B" 2005 Software Agreement, at §§4.1, 6.6. Under the agreement, La Rosa New York was to pay SFM in installments after the successful completion of each phase of the new software, and upon actual delivery of that software to La Rosa New York. *Id.*, at §4.2. La Rosa New York was not required to make the installment payments if La Rosa New York disputed the invoices. *Id.*

14.    Pursuant to the 2005 Software Agreement, La Rosa New York was not required to pay SFM the final 10% of the development fee ($19,000.00) until SFM had delivered all of the deliverables to La Rosa New York, and La Rosa New York had successfully used the new software for a period of ninety (90) days without failure (the "Trial Period"). 2005 Software Agreement, at §4.2.

15.    As part of the 2005 Software Agreement, La Rosa New York agreed to pay SFM a $58,000.00 maintenance fee such that La Rosa New York could continue to use the DOS/Windows-

based old software until the new software was fully developed and delivered by SFM. 2005 Software Agreement, at §4.6. Pursuant to this provision, SFM was required to maintain the current DOS/Windows-based software for La Rosa New York. *Id.*

16.     Pursuant to the terms of the 2005 Software Agreement, La Rosa New York could terminate the Agreement in whole or in part if SFM failed to perform a material obligation under the Agreement. 2005 Software Agreement, at §12.1. If La Rosa New York terminated the Agreement as a result of a default or material breach by SFM, La Rosa New York was entitled to a return of all monies paid by La Rosa New York to SFM pursuant to the terms of the Agreement. *Id.*, at §12.2. Furthermore, if the Agreement was terminated as a result of SFM's default or material breach, La Rosa New York had a right to continue use of the DOS/Windows-based software. *Id.*, at §12.2. In addition, even if SFM terminated the 2005 Software Agreement, La Rosa New York still had a right to use the old software. *Id.*, at §12.4.

17.     Under the express terms of the 2005 Software Agreement, SFM specifically agreed to arbitrate any and all disputes arising out of, relating to or in connection with the Agreement. 2005 Software Agreement, at §§13.12, 13.13.

18.     In March 2005, SFM also entered into a Maintenance Agreement with La Rosa New York concerning the new web-based software ("2005 Maintenance Agreement"). Exhibit "A" and Exhibit "C" to the Demand, 2005 Maintenance Agreement. Pursuant to the 2005 Maintenance Agreement, SFM agreed to maintain the new web-based software for a yearly maintenance fee of approximately $46,200.00 pursuant to Schedule A of the Maintenance Agreement. 2005 Maintenance Agreement, at p 6. Payment of this maintenance fee was not to begin until the software successfully passed the trial period described in the 2005 Software Agreement. 2005 Maintenance Agreement, at §3. If SFM defaulted, or failed to perform material obligations under

the 2005 Maintenance Agreement, La Rosa New York was entitled to withhold payment and maintenance fees until the default was cured. *Id.*, at §8. Furthermore, pursuant to the 2005 Maintenance Agreement, SFM agreed to arbitrate any and all disputes arising out of the Agreement. *Id.*, at §18.

19.    Subsequent to March 2005, in or about September 2006, SFM and La Rosa New York entered into an Addendum to Software Development & License Agreement ("Addendum"). 2005 Software Agreement, at p. 17. The Addendum contained four (4) terms that are set off in quotations, which are not defined in the Addendum, but are defined in the 2005 Software Agreements: (1) the term "Developer"; (2) the term "Software X"; (3) the term "Client"; and (4) the term "Moving Manager Web Version"). 2005 Software Agreement, Addendum, at p. 17. The Addendum is paginated as page "17" of the 17-page 2005 Software Agreement.

20.    SFM and La Rosa New York also entered into a Maintenance Schedule A which is part of the 2005 Maintenance Agreement. 2005 Maintenance Agreement, at p. 6. The Maintenance Schedule A is paginated as "page 6" of the 6-page 2005 Maintenance Agreement. *Id.*

## SFM BREACHES THE SOFTWARE AGREEMENTS

21.    Attached hereto as Exhibit "C" is a true and copy of the December 2, 2006 e-mail string between Roberto Medina of La Rosa New York and Shlomo Kogos, President of SFM. In this e-mail, Mr. Kogos specifically refers to "the agreement" between the parties regarding the new web-based Moving Manager Software, and indicates his willingness to review the agreement with La Rosa New York.

22.    Attached hereto as Exhibit "D" is a true and correct copy of the December 11, 2006 letter from Robert S. Ocko of Harrington, Ocko & Monk, LLP, to Shlomo Kogos, President of SFM. In his letter, Mr. Ocko specifically references the 2005 Software Agreement, as well as the

7

arbitration provision contained within that Agreement. *Id.* Furthermore, in this letter Mr. Ocko specifically advised Mr. Kogos and SFM that any disputes between the parties concerning the new web-based software had to be resolved by arbitration pursuant to the 2005 Software Agreement. *Id.* This letter was provided to Shlomo Kogos and SFM via Mr. Kogos' e-mail, as well as by certified mail, return receipt requested. *Id.* Mr. Kogos never disputed the statements in this letter.

23.    Attached hereto as Exhibit "E" is a true and correct copy of the December 13, 2006 e-mail from Shlomo Kogos, President of SFM, to Robert S. Ocko of Harrington, Ocko & Monk, LLP. In Mr. Kogos' response to the December 11, 2006 letter from Robert S. Ocko of Harrington, Ocko & Monk, LLP, Mr. Kogos does not deny the existence of the 2005 Software Agreement referenced in Mr. Ocko's December 11, 2006 letter. Nor does Mr. Kogos refute Mr. Ocko's assertion that the parties are required to arbitrate their disputes over the software. To the contrary, in this e-mail, Mr. Kogos specifically references "the agreement" between La Rosa New York and SFM and the specific amounts for maintenance referenced in those Agreements. *Id.* Indeed, Mr. Kogos specifically references the "agreement" between La Rosa New York and SFM regarding the web-based software four (4) times in this e-mail. *Id.* (Despite SFM's contention in Mr. Kogos' e-mail that SFM is the owner of the copyright for the old and new software, SFM has never registered the copyright for the new software, nor is SFM apparently the owner of the copyright for the DOS/Windows-based version of the Moving Manager Software according to SFM's pleadings in the Federal Action in the Northern District of Illinois.) This e-mail from Mr. Kogos serves as an admission by SFM that the 2005 Software Agreements exist, and are binding upon SFM. Included in this e-mail from Mr. Kogos are several threats by SFM regarding La Rosa New York's use of the new and old software. *Id.*

24.    Attached hereto as Exhibit "F" is a true and correct copy of the December 13, 2006 e-mail from Shlomo Kogos to Robert S. Ocko of Harrington, Ocko & Monk, LLP.  Some six hours after the first e-mail, Mr. Kogos sent an additional e-mail to Robert S. Ocko of Harrington, Ocko & Monk, LLP, again referencing the 2005 Software Agreement between the parties alleging that La Rosa New York was at that time in default of that Agreement. *Id.*

25.    Attached hereto as Exhibit "G" is a true and correct copy of the January 9, 2007 letter from Robert S. Ocko of Harrington, Ocko & Monk, LLP to SFM.  In Mr. Ocko's January 9th letter, Mr. Ocko indicates to SFM that pursuant to §12.2 of the 2005 Software Agreement, La Rosa New York was terminating the agreement due to SFM's material breach and that La Rosa New York was demanding the immediate return of the $245,250.00 paid to SFM by La Rosa New York pursuant to that agreement.  In his January 9th letter, Mr. Ocko also makes multiple references to, not only the 2005 Software Agreement, but the 2005 Maintenance Agreement and the parties' obligations pursuant to those agreements. *Id.*

26.    Attached hereto as Exhibit "H" is a true and correct copy of the January 9, 2007 letter from Philip Zukowsky, counsel for SFM, to Robert S. Ocko of Harrington, Ocko & Monk, LLP, counsel for La Rosa New York.  In this e-mail, Mr. Zukowsky specifically states that he has received Mr. Ocko's January 9, 2007 letter and "in the future all correspondence to my client should be sent through me.  Please do not send letters directly to my client, and I shall continue to follow the same rule with your client". *Id.*  Mr. Zukowsky's e-mail does not refute prior statements made by Roberto Medino or Robert Ocko that SFM had written agreements requiring SFM to arbitrate disputes.

## LAROSA NEW YORK INITIATES AN ARBITRATION

27.    On or about February 12, 2007, La Rosa New York initiated a Demand for Arbitration with SFM before the American Arbitration Association as provided for in the 2005 Software Agreement.  Exhibit "B".  The Demand was served via certified mail, return receipt requested on SFM and Shlomo Kogos at SFM's office address as set forth in the 2005 Software Agreement.  *Id.*  The Demand was also served via certified mail, return receipt requested upon SFM's counsel, Mr. Philip Zukowsky of Chernesky Heyman & Kress, P.L.L.  La Rosa New York served Mr. Zukowsky pursuant to his previous request to be provided with all correspondence from La Rosa New York to SFM.  <u>See</u> Exhibit "H".

28.    Attached hereto as Exhibit "I" is a true and correct copy of the February 21, 2007 letter from the AAA to Kevin J. Harrington of Harrington, Ocko & Monk, LLP and Philip Zukowsky, counsel for SFM.  In this letter, the AAA acknowledges receipt of La Rosa New York's Demand for Arbitration and indicates to Mr. Zukowsky that SFM and Mr. Kogos had until March 8, 2007 by which to file and serve an Answer to the Demand.  *Id.*  Mr. Zukowsky subsequently requested, and was granted, an extension of time by which to submit an Answer to the Demand on behalf of his clients.

29.    Attached hereto as Exhibit "J" is a true and correct copy of the February 27, 2007 letter from Philip Zukowsky to Kimberly Claxton of the AAA.  In this letter, Mr. Zukowsky indicates his client's objection to the Arbitration based on the alleged forgery of Mr. Kogos' signatures on the 2005 Software Agreements.  *Id.*  Mr. Zukowsky does however acknowledge that under Rule 7 of the "AAA Commercial Rules", the Arbitrator is authorized to rule upon his or her own jurisdiction.  *Id.*  Mr. Zukowsky goes on to state that "if AAA will not refuse to proceed with this matter, we will at least want assurances that the Arbitrator will first focus on the jurisdiction

issue and will not require my client to incur the considerable expense of responding to the 36-page Demand for Arbitration". *Id.* Thus, SFM clearly agreed to arbitrate the issue of arbitrability before the Arbitrator pursuant to the AAA Rules as requested by its counsel, Mr. Zukowsky, in his February 27, 2007 letter.

30.    Attached hereto as Exhibit "K" is a true and correct copy of the February 26, 2007 letter from Mr. Zukowsky to Kevin Harrington of Harrington, Ocko & Monk, LLP. In this letter, Mr. Zukowsky makes the following statements about the signatures of Mr. Kogos on the 2005 Software Agreements.

> Mr. Kogos' purported signatures on the 2005 agreements are obvious, and clumsy, forgeries even to a non-expert. … Admittedly the forgeries on the supposed March 3, 2005 Maintenance Agreement (Exhibit "C" to your Demand for Arbitration) are more artful, but the signatures are no more valid than the phony scrawl on the Software Development & License Agreement.

*Id.* Mr. Zukowsky's reference to "signatures" on the 2005 Maintenance Agreement must include both the signature on page 5 of that agreement, as well as the signature on page 6, the Maintenance Schedule A to that agreement. Thus, in this letter, Mr. Zukowsky is clearly asserting that all four (4) of Mr. Kogos' signatures on the 2005 Software Agreements, including the signatures on the Addendum and Maintenance Schedule A are forgeries, and not Mr. Kogos' actual signature. *Id.*

31.    Attached hereto as Exhibit "L" is a true and correct copy of the March 2, 2007 letter from Kevin Harrington to Kimberly Claxton of the AAA, as well as Philip Zukowsky, counsel for SFM. In this letter, counsel for La Rosa New York disputed Mr. Zukowsky's assertion that the signatures of Mr. Kogos on the operative 2005 Software Agreements are forgeries. *Id.* In this letter, counsel for La Rosa New York goes on to reiterate that SFM and its counsel acknowledged the 2005 Software Agreements, as well as made demands for money pursuant to those very agreements. *Id.*

## SFM PARTICIPATES IN THE NEW YORK ARBITRATION

32.    On or about March 6, 2007, I participated in a conference call with Ms. Claxton of the AAA as well as Mr. Zukowsky, counsel for SFM. During that call, Mr. Zukowsky reiterated his request that the AAA apply the Optional Rules for Emergency Measures of Protection to the issue of arbitrability. Counsel for La Rosa New York indicated its objection to the application of those rules, as such rules were obviously not intended to apply to the question of arbitrability, but rather, were rules formulated to address situations in which a temporary restraining order or preliminary injunction were required to maintain the *status quo* of the situation. However, in keeping with Mr. Zukowsky's request that the Arbitrator first rule on the arbitrability issue, counsel for La Rosa New York did not object to the Arbitrator deciding the issue of arbitrability and the validity of the 2005 Software Agreements as an initial matter in the Arbitration. In addition, pursuant to Mr. Zukowsky's request, counsel for La Rosa New York agreed to extend the time in which SFM and Mr. Kogos had to answer the Demand for Arbitration until March 16, 2007.

33.    Attached hereto as Exhibit "M" is a true and correct copy of the March 7, 2007 letter from Kimberly Claxton of the AAA to Kevin J. Harrington, counsel for La Rosa New York, and Philip Zukowsky, counsel for SFM and Shlomo Kogos. In this letter, Ms. Claxton indicated what had transpired between counsel for the parties and the AAA on the previous day's telephone conference. *Id.* In addition, Ms. Claxton indicated that Mr. Zukowsky had requested an Arbitrator with experience in contract law, as well as other intellectual property and copyright law, and that the parties had agreed to extend the search for an Arbitrator to include New York City. *Id.* In this letter, Ms. Claxton also indicates that "Mr. Zukowsky estimates that this matter will require approximately ten days of hearing". *Id.*

34.    Attached hereto as Exhibit "N" is a true and correct copy of the March 16, 2007 Objection to Jurisdiction of SFM filed with the AAA.  In the Objection, counsel for SFM clearly indicates that SFM agreed to submit the issue of arbitrability to the Arbitrator pursuant to the AAA's Rules. *Id.*, at ¶5.

35.    Attached hereto as Exhibit "O" is a true and correct copy of the March 21, 2007 letter from counsel for La Rosa New York filed with the AAA in response to SFM's March 16, 2007 Objection.  In its response, counsel for La Rosa New York pointed out to the AAA that pursuant to Rule 7 of the AAA Commercial Arbitration Rules, the Arbitrator has the authority to rule on the jurisdictional issue of another party's objection, and to rule on whether or not the Arbitrator has jurisdiction over the dispute. *Id.*  Counsel for La Rosa New York also reiterated its request that counsel for SFM provide it and the AAA with the current address of SFM as well as SFM's President, Shlomo Kogos.  *Id.*  To date, Mr. Zukowsky has refused to provide us with this address, and has yet, never provided SFM's address or the address of Mr. Kogos to any tribunal before which SFM has sought relief regarding the dispute between these parties.

36.    Annexed hereto as Exhibit "P" is a true and correct copy of the March 22, 2007 letter from Kimberly Claxton of the AAA to counsel of La Rosa New York and Philip Zukowsky, counsel for SFM and Shlomo Kogos.  In this letter, the AAA indicated that it had adopted the position propounded by Plaintiffs in this matter as to whether or not the AAA had jurisdiction over this dispute between these parties.  *Id.*  In this letter, the AAA went on to make the following suggestions and statements:

> Accordingly, in the absence of an agreement by the parties or a court order staying this matter, the Association will proceed with administration pursuant to the rules.  The parties may wish to raise this issue, upon appointment of the Arbitrator.  The AAA serves as a neutral administrative agency and does not generally appear or participate in judicial proceedings relating to Arbitration.  The AAA

> should not be named as a party-defendant. The rules state that the AAA is not a "necessary party". The AAA will <u>abide</u> by an order issued by the courts and the parties are requested to keep us informed as to the outcome.

*Id.* (Emphasis added). Thus, as early as March 22, 2007, SFM and Shlomo Kogos were on notice that in order to stay the Arbitration, they would need to make the proper application to a court of competent jurisdiction. *Id.* Arguably, SFM and Mr. Kogos have never made such timely and proper application to a court of competent jurisdiction requesting a stay of the Arbitration between the parties.

## SFM FILES A FORUM-SHOPPING COMPLAINT IN THE NORTHERN DISTRICT OF ILLINOIS

37.     Attached hereto as Exhibit "Q" is a true and correct copy of the April 3, 2007 Complaint and June 21, 2007 Amended Complaint of SFM before the Federal District Court in the Northern District of Illinois. SFM brought this forum-shopping action against La Rosa New York in Federal Court of the Northern District of Illinois as of April 3, 2007, but failed to disclose to that Court in its Complaint this pending Arbitration, and did not move at that time for a stay of this Arbitration.

38.     Attached hereto as Exhibit "R" is a true and copy of the April 16, 2007 letter from Kimberly Claxton of the AAA to counsel for La Rosa New York and Philip Zukowsky, counsel for SFM and Shlomo Kogos. In her April 16, 2007 letter, Ms. Claxton of the AAA advised the parties that the AAA had appointed Arbitrator Mandel as the Arbitrator for this matter and provided the parties with dates of availability for a preliminary hearing. *Id.* SFM and Shlomo Kogos have never objected to the appointment of Mr. Mandel as the Arbitrator in this matter.

39.     Our office made multiple requests for SFM's present business address to SFM's Arbitration counsel (Mr. Zukowsky), counsel in this action (Mr. Leyhane), and counsel in the New

York Action.   All of these lawyers refused to disclose this information.   See annexed hereto as Exhibits "S" and "T", true and correct copies of a June 19, 2007 letter to Philip Zukowsky, and January 9, 2008 letter to Timothy Wedeen.   Our office also made verbal requests for this information to Mr. Zukowsky on February 21, 2007, and Mr. Leyhane on May 8, 2007.   Both lawyers refused to disclose the addresses of SFM and Mr. Kogos.

## SFM FURTHER PARTICIPATES IN THE NEW YORK ARBITRATION

40.     Between May and September 2007, counsel for the parties participated in at least three (3) conference calls with Arbitrator Mandel:  May 16, 2007, June 22, 2007, September 10, 2007.

41.     Attached hereto as Exhibit "U" is a true and correct copy of Report of Preliminary Hearing and Scheduling No. 1 issued by Arbitrator Mandel.   Reflected in Scheduling Order No. 1, counsel for the parties agreed not only on a long discovery schedule, but on hearing dates in September 2007 for this Arbitration.   Indeed, Mr. Zukowsky on behalf of SFM, requested that the hearing be scheduled to last for at least ten days, and that Mr. Zukowsky be allowed broad and extensive discovery in order to defend his clients in this Arbitration.

42.     During this May 16th conference call, Arbitrator Mandel indicated that pending a Court ordered stay of this Arbitration, the Arbitration would proceed forward.   Arbitrator Mandel also indicated his belief that courts usually defer to the Arbitrator on the issue of jurisdiction in the first instance.   However, Arbitrator Mandel bent over backwards to accommodate SFM's concern over expenditure of resources and discovery in both the Arbitration and the pending Federal Action in the Northern District of Illinois.   In order to address that concern, Arbitrator Mandel specifically issued the following order:

> "By agreement of the parties, in the event of any court order staying
> the current arbitration proceeding, any discovery that has already been

15

conducted in this arbitration proceeding may be used in any court action between the parties."

*Id.*

## LA ROSA NEW YORK MOVES TO DISMISS THE FEDERAL ACTION

43.     It was not until after La Rosa New York filed a motion to dismiss the Federal Action in the Northern District of Illinois on April 30, 2007, that SFM belatedly filed for a stay of the ongoing New York Arbitration between the parties on June 8, 2007.  The Court in the Federal Action granted SFM's motion to amend its Complaint, but also granted La Rosa New York leave to file a renewed motion to dismiss.

44.     Belatedly, on June 8, 2007, SFM moved for the first time before any tribunal for a stay of the New York Arbitration.  SFM's request for a stay of the New York Arbitration came four (4) months after La Rosa New York initiated the New York Arbitration, two (2) months after SFM filed its forum-shopping Complaint which made no mention of the New York Arbitration, and a month after La Rosa New York filed its initial motion to dismiss, or in the alternative, to stay the Federal Action.

45.     On or about July 23, 2007, La Rosa New York filed a renewed motion to dismiss SFM's Amended Complaint, or in the alternative, to stay the Federal Action, or transfer the Federal Action to the Southern District of New York.

## SFM MOVES ARBITRATOR MANDEL TO
## STAY THE NEW YORK ARBITRATION

46.     On August 13, 2007, SFM moved before Arbitrator Mandel to stay the Arbitration pending a decision by the Federal Court in the Northern District of Illinois as to La Rosa New York's motion to dismiss that action or stay the action pending Arbitration.  Arguably, this very act is an acknowledgment by SFM that it is subject to the jurisdiction of the Arbitrator.

16

47.    Arbitrator Mandel ordered substantial briefing on SFM's motion.  See attached hereto as Exhibit "V", a true and correct copy of Arbitrator Mandel's September 10, 2007 Scheduling Order No. 4 staying the New York Arbitration pending further briefing on the issue of arbitrability.

## SFM PETITIONS TO STAY THE NEW YORK ARBITRATION BEFORE JUDGE FEINMAN

48.    SFM had a motion to stay the New York Arbitration pending before the Federal Court in the Northern District of Illinois, and a motion to stay the New York Arbitration pending before Arbitrator Mandel, when SFM filed yet a third motion to stay the New York Arbitration before Judge Feinman of the New York Supreme Court.  See attached hereto as Exhibit "W", a true and correct copy of the September 7, 2007 Order to Show Cause as entered by the Hon. Paul G. Feinman.  In this Order, Judge Feinman denied as untimely SFM's application for a temporary restraining order staying the New York Arbitration.  Judge Feinman specifically set out a briefing schedule providing La Rosa New York until October 10, 2007 in which to file opposition papers to FM's application for a stay of the New York Arbitration.  Id.  SFM then had until October 26, 2007 to file any reply papers, with oral argument to take place on October 31, 2007.

49.    In making its application for a temporary restraining order, SFM, for the first time, disclosed that its only place of business is in New York City.  Attached hereto as Exhibit "X" is a true and correct copy of the September 6, 2007 Petition to Stay Arbitration executed by Shlomo Kogos.  In this Petition, Mr. Kogos, for the first time, acknowledges that at all pertinent times SFM does business and has its offices in the city, county and State of New York.  Id., at ¶2.  Even in this acknowledgement, SFM and Mr. Kogos do not provide their actual addresses.

50.    Ultimately, Arbitrator Mandel ruled that the Arbitration was stayed pending an order of a court of competent jurisdiction resolving the issue of whether SFM and La Rosa New York are

required to arbitrate their disputes over the software at issue. Attached hereto as Exhibit "Y" is a true and correct copy of the October 1, 2007 Order of Arbitrator Richard Mandel.

## LA ROSA NEW YORK CROSS-MOVES FOR
## AN ORDER COMPELLING SFM TO ARBITRATE

51.    Pursuant to Judge Feinman's Order, on or about October 10, 2007, La Rosa New York served SFM with opposition papers to its motion to stay the Arbitration and a cross-motion to compel Arbitration between the parties. See attached hereto as Exhibit "Z", a true and correct copy of the Notice of Cross-Motion of La Rosa New York.

52.    La Rosa New York served this motion on SFM as was required by Judge Feinman's Order.

53.    On or about October 17, 2007, counsel for SFM, Max Marcus Katz, contacted La Rosa New York's counsel indicating a desire for an extension of time in which to serve reply papers and oppose La Rosa New York's cross-motion to compel Arbitration. Counsel for La Rosa New York agreed to extend by thirty (30) days until November 14, 2007, the time in which SFM had to file opposition papers to La Rosa New York's cross-motion. At no time did counsel for SFM indicate that SFM would not be filing opposition papers. To the contrary. In order to insure that the Court would be aware of the new schedule, La Rosa New York's counsel required that the adjournment of SFM's reply date be So Ordered by Judge Feinman. See attached hereto as Exhibit "AA", a true and correct copy of the So Ordered adjournment by Judge Feinman.

## SFM FAILED TO FILE OPPOSITION PAPERS TO LA ROSA
## NEW YORK'S CROSS-MOTION COMPELLING ARBITRATION

54.    On or about November 19, 2007, counsel for La Rosa New York sent a letter to counsel for SFM, Max Marcus Katz, indicating that as of that date SFM had not served or filed

reply papers to La Rosa New York's cross-motion to compel Arbitration. <u>See</u> attached hereto as Exhibit "BB", a true and correct copy of the letter to Max Marcus Katz, P.C.

55.    Subsequently, counsel for La Rosa New York received a letter from Edward J. Grossman, acknowledging that SFM had failed to file papers opposing La Rosa New York's cross-motion to compel Arbitration, and requesting a belated extension of time in which to file such papers; SFM was actually in default.  However, Mr. Grossman never served counsel for La Rosa New York with a notice of change of counsel for SFM, and never filed such notice of change of counsel with the Court on that date or any other date.  As a result, Mr. Grossman was not counsel of record in the action when he sent his November 19th letter to counsel for La Rosa New York.  <u>See</u> attached hereto as Exhibit "CC", a true and correct copy of the November 19, 2007 letter of Edward Grossman.

56.    Our offices called counsel for SFM, Max Marcus Katz, inquiring about the letter from Mr. Grossman, and if SFM would be attempting to file late reply papers in opposition to La Rosa New York's cross-motion to compel Arbitration.  At that time, counsel for SFM, Max Marcus Katz, indicated that after the stay of Arbitration granted by Arbitrator Mandel, SFM had instructed its counsel to <u>stop</u> working on the case.

57.    On November 21, 2007, I responded to Mr. Grossman's letter, indicating that since he was not counsel of record for SFM, we declined to grant SFM a further extension of time, and SFM had simply failed to file opposition papers to La Rosa New York's cross-motion.  <u>See</u> attached hereto as Exhibit "DD", a true and correct copy of the November 21, 2007 letter.

## JUDGE FEINMAN GRANTS LA ROSA NEW YORK'S
## CROSS-MOTION TO COMPEL ARBITRATION

58.    On or about December 5, 2007, counsel for La Rosa New York appeared before Hon. Judge Feinman for oral argument on the cross-motion compelling Arbitration.  Purported

counsel for SFM appeared but was unable to indicate to the Court that any notice of change of counsel had been provided to opposing counsel or the Court for that matter. See attached hereto as Exhibit "EE", a true and correct copy of the December 5, 2007 hearing transcript.

59.    Notwithstanding the failure of purported counsel for SFM to file any notice of change of counsel with the Court, Judge Feinman allowed SFM's purported counsel to withdraw its motion to stay the Arbitration, but granted La Rosa New York's cross-motion compelling Arbitration. Judge Feinman also allowed counsel for SFM to argue on the merits in opposition to La Rosa New York's cross-motion. Judge Feinman indicated that because SFM had filed no opposition to the cross-motion, and because there were clearly multiple agreements to arbitrate between the parties, he would issue an Order compelling Arbitration. Judge Feinman also indicated that even if SFM had filed opposition papers, he would have decided against SFM on the merits, and in favor of La Rosa New York's cross-motion to compel Arbitration. *Id.*

60.    Subsequently, on or about December 7, 2007, Judge Gotschall in the Northern District of Illinois issued an Order denying La Rosa New York's motion to compel Arbitration in the Federal Action, and transferring the case to the Southern District of New York. See attached hereto as Exhibit "FF", a true and correct copy of Judge Gotschall's December 7, 2007 Order. However, Judge Gotschall had not been apprised of the fact that Judge Feinman had already issued an Order compelling the parties to arbitrate because such Order had not been entered with the Clerk of the Court of New York Supreme Court until later. See attached hereto as Exhibit "GG", a true and correct copy of the December 19, 2007 Order with Notice of Entry. However, Judge Gotschall's Order does acknowledge the Court's understanding that SFM had filed a motion to stay the Arbitration before Judge Feinman.

61.     Furthermore, because of SFM's repeated refusal to disclose where its corporate headquarters were located or the address of its President Shlomo Kogos, Judge Gotschall was not apprised of the fact that the Federal Arbitration Act, upon which the Federal Court's December 7, 2007 Decision was grounded, is not applicable to this dispute; interstate commerce is not impacted in this matter because SFM belatedly acknowledged in the New York State Court action that it is a New York corporation with its only place of business in New York, the same city and state as La Rosa New York.  Therefore, because interstate commerce is not impacted by this dispute and the Agreements at issue, the Federal Arbitration Acts cannot be applied to stay the New York Arbitration.

62.     To date, SFM still refuses to provide our offices with information about its corporate address.  On January 9, 2008, our offices sent a letter to Wedeen & Kavanagh, SFM's fourth counsel in the New York Action, requesting that they provide us with SFM's corporate address, and Mr. Kogos' actual address.  Wedeen & Kavanagh have never responded to this request or furnished the requested information.

Dated: White Plains, New York
       February 21, 2008

                              Respectfully submitted,


                                   s/ Kevin J. Harrington
                         By: _____
                              Kevin J. Harrington (KH-5027)
                              John T. A. Rosenthal (JR-4819)
                              HARRINGTON, OCKO & MONK, LLP
                              *Attorneys for Defendants*
                              *LA ROSA NEW YORK DEL MONTE EXPRESS,*
                              *INC. and LA ROSA NEW YORK DEL MONTE*
                              *EXPRESS (CHICAGO), LLC*
                              81 Main Street, Suite 215
                              White Plains, New York 10601
                              Telephone: (914) 686-4800
                              Facsimile:  (914) 686-4824

TO:    Francis J. Leyhane, III, Esq.
        LEYHANE & ASSOCIATES, LTD.
        *Attorneys for Plaintiff*
        *SOFTWARE FOR MOVING, INC.*
        205 West Randolph Street
        Suite 1320
        Chicago, IL 60606

**EXHIBIT "A"**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

------------------------------------------------------------x

SOFTWARE FOR MOVING, INC., a New
York Corporation,

                Plaintiff,

              v.

LA ROSA DEL MONTE EXPRESS, INC., a
New York Corporation, and LA ROSA DEL
MONTE EXPRESS (CHICAGO), LLC, an
Illinois Limited Liability Company,

                Defendants.

------------------------------------------------------------x

CASE NUMBER: 07 C 1839

Judge: Gottschall

Designated
Magistrate Judge: Jeffrey Cole

**DECLARATION OF HIRAM RODRIGUEZ IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT
MATTER JURISDICTION, OR IN THE ALTERNATIVE, TO TRANSFER
THE ACTION TO THE SOUTHERN DISTRICT OF NEW YORK,
DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO
STAY ARBITRATION, DEFENDANTS' OPPOSITION TO STRIKE
DECLARATION OF JOHN T.A. ROSENTHAL, AND DEFENDANTS'
CROSS-MOTION TO STAY THE ACTION AND/OR COMPEL ARBITRATION**

    I, HIRAM RODRIGUEZ, the undersigned, declare under penalty of perjury under the

laws of the United States that the following is true and correct, and that this Declaration was

executed on July __, 2007, at Bronx, New York.

    1.    I am the President of Defendant, LA ROSA DEL MONTE EXPRESS, INC. ("La

Rosa"), in the above-captioned action.  I make this Declaration in support of Defendants' motion

to dismiss Plaintiff's Amended Complaint, or in the alternative, to stay this action and/or compel

Plaintiff, SOFTWARE FOR MOVING, INC. ("SFM"), to arbitrate this dispute, or to transfer

this action to the United States District Court for the Southern District of New York.  I know all

1

of the following facts of my personal knowledge or through conversations with employees, former employees and/or agents of La Rosa, and, if called and sworn as a witness, could and would testify competently thereto.

2.    La Rosa is a New York corporation with its principal place of business located at 1133-35 Tiffany Street, Bronx, NY 10459.   La Rosa is in the business of moving and transporting clients' goods to various places within the United States and countries in the Caribbean, including Puerto Rico.

3.    In or about November and/or December of 2004, La Rosa entered into discussions with SFM to engage SFM to provide La Rosa with a web-based version of the Moving Manager Software.   Previously, in 1999, La Rosa and a company by the name of Safeguard Computer Services, Inc. ("Safeguard") had entered into a written Software Agreement in which Safeguard agreed to provide La Rosa with a Windows/Dos-based version of the Moving Manager Software. *See* annexed hereto as Exhibit "A", a true and correct copy of the 1999 Software License Agreement ("1999 Agreement").   SFM's President, Shlomo Kogos, was the President of Safeguard at the time La Rosa and Safeguard entered into the 1999 Agreement..

4.    With regard to the new software agreements, La Rosa employee, Steven Dalzell, principally handled the negotiations with SFM concerning the 2005 Software & License Agreement ("2005 Software Agreement") as well as the 2005 Maintenance Agreement (together with the 2005 Software Agreement, the "2005 Agreements").   Mr. Dalzell kept me apprised of how negotiations with SFM were proceeding with regard to the 2005 Agreements, and informed me in 2005 that the 2005 Agreements were executed.   Mr. Dalzell also kept me informed about the implementation of the 2005 Agreements, and new software program. <u>See</u> Exhibit "B" a true and correct copy of the 2005 Software Agreement.

5.     The following terms are defined within the 2005 Software Agreement: (1) "current maintenance agreement" means the Maintenance Agreement between La Rosa and SFM dated March 1999; (2) "current software" means the DOS/Windows-based software developed and maintained by SFM pursuant to the 1999 Software Agreement between the parties; (3) "deliverables" means new web-based software in object and/or source codes and all other materials required to be delivered by SFM to La Rosa under the 2005 Software Agreement; (4) "new software" means the source code and executable object code for all computer programs, subroutines, diagnostic routines, control software, special software to be delivered by SFM under the 2005 Software Agreement. Demand, at §1.1.

6.     Under the terms of the 2005 Software Agreement, La Rosa was to pay SFM $190,000 for development and delivery of the new web-based software. 2005 Software Agreement, at §4.1. In addition, La Rosa was required to pay SFM a license fee of $105,000 for the use of the new software. 2005 Software Agreement, at §6.6.

7.     Under the specific terms of the Agreement, La Rosa was required to make these payments with regard to the development and delivery of the new software in installments. La Rosa, however, was not required to make these installment payments to SFM if there were disputed invoices or disputes as to whether a particular phase of software development had been successfully completed and delivered. 2005 Software Agreement, at §§4.1, 4.2. In addition, La Rosa was not required to pay SFM the final 10% of the development fee (approximately $19,000) until all deliverables had been provided to La Rosa by SFM, and La Rosa was able to utilize the new software successfully for a period of ninety (90) days without failure; defined in the 2005 Software Agreement as the "Trial Period". 2005 Software Agreement, at §4.2.

3

Payment of the license fee for the new software was not to occur until successful completion of the Trial Period. 2005 Software Agreement, at §6.6.

8.    The 2005 Software Agreement also provided that SFM was to continue to maintain all DOS/Windows-based software pursuant to the terms of the parties' 1999 Software Agreement until the new web-based software was fully delivered and the Trial Period successfully completed.  2005 Software Agreement, at §4.6.  In exchange for SFM maintaining the old DOS/Windows-based software, La Rosa agreed to pay SFM a maintenance fee of $58,000 for the continued use of the current software. *Id.*

9.    Pursuant to the 2005 Software Agreement, La Rosa had the right to terminate the Agreement if SFM failed to perform a material obligation under the Agreement. 2005 Software Agreement, at §12.1.  If La Rosa terminated the Agreement due to SFM's default and material breach, La Rosa had the right to demand SFM return all monies paid to SFM pursuant to the Agreement. *Id.*, at §12.2.  In addition, if SFM defaulted and materially breached the Agreement, La Rosa had the right to continue to use the 1999 DOS/Windows-based software and to require that SFM continue to provide maintenance for that software. *Id.*, at §12.2.  Furthermore, the 2005 Software Agreement provided that even if the Agreement was terminated by SFM, La Rosa had a right to continue to use the 1999 DOS/Windows-based software. *Id.*, at §12.4.

10.    Under the terms of the 2005 Software Agreement, SFM specifically agreed to arbitrate "any dispute or controversy arising out of, relating to, or in conjunction with the interpretation, validity, construction, performance, breach or termination of this agreement", and that such binding arbitration would be held in Westchester County, New York, pursuant to the rules of the American Arbitration Association.  2005 Software Agreement, at §13.12.   In

4

addition, SFM agreed that the venue for any dispute would be exclusively in the County of Westchester, New York. *Id.*, at §13.13.

11.    Attached as Exhibit "C" to the hereto is the March 3, 2005 Maintenance Agreement ("2005 Maintenance Agreement") entered into between SFM and La Rosa with respect to the new web-based software.

12.    Under the 2005 Maintenance Agreement, SFM was required to maintain the new web-based software once it was installed. 2005 Maintenance Agreement.

13.    Under the terms of the 2005 Maintenance Agreement, La Rosa was to pay SFM a yearly maintenance fee of approximately $46,200 pursuant to Schedule A of the 2005 Maintenance Agreement.   2005 Maintenance Agreement, at §3, Maintenance Schedule A. Payment of the maintenance fee to SFM was not to begin until completion of the Trial Period as that term is defined in the 2005 Software Agreement. 2005 Maintenance Agreement, at §3.

14.    In the event of default by SFM for failing to perform its material obligations under the 2005 Maintenance Agreement, La Rosa was entitled to withhold payment of the maintenance fees owed until the default was cured. 2005 Maintenance Agreement, at §8.

15.    Pursuant to the express terms of the 2005 Maintenance Agreement, SFM was required to arbitration "any dispute or controversy arising out, relating to, or in connection with the interpretation, validity, construction, performance, breach or termination of this agreement." *Id.*, at 18.   Arbitration, pursuant to the terms of the 2005 Maintenance Agreement, was to be conducted <u>exclusively</u> in Westchester County, New York under the American Arbitration Association rules.  *Id.*  In addition, if either party to the Agreement was of the belief that it required immediate injunctive relief, that party could obtain such relief <u>only</u> through proper application to the Supreme Court of the State of New York in Westchester County, and that

venue for any conflicts would be <u>exclusively</u> in the County of Westchester, New York. *Id.*, §§18, 19.

16.   Between March 2005 and November 2006, SFM attempted to create and provide La Rosa with a web-based version of the Moving Manager Software.  During that period, Mr. Shlomo Kogos, President of SFM, had almost unfettered access to La Rosa's office spaces in the Bronx, New York, including the office space in which La Rosa kept contracts like the 2005 Software & License Agreement, 2005 Maintenance Agreement, the associated Addendum and Maintenance Schedule A.  Mr. Kogos was often at La Rosa's offices 3 to 5 hours per day during this period facilitating the implementation and integration of the new software into La Rosa's business and onto La Rosa's computer system.

17.   In or about September 2006, I requested that Steven Dalzell provide me with a copy of the 2005 Software & License Agreement entered into between La Rosa and SFM.  I requested a copy of the contract in conjunction with my meeting with La Rosa employees in Puerto Rico in order to discuss with these employees the problems with the new web-based software as well as implementation issues concerning such software.  Mr. Dalzell informed me that he was unable at that time to locate the signed original of the 2005 Agreements, and that he would contact Mr. Kogos of SFM in order to obtain a copy of these Agreements.

18.   Subsequently, while I was still in Puerto Rico, Mr. Dalzell contacted me and informed me that he had contacted Mr. Kogos about this issue, and that Mr. Kogos had brought him a copy of the executed 2005 Agreements, and provided copies of those Agreements to Mr. Dalzell.  Mr. Dalzell subsequently faxed a copy of written Agreements to me in Puerto Rico.

19.   La Rosa is basically a family run business; I am the President of La Rosa.  La Rosa does have offices and affiliates located in various states in the United States as well as Puerto

Rico. However, La Rosa's offices in the Bronx , New York, are the hub and focal point of La Rosa's business operations. Indeed, on any given day, both myself and Roberto Medina, La Rosa's Controller, are required to make numerous decisions regarding the business, including gathering information about various clients' needs, soliciting new clients, contacting and monitoring moving contractors, making payments to contractors, tracking the shipment of client goods, and ensuring that our clients' goods are picked up and delivered to the appropriate destinations on time.

20.    Our business requires face-to-face communications with clients and contractors, as well as relatively quick decisions about certain aspects of the business.  Without the ability of either myself or Mr. Medina to gather facts and make decisions in a timely manner, our business would be at a competitive disadvantage to other moving businesses both in New York City, and in various states throughout the United States.    Such competitive disadvantage and inconvenience to La Rosa's business operations could be mitigated if this action were transferred to the Southern District of New York.  Due to the close vicinity of La Rosa's principal place of business to New York City, a trial of this matter in the Southern District of New York would allow either myself or Mr. Medina to have continued access to our employees, our customers, our contractors, and any facts that would be necessary for our review in order to make prompt and appropriate business decisions.

21.    If this action were to remain in the Northern District of Illinois, and we were required to both be available for testimony during the duration of the litigation, it would be a serious impediment to La Rosa's ability to conduct its business., and place La Rosa at a competitive disadvantage.

Dated:  July __, 2007
        Bronx, New York

HIRAM RODRIGUEZ

Dated: July 19, 2007

Sworn to before me
this 19 day of July 2007

BRUCE B. BROWN JR.
Notary Public, State Of New York
No. 01BR6076996
Qualified In Bronx County
Commission Expires July 1, 20 10

8

**EXHIBIT "B"**


American Arbitration Association

---

COMMERCIAL ARBITRATION RULES
(ENTER THE NAME OF THE APPLICABLE RULES)

### Demand for Arbitration

**MEDIATION:** *If you would like the AAA to contact the other parties and attempt to arrange mediation, please check this box.* ☐
*There is no additional administrative fee for this service.*

| Name of Respondents<br>Software for Moving, Inc. and Shlomo Kogos | Name of Representative (if known)<br>Philip A. Zukowsky |
|---|---|
| Address:<br>211 Warren Street, Suite 305 | Name of Firm (if applicable):<br>Chernesky Heyman & Kress, LLP |
| | Representative's Address<br>10 Courthouse Plaza SW, Suite 1100 |

| City<br>Newark | State<br>NJ | Zip Code<br>07103 | City<br>Dayton | State<br>OH | Zip Code<br>45402 |
|---|---|---|---|---|---|
| Phone No. | | Fax No. | Phone No.<br>(937) 449-2800 | | Fax No.<br>(937) 449-2821 |
| Email Address: | | | Email Address:<br>PAZ@CHKlaw.com | | |

The named claimant, a party to an arbitration agreement dated **March 3, 2005**
_____, which provides for arbitration under the
**Commercial** Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

THE NATURE OF THE DISPUTE
Contract dispute arising from software and license agreements.

| Dollar Amount of Claim $383,250.00 | Other Relief Sought: ☒ Attorneys Fees   ☒ Interest<br>☒ Arbitration Costs ☐ Punitive/ Exemplary ☐ Other |
|---|---|

AMOUNT OF FILING FEE ENCLOSED WITH THIS DEMAND (please refer to the fee schedule in the rules for the appropriate fee) $

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:

Complex commercial litigation, intellectual property disputes

| Hearing locale **New York City** _____ (check one) ☒ Requested by Claimant   ☒ Locale provision included in the contract |
|---|

| Estimated time needed for hearings overall:<br>_____ hours or   3-4   days | Type of Business:  Claimant Moving and Storage<br>Respondent Software Development |
|---|---|

Is this a dispute between a business and a consumer?   ☐Yes  ☒ No
Does this dispute arise out of an employment relationship?   ☐Yes  ☒ No

If this dispute arises out of an employment relationship, what was/is the employee's annual wage range?  Note: This question is required by California law. ☐Less than $100,000 ☐ $100,000 - $250,000 ☐ Over $250,000

You are hereby notified that copies of our arbitration agreement and this demand are being filed with the American Arbitration Association's Case Management Center, located in (check one) ☐ Atlanta, GA  ☐ Dallas, TX  ☐ East Providence, RI ☒ International Centre, NY, with a request that it commence administration of the arbitration. Under the rules, you may file an answering statement within the timeframe specified in the rules, after notice from the AAA.

| Signature (may be signed by a representative)   Date:<br>*[signature]* 2-12-07 | Name of Representative<br>Kevin J. Harrington |
|---|---|
| Name of Claimant<br>La Rosa Del Monte Express, Inc. | Name of Firm (if applicable)<br>Harrington, Ocko & Monk, LLP |
| Address (to be used in connection with this case)<br>1133-35 Tiffany Street | Representative's Address:<br>81 Main Street, Suite 215 |

| City<br>Bronx | State<br>NY | Zip Code<br>10459 | City<br>White Plains | State<br>NY | Zip Code<br>10601 |
|---|---|---|---|---|---|
| Phone No.<br>(718) 991-5560 | | Fax No.<br>(718) 842-5986 | Phone No.<br>(914) 686-4800 | | Fax No.<br>(914) 686-4824 |
| Email Address: | | | Email Address:<br>kharrington@HOMlegal.com | | |

To begin proceedings, please send two copies of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to the AAA.  Send the original Demand to the Respondent.
Please visit our website at www.adr.org if you would like to file this case online. AAA Customer Service can be reached at 800-778-7879

## AMERICAN ARBITRATION ASSOCIATION

**NEW YORK, NEW YORK**               **COMMERCIAL ARBITRATION RULES**

| | |
|---|---|
| LA ROSA DEL MONTE EXPRESS, INC., <br><br> Claimant, <br><br> vs. <br><br> SOFTWARE FOR MOVING, INC., and SHLOMO KOGOS, as an Individual, <br><br> Respondents. | Case No. _____ |

## DEMAND FOR ARBITRATION

LA ROSA DEL MONTE EXPRESS, INC. ("LA ROSA," or "Claimant"), by and through its attorneys, Harrington, Ocko & Monk, LLP, alleges the following as its Demand against Respondents, SOFTWARE FOR MOVING, INC. ("SFM"), and SHLOMO KOGOS ("KOGOS," together with SFM, "Respondents").

### Introduction

1.      Claimant, LA ROSA, by and through its attorneys, Harrington, Ocko & Monk, LLP, has commenced this Arbitration to obtain a declaration and award that SFM is in breach of the parties' Software Development and Maintenance Agreements (the "Agreements") both dated March 3, 2005, and that SFM owes LA ROSA $245,250, the amount paid by LA ROSA to SFM under the Agreements that SFM would develop and provide LA ROSA with new software for its moving company operations, as well as maintain this new software. SFM has done neither.

2.      Claimant LA ROSA also seeks an award of damages of at least $88,000 as a result of SFM's breach of the Agreements and breach of the parties March 1999 agreement due

1

to the failure of SFM to maintain either the new, web-based software, pursuant to the Agreements, or the older DOS/Windows based software pursuant to the Agreements and the parties' March 1999 Agreement.

3.    Claimant is also seeking a declaration requiring that SFM and KOGOS immediately cease interfering with LA ROSA's ability to access any software programs that LA ROSA has a right to use, and which are currently being hosted by XL Hosting in Columbus, Ohio (a company which was under apparent contract with LA ROSA).

4.    Claimant also seeks an award of damages in an amount to be determined by this Arbitration, but no less than $50,000, resulting from SFM's and KOGOS' tortious interference with contract regarding LA ROSA's ability to conduct LA ROSA's business by preventing LA ROSA from gaining access to its confidential business information on computer servers containing such information, tortious interference with LA ROSA's contract with XL Hosting, and tortious interference with LA ROSA's ability to have a hosting company of its choice download the software that it has a contractual right to utilize pursuant to the parties' Agreements.

5.    Claimant is also seeking an award of damages in an amount to be determined at trial, but no less than $50,000, as a result of the conspiracy between KOGOS, SFM, and XL Hosting (an Ohio-based server hosting company) to tortiously interfere with LA ROSA's ability to access the New Software, allow a new server hosting company of LA ROSA's choice to download the New Software onto its servers, as well as fulfill existing contracts with clients.

## The Parties

6.    Claimant, LA ROSA, is a successful international moving and storage company with its headquarters and principal place of business located at 1133-35 Tiffany Street in the

2

Bronx, New York. LA ROSA has offices and warehouses in 11 locations in the United States Puerto Rico and the Dominican Republic, in order to facilitate the conduct of its moving and storage business throughout the United States and overseas. LA ROSA's business requires the extensive use of software programs, in order to efficiently conduct its business, including, but not limited to, database entry, data storage, form creation, moving and storage location information, and information transmission requirements between offices, employees and contractors.

7.    Upon information and belief, Respondent, SFM, is a New Jersey corporation with its principal place of business at 211 Warren Street, Suite 305, Newark, New Jersey 07103. Upon information and belief, SFM is in the business of developing, licensing, and providing software and software maintenance for companies involved in the moving and storage industry. Upon information and belief, SFM is not qualified to do business in the State of New York.

8.    Upon information and belief, Shlomo Kogos is the President, and sole shareholder of SFM.

## Jurisdiction and Venue

9.    The Arbitrator for the American Arbitration Association ("AAA") has jurisdiction over this dispute pursuant Article 13.12 of the parties' Software Development and License Agreement (the "License Agreement"), in which the parties agreed that "any dispute or controversy arising out of, relating to or in connection with the interpretation, validity, construction, performance, breach, or termination of this agreement shall be submitted to binding arbitration to be held in … New York in accordance with the Rules of the [AAA]. The decision of the Arbitrator shall be final, conclusive and binding on the parties to the arbitration."

10.    The Arbitrator for AAA also has jurisdiction over this dispute pursuant to Section 18 of the parties' Maintenance Agreement (the "Maintenance Agreement"), in which the parties agreed "that any dispute or controversy arising out of, relating to or in connection with the interpretation, validity, construction, performance, breach or termination of this Agreement shall be submitted to binding arbitration to be held in ... New York in accordance with the rules of the [AAA]."

11.    The Arbitrator has jurisdiction over LA ROSA's dispute with KOGOS, because as the President and sole shareholder of SFM, KOGOS substantially and directly benefits from the License Agreement and the Maintenance Agreement through his receipt of substantial monies and business as a result of such agreements.

12.    Venue is appropriate in New York, New York, as it is Claimant's understanding that AAA no longer has a facility or offices located in Westchester County in New York, and that Manhattan is the next closest venue that AAA offers for arbitration.

## Factual Allegations

13.    LA ROSA is in the business of moving and storing personal belongings and other items for clients throughout the United States, Puerto Rico and the Dominican Republic, among other places.  LA ROSA does moving and storage for both residential clients, as well as commercial and government clients.

14.    In order to accomplish its business in an effective and economic manner, LA ROSA is required to utilize custom software in order to facilitate the processing of various moving and storage requests for clients, as well as to communicate the details of such moving and storage requests of clients to other LA ROSA employees, and/or offices, and contractors and agents throughout the United States, Puerto Rico and the Dominican Republic.

4

15.     In or about March 1999, LA ROSA engaged SFM (formerly known as Safeguard Corporate Services, Inc.), and its President, Mr. Shlomo Kogos, to develop and maintain custom moving software, programs, and software codes for LA ROSA in order to allow LA ROSA to effectively conduct its moving and storage operations.  See Exhibit "A" attached hereto, a true and correct copy of the parties' March 1999 Software License Agreement (the "1999 Software Agreement).

16.     1999 Software Agreement required that SFM would provide LA ROSA with a DOS/WINDOWS-based software operating system, in order to allow LA ROSA to conduct its moving and storage business.

17.     Pursuant to the 1999 Software Agreement, SFM was also obligated to maintain and upgrade LA ROSA's DOS/WINDOWS-based operating software.  Under this Agreement, LA ROSA was to pay SFM an annual maintenance fee for SFM's work done in maintaining the operational capabilities of the DOS/WINDOWS-based operating software (or the "Old Software").  If SFM committed a substantial breach of the 1999 Software Agreement, LA ROSA was not required to pay the maintenance fees.  Exhibit "A," 1999 Software Agreement, at Exhibit "C," Section 8.

18.     Upon information and belief, as a result of KOGOS' familiarity with the moving and storage business generally, as well as LA ROSA's particular moving and storage business, and LA ROSA's dependency on computers, computer software, the data contained in LA ROSA's computers, and the contracts LA ROSA has with its moving and storage clients, KOGOS was fully aware of the severe damage to LA ROSA's business that would result should LA ROSA not have access to its computers, computer software, and the information contained on those computers or in the software.

5

## SFM Contracts to Provide LA ROSA with New Software

19. On or about March 3, 2005, the parties entered into new software and maintenance agreements. LA ROSA entered into the License Agreement and Maintenance Agreement with SFM in order to replace its existing and outdated moving software programs and/or applications and in order to allow LA ROSA to function more efficiently as LA ROSA expanded its operations. This New Software to be provided to LA ROSA by SFM would function using the internet and world-wide web in order to allow LA ROSA's employees in its various offices world-wide to utilize the software regardless of their location.

20. LA ROSA was enticed into obtaining this New Software from SFM as a result of representations by KOGOS that SFM would not be able to maintain the Old Software in the near future.

21. Pursuant to the terms of the License Agreement, SFM was to develop and provide to LA ROSA a web-based computer software (the New Software), in order to allow LA ROSA and its employees to access the new software and information contained on computer servers via the world-wide web through any of LA ROSA's locations throughout the United States, Puerto Rico and the Dominican Republic. See Article II, Section 2 of the License Agreement attached hereto as Exhibit "B."

22. The License Agreement provided that SFM was to have the New Software available to LA ROSA in phases in accordance with the agreed-upon "Plan of Development." See Article II. SFM was contractually obligated to devote sufficient time and resources to the development effort. Id.

23. Upon completion of each milestone and/or phase of the software project, SFM was to notify LA ROSA's design and development coordinator for the project. See Article V,

6

Section 5.2. Upon this notification, SFM was to promptly deliver that phase of the New Software for review and acceptance, and testing by LA ROSA. Article V, Section 5.2. The License Agreement specified that "time was of the essence" as to each phase of the development plan. Id.

24.     Under the License Agreement, LA ROSA had the option to terminate the License Agreement if any phase of the new software failed any acceptance test after delivery by SFM. Article V, Section 5.5.

25.     In return for developing and providing to LA ROSA the web-based New Software, LA ROSA was to pay to SFM a development fee equal to $190,000 (the "Development Fee") for the development and delivery of the new software. See License Agreement Article 4, Section 4.1. This Development Fee was to be paid in installments upon successful delivery and testing of each phase of the New Software as set forth in the License Agreement. Id., Section 4.2.

26.     Each installment payment by LA ROSA was to be due upon the successful completion of each of the phases set forth in the Development Plan. Such installment payment by LA ROSA for each phase was to be received by SFM no later than 30 days following the date that SFM delivered the new software to LA ROSA. See id. However, LA ROSA would not be deemed in default of such payment if, in good faith, LA ROSA disputed the invoices or was of the belief that the particular development phase had not been successfully completed. See id., Section 4.2.

27.     In addition, LA ROSA was not required to pay to SFM the entire amount of the development fee until after LA ROSA had used the entire New Software successfully for a period of 90 days without failure (the "Trial Period"). Section 4.2. Until the delivery of all the

New Software and the completion of the Trial Period, LA ROSA was permitted to withhold 10% of the Development Fee. Id.

28.    Due to the fact that the New Software was not anticipated to be up and running and fully complete for a period of several months or more, under the License Agreement, the parties agreed that LA ROSA would continue to utilize its DOS/WINDOWS-based Old Software, and pay SFM a yearly software maintenance fee of $58,000 (the "Current Software Maintenance Fee"). Article IV, Section 4.6.  The Current Software Maintenance Fee was to cover SFM's maintenance services on the existing DOS/WINDOWS Old Software for calendar year 2005.

29.    Under the express terms of the License Agreement, either party had the option to terminate the License Agreement, in whole or in part, if the other party failed to perform a material obligation set out in the Agreement.  See License Agreement, Article 12, Section 12.1. Such termination pursuant to Article 12 of the License Agreement could only be effectuated if the breach could be cured, and was not, and the purportedly, breaching party was given written notice of such breach by the non-breaching party prior to the beginning of the 20-day cure period.  See id.  Furthermore, if the License Agreement was terminated by SFM prior to completion of its new software, or due to the purported default or material breach by LA ROSA, SFM was to issue an invoice to LA ROSA for work performed.  Article XII, Section 12.3.

30.    In addition, pursuant to Article XII, Section 12.2 of the License Agreement, if LA ROSA terminated the License Agreement as a result of a default or material breach by SFM, LA ROSA had the right to continue the license of its current DOS/WINDOWS Old Software, and to require SFM to continue to provide maintenance services based upon the parties' March 1999 Agreement.  Article XII, section 12.2.  The original software maintenance fee was $35 per

month per workstation. As indicated above, under the 1999 Software Agreement, SFM was not entitled to any maintenance fee if it breached or defaulted on the 1999 Software Agreement.

31.    Furthermore, if SFM committed a material breach of the License Agreement or defaulted on the License Agreement, LA ROSA had the right to require that SFM return all of the monies paid to SFM under the License Agreement. Article XII, section 12.2. Even if SFM breached or defaulted on its obligations under the License Agreement, and LA ROSA obtained all amounts paid to SFM under the License Agreement, SFM was required to allow LA ROSA to use the DOS/Windows-based Old Software, and to provide maintenance for such Old Software. Id.

32.    In addition, under the terms of the License Agreement, SFM agreed to maintain LA ROSA's confidential information, and not to use such confidential information other than in the performance of the License Agreement, and not to disclose or release such confidential information to other parties. Article VII, Section 7.6. This non-disclosure provision in the License Agreement regarding LA ROSA's confidential information survives the termination of the Agreement. Id., Section 7.6.

33.    In addition to the development fee, and the Current Software Maintenance Fee, LA ROSA agreed to pay SFM a license fee of $105,000 (the "License Fee"). Article VI, Section 6.6. The term of the license was to begin on the date the "new software" was installed on any of LA ROSA's sites. Id., Section 6.4. As defined in the License Agreement, "new software" means the source code and/or executable object code for "all" the programs to be delivered by SFM to LA ROSA under the License Agreement. Article I, Section 1.k. Thus, under the terms of the License Agreement, LA ROSA was not required to pay SFM any of the

$105,000 License Fee until SFM had delivered "all" the new software, and such new software had passed the Trial Period.

34.    The License Agreement also provides that "[i]n the event of any dispute between LA ROSA and SFM regarding the License Agreement, the parties would attempt to resolve the dispute through good faith negotiations." Article XIII, Section 13.11. Under the License Agreement, the party alleging a dispute is required to notify the other party, in writing, of the exact nature of the dispute, and then engage in good faith negotiations within seven (7) business days of notification. Id.

35.    If the parties are unable to resolve the dispute in the manner described in Section 13.11, they are required to submit the dispute to binding arbitration under the AAA Rules. Id., Section 13.12.

## SFM Contracts with LA ROSA to Provide Maintenance for the New Software

36.    Concurrent with the execution of the License Agreement, the parties executed a Maintenance Agreement on March 3, 2005 (the "Maintenance Agreement"). See attached hereto as Exhibit "C" a true and correct copy of the Maintenance Agreement.

37.    The Maintenance Agreement was to apply to the "new software" being developed by SFM under the License Agreement, as that term is defined in the License Agreement. The maintenance fee for the new software that amounted to $46,200 per year for the first three (3) years of the Maintenance Agreement. See Maintenance Schedule "A."

38.    The maintenance fee was not to commence until the completion of the "Trial Period" as defined in the License Agreement, as well as the completion of training of LA ROSA employees. Maintenance Agreement, Section 3.

10

39.    In addition, under the terms of the Maintenance Agreement, SFM was required to respond to, and make diligent efforts to correct any and all failures of the new software within four (4) hours. Id., Section 7.a. If SFM failed to respond appropriately to errors or failures of the new software within four (4) hours, such inaction constituted a default by SFM.

40.    Under the express terms of the Maintenance Agreement, pursuant to a default by SFM, LA ROSA was entitled to withhold maintenance fees owed until such default was cured. Id., Section 8.

41.    Pursuant to the provisions in the Maintenance Agreement, any dispute or controversy between the parties was to be resolved through arbitration upon the AAA Rules. Id., Section 18.

## SFM Delivers "New Software" that Contains Numerous Material Errors and Problems, and Delivers the "New Software" in an Untimely Manner

42.    Despite the terms of the License Agreement indicating that time was of the essence in terms of delivery of the new software to LA ROSA, SFM continually delivered the various phases of the new web-based software in an untimely manner to LA ROSA. Indeed, many of the software deliveries by SFM contained problems that required numerous workarounds, and prevented LA ROSA from fully utilizing the limited software contained in the phase that had been delivered by SFM. LA ROSA timely notified SFM of all those problems.

43.    During the period from December 2004 to November 2006, LA ROSA made various payments to SFM under the terms of the License Agreement totaling $333,250.

44.    During this same period, SFM was continuously late in providing LA ROSA with installments of the New Software. In addition, those New Software installments SFM did

11

provide to LA ROSA contained significant problems and errors, requiring notification and periods of disuse of the New Software by LA ROSA.

45.    On or about November 19, 2004, in anticipation in anticipation of the parties' License Agreement and Maintenance Agreement, LA ROSA paid SFM $22,500 as an initial payment for the development of the New Software.

46.    On or about December 13, 2004, in anticipation of the parties' License Agreement and Maintenance Agreement, LA ROSA paid SFM $58,000 under the License Agreement for maintenance of the DOS/WINDOWS Old Software, and $50,250 as an initial payment for the development of the New Software.

47.    Upon information and belief, SFM failed to provide LA ROSA with any maintenance services in 2005 for the Old Software. Indeed, upon information and belief, SFM and KOGOS indicated to LA ROSA in late 2004/early 2005 that SFM/KOGOS did not have personnel capable of maintaining the Old Software, despite the terms of the License Agreement requiring SFM to do so, and that for this reason, among others, LA ROSA needed the New Software.

48.    Despite the express terms of the License Agreement requiring that SFM maintain the Old Software in 2005 and 2006, SFM did not properly and/or adequately maintain the Old Software properly, and LA ROSA was required to fix any problems which arose with the Old Software during this period.

49.    In or about April 26, 2005, LA ROSA made a payment of $26,250 pursuant to the License Agreement.

50.    In or about May 6, 2005, LA ROSA made an additional payment to SFM of $23,750 pursuant to the License Agreement.

12

51.    In or about May 23, 2005, LA ROSA made another payment to SFM of $23,750 pursuant to the License Agreement.

52.    In or about July 26, 2005, LA ROSA made another payment of $47,500 to SFM pursuant to the License Agreement.

53.    On or About July 26, 2005, LA ROSA Made a Payment of $26,250 to SFM Pursuant to the License Agreement.

54.    On or about May 31, 2006 LA ROSA notified SFM in writing that numerous serious problems existed with regard to the New Software that had been delivered to date, and that more than four (4) months had elapsed since LA ROSA first made SFM aware of these problems, and that the New Software still did not function correctly.

55.    As of no later than June 1, 2006, SFM, through KOGOS, acknowledged the significant, detrimental programming and installation problems regarding the New Software installments that SFM had provided to LA ROSA.  These problems, brought to SFM's attention by written notice from LA ROSA, precluded LA ROSA from properly utilizing the New Software as intended and required.   KOGOS and SFM also acknowledged that they had delivered the installments late, in an untimely manner, and that further changes in the present installments of the New Software need to be accomplished.

56.    In or about August 28, 2006, LA ROSA made a payment to SFM of $10,000, for maintenance of the Old Software pursuant to Article IV, Section 4.6 of the License Agreement.

57.    In or about September 6, 2006, LA ROSA brought to the attention of SFM, in writing, further problems with the New Software installments that had been provided to date. These problems persisted throughout September 2006, and precluded LA ROSA from fully utilizing the new software as intended.

13

58.     In or about September 8, 2006, LA ROSA made a payment of $7,500 to SFM for maintenance of the Old Software pursuant to the License Agreement.

59.     In or about September 14, 2006, LA ROSA made a payment of $7,500 to SFM for maintenance of the Old Software pursuant to the License Agreement.

60.     In or about September 21, 2006, LA ROSA made a payment of $5,000 to SFM for maintenance of the Old Software pursuant to the License Agreement.

61.     In or about early October 2006, LA ROSA notified SFM of yet more problems with regard to the various installments of the New Software. These problems were not resolved in a timely manner, and precluded LA ROSA from utilizing the New Software as intended and required.

62.     Indeed, on October 24, 2006, Shlomo Kogos, President of SFM, acknowledged major persistent problems regarding various aspects of the New Software that SFM had delivered to LA ROSA pursuant to the parties' License Agreement.

63.     On or about November 6, 2006, LA ROSA made a payment to SFM under the License Agreement in the amount of $25,000.

64.     On or about November 30, 2006, Shlomo Kogos made a demand of LA ROSA to pay him and SFM approximately $47,500 purportedly pursuant to the terms of the parties' Agreements.

65.     In the November 30, 2006 demand, KOGOS admitted that as of at least November 7, 2006, the New Software was not finished, all the installments of the New Software had not been delivered to LA ROSA, and SFM still had work remaining to be done on the New Software.

14

66.    As of no earlier than November 30, 2006, all of the New Software installments had not been delivered by SFM to LA ROSA, all of the New Software had not been placed on servers for LA ROSA's use, LA Rosa employees had not been trained on all the New Software, and the 90-day Trial Period for the New Software had not started.

67.    On December 1, 2006, in accordance with his previous threat made two days prior regarding payments, individuals/agents of XL Hosting working with KOGOS indicated to employees of LA ROSA that from then on, all support and telephone calls were to go through KOGOS before being acted upon.

68.    On December 4, SFM (via KOGOS), indicated that there were still problems and issues with the New Software installments that SFM had delivered to LA ROSA.

69.    Upon information and belief, given the web-based nature of the New Software, SFM (and MR. KOGS) suggested sometime in mid-2006 that LA ROSA hire a server hosting company in order to have the New Software placed on servers that could be maintained by such a company.  At that time, KOGOS suggested that LA ROSA hire an Ohio-based server hosting company, XL Hosting.

70.    Upon information and belief, XL Hosting (of Ohio), was retained by LA ROSA (at the suggestion and request of SFM) in order to provide server hosting services to LA ROSA in order to allow LA ROSA to place the New Software on XL servers.  It is the understanding of LA ROSA that XL was paid for the hosting of the New Software on behalf of LA ROSA.

71.    Upon information and belief, SFM and KOGOS suggested that LA ROSA use XL Hosting (an out of state company) in order to allow SFM and KOGOS to maintain control over how, when, and if LA ROSA was given access to the New Software.

15

72.    On or about December 8, 2006, employees of LA ROSA indicated to SFM that they LA ROSA had made a decision regarding a new hosting company for the software, and that that hosting company, Studio 775, would be contacting SFM and/or present server hosting company XL Hosting regarding installing the new and existing software program in the new hosting company's server, as opposed to the company recommended by SFM to host the New Software.

73.    On December 8, 2006, KOGOS of SFM, rather than responding to the decision by LA ROSA regarding a new hosting company, made a demand to LA ROSA, and indicated his belief that $87,500 was due SFM, and inquired as to whether he could pick up the check on that day. As of December 8, 2006, SFM had not delivered all the installments of the New Software to LA ROSA, the New Software had not been completely debugged, and the Trial Period of 90 days had not started. Thus, under the express terms of the License Agreement, SFM was entitled, at a minimum, to withhold $19,000 of the $190,000. Indeed, LA ROSA was entitled to a full 90-day trial period after completion of the New Software before such payment was due.

74.    In addition, as of December 8, 2006, under the terms of the License Agreement, SFM was not entitled to any of the $105,000 License Fee, since not all of the New Software had been installed to LA ROSA's satisfaction, and the New Software had not passed testing.

75.    As of December 2006, LA ROSA had already paid SFM approximately $245,250 pursuant the License Agreement, more than the amount actually owed.

76.    On December 9, 2006, Mr. Roberto Medina of LA ROSA indicated to KOGOS of SFM that the two should meet on the following Monday, in order to discuss issues regarding the problematic new software provided by SFM.

**KOGOS and SFM Demand Payments to which They are Not Entitled**

77.     On or about December 11, 2006, KOGOS met personally with representatives of LA ROSA regarding the New Software. During this meeting, KOGOS demanded that LA ROSA pay SFM monies purportedly owed under the License Agreement and the Maintenance Agreement. Upon completion of the meeting, KOGOS stated to representatives of LA ROSA that "I know how to play dirty games. I will put you out of business." KOGOS made such threat after informing LA ROSA that he/SFM would shut off LA ROSA's access to the XL Hosting servers hosting the New Software.

78.     On or about December 11, 2006, KOGOS, of SFM, communicated via e-mail with Roberto Medina, of LA ROSA, indicating that a balance of $47,500 was due for the New Software program, in addition to $16,000 for maintenance of the existing Old Software for September through December 2006, and $40,000 for maintenance for the year 2007. KOGOS indicated that unless these amounts were paid immediately, no other work would be done on the problematic New Software that SFM had provided to LA ROSA. None of the software maintenance agreements between the parties require that LA ROSA pay the maintenance fee in its entirety at the beginning of the calendar year.

79.     As not all of the New Software had been delivered, and the New Software had not passed the 90-day Trial Period, SFM was not entitled to at least the final $19,000 payment from LA ROSA under Article IV, Section 4.2 of the License Agreement. Furthermore, contrary to KOGOS' demands, SFM was not entitled to an upfront payment of the entire maintenance fee for the existing Old Software. Indeed, if SFM had not defaulted in the "time of the essence" terms of the License Agreement for developing and implementing the new software, LA ROSA would not have needed the Old Software.

17

80.    Finally, given that the New Software had not been fully delivered by SFM, and the New Software had not passed the Trial Period and was not fully functional, and training on each computer station had not been accomplished, SFM was not entitled to any Maintenance Fee under the Maintenance Agreement.  Maintenance Agreement, Sections 3 and 4.

81.    Upon information and belief, right after leaving the December 11, 2006 meeting with LA ROSA regarding problems with the New Software, and SFM's demands for payment for the New Software and use of the Old Software, SFM, KOGOS and XL Hosting (the Ohio hosting company), disconnected and/or interrupted server services to LA ROSA.    This interruption of server access to LA ROSA by SFM, KOGOS, and XL Hosting interfered with the ability of LA ROSA to complete contractual obligations to other clients in a timely manner, as well as transfer the New Software to a new server hosting company of LA ROSA's choice.

82.    Upon information and belief, KOGOS, SFM and XL Hosting acted in a manner to prevent LA ROSA from accessing the servers containing LA ROSA's business information and the New Software, knowing that LA ROSA had contracts with clients, and that LA ROSA would be impeded from carrying out the terms of those contracts in a timely manner as a result of SFM, KOGOS and XL Hosting preventing LA ROSA from accessing the servers and software.

83.    Upon information and belief, KOGOS has admitted interrupting LA ROSA's access to the servers in mid-December, and KOGOS has admitted directing the server hosting company to change the time for updating of certain programs on the servers to business hours, rather than at night as done previously.  Upon information and belief, KOGOS, SFM and XL Hosting changed the time for updating certain programs in order to wrongfully inhibit the ability

18

of LA ROSA to properly and timely carry out the terms of its contracts with various moving customers.

84.    On or about December 11, 2006, counsel for LA ROSA sent KOGOS and SFM a letter, via certified mail, regarding KOGOS' threats to terminate LA ROSA's access to the New Software and/or the computer servers hosting the New Software. In this December 11th letter, counsel for LA ROSA reminded KOGOS and SFM of their obligations under the License Agreement to engage in good faith negotiations regarding any disputes, and the requirement for binding arbitration pursuant to AAA Rules if such good faith negotiations failed to resolve any dispute. In this letter, counsel for LA ROSA also reiterated to KOGOS and/or SFM that, under the License Agreement and the Maintenance Agreement, neither had a contractual right to terminate LA ROSA's use of the Old Software or even the New Software, or to tortiously interfere with LA ROSA's other contractual obligations.

85.    On or about December 12, 2006, representatives of LA ROSA held a telephone discussion with KOGOS, of SFM, regarding the extensive problems with the new software, as well as issues regarding payment for the software pursuant to the terms of the Agreement. Subsequent to this discussion, representatives and employees of LA ROSA noticed that they were unable to access the servers and/or the software for the rest of the day, at great expense and interruption to LA ROSA's business.

86.    On or about December 13, 2006 KOGOS of SFM made a demand via e-mail for additional monies to which SFM was not due for both the New Software and the Old Software.

87.    In this most recent demand December 13, 2006 communication, KOGOS also threatened that LA ROSA would have to pay SFM $116,000 the next year for using the Old Software (DOS/Windows-based software), unless LA ROSA paid SFM immediately. KOGOS

made this demand despite the specific provision in Article IV, Section 4.6 and Article XII, Section 12.2 of the License Agreement that required SFM to allow LA ROSA to continue to use the Old Software (DOS/Windows program), and required that SFM provide maintenance for such Old Software.

88.     In conjunction with these threats, KOGOS threatened litigation in federal court. This despite the specific provisions in the License Agreement that provide for written notice, followed by good faith negotiations, and requiring binding arbitration should such good faith negotiations be unsuccessful in resolving the dispute. License Agreement, Article XIII, Section 13.11, 13.12.

## KOGOS and SFM Intentionally Interfere with LA ROSA's Operation of its Business

89.     Subsequently, LA ROSA attempted to contact both the server hosting company (XL Hosting) and SFM regarding problems, and the desire to have software switched to a server hosting company of LA ROSA's choice. Upon contacting XL Hosting in Ohio, LA ROSA was informed by the employees of that company that the hosting company could not, and would not, do anything regarding the servers unless instructed to do so by KOGOS, of SFM.

90.     On December 13, 2006 KOGOS of SFM informed LA ROSA that LA ROSA should not contact XL Hosting, the Ohio-based server hosting company under supposed contract with LA ROSA. KOGOS informed LA ROSA that if LA ROSA contacted the present hosting company, "[t]he result will be worse service from them . . . [and] [i]f you want something from those servers let me know."

91.     Despite repeated requests that SFM and the present Ohio server hosting company (XL Hosting) facilitate the transfer of the New Software to LA ROSA's new hosting company,

neither SFM, KOGOS, nor XL would facilitate the transfer of the New Software or the information necessary to make the transfer possible.

92.    On or about December 14, 2006 Roberto Medina of LA ROSA contacted KOGOS and SFM to inform them that LA ROSA and/or LA ROSA's new server hosting company would be contacting SFM in the next several days regarding changing server hosting companies.    KOGOS and SFM acknowledged this request, but demanded that Mr. Medina be on the phone call.

93.    On or about December 22, 2006, Mr. Philip Zukowsky, purported counsel for SFM, contacted counsel for LA ROSA and made demands on behalf of SFM regarding payment for the New Software and Old Software.    Upon information and belief, Mr. Zukowsky had neither the License Agreement nor the 1999 Software Agreement, when he made these payment demands on behalf of SFM and KOGOS. Mr. Zukowsky indicated in his communication that if LA ROSA did not pay SFM by January 1, 2007, additional fees would be due from LA ROSA.

94.    On or about December 27, 2006 Mr. Zukowsky again contacted counsel for LA ROSA.    During this communication Mr. Zukowsky informed LA ROSA of the potential loss of information still on the servers in the Ohio server company's systems, if payment was not made to the Ohio server company.    That same day, Mr. Zukowsky represented to counsel for LA ROSA that LA ROSA had all the information necessary to use the New Software in LA ROSA's operations.    Upon information and belief, the representations made by Mr. Zukowsky due to statements from his client, SFM, on December 27, 2006 to counsel for LA ROSA were false and misleading, as SFM and the Ohio server hosting company were still taking actions that precluded LA ROSA from accessing the New Software or its information on these servers.

95.    On December 28, 2006 counsel for LA ROSA against requested of Mr. Zukowsky that his client, SFM, provide the information necessary for LA ROSA to access its software.

96.    Furthermore, during various communications with KOGOS, and SFM, LA ROSA employees were informed by KOGOS that if LA ROSA did not pay certain monies purportedly owed to SFM by LA ROSA, that KOGOS would provide the New Software to LA ROSA's competitors, including the proprietary business information contained on that software, as it pertained to LA ROSA.  Such an act by SFM/KOGOS would be a clear violation of the terms of the parties' License Agreement regarding non-disclosure.

## AS AND FOR A FIRST CAUSE OF ACTION
## (FOR BREACH OF THE LICENSE AGREEMENT)

97.    Claimant repeats and realleges the allegations contained in paragraphs "1" through "96" of the Demand, as if fully set forth herein at length.

98.    On or about March 3, 2005, LA ROSA and SFM entered into a License Agreement and a Maintenance Agreement regarding the installation and delivery of the New Software by SFM to LA ROSA.

99.    Pursuant to the terms of the License Agreement, SFM was to provide LA ROSA with a version of SFM's web-based New Software in phases.

100.    Under the terms of the Agreement, SFM was to deliver the New Software in phases pursuant to the Plan of Development.

101.    Under the terms of the Agreement, LA ROSA was to pay SFM a development fee of $190,000 for the development and delivery of the New Software pursuant to the License Agreement.

22

102.    Each of LA ROSA's installment payments was to be due upon successful completion of each respective phase of the Development Plan, and after acceptance by LA ROSA of each installment of the New Software.

103.    Pursuant to the Agreement, LA ROSA was not to be deemed in default of the Agreement if, in good faith, it disputed whether or not a particular phase of the New Software had been successfully completed, and withheld payment from SFM as a result.

104.    Under the terms of the Agreement, LA ROSA was not required to pay SFM the final 10% of the Development Fee until LA ROSA had successfully used the new software for a period of 90 days without failure (the "Trial Period").

105.    Upon information and belief, SFM has never provided LA ROSA with a complete and final version of the New Software, as promised and agreed to by SFM under the License Agreement.

106.    Upon information and belief, SFM has never delivered to LA ROSA a final and complete version of the New Software that has successfully run for a period of 90 days without failure (the "Trial Period").

107.    Furthermore, upon information and belief, SFM has never delivered a final invoice for payment due.

108.    Upon information and belief, LA ROSA has completed or satisfied all of its requirements under the parties' License Agreement, including paying SFM $245,250.

109.    Upon information and SFM has precluded LA ROSA from accessing or utilizing any portion of the incomplete installments of the New Software, as of December 2006.

110.    As a result of SFM's breach of the License Agreement, LA ROSA has suffered damages, including, but not limited to, receiving repayment in full of the $245,250 which LA

23

ROSA has paid SFM without receiving a complete, fully operational, debugged New Software program, or training for such New Software as required of SFM pursuant to the License Agreement.

## AS AND FOR A SECOND CAUSE OF ACTION
## (FOR BREACH OF THE LICENSE AGREEMENT)

111.    Claimant repeats and realleges the allegations contained in paragraphs "1" through "110" of the Demand, as if fully set forth herein at length.

112.    On or about March 3, 2005, LA ROSA and SFM entered into a License Agreement and a Maintenance Agreement regarding the installation and delivery of the New Software by SFM to LA ROSA.

113.    Pursuant to the terms of the License Agreement, SFM was to provide LA ROSA with a version of SFM's web-based New Software in phases.

114.    Under the terms of the License Agreement, SFM was to maintain the Old Software and allow LA ROSA to use such Old Software, in exchange for payment of $58,000.

115.    Pursuant to the Agreement, LA ROSA was not to be deemed in default of the Agreement if, in good faith, it disputed whether or not a particular phase of the New Software had been successfully completed, and withheld payment from SFM as a result.

116.    Upon information and belief, SFM never provided LA ROSA sufficient maintenance service in 2005 or 2006 for the Old Software, as promised and agreed to by SFM under the License Agreement.

117.    Upon information and belief, LA ROSA has completed or satisfied all of its requirements under the parties' License Agreement, including paying SFM $88,000.

118.   As a result of SFM's breach of the License Agreement, LA ROSA has suffered damages, including, but not limited to, $88,000 which LA ROSA has paid SFM without receiving proper or complete Old Software maintenance in 2005 or 2006, as required of SFM pursuant to the License Agreement.

## AS AND FOR A THIRD CAUSE OF ACTION AS AGAINST SFM
### (FOR UNJUST ENRICHMENT)

119.   Claimant repeats and realleges the allegations contained in paragraphs "1" through "118" of the Demand, as if fully set forth herein.

120.   On or about March 3, 2005, LA ROSA and SFM entered into a License Agreement and a Maintenance Agreement.

121.   Under the terms of the License Agreement, SFM was to provide LA ROSA with a new web-based software package that was fully functional. SFM was to grant LA ROSA an exclusive license to use the software during the "Trial Period," and for seven (7) years thereafter.

122.   The License Period was not to begin until the New Software was installed at LA ROSA's various sites.

123.   As defined by the License Agreement, "New Software" means source codes and/or executable objective codes for "all" programs, subroutines, diagnostic routines, computer software, or special software required to utilize the New Software.

124.   LA ROSA was not required to pay SFM a license fee under the License Agreement until the New Software was fully delivered and properly running under the License Agreement.

25

125.    Upon information and belief, SFM has not provided LA ROSA with all source code and/or executable codes for all computer programs, subroutines, diagnostic routines, control software, or special software required to run the new software without error as required under the License Agreement.

126.    Upon information and belief, SFM has precluded LA ROSA from accessing the unfinished New Software program.

127.    LA ROSA has paid SFM $245,250, in good faith, for a New Software under the License Agreement.

128.    LA ROSA has not received value from, and/or the value promised by SFM, in the form of a fully operational, debugged and functioning New Software program for which LA ROSA has already paid $245,250 to SFM.

129.    LA ROSA has also paid SFM $88,000 under the License Agreement for maintenance by SFM on the Old Software which SFM is no longer maintaining, and did not properly maintain the Old Software in 2005 or 2006.

130.    Upon information and belief, SFM did not provide actual services or value for receipt of the $88,000 payment made by LA ROSA.

131.    As a result of SFM's failures, and acceptance of payment from LA ROSA, SFM has been unjustly enriched in the sum of at least $333,250.

## AND FOR A FOURTH CAUSE OF ACTION AS AGAINST SFM
### (FOR BREACH OF THE LICENSE AGREEMENT)

132.    Claimant repeats and realleges the allegations contained in paragraphs "1" through "131" of the Demand, as if fully set forth herein at length.

133.    On or about March 3, 2005 SFM and LA ROSA entered into a License Agreement.

134.    Pursuant to the terms of the License Agreement, if SFM materially breached or defaulted under the provisions of the License Agreement, SFM was required to return all monies paid to SFM by LA ROSA under the License Agreement.

135.    In addition, under the terms of the License Agreement, SFM was required to allow LA ROSA the right to continue use of the Old Software, and SFM was required to provide maintenance services for the Old Software under the 1999 Software Agreement.

136.    Upon information and belief, LA ROSA has completed or satisfied all of its requirements under the parties' License Agreement.

137.    Upon information and belief, SFM has breached the License Agreement by attempting to and/or precluding LA ROSA from fully using the Old Software, and all aspects of the Old Software as required under the License Agreement.

138.    Upon information and belief, SFM has breached the License Agreement by failing to conduct proper or adequate maintenance of the Old Software pursuant to the terms of the License Agreement.

139.    As a result of SFM's breach of the License Agreement, LA ROSA has suffered damages, including, but not limited to $333,250 paid to SFM for an incomplete New Software program and problems resulting from lack of maintenance on the Old Software.

## AND FOR A FIFTH CAUSE OF ACTION AS AGAINST SFM
## (FOR TORTIOUS INTERFERENCE WITH BUSINESS ADVANTAGE)

140.    Claimant repeats and realleges the allegations contained in paragraphs "1" through "139" of the Demand, as if fully set forth herein at length.

27

141.   LA ROSA is in the business of moving and storing goods and materials for clients throughout the United States, Puerto Rico, and the Dominican Republic.

142.   LA ROSA requires sophisticated computer software to facilitate the completion of the contracts it has with its various clients.

143.   Upon information and belief, SFM is in the business of providing software and computer-related services to clients in the moving and storage business.

144.   Upon information and belief, SFM and LA ROSA entered into a License Agreement which required SFM to provide LA ROSA with a software package. The New Software would be used via the worldwide web.

145.   Upon information and belief, the New Software (web-based software) to be provided by SFM to LA ROSA would require hosting on various computer servers.

146.   Upon information and belief, on or about mid-2006, SFM, through its President (KOGOS), suggested to LA ROSA that LA ROSA hire and/or contract with XL Hosting (an Ohio-based server hosting company) to host the New Software on XL's servers located in Ohio.

147.   Upon information and belief, XL Hosting was under contract/agreement with LA ROSA to provide software hosting services for the New Software.

148.   Upon information and belief, SFM was aware of the contract/agreement between LA ROSA and XL Hosting.

149.   Upon information and belief, SFM, through its President, KOGOS, directed XL Hosting to engage in conduct that would prevent LA ROSA from accessing and/or downloading the New Software.

150. Upon information and belief, SFM and its President, KOGOS, have prevented XL Hosting (the Ohio-based server hosting company) from fully and properly completing its contract/agreement with LA ROSA.

151. Upon information and belief, as a result of the tortious actions of SFM regarding the contract/agreement between LA ROSA and XL Hosting (and its President, KOGOS), LA ROSA has suffered damages, to be determined at this Arbitration, but no less than $50,000, including, but not limited to, loss of the use of the New Software, and loss of any rights and obligations LA ROSA was entitled to pursuant to any contract/agreement it had with XL Hosting.

## AND FOR A SIXTH CAUSE OF ACTION AS AGAINST SFM
## (FOR TORTIOUS INTERFERENCE WITH BUSINESS ADVANTAGE)

152. Claimant repeats and realleges the allegations contained in paragraphs "1" through "151" of the Demand, as if fully set forth herein at length.

153. LA ROSA is in the business of moving and storing goods and materials for clients throughout the United States, Puerto Rico, and the Dominican Republic.

154. LA ROSA has contracts with these clients to move and store materials throughout the United States, Puerto Rico, and the Dominican Republic.

155. In order to successfully and efficiently operate its moving and storage business, LA ROSA requires access to sophisticated computer software.

156. Upon information and belief, LA ROSA entered into a contract with SFM in which SFM was required to provide LA ROSA with New Software. This New Software was to be a web-based system which would be accessible to LA ROSA's employees worldwide.

157.    Upon information and belief, LA ROSA entered into an agreement with XL Hosting (an Ohio-based server hosting company), to provide LA ROSA with server hosting services for the New Software.

158.    Upon information and belief, LA ROSA engaged XL Hosting to act as its server hosting company, at the suggestion of SFM and its President, KOGOS.

159.    In or about mid-December 2006, LA ROSA entered into an agreement with a different server hosting company to have its servers host the New Software.

160.    Upon information and belief, SFM and KOGOS were aware that LA ROSA had entered into an agreement with a new server hosting company to host the New Software.

161.    Upon information and belief, in December of 2006, SFM and its President, KOGOS, directed XL Hosting (an Ohio-based server hosting company), to engage in conduct that would inhibit the ability of LA ROSA from having XL Hosting allow the New Software to be downloaded onto the servers of a new hosting company that had been engaged by LA ROSA.

162.    Upon information and belief, SFM, KOGOS, and XL Hosting precluded LA ROSA and LA ROSA's new server hosting company from downloading and/or accessing the New Software, to facilitate the hosting of New Software by the new hosting company engaged by LA ROSA for such purpose.

163.    Upon information and belief, as a result of the tortious actions and interference of SFM (and XL Hosting), LA ROSA has suffered damages, to be determined at this Arbitration, but no less than $50,000, including, but not limited to, loss of business reputation, loss of contracts, and loss of the rights and obligations LA ROSA was entitled to pursuant to its contract with the new server hosting company.

## AND FOR A SEVENTH CAUSE OF ACTION AS AGAINST SFM
## (FOR TORTIOUS INTERFERENCE WITH BUSINESS ADVANTAGE)

164.    Claimant repeats and realleges the allegations contained in paragraphs "1" through "163" of the Demand, as if fully set forth herein at length.

165.    LA ROSA is in the business of moving and storing goods and materials for clients throughout the United States, Puerto Rico and the Dominican Republic.

166.    LA ROSA has contracts with these clients to move and store materials throughout the United States, Puerto Rico and the Dominican Republic.

167.    In order to successfully and efficiently operate its moving and storage business, LA ROSA requires access to sophisticated computer software.

168.    Upon information and belief, SFM is in the business of providing software and computer related services to clients in the moving and storage business.

169.    Upon information and belief, SFM is aware that the moving and storage companies with which SFM does business require uninterrupted access to their software and computer based information in order to properly and timely carry out the contracts these businesses have with their clients.

170.    LA ROSA uses/used SFM's (Old Software and New Software) to carry out the numerous contracts which LA ROSA had with LA ROSA's clients.

171.    Upon information and belief, SFM, KOGOS, and the Ohio server hosting company, XL Hosting, precluded LA ROSA from accessing either the Old Software (DOS/WINDOWS-based) or the New Software rendering LA ROSA's performance of its contracts with various moving and storage clients impossible to complete and undertake in a timely manner.

31

## AND FOR A EIGHTH CAUSE OF ACTION AS AGAINST SFM
## (FOR CIVIL CONSPIRACY UNDER NEW JERSEY LAW)

172.    Claimant repeats and realleges the allegations contained in paragraphs "1" through "171" of the Demand, as if fully set forth herein at length.

173.    Upon information and belief, KOGOS and SFM communicated from the State of New Jersey with XL Hosting regarding the servers and New Software SFM and XL Hosting were required to provide to and/or maintain for LA ROSA pursuant to contract and/or agreement.

174.    Upon information and belief, SFM, KOGOS, and the Ohio-based server hosting company conspired and /or combined together to tortiously interfere with the ability of LA ROSA to access the New Software or allow a server hosting company of LA ROSA's choice to download the New Software and be supported by a server hosting company of LA ROSA's choice.

175.    Upon information and belief, SFM, KOGOS, and the Ohio-based server hosting company, XL Hosting, conspired and/or combined together to tortiously interfere with the ability of LA ROSA to access the New Software, and thereby complete and/or render proper performance to various moving and storage clients pursuant to the terms of the contracts and agreements LA ROSA had with those clients.

176.    Upon information and belief, SFM, KOGOS, and the Ohio-based server hosting company, XL Hosting, conspired and/or combined together to tortiously interfere with the ability of LA ROSA to access the New Software, SFM, KOGOS, and the Ohio-based server company, XL Hosting, knew that LA ROSA was under contract with various clients to either move or store these clients goods and/or materials.

32

177.    Upon information and belief, SFM, KOGOS, and the Ohio-based server hosting company, XL Hosting, knew that by conspiring and/or combining together to tortiously interfere with the ability of LA ROSA to access the New Software SFM, KOGOS, and the Ohio-based server company, XL Hosting, would prevent LA ROSA from being able to fulfill LA ROSA's contractual obligations to its clients in a proper and timely manner.

178.    Upon information and belief, SFM, KOGOS, and the Ohio-based server hosting company, XL Hosting's, acts with regard to LA ROSA were unlawful, or lawful, but committed by an unlawful means.

179.    Upon information and belief, SFM, KOGOS, and the Ohio-based server hosting company, XL Hosting's, acts of conspiracy and/or combination to tortiously interfere with the ability of LA ROSA to access the New Software, or to fulfill its contractual obligations with LA ROSA's clients were done with malice and the intent of inflicting harm or injury as to LA ROSA.

180.    Upon information and belief, as a result of the tortious actions of SFM, KOGOS, and the Ohio server company, XL Hosting, LA ROSA has suffered damages, to be determined at this Arbitration, but no less than $50,000, including but not limited to, loss of business reputation and contracts, as a result of SFM's interference with LA ROSA's ability and capability to complete and/or carry out LA ROSA's contracts with its clients.

181.    Upon information and belief, SFM, KOGOS, and the Ohio-based server hosting company, XL Hosting's, acts of conspiracy and/or combination to tortiously interfere with the ability of LA ROSA to access the New Software, or to fulfill its contractual obligations with LA ROSA's clients were done with malice and the intent of inflicting harm or injury as to LA ROSA.

182.    Upon information and belief, as a result of the tortious and conspiratorial actions of SFM, KOGOS, and the Ohio server company, XL Hosting, LA ROSA has suffered damages (including but not limited to, loss of business reputation and contracts) as a result of SFM's/KOGOS' interference with LA ROSA's ability and capability to complete and/or carry out LA ROSA's contracts with its clients.

**WHEREFORE,** Claimant prays that the arbitrator:

1.    Grants a judgment against Respondent for breach of contract in an amount to be determined at this Arbitration, but no less than $333,250, plus interest, and recovery of costs, disbursements, and attorneys' fees, incurred by Claimant in this action, and such other relief as the Arbitrator may deem just and proper.

2.    In the alternative to the relief requested in the first cause of action, grants a judgment against Respondent for breaches of contract in an amount to be determined at this Arbitration, but no less than $88,000, plus interest, and recovery of costs, disbursements, and attorneys' fees, incurred by Claimant in this action, and such other relief as the Arbitrator may deem just and proper.

3.    In the alternative to the relief requested in the previous causes of action, grants a judgment against Respondents for unjust enrichment amount to be determined at this Arbitration, but no less than $333,250, plus interest, and recovery of costs, disbursements, and attorneys' fees, incurred by Claimant in this action, and such other relief as the Arbitrator may deem just and proper.

4.    In the alternative to the relief requested in the previous causes of action, grants a judgment against Respondents for tortious interference with contract/business advantage in an amount to be determined at this Arbitration, but no less than $333,250, plus interest,

34

and recovery of costs, disbursements, and attorneys' fees, incurred by Claimant in this action, and such other relief as the Arbitrator may deem just and proper.

5.      In the alternative to the relief requested in the previous causes of action, grants a judgment against Respondents for tortious interference with contract/business advantage in an amount to be determined at this Arbitration, but no less than $50,000, plus interest, and recovery of costs, disbursements, and attorneys' fees, incurred by Claimant in this action, and such other relief as the Arbitrator may deem just and proper.

6.      In the alternative to the relief requested in the previous causes of action, grants a judgment against Respondents for tortious interference with contract/business advantage in an amount to be determined at this Arbitration, but no less than $50,000, plus interest, and recovery of costs, disbursements, and attorneys' fees, incurred by Claimant in this action, and such other relief as the Arbitrator may deem just and proper.

7.      In the alternative to the relief requested in the previous causes of action, grants a judgment against Respondents for tortious interference with contract/business advantage in an amount to be determined at this Arbitration, but no less than $50,000, plus interest, and recovery of costs, disbursements, and attorneys' fees, incurred by Claimant in this action, and such other relief as the Arbitrator may deem just and proper.

8.      In the alternative to the relief requested in the previous causes of action, grants a judgment against Respondents  for civil conspiracy in an amount to be determined at this Arbitration, but no less than $50,000, exclusive of punitive damages,

and recovery of costs, disbursements, and attorneys' fees, incurred by Claimant in this

action, and such other relief as the Arbitrator may deem just and proper.

Dated: White Plains, New York
       February 12, 2007

Yours, etc.

Kevin J. Harrington
John T. A. Rosenthal
HARRINGTON, OCKO & MONK, LLP
Attorneys for *Claimant*
LA ROSA DEL MONTE EXPRESS, INC.
81 Main Street, Suite 215
White Plains, New York 10601
Telephone: (914) 686-4800
Facsimile: (914) 686-4824

TO:   Software For Moving, Inc.
      c/o Mr. Shlomo Kogos
      211 Warren St., Suite 305
      Newark, New Jersey 07103

      Philip Zukowsky
      Counsel for Respondent
      Software For Moving, Inc.
      Chernesky Heyman & Kress
      Suite 1100
      10 Courthouse Plaza SW
      Dayton, OH 45402
      Phone: (937) 449-2800

36

EXHIBIT "A"

ORIGINAL

# SOFTWARE LICENCING AGREEMENT

WHEREAS, SAFEGUARD COMPUTER SERVICES, INC., a New York Corporation, maintaining offices at 24-16 Bridge Plaza South, Long island City, New York, 11101 (Hereinafter "Licensor") represents and warrants that it is the owner of all right, title and interest in and to the software applications and source code otherwise known and referred to for purposes of identification as the "MOVING MANAGER FOR WINDOWS" (Hereinafter "the Software"); and

WHEREAS, LA ROSA DEL MONTE EXPRESS, INC., a New York, Corporation with world headquarters located at 1133-35 Tiffany Street, Bronx, New York 10459, and primarily engaged in the moving, shipping and storage industry, its subsidiaries, sister corporations, partners, subsidiaries, affiliates and sub-licensees and/or associates, (Hereinafter collectively "Licensee"), desires to utilize the software in its day to day national and international operations; and

WHEREAS, Licensee desires certain specific and individual modifications to the software requiring additional code capable of meeting the unique and specific needs of licensee's national and international day to day operations; and

WHEREAS, Licensor warrants that the software may be modified so as to accommodate licencee's unique needs and further agrees to modify the software to include the said specific and

individual modifications to the software and to cause to have written the necessary additional software code capable of meeting the said unique and specific needs of licensee's national and international day to day operations;

NOW, THEREFORE, in consideration for valuable consideration, receipt of which is hereby acknowledged (the terms and conditions of which are set out at **Exhibit "A"**), Licensor agrees to develop and/or modify its software and grants Licensee a license to use its software pursuant to the terms which follow:

## <u>TERMS AND CONDITIONS OF SOFTWARE USE</u>

1.  <u>SCOPE OF LICENSES</u>.  (a) Licensee is hereby licensing the use of Licensor's MOVING MANAGER software (the "Software"), and thus to make copies of Licensor's copyrighted materials, on Licensee's computer systems.  (b) This license is limited to use of the Software at the site(s) specified and only for purposes of Licensee's own moving and shipping enterprise.  (c) This license grants Licensee the right to make one back up copy of the Software per site which may be stored away from the site(s) or at such location(s) as Licensor may determine at its convenience and for the sole purpose of making said backup copy immediately available if and when the need for its utilization should arise.

2.    TERM OF LICENSE; TERMINATION; CONSIDERATION.    (a) This license begins on the date that the Software is installed at any of Licensee's sites.  This license is perpetual unless its terms are breached by Licensee. (b) This license in its entirety and as to all Software licensed shall terminate immediately if Licensee does not comply with these terms, including but not limited to, non payment of licensing fees or maintenance fees, unauthorized copying or use of the Software, or unauthorized modification of the Software.  (C) Upon termination, the license shall cease, and all copies of the Software shall be returned to Licensor or destroyed, at Licensor's option.  Use of the Software is not authorized after termination by Licensor and shall be considered by Licensor to be infringement of its intellectual property rights, in addition to any other rights that may accrue to Licensor by such use.  Payment of fees shall be made pursuant to the Schedules attached hereto at **Exhibit "A" and "C"**

3.    GUARANTEE OF ORIGINAL DEVELOPMENT. Licensor warrants that all modifications developed hereunder will be of original development by Licensor, and will be specifically developed for the fulfillment of this Agreement and will not infringe upon or violate any patent, copyright, trade secret or other proprietary right of a third party, and Licensor will indemnify and hold Licensee harmless from and against any loss, cost, liability or expense (including reasonable counsel fees) arising out of any

breach or claimed breach of this warranty; Licensor shall assist
Licensee in the expeditious transfer of licenses and/or title for
use of perpetual licenses to Licensee for such non-original
components unless Licensee already has title or license to any
non-original components used hereunder.

4. <u>PATENT COPYRIGHT OR TRADE SECRET INDEMNITY</u>. Licensor
will defend at its expense, any action brought against Licensee
or Licensor that is based on a claim that the systems developed
and furnished hereunder infringes a United States patent or
copyright or trade secret or other proprietary right of a third
party and will pay the loss, damages, and reasonable attorney
fees finally incurred by or awarded against Licensee in any such
actions which are attributable to any such claim, but such
defense and payments are conditioned on the following: (1)
Licensee promptly notifies Licensor in writing of the claim, and
(2) Licensor shall have sole control of the defense of any such
action on such a claim and all negotiations for its settlement or
infringement of a United States patent or copyright, Licensee
shall permit Licensor, at its option and expense, either to
procure for Licensor the right to continue using the Software, to
replace or modify the same so that they become non-infringing, or
to accept Licensee's return of the Software and grant Licensee a
refund of monies paid under this Agreement.  Licensor shall have
no obligation to defend Licensee or to pay costs, damages, or

attorney's fees for any claim based upon (1) use of other than an unaltered configuration of the Software if such infringement would have been avoided by the use of an unaltered configuration of the Software, or the combination, operation, or use of any Software furnished hereunder with non-Licensor programs or data if such infringement would have been avoided by the combination, operation, or use of the Software with other programs or data.

5.  INDEMNIFICATION INCLUSION OF COSTS. Each party hereunder agrees to indemnify the other against all losses, costs, expenses (including reasonable counsel fees) which may occur by reason of the breach of any term, provision, warranty or representation contained herein and/or in connection with the enforcement of this Agreement or any provision thereof.

6.  MODIFICATION OF SOFTWARE.  Licensee shall not modify nor authorize modification of any of the Software in any manner without the express written permission of Licensor. The parties agree that Licensor possess certain unique knowledge of Licensee's business enterprise making Licensor the unique candidate for the development of the software for Licensee, and therefore, this Agreement may not be assigned by Licensor without the prior written consent (not to be unreasonably withheld) of Licensee.

7.  NOTICES OF INTELLECTUAL PROPERTY RIGHTS. Licensee shall assure that Licensor notices of intellectual property (e.g., copyright notices contained in the software) shall remain within the Software.

8. <u>WARRANTIES; LIMITATIONS ON LIABILITY</u>. LICENSOR DOES NOT GUARANTEE THAT THE SOFTWARE WILL MEET "ALL REQUIREMENTS" OF CUSTOMER'S BUSINESS OR THAT THE SOFTWARE WILL INTERFACE WITH THE SOFTWARE AND HARDWARE WITH WHICH CUSTOMER INTENDS IT TO OPERATE WITH TO UTILIZE THE SOFTWARE. LICENSOR WARRANTS THAT THE SOFTWARE, AS MODIFIED, HAS BEEN DEVELOPED FOR OPERATION UNDER THE WINDOWS OPERATING SYSTEM. Licensor warrants that the software shall be Y2K compliant pursuant to separate agreement incorporated by reference and attached hereto at **Exhibit "B"**.

9. <u>CONFIDENTIALITY AND SECURITY OF THE SYSTEMS</u>. Each party acknowledges that all material and information which has or will come into the possession and knowledge of each other in connection with this Agreement or the performance hereof, consists of confidential and proprietary data, whose disclosure to or use by third parties will be damaging, both parties, therefore, agree to hold such material and information in strictest confidence, not to make use thereof other than for the performance of this Agreement, to release it only to employees requiring such information, and not to release or disclose it to any other party.

10. <u>RIGHTS TO NEW IDEAS AND CODE</u>. The parties acknowledge that performance of this Agreement will result in the development of new proprietary and secret concepts, methods, techniques, processes, adaptations and ideas. The parties agree that the same

shall belong solely to Licensee without regard to the origin thereof and that Licensor will not, other than in the performance of the Agreement, without the express written consent, which will not be unreasonably withheld, sell, make use or disclose same to any person, group, company or corporation that competes with Purchaser's business as defined herein.

11.  ASSIGNMENTS.  This Agreement and its rights, duties and obligations may not be assigned by Licensee without the prior written consent of Licensor.

12.  COPYING.  All intellectual property, including but not limited to copyright, patents and trade secrets, in the Software, except for improvements, revisions, and modifications made at specific request of Licensee, shall remain the property of Licensor.  Licensee agrees that, except as directed by Licensor and this Agreement, it will not at any time during or after the term of this Agreement allow unauthorized copying of the Software.

13.  INJUNCTIVE RELIEF.  Licensee acknowledges that unauthorized use or copying of the Software will give rise to irreparable injury to Licensor, and leave Licensor inadequately compensable in damages.  Accordingly, Licensor may seek and obtain injunctive relief against the breach or threatened breach of license terms, in addition to any other legal remedies which may be available.  Licensee further acknowledges and agrees that

the covenants contained herein are necessary for the protection of Licensor's legitimate business interests and are reasonable in scope and content.

14. NOTICE OF NON AFFILIATION. Licensor is not affiliated in any way with Safeguard Business Systems, Inc.; which is a totally separate and independent company that neither sponsors nor endorses Licensor's activities.

15. TRAINING. Licensor shall provide the operational manuals and onsite training to Licensee's designated personnel as provided for under the maintenance provisions stated herein and set out at **Exhibit "C"**.

16. MAINTENANCE. Maintenance schedules and fees shall be in compliance with the terms and conditions made a part hereof and incorporated by reference as set out at **Exhibit "C"**.

17. LICENSOR'S EMPLOYEES ASSIGNED TO THIS AGREEMENT. In the event that Licensor uses contractors or subcontractors, Licensor specifically assumes all responsibilities for such contractors or subcontractors as if they were employees of Licensor, and Licensor shall indemnify and hold harmless Licensee for the acts of such contractors or subcontractors. Licensor-assigned employees may be rejected by Licensee should Licensee determine unilaterally that any employee's services are unsatisfactory. Upon written notification from Licensee regarding an unsatisfactory employee, Licensor shall remove such employee

immediately and replace the removed employee with an employee acceptable to Licensee as soon as possible. Under no circumstances shall Licensor's employees be considered employees of or agents of Licensee.

18. <u>FORCE MAJEURE</u>. Neither party shall be responsible for delays or failures on performance resulting from acts beyond the control of such party. Such acts shall include but not be limited to acts of God, strikes, lockouts, riots, acts of war, epidemics, government regulations superimposed after the fact, fire, communication line failures, power failures, earthquakes or other disasters.

19. <u>COMPLIANCE WITH ALL LAWS - PARTIAL INVALIDITY</u>. Each party agrees that it will perform its obligations hereunder in accordance with all applicable laws, rules and regulations now or hereafter in effect. If any item or provision of this Agreement shall be found to be illegal or unenforceable, them notwithstanding, this Agreement shall remain in full force and effect and such term or provision shall be deemed stricken.

20. <u>ALL AMENDMENTS IN WRITING</u>. No amendments to this Agreement shall be effective unless they are in writing and signed by duly authorized representatives of both parties.

21. <u>HEADINGS NOT CONTROLLING</u>. Headings used in this Agreement are for reference purposes only and shall not be deemed a part of this Agreement.

23. <u>SURVIVAL BEYOND COMPLETION</u>. The provisions of this

Agreement and the Software developed under this Agreement as well as confidentiality, indemnification, use, assignment, reproduction, warranty, ownership, return or destruction shall survive the delivery of the software and the payment of associated charges.

22. <u>GOVERNING LAW</u>. This Agreement shall be governed by all the laws of the State of New York, including its conflicts of laws rules and/or common law precedent.

IN WITNESS WHEREOF the parties have executed this Agreement this __ day of March, 1999.


_____
Safeguard Computer Services, Inc.
By: Shlomo Kogos, President


_____
La Rosa Del Monte Express, Inc.
By: Hiram Rodriguez, President

## EXHIBIT "A"

### FEES AND MILESTONES

Licensee agrees to pay $83,000.00 (Hereinafter "the Licensing Fee") to Licensor for the perpetual License to use the software at sixty-three (63) sites as defined in **Exhibit "C"**, the Software Maintenance Agreement.  Licensee further agrees to pay an additional $1,000.00 licensing fee for each additional site which is added in excess of the said sixty-three sites provided for herein.  The Licensing Fee shall be paid in accordance with five (5) developmental phases (Hereinafter "Milestones").  At the completion of the fifth (5th) Milestone, Licensor agrees to have sufficiently developed the software, so as to have Licensee's New York Headquarters operations, and all other national and international business locations up and running.  Licensor possesses unique knowledge of the moving and storage industry and as such fully recognizes that Licensee's activity and operations will increase dramatically and in proportion to an increased surge in demand for Licensee's services beginning with the spring season.  In order for Licensee to adequately meet said demand, and to reduce the likelihood of any disruption in Licensee's operations, Licensor agrees to exert his good faith and best efforts to complete the said fifth (5th) Milestone by on or before June 15, 1999.  Each individual Milestone in the developmental process shall hereinafter be designed, approved,

programmed, delivered, tested, and accepted pursuant to the
schedule and procedures listed below.

## I. As for each Milestone:

(a) Licensor shall consult with Licencee's employee, Miriam
Rodriguez (Hereinafter "the Systems Specialist") for the purpose
of designing programming specifications and in conjunction with
Licensor's controller, Ricardo Colon, for the purposes of
financial data merging.  Specifications shall contain those items
provided by her and the controller to Licensor.

(b)  Once Licensor has designed , developed, and completed a
Milestone, they will be delivered to the Systems Specialist
together with their operation performance estimates (Hereinafter
"OPE") and the Software Manual (Hereinafter "the SM") for every
Milestone in the specifications provided by the Systems
Specialist. The OPE and SE shall indicate any limitations on the
software at that time, e.g. size, and the estimated response
times for on-line programs or runtimes for the batch programs so
as to adequately prepare her for said limitations and to reduce
the likelihood of negatively impacting on Licensee's day to day
operations.

(c)  Upon receipt of said completed Milestones, the Systems
Specialist will either approve or disapprove the completion of

said Milestone.  Such approval will be at the sole discretion of Purchaser, but said approval or disapproval shall be made in good faith and an approval shall not be unreasonably withheld.

(i) When, upon approval of the completed Milestones, in conjunction with the Systems Specialist, an Acceptance test for the Milestone and its individual specifications has been performed and completed satisfactorily to the Systems Specialist, said milestone is to be deemed completed

(ii)  If the Systems Specialist does not approve said Milestone, Licensor and the Systems Specialist will again consult and restart the procedure as stated above.

(d)  (i) The Systems Specialist in conjunction with Licensor shall develop an acceptance test.  After the creation of the Acceptance Test, the parties shall also create the Milestone Agreement. The Milestone Agreement shall contain the following: The functional names of the Milestones to be completed, the date of delivery, and the understanding that time is of the essence.

(ii)  The Milestone Agreement will also have the following items attached thereto:

The Functional Specifications which is a narrative explanation of the operation of the programs, containing Exhibits of all screen and reports. The Programming Specifications to be used by the programmers creating the software for Purchaser. The Functional Specifications for the software after customization.

File layouts for all files used or created in that Milestone, including record and/or data field descriptions. The operation performance estimates. The Acceptance Tests, including test data.

(iii)  The Milestones Agreement will make explicit and express reference to this agreement, and the date this agreement was executed.

(iv)  Upon the signing of the Milestones Agreement by both the Systems Specialist and Licensor, Licensee shall pay to Licensor pursuant to the following fixed payment schedule:

Upon completion of the first Milestone (Installation) Twenty Thousand Dollars ($20,000.00) payable in two installments.  First installment of $15,000.00 with a second installment of $5,000.00 within a week of the first installment.

> A.    Upon completion of the Second Milestone through and including the Fourth Milestone, licensor shall be paid $14,000.00 per completed Milestone.
> B.    Upon completion of the Fifth Milestone, Licensor shall receive a payment of $8,000.00
> C.    A final payment of $13,000.00 shall be paid to Licensor 60 days subsequent to the completion of the Fifth Milestone.

(v) Licensor will then proceed to write the programming for that Milestone.

(e)  (i)  On the delivery date specified in the Phase Agreement, Licensor shall deliver to Licensee the completed programming for that Milestone.

(ii)   Failure by Licensor to deliver the completed programming by the end of the 30 days after the delivery date specified in the Milestone Agreement, will entitle Licensee to a 10 percent reduction in the cost of the entire Milestone payment for each 30 day period in which Licensor is late.  The delivery date may only be modified by written amendment to the Milestone Agreement signed by both parties.

(iii)  In the event that Licensor fails to deliver the completed Milestones three (3) months after the original delivery date, and the delivery date was not modified, Licensee may cancel payment for that Milestone in its entirety, said payment to be held in escrow, minus any penalties accrued after the final completion of all Milestones.

(ii)   If the programs fail to perform the acceptance tests, the parties shall follow the following procedure:

(1) Licensee shall immediately notify Licensor by telephone of the failure of the test. Licensee shall then confirm such notice by sending written confirmation of the failure plus proper documentation of said failure to Licensor by certified mail, return receipt requested.

(2) Licensor shall immediately begin reprogramming to remedy the failure.

(3)  If the failure cannot be remedied within five (5) days, the penalty provision shall take effect.

(4)   After Licensee has used all the completed Milestone programs successfully for a period of 90 consecutive days of uptime and without failure, Licensee shall pay to Licensor the final $13,000.00 payment, along with any monies held in escrow as provided herein.   Nothing in this procedure shall be construed to prevent several Milestones to be commenced simultaneously.

## II. SYSTEMS UPTIME.

(A)   System uptime, is defined as follows: Licensor warrants that the software shall be functionally operational within the specifications of each Milestone no less than 96 percent  of any consecutive ninety (90) day period beginning with the start of acceptance.   Any time that the system is not functionally operational due to hardware failure or other causes beyond Licensor's design or control shall be excluded from  this computation.

(B)   In the event of a failure of any program during the ninety (90) day period, Licensee shall notify Licensor by telephone immediately. Licensee will confirm said telephone notice by serving Licensor with written notice, with proper documentation of said error or failure, sent certified mail, return receipt requested.

(C)   Upon notification of the failure, Licensor may begin

immediate repairs of said failures.  If the failure is remedied
before the expiration of 36 cumulative days, including previous
failures, within that Phase, the required ninety (90) day uptime
period will continue to run.


    IN WITNESS WHEREOF, each of the parties hereto has causes
this Agreement to be duly executed as of the date below.

_____
Safeguard Computer Services, Inc.
By: Shlomo Kogos, President


_____
La Rosa Del Monte Express, Inc.
By: Hiram Rodriguez, President

## EXHIBIT "B"

## (Y2K) YEAR 2000 COMPLIANCE

A. Licensor represents and warrants that the Software is designed to be used prior to, during, and after the calendar year 2000 A.D., and that the Software, together with its modifications will operate during each such time period without error relating to date data, specifically including any error relating to, or the product of, date data which represents or references the new century and millennium.

1. Without limiting the generality of the foregoing, Licensor further represents and warrants:

2. That the Software has been designed to ensure year 2000 compatibility, including, but not limited to, date data century and millennium recognition, calculations which accommodate same century and multi-century formulas and date values, and date data interface values that reflect the new century;

3. That the software includes "year 2000 capabilities". For the purposes of this Agreement, "year 2000 capabilities" means that the Software: (a) will manage and manipulate data involving dates, including single century formulas and multi-century formulas, and will not cause an abnormally ending scenario within the application or generate incorrect values or invalid results involving such dates; and, (b) provides that all date-related user interface functionalities and data fields include the indication of century; and, (c)

provides that all date-related data interface functionalities include the indication of a new century and millennium.

4.   The term "Year 2000 Compliance Warranty" shall mean, collectively, the warranties set forth herein.

WARRANTY TERM  The Year 2000 Compliance Warranty set forth herein shall begin as of the date of the License Agreement and end on the date after January 1, 2000, subsequent to which the Software has operated without a breach of the Year 2000 Compliance Warranty for a consecutive thirteen month period.

WAIVER OF LIMITATION OF LIABILITY.  Any provisions of the License Agreement which tend to limit or eliminate the liability of either party shall have no application with respect to the Year 2000 Compliance Warranty set forth herein.

LIMITATION ON USE/LIMITATION ON LIABILITY. Licensee agrees that it shall not modify the Software in any manner which would affect the performance of the Software in such a manner as to cause it to fail to meet the Year 2000 Compliance Warranty set forth herein. There shall be no liability on the part of Licensor for any failure of the Software to conform to the Year 2000 Compliance Warranty to the extent that any such failure is attributable to a modification of the Software by Licensee. Licensee agrees to independently confirm its hardware Y2K compliance and Licensor shall not be liable under the present agreement for Y2K compliance arising out of hardware incompatibility or Y2K non compliance.

PROVISIONS OF COMPLIANCE AGREEMENT CONTROLLING. In the event of any conflict or apparent conflict between the terms and conditions of the License Agreement and the terms and conditions of this Compliance Agreement, the terms and conditions of this Compliance Agreement shall control. Except to the extent otherwise set forth herein, the terms and conditions of the License Agreement shall remain in full force and effect.

ENTIRE AGREEMENT. This Compliance Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof. This Compliance Agreement shall not be modified except by later written agreement signed by both parties.


IN WITNESS WHEREOF the parties have executed this Agreement this __ day of March, 1999.

Safeguard Computer Services, Inc.
By: Shlomo Kogos, President


La Rosa Del Monte Express, Inc.
By: Hiram Rodriguez, President

EXHIBIT "C"

SOFTWARE MAINTENANCE AGREEMENT

1.    Licensee shall pay Licensor a fee of $35.00 per month per user (Hereinafter "Station") as a maintenance charge until that time when Licensee, upon 90 day notice of cancellation to Licensor, elects to no longer utilize the software and same is returned and surrendered to Licensor.  Licensee's right of election to surrender as provided herein will become effective only after the minimum twenty-four months period of performance and use of the software and maintenance services and shall not be deemed a waiver of licensee's rights to new ideas and code as provided for under Paragraph "10" of the "Software Licensing Agreement", which covenant shall survive the completion of all other obligations under the agreement.

2.    Licensee shall begin payment of said maintenance fees upon successful installation and use of the software per each particular Station as the software becomes installed per location.

3.    It is contemplated by and between the parties that Licensee's operations shall in total contain sixty-three (63) stations spread out over Licensee's various national and international offices.

4.    Upon receipt and installation of the Software, Miriam Rodriguez (Hereinafter for purposes of identification "Systems Specialist"), in conjunction with Licensor, shall schedule

training sessions with the various locations wherein Licensee will utilize the Software in its day to day operations.

5.    Payment of maintenance fees shall commence subsequent to training per location.  Once training has been successfully completed per location and the Software's utilization has commenced, maintenance fees per site of said location will become due and payable.

6.    It is further understood by and between the parties that the Systems Specialist will exert her good faith best efforts to complete all installations and training within 160 days from the date of the completed five (5) Milestone, as (defined under **Exhibit "A")**, fully operational software, and that Licensor will exert his good faith best efforts to cooperate with the Systems Specialist to achieve this goal.  It is further understood by and between the parties that at the expiration of the said 160 day period, maintenance fees for all 63 stations will become due and owing regardless of whether or not all locations and stations have been trained and/or begun to utilize the Software, unless a delay may be attributable to the acts or omissions of Licensor or to occurrences covered under the Licensing Agreement's Force Majeure.  Licensor shall work in coordination with the Systems Specialist to assure that all locations have been properly trained and prepared to utilize the Software in their day to day operations.

7.    In the event that Licensor is required be Licensee to

visit any of Licencee's offices situated outside of the state of New York (Hereinafter the New York Office" and "Foreign Office(s)" respectively) in order to perform the maintenance services provided for herein, including training, Licensee shall provide for the reasonable costs of lodging and meals.  In the event that Licensor is required to remain at any foreign office in excess of five (5) days, Licensee in addition to providing the reasonable costs for lodging and meals, shall further compensate Licensor with an additional $400.00 daily compensation for each and every day exceeding the said five (5) day period.

7.    Payment of maintenance under the schedule herein above stated shall entitle Licensee to the following for the life of the perpetual license for the New York and Foreign Offices:

    a.    Unlimited customer support hotline

    b.    On site training.

    c.    Daily data merging of all information compiled from each location and its respective sites.

    d.    Continual software product updates, including but no limited to, user interface improvements, cosmetic improvements, Windows operating systems upgrades, upgrades and enhancements making the software conform to advances in hardware technologies, data enhancements, training aids, operational manuals, system backups, on site technical support, seamless technical support, and

correction of software and Windows operating
systems bugs.

e.   Forms modifications, including modifications for
reports, letters, BOL and Order Service, Outside
agency forms and reports, Tariff Charges,
accounting department data merging and use, ddata
flow, and customization.

8.   Failure of Licensor to abide by the terms of this
maintenance agreement shall be deemed a substantial breach and
shall result in a waiver by Licensor of all Maintenance fees for
the period of said breach.


IN WITNESS WHEREOF the parties have executed this Agreement
this __ day of March, 1999.

_____
Safeguard Computer Services, Inc.
By: Shlomo Kogos, President


_____
La Rosa Del Monte Express, Inc.
By: Hiram Rodriguez, President

EXHIBIT "B"

# SOFTWARE DEVELOPMENT & LICENSE AGREEMENT

This Software Development & License Agreement ("Agreement") is made and entered into as of the _____ day of _____, 2005, by and between **La Rosa del Monte Express Inc.**, having an office at 1133-35 Tiffany Street, Bronx, New York, and its affiliates (hereinafter collectively referred to as the "Client") and **Software For Moving, Inc.** having an office located at 211 Warren St., Suite 305, Newark, New Jersey 07103 (hereinafter referred to as the "Developer");

## RECITALS

WHEREAS, the Client operates a moving and storage business in the continental United States, Puerto Rico and the Dominican Republic; and,

WHEREAS, the Developer specializes in providing software development and programming services for storage and moving companies, and is the owner of certain software applications and source code known as "Moving Manager for Windows" ("Moving Manager"); and

WHEREAS, the Developer is the owner of certain software applications and source code known as "Moving Manager Web Version" ("Software X"); and

WHEREAS, the Client now wishes to have Software X modified to meet clients' specific needs as described in the specifications attached hereto as **Exhibit "A"** ("Specifications") and wishes to have Developer maintain, and license to Client, Software X as modified ("New Software"); and

WHEREAS, the Developer wishes to accept the assignment to provide services to the Client pursuant to the terms and conditions set forth in this Agreement.

NOW, THEREFORE, the parties hereto, intending to be legally bound by the terms hereof, hereby enter into the following agreements:

## ARTICLE I
## DEFINITIONS

1    *Definitions*. In this Agreement, the following terms shall have the meanings set forth below:

a)    "*Background IP*" means that intellectual property including know-how, secrets, designs, inventions, patents, patent applications, copyrights, maskworks, discoveries,

formulas, processes, plans and other intellectual property rights, domestic and worldwide, covered or embodied in, Background Materials. Background IP does not include trademarks.

b)  *"Background Materials"* means pre-existing items and items that are not developed for or directed to the creation of Deliverables for the Client, including discoveries, formulas, processes, plans, specifications, guidelines, graphics, marks, logos, notes, instructions, training materials, software, software programs, software documentation, films, videotapes, slides, scripts, processes, records, drawings, illustrations, instructor guides, student materials, master tapes, copyrightable works or ideas or materials.

c)  *"Current Maintenance Agreement"* means the maintenance agreement between Client and Developer (formerly known as Safeguard Computer Services, Inc.), dated March, 1999.

d)  *"Current Software"* means that certain software currently licensed by Developer to, and used by, the Client in connection with Client's moving and storage business, which software is maintained by Developer pursuant to a maintenance agreement between Client and Developer (formerly known as Safeguard Computer Services, Inc.), dated March, 1999.

e)  *"Deliverables"* means the New Software in object and/or source code format as set forth in the Specifications, provided that, if not specified, delivery shall be in object code format, Documentation, and other materials required to be delivered by the Developer to the Client hereunder, as more fully described in the Specifications.

f)  *"Development Coordinator"* shall have the definition given it in Section 3.1.

g)  *"Documentation"* means user manuals including those in electronic form, handbooks, maintenance libraries, education materials and other publications containing specifications to be supplied in order to assist the use, operation or support of the New Software.

h)  *"Effective Date"* means the date this Agreement comes into force, which is the date specified above.

i)  *"Error(s)"* means defect(s) or problems in the New Software or a Deliverable which prevent(s) it from performing in accordance with the Specifications.

j)  *"New Developments"* means those specific items or technology created or newly developed by the Developer, independent contractors engaged by the Developer, or by the Client under this Agreement based on an idea supplied by the Developer or the Client, which idea theretofore was not developed in any significant manner (such as by developing algorithms or devising substantial portions of code toward implementation of the idea) and which development is funded in whole or in substantial part by the Client, including modifications and enhancements of Software X pursuant hereto, Documentation, discoveries, formulas, processes, plans, specifications, guidelines, graphics, marks, logos, notes, instructions, training materials, software, software programs, software documentation, films, videotapes, slides, scripts,

2

process, records, drawings, illustrations, instructor guides, student materials, masters, tapes, copyrightable works or other ideas or materials, which are not Background Materials.

k)    *"New Software"* means the source code and/or executable object code for all computer programs, subroutines, diagnostic routines, control software or special software to be delivered by the Developer under this Agreement.

l)    *"Newly Developed IP"* means that intellectual property including know-how, secrets, designs, inventions, patents, patent applications, copyrights, maskworks, discoveries, formulas, processes, plans, and other intellectual property rights, domestic and worldwide, covering or embodied in, New Developments and which is not Background IP. Newly Developed IP does not include trademarks.

m)    *"Requirements"* means the statement of the Purchaser's business requirements for the New Software as set out in Schedule A.

n)    *"Services"* means the customization and enhancement of Software X in accordance with the Specifications and delivery of the Deliverables, as they may be modified from time to time, and all other services performed or to be performed by the Developer pursuant to this Agreement.

o)    *"Specifications"* means the specifications for the Deliverables, which include (i) a product design and content summary, as well as a detailed specification for all required features and functionality as specified on **Exhibit A** attached hereto, and (ii) a complete delivery and production schedule as specified on **Exhibit B** attached hereto.   The parties contemplate that the Specifications may be modified by mutual consent from time to time during the Term.   If and when the Specifications are modified, the parties shall initial the new Specifications or amendments to the existing Specifications, and, immediately following the last initialing, such new Specifications or amendments shall automatically be deemed to supercede or supplement (as the case may be) Exhibit A or Exhibit B (as the case may be).

p)    *"Technical Coordinator"* shall have the definition given to it in Section 3.3.

q)    *"Term"* means the period of time commencing on the Effective Date and continuing thereafter indefinitely until this Agreement is terminated pursuant to Article 12.

## ARTICLE II
## AGREEMENT TO PROVIDE SERVICES

2    *Commencement of Development*.  Developer began providing Services to Client on and agrees to perform the Services and deliver to the Client the Deliverables in accordance with the Specifications, as the same may change from time to time during the Term with the mutual consent of the parties, and all other terms and conditions contained in this Agreement. All New Software shall be created substantially in conformance with the Specifications and Requirements attached hereto as **Schedule "A."**

3

2.    *Changes To Specifications.* The parties expect that there will be some changes to the Specifications after acceptance by the Client. Requests for changes shall be proposed by the Development Coordinators or the Technical Coordinators, but shall not be effective without the written consent of both parties. Prior to acceptance of any change requests, the parties shall cooperate to equitably determine the impact on time commitments, scheduling and deadlines and other project factors and reflect these changes on any amendments to Schedule A or B, as the case may be. All amendments must be approved and executed by the Development Coordinators of each party. Developer may not decline any changes in Specifications provided that Developer has ample staffing to meet any increased demands, Developer has ample expertise to fulfill the technical requirements of such changes, reasonable adjustments are made to project scheduling and deadlines, the changes requested are reasonably achievable from a technical standpoint, and the changes are reasonable in scope.

2    *Plan of Development.* The development of the Software shall be conducted substantially in compliance with the Plan of Development to be agreed upon and developed by both parties (hereinafter referred to as "Plan of Development"). The Plan of Development shall include a description of the various steps involved in the development process, various development phases with a description of the milestones to be achieved in each stage, estimated dates of completion for each phase of development, allocation of tasks for each phase and a listing of items and input to be provided by the Client for each phase, definition of the Deliverables to be provided at the end of each phase and upon completion of the development process and the respective amounts payable to the Developer upon successful completion of each phase of development.

The Development Coordinators shall periodically review the Plan of Development during the project and discuss any necessary revisions as the project moves forward. Developer shall devote sufficient time and effort and shall allocate sufficient personnel resources to the project as may be required for the development and testing thereof. Developer shall conduct and complete such development and tests in a professional manner, incorporate into the final version such modifications as the tests indicate are necessary, and conduct such further tests as may be required in the circumstances. Developer shall promptly inform the Client of factors and circumstances, when and as they arise, that reasonably may be anticipated to result in a material deviation from such schedule, including delays due to labor shortages, technical difficulties, competing projects, mechanical problems and other factors.

# ARTICLE III
# DEVELOPMENT COORDINATION

3    *Appointment of Development Coordinators.* Each party shall appoint a single individual from its respective organization to act as Development Coordinator to represent the interests of the party in connection with the Development process. Steven Dalzell shall be the Development Coordinator for the Client. Shlomo Kogos shall be the Development Coordinator for Developer. The Development Coordinators of the parties shall communicate with each other

4

... dar periodic basis to assure the smooth administration of the Development process and ... ordination of activities between the parties.

3    *Functions of Development Coordinators*.  The Development Coordinators shall be the primary non-technical contact between the parties relative to development projects.  The Development Coordinators shall arrange all non-technical meetings and communications between the parties and shall be the primary point of contact relating to the progress made and decisions to be made with respect to the development projects.  All notices between the parties shall be presented to the Development Coordinators.  All administrative matters relating to the development projects shall be communicated through the Development Coordinators.  Each of the Development Coordinators shall be responsible for communicating within their respective organizations and procuring the input of management and others who are necessary for the achievement of project goals.


## ARTICLE IV
## DEVELOPMENT COSTS AND FEES

4.    *Project Pricing*.  Client shall pay to the Developer a fee equal to $190,000.00 for the development and delivery of the Deliverables ("Development Fee").  Such Development Fee shall be paid in installments as set forth in the Plan of Development.  Subject to any agreed variations or changes, the Development Fee is the total amount to be charged to the Client for the Services, exclusive of the license fees payable pursuant to Section 6.5, below and certain maintenance fees payable pursuant to Section 4.6, below.

(    )    *Timing of Payments*.  Each installment payment shall be due upon the successful completion of each of the respective phases set forth in the Plan of Development and Developer's delivery of respective Deliverables due at such time.  The Client shall be in default under this Agreement if payment is not received within thirty (30) days following such dates; provided, however, that Client shall not be in default if, in good faith, the Client disputes such invoice or believes such phase has not been successfully completed.  After the Developer has delivered all Deliverables and the Client has used the New Software successfully for a period of [ ] days without failure ("Trial Period"), the Client will pay the Developer the final ten percent (10%) of the Development Fee.

4.    *Taxes; Project Expenses*.  The fee to be paid to the Developer under Section 4.i, above, shall be inclusive of all taxes, levies, and assessments and all of Developer's expenses, including without limitation (i) postal charges, federal express, facsimile charges, long distance telephone charges, and other costs of project specific communications, (ii) costs of purchasing or licensing graphics, sound, or other content from third parties, (iii) costs of any special software hardware that is necessary to complete the specific development task for the project, (iv) travel expenses, (v) costs of acquiring or leasing any special development tools made necessary by the nature of the project, and (vi) all other expenses identified by the parties in the Plan of Development.

5

4    *Project Deposit*.  Developer hereby acknowledges that the Client has delivered to the Developer a deposit, which amount shall be credited to the Development Fee to be paid by the Client hereunder upon Developer's completion and delivery of the Deliverables. The deposit shall be refunded in accordance with the termination provisions of Article 12, below.

4    *Verification Records*.  Developer shall maintain accounting, time, and other records as are necessary to verify any amount to be paid by the Client hereunder.  Upon any dispute of any invoice, Developer shall provide backup records to support the invoice that is questioned if applicable.

4    *Current Software*.  Upon execution of this Agreement by all parties, the Client shall pay Developer a fee of **$58,000.00** ("Current Software Maintenance Fee") to continue to maintain the Current Software on the same terms as the Current Maintenance Agreement between them, provided that such fee shall cover all such maintenance services for the 2005 calendar year.  Notwithstanding the foregoing, in the event that this Agreement is not terminated pursuant to Article 12 below, and the New Software is successfully installed and operating free of Errors, then Client may elect to have the Current Software removed from its computers and all maintenance related thereto terminated.  The Client shall so elect by sending written notice thereto to Developer, and such termination of services shall be effective as of the date received by Developer.  In such event, the Current Software Maintenance Fee shall be prorated based on the number of calendar days remaining in 2005 and such prorated amount shall be credited to the license fee or any unpaid portion of the Development Fee, at the Client's discretion.

## ARTICLE V
## DELIVERY AND ACCEPTANCE OF DELIVERABLES

5    *Scheduling*.   The Developer will perform Services according to the schedule set forth in the Plan of Development.

5    *Delivery*.  Upon completion of each milestone and/or each phase of the project as set forth in the Plan of Development, the Developer shall notify the Development Coordinator for the Client, and shall promptly deliver the Deliverables to the Client for review and acceptance testing.  Unless otherwise agreed to between the parties, in writing, **time is of the essence** with respect to delivery of the Deliverables on the date(s) specified in the Plan of Development.

5    *Acceptance Testing*.   Unless otherwise agreed to in writing, acceptance of all Deliverables shall be conditioned upon such Deliverables having successfully completed all of the Client's acceptance tests by the agreed date for completion and the Developer having performed all actions required by this Agreement as of such date.  Such acceptance tests shall be developed jointly by the Client's Development Coordinator and the Developer's Development Coordinator or Technical Coordinator.

6

a)    **Performance of Acceptance Testing.**  Upon delivery of each Deliverable, the Client shall have ten (10) business days to examine and test each such Deliverable in order to determine whether it conforms to the Specifications and Requirements.

b)    **Acceptance/Rejection.**  The Client will be entitled to accept or reject each Deliverable based solely on such Deliverable's conformance with the applicable Specifications and Requirements. If the Client does not accept or reject a Deliverable within the ten (10) business day acceptance period, then acceptance will be deemed to have occurred at the end of such period. If a Deliverable fails to conform to the Specifications or Requirements, the Client shall notify the Developer by telephone and in writing of such failure, and shall state with reasonable detail the reasons for or nature of the failure.  Upon receipt of such notice, the Developer will correct, modify or improve the Deliverable to conform to the Specifications and Requirements and will deliver a corrected version of the Deliverable to the Client within five (5) days or such longer time as requested by the Developer, such longer time subject to the approval of Client, which will not be unreasonably withheld. The Client's receipt of the corrected Deliverable will commence another acceptance period as specified in this section.  This process shall be repeated as may be necessary until the Deliverables are deemed to be accepted hereunder; provided, however, that if the Deliverables are not accepted by the agreed date for completion, then the Client may take the actions specified in Section 5.4 below.

If, in good faith, the Client requests additional revisions to any Deliverable that has been accepted or deemed to be accepted, because the Deliverable does not conform to the Client's Requirements or Specifications, or if the Client desires to change or refine any Specifications set forth in the Plan of Development to permit it to conform to the Client's Requirements, then the parties shall negotiate a new timetable for such development and shall set forth any changes in an amendment to the Plan of Development.  The Developer shall thereafter make such revisions in accordance therewith without any changes to the Development Fee.

5.4    _Acceptance Test Failure._  If the Deliverables fail to satisfy the acceptance tests within the period permitted hereunder, then, in addition to any other remedy, the Client may elect to (i) agree to an extension of time for the completion of the acceptance tests; (ii) accept the Deliverables upon terms acceptable to the Client including a reduction of the Development Fee; or (iii) terminate this Agreement in accordance with Article 12.

## ARTICLE VI
## LICENSE

6.    _License of Software X._  Developer hereby grants to the Client a perpetual, world-wide, nontransferable license to use Software X, subject to the terms and conditions of this Agreement, including payment of the license fee.  Such license shall be limited to the right to install the computer software portion of the Software X on computer systems owned, leased, or controlled by Client, utilize Software X for its own internal purposes, and make sufficient copies of the Software X and any related copyrighted materials for backup purposes and as reasonably necessary to exercise the right to use Software X as permitted hereunder.  This Agreement shall not provide Client with the right of ownership or title in and to Software X, but rather, Client's

7

rights shall be limited to the scope of license provided herein. Client shall not take any action or permit any occurrence that would create a lien or encumbrance on the Software X or the copyright thereto, or create any cloud on Developer's title thereto. Client shall not use the Software X in such a manner that may infringe upon the rights of any other party.

6.     *Scope of License*. This license is limited to use of Software X at the client's business locations and only for purposes of Client's own moving and shipping enterprise. This license grants Client the right to make one backup copy of Software X per business site which may be stored away from the site(s).

6.     *Term of License*. This license begins on the date that the New Software, in any form, is installed at any of the Client's sites. This license is perpetual unless its terms are breached by the Client. This license in its entirety and as to all software licensed shall terminate immediately if Licensee does not comply with these terms, including but not limited to, non-payment of the licensing fee hereunder or maintenance fees pursuant to the maintenance agreement entered into between the two parties, unauthorized copying or use of Software X, or unauthorized modification of Software X. Upon termination, the license shall cease. Use of Software X is not authorized after termination by Developer and shall be considered by Developer to be an infringement of its intellectual property rights, in addition to any other rights that may accrue to Developer by such use.

6.     *Exclusivity*. The Client shall have an exclusive license to use Software X as incorporated into the New Software during the Trial Period and for seven (7) years thereafter. At the expiration of such period, the Developer shall have the right to license Software X to other persons or entities.

6.     *License Fee*. For the license of Software X, the Client will pay the Developer a one-time license fee of $105,000.00.

## ARTICLE VII
## PROPRIETARY RIGHTS

7.     *Background Materials*. In the event that the Deliverables include any Background Materials created by the Developer or any other party, the Developer hereby grants, and shall arrange for applicable third parties to grant, a perpetual, non-exclusive, royalty free license to use such Background Materials in connection with the Deliverables.

7.     *Infringement On Third Party Rights*. The Developer agrees to use reasonable diligence to avoid infringement on the proprietary rights of any third party in performance of the creation of Deliverables. The Developer agrees that all aspects of the Deliverables shall be original works of creation and shall not use, in whole or in part, any work created by any other party except where specifically disclosed by the Developer to the Client and where a license to use such items is obtained for the benefit of the Client. All such licenses shall be royalty free, perpetual, world-wide licenses, sufficient in scope to permit Client's full use and enjoyment of the Deliverables, except where specifically agreed in writing by the Client.

8

7.    *Rights to New Developments and Newly Developed IP*.  The parties acknowledge that performance of this Agreement will result in the development of new proprietary and secret concepts, methods, techniques, processes, adaptations and ideas.  The parties agree, therefore, that the New Developments and Newly Developed IP shall belong solely to Client without regard to the origin thereof and that Developer will not, other than in the performance of the Agreement, without the express written consent, which will not be unreasonably withheld, sell, make use of or disclose same to any person, group, company or corporation.

7.    *Modification of Software*.  Client shall not modify nor authorize modification of any of the Software X in any manner without the express written permission of Developer.

7.    *Rights to Background Materials and Background IP*.  All intellectual property, including but not limited to copyright, patents and trade secrets, in Software X, except for improvements, revisions, and modifications made at specific request of Client, shall remain the property of Developer.  Client agrees that, except as directed by Developer and this Agreement, it will not at any time during or after the term of this Agreement allow unauthorized copying of Software X.

7.    *Confidential Information*.  During the course of this Agreement, either Developer (or Developer's contractors) or Client may have or may acquire access to the other party's confidential information, including without limitation trade secrets, business plans and operations and financial data (collectively, "Confidential Information").  The parties agree to maintain such Confidential Information in strict confidence, not to make use thereof other than for the performance of this Agreement, to release it only to employees requiring information and not to release or disclose it to any other party.   Any Confidential Information that becomes available to the general public through lawful means and not by a breach of this Agreement shall cease to be confidential.  The obligations of this Section 7.6 shall survive the termination or cancellation of this Agreement.

## ARTICLE VIII
## EMPLOYEE AND CONTRACTORS

8.    *Independent Contractors*.  Developer shall use only bona fide employees to conduct all aspects of the development project, unless independent contractors are specifically consented to by the Client.  In the event independent contractors are used and consented to by the Client, Developer shall obtain from such independent contractors written assignments of all items developed by or contributed to by such independent contractors in the course of their work on the development project and an agreement that all such items are created as "works for hire" under the copyright laws and are the sole and exclusive property of the Client.   Independent contractors shall also be required to execute a confidentiality agreement in favor of the Client.  Developer specifically assumes all responsibilities for such contractors as if they were employees of Developer

9

8. *Employees*. Developer shall enter and maintain in full force and effect, written agreements with all of its employees in which the employees acknowledge that all work performed in the course of the development project are "works for hire" and are the property of the Client. Additionally, employees shall enter a confidentiality agreement agreeing to maintain the confidentiality of all information relative to the Client. Developer-assigned employees may be rejected by Client should Client determine unilaterally that any employee's services are unsatisfactory. Upon written notification from Client regarding an unsatisfactory employee, Developer shall remove such employee immediately and replace the removed employee with an employee acceptable to Client as soon as possible. Under no circumstances shall Developer's employees be considered employees or agents of Client.

## ARTICLE IX
## TRAINING & SUPPORT SERVICES; MAINTENANCE

9. *Training and Initial Support Services*. For a period of ninety (90) days following delivery of the Deliverables and final acceptance thereof by the Client, Developer shall provide certain training and initial support services to the Client related to the Software. Such training and initial support services shall be part of the Services to be provided hereunder and are included in the Development Fee.

9. *Client Responsibilities*. Client shall not attempt to correct any Errors in the Software or do anything to alter or modify any programming code. Client shall promptly report any Errors in the operation of the Software to the Developer and shall not take any actions that would increase the severity of the Error. Client shall use the Software only for its intended purpose and only in the manner intended.

9. *Place of Support Services*. All training and initial support services shall be provided by the Developer either at the Client's principal business location at 1133-35 Tiffany Street, Bronx, New York or from the Developer's facility, or through electronic access to the Client's computers, as may be determined by Developer and Client according to the Client's needs.

## ARTICLE X
## REPRESENTATIONS AND WARRANTIES OF THE DEVELOPER

10.1 *Warranties*. Developer hereby represents and warrants that:

a) it is highly skilled and experienced in programming for the operating system the programming language, and that it also possesses the additional expertise needed to develop and provide the particular Deliverables required by this Agreement. The Developer acknowledges that the Client is relying upon the skill and expertise of the Developer for the performance of this Agreement;

b)      the Services required hereunder shall be performed in a workmanlike manner consistent with industry standards and in compliance with all applicable state, federal and local laws, rules and regulations;

c)      the Deliverables produced and provided hereunder, including software and source code provided as part of such Deliverables, will be of original development by the Developer and will not violate any proprietary information or non-disclosure rights, or infringe upon any United States patent, copyright, trade secret or other property right of any third party, and the Developer will indemnify and hold the Client harmless from and against any loss, cost, liability or expense (including reasonable legal fees) arising out of any breach or claimed breach of this warranty;

d)      the New Software and Documentation delivered hereunder will materially conform to the Specifications. The Developer will, without additional charge to the Client, use its best efforts to make such additions, modifications, or adjustments to the New Software as may be necessary to correct any Errors discovered in the New Software or Documentation and reported to the Developer by the Client during the Trial Period, excluding defects or problems arising from misuse by the Client; and

e)      The New Software shall be functionally operational within the specifications of each milestone no less than ninety-six percent (96%) of any consecutive ninety (90) day period beginning as of the date of acceptance of such milestone or phase excluding any time that the system is not functionally operational due to hardware failure or other causes beyond Developer's design or control.

10.2    *License; Pre-Existing Works*. Developer represents and warrants that Client, upon payment in full of all amounts due hereunder, shall have a perpetual, royalty free, worldwide license to use Software X and other Background Materials and Background IP whether developed by the Developer or by another party, which are used in connection with the Deliverables.

## ARTICLE XI
## INDEMNIFICATION AND LIMITED LIABILITY

11.1    *Indemnification*. Developer shall indemnify, defend and hold Client harmless from and against any and all damages, losses, liabilities, obligations, claims, litigation, demands, suits, judgments, costs or expenses, including reasonable attorneys' fees ("Claims") brought against Client based upon a claim that any Deliverable, as delivered to Client, or any Background IP that is incorporated into or used in connection with and is not separable from any such Deliverable, constitutes a direct infringement of any United States patent, copyright, trade secret or property right of a third party or violates any proprietary information or non-disclosure rights of any third party. Developer shall also indemnify Client against any Claim based on damage to Client's premises or items located on such premises, caused by Developer, its employees, agents or independent contractors and against all acts of such employees and contractors. In the event of a Claim, Client shall (i) give Developer prompt written notice of any such Claim; (ii) cooperate

11

... Developer in the defense and settlement of such Claim, and (iii) allow Developer to control the defense or settlement of any such Claim, *provided that* the Client must be released from all liability as a result of any settlement, and any settlement that is non-monetary in nature must be agreed to by the Client, whose consent shall not be unreasonably withheld. The Client shall also be entitled to its own Counsel at its expense.

11.2    *Limitation on Indemnification.*    Developer shall have no indemnification responsibility under the preceding subsection if it is determined that (i) the liability is caused solely by Client's Background IP, (ii) the liability is caused solely by modification of the Deliverable by Client or any third party, (iii) the liability is caused by the combination, operation or use of the Deliverable with other software, hardware, products or data that does not originate from Developer, in such combined form, where such claim would not have arisen from the use of the Deliverable standing alone, or (iv) such infringement would have been avoided by the use of a revised or updated Deliverable delivered by Developer to Client.

11.3    *Infringement Remedy.* If any Deliverable (or portion thereof, including any portion of Developer's Background IP) is found to infringe the intellectual property rights of any third party and its use is enjoined or threatened to be enjoined, Developer shall, at Developer's option and expense, either: (i) procure for Client a license or right to continue to use such Deliverable or the applicable portion, (ii) replace the Deliverable or applicable portion with a non-infringing Deliverable, (iii) modify the Deliverable or infringing portion to become non-infringing; or (iv) accept the Client's return of the New Software and return to the Client all monies paid under this Agreement.    Customer shall reasonably cooperate with Developer in its fulfillment of its obligations under this section.

11.4    *Damages.*    Neither party shall be liable for any indirect, special, incidental or consequential damage of any kind

## ARTICLE XII
## TERM AND TERMINATION

12.1    *Termination For Cause.* Either party may terminate this Agreement in whole or in part if the other party fails to perform any material obligation set out in this Agreement, provided, however, if such breach is of a nature which may be cured by the party in breach, then Developer or Client may exercise its right to terminate this Agreement only if such breach continues uncured for a period of twenty (20) business days following the party in breach's receipt of written notice of such breach or such longer time subject to the approval of both parties, such approval not to be unreasonably withheld.

12.2    *Remedy of Client.* In the event that this Agreement is terminated by the Client due to the Developer's default or material breach, the Client, upon demand to the Developer, shall be entitled to the return of all monies paid to the Developer pursuant hereto, including its deposit, and shall have the right to continue to license the Current Software, for which Developer shall continue to provide maintenance services pursuant to any agreement related thereto.

13.3    *Prior To Completion.* In the event this Agreement is terminated by Developer prior to completion of development due to a default or material breach by the Client, the Developer shall immediately cease work on the relevant project and shall issue an invoice to the Client for all work performed through the date of termination. The final invoice shall be due and payable by the Client upon receipt thereof.

13.4    *Survival of Certain Provisions.* In the event of any termination of this Agreement, Articles 7 and 8 and Sections 10.1(c), 11.1, 12.2, 13.7, 13.8, 13.11 and 13.12 shall survive.

# ARTICLE XIII
## MISCELLANEOUS PROVISIONS

13.1    *Entire Agreement.* This Agreement, together with the Schedules and Exhibits attached hereto, contains the entire agreement and understanding of the parties with respect to the subject matter hereof and supercedes and replaces all prior discussions, agreements, proposals, understandings, whether orally or in writing, between the parties related to the subject matter of this Agreement. This Agreement may be changed, modified or amended only in a written agreement that is duly executed by authorized representatives of the parties.

13.2    *Severability.* Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law. However, if any provision of this Agreement shall be prohibited by or invalid under such law, it shall be deemed modified to conform to the minimum requirements of such law or, if for any reason it is not deemed so modified, it shall be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other such provision being prohibited or invalid.

13.3    *Waiver.* No party's waiver of any breach or accommodation to the other party shall be deemed to be a waiver of any subsequent breach of this Agreement. No failure or neglect of either party to exercise any right or remedy hereunder or under law shall constitute a waiver of any other right or remedy or of the same right or remedy in any other instance.

13.4    *Excusable Delays.* Any delay or nonperformance of any provision of this Agreement caused by conditions beyond the reasonable control of a party shall not constitute a breach of this Agreement, provided that such party has taken reasonable measures to notify the affected party of the delay in writing and uses reasonable efforts to perform in accordance with this Agreement notwithstanding such conditions. The delayed party's time for performance shall be deemed to be extended for a period equal to the duration of the conditions beyond its control. Conditions beyond a party's reasonable control include, but are not limited to, natural disasters, acts of government after the date of the Agreement, power failure, fire, flood, acts of God, labor disputes, riots, acts of war and epidemics. In such an event, the affected party shall be excused from such performance for a time period commensurate with the duration of such prevention, restriction or interference.

1.5   *Notices.*  Unless otherwise specified herein, all notices required or permitted pursuant to the provisions of this Agreement shall be in writing and shall be sent by certified mail, return receipt requested, or overnight mail, or delivered by hand, or by E-Mail and shall be sent to the parties at the addresses set forth below, or such other place as such party shall notify the other parties hereto.  Any such notice shall be deemed given and effective upon receipt at such address.  Notwithstanding the foregoing sentence, any notice of termination of this Agreement or of the Current Maintenance Agreement pursuant to Section 4.6 above, or notice of default of this Agreement must be in writing and sent by Registered or Certified Mail, Return Receipt Requested and shall be deemed to have been delivered five (5) business days after the date of mailing. Addresses for notices shall be:

|  | |
|---|---|
| If To Developer: | Software For Moving, Inc. |
| | 211 Warren St., Suite 305 |
| | Newark, New Jersey 07103 |
| Attn: | Shlomo Kogos |
| E-Mail: | skogos@earthlink.net |
| Phone: | _____ |

|  | |
|---|---|
| If To Client: | La Rosa del Monte Express, Inc. |
| | 1133-35 Tiffany Street |
| | Bronx, New York 10459 |
| Attn: | Steven Dalzell, V.P. |
| E-Mail: | sdalzell@larosadelmonte.com |
| Phone: | 718-991-3300 |

1.6   *Assignment.* The Services to be performed by Developer hereunder are personal in nature and Client has engaged Developer as a result of Developer's unique expertise relating to such Services. Neither this Agreement nor any right, interest, duty or obligation hereunder may be assigned, transferred or delegated by Developer without the express written consent of Client which consent may be withheld in the discretion of the Client. Neither this Agreement nor any right, interest, duty or obligation hereunder may be assigned, transferred or delegated by the Client without the express written consent of the Developer, such consent not to be unreasonably withheld, except that Client may freely assign its rights and obligations under this Agreement to parents, affiliates, or subsidiaries of the Client or to any entity in which the Client's principal owns a majority interest. This Agreement shall be binding upon, and inure to the benefit of, each of the parties hereto, and their heirs, administrators, executors, successors and assigns.

1.7   *Advertising And Publicity.* Neither party shall make any public or press announcement about this Agreement or its terms and conditions, or of such party's business relationship with the other party, without prior express written consent of the other party. The form and content of such announcement, if any, shall be subject to the prior approval of each party. In addition, neither party shall make any use of the other party's name for its published customer or business partner list, or for any other publicity or marketing purposes, without the prior express written consent of the other party. Breach of this Section 13.7 by either party shall be considered a material breach of this Agreement.

14

13.  *Independent Contractor Status.*  The Developer is an independent contractor and not an agent, employee or representative of Client. Nothing in this Agreement shall be construed to make the parties partners or joint ventures or to make either party liable for the obligations, acts, omissions, or activities of the other party.  The Client shall have no right to direct or control the details of the Developer's work. Developer shall not receive any fringe benefits or other perquisites that the Client may provide to its employees and Developer agrees to be responsible for its own business overhead and costs of doing business and to furnish (or reimburse Client for) all tools and materials necessary to accomplish the services required of the Developer pursuant to this Agreement, and shall incur all expenses associated with performance, except as expressly provided in Schedules or amendments to this Agreement. Developer shall be responsible for paying all taxes on payments received pursuant to this Agreement and Client shall have no obligation to withhold taxes from service fees payable to the Developer hereunder. Developer hereby indemnifies and holds the Client harmless from any obligation that may be imposed on Client (i) to pay in withholding taxes or similar items or (ii) resulting from Developer's being determined not to be an independent contractor.  Developer and its independent contractors shall bear sole responsibility for payment of compensation to their respective its employees and agents, including federal and state income tax withholding, workers' compensation, social security taxes, and unemployment insurance applicable to such employees.  Developer and its independent contractors shall also bear sole responsibility for any health or disability insurance, retirement benefits, or other welfare or pension benefits, if any, to which their personnel may be entitled.

13.  *Counterparts.*  This Agreement may be signed in counterparts and all counterparts shall be construed together and shall constitute one agreement.

13.0  *Headings*  All headings are for convenience only and shall not constitute a part hereof or affect in any way the meaning or interpretation of this Agreement.

13.1  *Dispute Resolution.*  In the event of a dispute between the parties arising from or concerning in any manner the subject matter of this Agreement, the parties agree to first attempt to resolve the dispute through good faith negotiation.  Upon written notice by a party to the other party that a dispute exists, the exact nature of the dispute shall be identified, and good faith discussions and negotiations shall be conducted within seven (7) business days directly between senior management of the Developer and the Client to fully address the issues raised.  Each representative shall be authorized to fully negotiate for, and bind, his or her respective company. If such negotiations fail to adequately resolve the issues raised or immediate legal relief is required, either party shall submit such dispute to binding arbitration pursuant to Section 13.12. below.  All prior discussions are agreed to be in the course of pursuing settlement and shall be inadmissible in any subsequent legal proceeding.

13.2  *Arbitration.* Except as specifically provided in this Agreement, the parties agree that any dispute or controversy arising out of, relating to or in connection with the interpretation, validity, construction, performance, breach or termination of this Agreement shall be submitted to binding arbitration to be held in Westchester County, New York in accordance with the rules of the American Arbitration Association. The decision of the arbitrator shall be final, conclusive

and binding on the parties to the arbitration. Judgment may be entered on the arbitrator's decision in any court of competent jurisdiction. The parties shall each bear their own attorney fees with respect to such Arbitration but shall share equally the other costs and expenses of arbitration.

13  _Controlling Law._   The interpretation, construction and performance of this agreement and the rights and remedies of each party hereunder shall in all respects be governed by the laws of the State of New York, without regard to the conflict of laws provisions thereof. The parties further agree that venue shall be exclusively in the County of Westchester, New York

IN WITNESS WHEREOF, the parties hereto have duly entered and executed this agreement as of the day and year first above written and represent and warrant that the party executing this Agreement on their behalf is duly authorized.

Software for Moving, Inc.
By:  Shlomo Kogos, President

La Rosa Del Monte Express, Inc.
By:  STEVEN DARZUL
     VP OPERATIONS

16

## ADDENDUM TO
## SOFTWARE DEVELOPMENT & LICENSE AGREEMENT

By agreement of both parties, in the event the "Developer" has ceased operations, is no longer a viable operating entity or due to a situation, emergency or otherwise, in which the "Developer" is unable to provide contracted services, upgrades or maintenance as required for the continued and uninterrupted use of "Software X" by "Client", the "Client" shall contact the agent of the Developer, Mr. Philip Zukowsky of the firm Chernesky, Heyman & Kress, P.L.L. located at 10 Courthouse Plaza SW, Suite 1100, Dayton, Ohio 45402, telephone 937-449-2800. Mr. Zukowsky will provide to "Client" at no additional charge (1) a copy of the source code for the program, (2) the right to make changes as necessary to source code for the continued and forever use of the program and (3) access to contact information of other companies utilizing "Moving Images Web Version" so they may assist each other in maintaining the source code. The Client will be granted full ownership of the source code with the limitation that it cannot resell to others or allow to be installed at or used by a non-related entity of "Client".


Software for Moving, Inc.

By:    Shlomo Kogos, President


La Rosa Del Monte Express, Inc.

By:    STEVEN DREW
       VP OPERATIONS

17

EXHIBIT "C"

# MAINTENANCE AGREEMENT

This MAINTENANCE AGREEMENT ("Agreement") is made and entered into as of the _3RD_ day of _MARCH_, 2005, by and between **La Rosa del Monte Express Inc.**, a New York corporation, having an office at 1133-35 Tiffany Street, Bronx, New York, and its Affiliates (hereinafter collectively referred to as the "Client") and **Software For Moving, Inc.**, a _____, with its principal office at 211 Warren St., Suite 305, Newark, New Jersey 07103 (hereinafter referred to as the "Developer").

WHEREAS, Developer has agreed to modify and deliver certain Software ("Software") to the Client pursuant to a certain Development and License Agreement between them dated _MARCH 3_, 200_5_ ("Development Agreement"); and

WHEREAS, the Client desires to have Developer maintain the Software and Developer desires to provide such maintenance services to Client.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, and intending to be legally bound hereby, the parties hereto agree as follows:

1.    **Definitions.** Except as otherwise defined herein, all terms shall have the same meaning and definition given to them in the Development Agreement.

2    **Term.** This Agreement shall be in effect for successive one year terms beginning on the Effective Date of the Development Agreement, and shall automatically renew on each anniversary of the Effective Date unless (i) terminated in writing by the Client within thirty (30) days of any anniversary, (ii) terminated in writing by the Developer within thirty (30) days of the seventh (7th) anniversary of the Effective Date or (iii) sooner terminated by either party pursuant to Paragraph 9 below.

3.    **Fees.** Client shall pay Developer a per user fee (each user location hereinafter referred to as a "Station") maintenance charge for the term of this Agreement. Agreed monthly maintenance charge is attached hereto as **Maintenance Schedule A**. Notwithstanding the effective date of this Agreement, payment of the maintenance fees shall commence only upon the completion of the Trial Period and training at each Station pursuant to the terms of the Development Agreement. In no event shall maintenance fees be required for any Station that (i) has not had the Software successfully installed, (ii) is incapable of using the Software because of Errors with the Software and/or (iii) has not had training completed by Developer.

4.    **Stations.** It is contemplated by and between the parties that Client's operations shall in total contain 70 Stations spread out over Client's various national and international offices.

5.    **Location of Maintenance.** Maintenance shall be provided at the location of the Station or by remote access, in accordance with the Client's needs. In the event that Developer

is required by Client to visit any of Client's offices situated outside of the State of New York, in order to perform the maintenance services provided for herein, Client shall provide for the reasonable costs of lodging and meals.

6.   **Maintenance Services**.  For so long as this Agreement is in effect and for the life of the perpetual license of the Software by Client, the Developer will provide the following services to client and each of its Stations:

  a.   Unlimited customer support hotline;

  b.   On site training;

  c.   Daily data merging of all information compiled from each location and its respective sites;

  d.   Continual software product updates, including but not limited to, user interface improvements, cosmetic improvements, Windows operating systems upgrades, upgrades and enhancements making the Software conform to advances in hardware technologies, data enhancements, training aids, operational manuals, system backups, on site technical support, seamless technical support, and correction of Software and Windows operating systems bugs; and

  e.   Forms modifications, including modifications for reports, letters, BOL and Order Service, outside agency forms and reports, tariff charges, accounting department data merging and use, data flow, and customization.

7.   **Response Time**.

  a.   *Emergency Services*.  Developer is aware that the Client's New York office will be the central control for all of the Client's other offices and that it is therefore, imperative that the Software be working according to the Client's Requirements and Specifications at all times.  In the event that the Software is not, at any time, working in accordance therewith, and such failure is expected by Client to immediately materially impact the Client's business, Developer hereby agrees to respond to Client and begin diligent efforts to correct such failure within four (4) hours after receipt of notice thereof.

  b.   *Non Emergency Services*.  In the event of the failure of the Software to work in accordance with the Client's Specifications and Requirements, where such failure is not expected to immediately materially impact the Client's business, Developer shall respond to Client and begin diligent efforts to correct the failure within 24 hours after receipt of notice.

  c.   *Notices*.  Notice may be provided by telephone, followed by written notice in accordance with Section 13.5 of the Development Agreement.  **Time is of the essence with** respect to the response times specified above.

2

d.  *Diligent Efforts*.  "Diligent efforts" shall mean dedicating reasonably sufficient resources and personnel to correct such failures.

e.  *Failure to respond*.  Developer's failure to respond and begin diligent efforts to correct any Errors or failure of the Software within the required response time shall constitute a default of the Developer hereunder.

8.  **Default**.  In the event that Developer fails to perform any material obligation hereunder, then Developer shall be deemed to be in default hereunder.  In the event of Developer's default, then, in addition to any other rights of Developer, Client shall be entitled to withhold payment of the maintenance fees owed hereunder until such default is cured.

9.  **Termination for Cause**.  If a party breaches any material obligations under this Agreement, the non-breaching party may cancel this Agreement upon written notice to the breaching party; provided, however, that upon receipt of such notice, the breaching party shall have fifteen (15) days to cure such breach ("Cure Period"), or if such breach cannot be cured within fifteen (15) days, then it shall begin curing such breach in good faith. If such breach is not cured within the Cure Period or if the breach cannot be cured within the Cure Period and the breaching party has not made a good faith effort to begin curing such breach within such period, then upon the expiration of the Cure Period, the non-breaching party shall have the right to cancel this Agreement upon five (5) days' written notice.  If this Agreement is terminated for cause by the Client, then Developer shall refund any maintenance fees paid by Client before the effective date of the termination for maintenance services after the effective date of termination. All notices shall comply with the provisions of

10.  **Notices**.  Unless otherwise specified herein, all notices required or permitted pursuant to the provisions of this Agreement shall be in writing and shall be sent by certified mail, return receipt requested, or overnight mail, or delivered by hand, or by E-Mail and shall be sent to the parties at the addresses set forth in Paragraph 13.5 of the Development Agreement. Any such notice shall be deemed given and effective upon receipt at such address. Notwithstanding the foregoing sentence, any notice of termination or notice of default of this Agreement must be in writing and sent by Registered or Certified Mail, Return Receipt Requested and shall be deemed to have been delivered five (5) business days after the date of mailing.

11.  **Assignment**.  The Services to be performed by Developer hereunder are personal in nature, and Client has engaged Developer as a result of Developer's unique expertise relating to such Services. Neither this Agreement nor any right, interest, duty or obligation hereunder may be assigned, transferred or delegated by Developer without the express written consent of Client, which consent may be withheld in the discretion of the Client. Neither this Agreement nor any right, interest, duty or obligation hereunder may be assigned, transferred or delegated by the Client without the express written consent of the Developer, such consent not to be unreasonably withheld, except that Client may freely assign its rights and obligations under this Agreement to parents, affiliates, or subsidiaries of the Client or to any entity in which the Client's principal owns a majority interest. This Agreement shall be binding upon, and inure to

3

the benefit of, each of the parties hereto, and their heirs, administrators, executors, successors and assigns.

12.    **Entire Agreement**.  This Agreement, together with the Development Agreement, contains the entire agreement and understanding of the parties with respect to the subject matter hereof and supercedes and replaces all prior discussions, agreements, proposals, understandings, whether orally or in writing, between the parties related to the subject matter of this Agreement. This Agreement may be changed, modified or amended only in a written agreement that is duly executed by authorized representatives of the parties.

13.    **Severability**.  Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law. However, if any provision of this Agreement shall be prohibited by or invalid under such law, it shall be deemed modified to conform to the minimum requirements of such law or, if for any reason it is not deemed so modified, it shall be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other such provision being prohibited or invalid.

14.    **Waiver**.  No party's waiver of any breach or accommodation to the other party shall be deemed to be a waiver of any subsequent breach of this Agreement. No failure or neglect of either party to exercise any right or remedy hereunder or under law shall constitute a waiver of any other right or remedy or of the same right or remedy in any other instance.

15.    **Force Majeure**.  Any delay or nonperformance of any provision of this Agreement caused by conditions beyond the reasonable control of a party shall not constitute a breach of this Agreement, provided that such party  has taken reasonable measures to notify the affected party of the delay in writing and uses reasonable efforts to  perform in accordance with this Agreement notwithstanding such conditions.  The delayed party's time for performance shall be deemed to be extended for a period equal to the duration of the conditions beyond its control.  Conditions beyond a party's reasonable control include natural disasters, acts of government after the date of the Agreement, power failure, fire, flood, acts of God, labor disputes, riots, acts of war and epidemics. In such an event, the affected party shall be excused from such performance for a time period commensurate with the duration of such prevention, restriction or interference.

16.    **Counterparts**.  This Agreement may be signed in counterparts and all counterparts shall be construed together and shall constitute one agreement.

17.    **Headings**  All headings are for convenience only and shall not constitute a part hereof or affect in any way the meaning or interpretation of this Agreement.

18.    **Arbitration**.  The parties agree that any dispute or controversy arising out of, relating to or in connection with the interpretation, validity, construction, performance, breach or termination of this Agreement shall be submitted to binding arbitration to be held in Westchester County, New York in accordance with the rules of the American Arbitration Association. The decision of the arbitrator shall be final, conclusive and binding on the parties to the arbitration. Judgment may be entered on the arbitrator's decision in any court of competent jurisdiction. The parties shall each bear their own attorney fees with respect to such Arbitration but shall share

4

equally the other costs and expenses of arbitration. Notwithstanding the provisions of this paragraph 18, in the event that a party requires immediate injunctive relief, such party may obtain such relief in the Supreme Court of the State of New York, County of Westchester, and each party hereto submits to the jurisdiction of such Court.

19. **Controlling Law**. The interpretation, construction and performance of this Agreement and the rights and remedies of each party hereunder shall in all respects be governed by the laws of the State of New York, without regard to the conflict of laws provisions thereof. The parties further agree that venue shall be exclusively in the County of Westchester, New York

IN WITNESS WHEREOF, the parties have executed this Agreement this 3-rd day of _MARCH_, 2005.

Software for Moving, Inc.
By: Shlomo Kogos, President

La Rosa Del Monte Express, Inc.
By: STEVEN DRIZELL
    V P OPERATIONS

5

## MAINTENANCE SCHEDULE A

| Year | Monthly per user | Total Monthly @ 70 users |
|---|---|---|
| First Year | $55 | $3,850 |
| Second Year | $55 | $3,850 |
| Third Year | $55 | $3,850 |
| Fourth Year | $60 | $4,200 |
| Fifth Year | $65 | $4,550 |
| Sixth Year | $70 | $4,900 |
| Seventh Year | $80 | $5,600 |

Software for Moving, Inc.
Shlomo Kogos, President

By:

La Rosa Del Monte Express, Inc.

By: STEVEN DREELL
VP OPERATIONS

6

```
NYNB
Account:          04330124
Check:            003916
Amount:           10000.00
Date cleared:     8/29/2006
Run-batch-seq:    1-5-2480
```





**Rob S Ocko**

| | |
|---|---|
| **From:** | shlomo kogos [skogos@earthlink.net] |
| **Sent:** | Wednesday, December 13, 2006 7:33 AM |
| **To:** | Rob S Ocko |
| **Cc:** | hrodriguez@larosadelmomte.com; rmedina@larosadelmonte.com |
| **Subject:** | Re: La Rosa del Monte |

Dear Mr. Ocko, Your client have been using The Moving Manager Windows Version, and the Dos Version of the Moving manager last about 10 years. Now they are using the ASP version(Internet) version.

The agreement with your client (on the Window and Dos versions) was $58,000 per year in maintenance charge to you.

We got paid $58,000 (late 2004) for the Year 2005.
We got paid $30,000 (around Oct 2006) The balance for the year 2006 is at least $28,000.
If you would like to keep using the Windows and Dos program next year the price is $116,000 (out of contract price, double).
If you do not pay us for the balance of 2006, $28,000 which was due in late 2005.
You are in default of the contract and in breach of the license agreement.
Please stop using the Windows and Dos program, other wise you are in copy write violation.
Again if you use the program in 2007 you violation the copy write agreement and you will owe us for year maintenance.

Your client has about 12 location. Each location is in violation since the program installed in each location.
Please submit to us a list of address where we can serve paper in each location.
If not we will use the web site address or whatever we find.

Again this email is about the old programs.
You are in violation of the agreement, and you are breaking the copy write law.

Mr. Ecko, I am asking you to talk to your client and explain to them the possible loss as a result of copy write violation Copy write court is different then small claim court.
That what the client knows a lot about, but not copy write court.

I had experience in the past with moving companies that did not want to pay maintenance and some who used the program after the contract expired.
We won all those cases.
The last mover paid $42,000 for one location.
If you want me to get you the info, I will do.
Maybe your client can win in small claim court, they will loss in federal court if the subject is copy write.

Again all I am asking is what due to me.

PLEASE ADVICE YOUR CLIENT THAT IF WE SUE HIM ON COPYWRITE VIALATION, HE MIGHT HAVE TO GET A COPYWRITE LAWYER, WHICH I THINK IT IS NOT YOU.

THE RETAINER FEE WOULD BE HIGH AND HE WILL TELL YOUR CLIENT THAT HE WILL LOSS.
I DO NOT WANT TO WAIST YOUR CLIENT MONEY ON LAWYER FEES.

But if I have to go to court I can assure you that your client will loss by the time it is finished and done over $1,000,000

Shlomo

P.S.

Again this all can get fixed by you paying me what I am sure you people tell you owe me on the new program.
We worked hard in a very difficult environment to get the job done.
And we keeping adding stuff as you ask for them.
There is no one in the industry who can do the job we have done using the latest in technology.

-----Original Message-----
From: Rob S Ocko
Sent: Dec 12, 2006 6:12 PM
To: skogos@earthlink.net
Cc: hrodriguez@larosadelmomte.com, rmedina@larosadelmonte.com
Subject: La Rosa del Monte

   Dear Mr. Kogos, based on our telephone conversation in the past hour, I recommend that you have your legal counsel contact me immediately if you want to resolve the current dispute with my client. I am no longer in a position to discuss this with you without counsel.

   If I do not hear from your consel, my client will take all legal action to protect its interests.

   ×

*81 Main Street, Suite 215*
*White Plains, NY 10601*
*Tel: (914) 686-4800*
*Fax: (914) 686-4824*

HARRINGTON, OCKO & MONK, LLP - CONFIDENTIALITY NOTICE: This electronic message is intended to be viewed only by the individual or entity to whom it is addressed. It may contain information that is privileged.

1/5/2007

confidential and exempt from disclosure under applicable law. Any dissemination, distribution or copying of this communication is strictly prohibited without our prior permission. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, or if you have received this communication in error, please notify us immediately by return e-mail and delete the original message and any copies of it from your computer system.

# Rob S Ocko

From:     Philip Zukowsky [paz@chklaw.com]
Sent:     Friday, December 22, 2006 2:01 PM
To:       Rob S Ocko
Cc:       shlomo kogos
Subject:  La Rosa Del Monte

Software for Moving is seeking to collect the following amounts from La Rosa Del Monte.

1. Dos and Window Program. The annual maintenance/license fee for the use of this program is $58,000. La Rosa has paid the annual fee in full through 2005. For 2006 it has only paid $30,000 (which payment was made in August 2006 although the annual fee is required to be paid in January). Thus, for 2006 La Rosa owes $28,000. If La Rosa chooses to use SFM's Dos and Window Program in 2007, an additional $58,000 is due on January 1, 2007.

2. New SFM Program. La Rosa contracted with SFM to use SFM's new server based program and for customization work to the program. The agreement called for payments to SFM of $295,000 payable no later than when La Rosa started to use the program, and an annual maintenance/license fee of $40,000 commencing in the month when La Rosa began using the program. La Rosa went live with the program in August. La Rosa has paid $242,500 of the $295,000 upfront money, so $52,500 of the upfront money is due and owing. There is also five months of fees due and owing, an additional $16,666. If La Rosa chooses to use SFM's New Program in 2007, an additional $40,000 is due on January 1, 2007.

In addition, two other fees were agreed to by La Rosa and SFM. The first was payment for enhancements to the program that La Rosa could accept or reject. An example of this is the Google Map feature that SFM added to the program. These total cost for these programs is $60,000. La Rosa can reject these enhancements and not have any payment obligations (in which case SFM will remove them from the program), or it can accept some or all of these enhancements. However, we want La Rosa to let us know their position on these as soon as possible.

The other fee was for "manifest planning" requested by La Rosa. This was additional customization requested by La Rosa. These are not optional like the fee discussed above. The total cost of the manifest planning enhancements is $50,000. However, SFM would be willing to discuss discounting this amount if La Rosa brings its account up to date promptly.

I look forward to hearing from you next week regarding this matter. However, as you can tell time is of the essence as beginning January 1, 2007, there will be additional fees dues from La Rosa. Best Regards and Merry Christmas to you.

Philip A. Zukowsky
Chernesky, Heyman & Kress P.L.L.
paz@chklaw.com
937-449-2842
937-449-2824 (fax)

=========================================
CIRCULAR 230 DISCLOSURE
=========================================
PURSUANT TO RECENTLY-ENACTED US TREASURY DEPT. REGULATIONS, WE ARE NOW REQUIRED TO ADVISE YOU THAT, UNLESS OTHERWISE EXPRESSLY INDICATED, ANY FEDERAL TAX ADVICE CONTAINED IN THIS COMMUNICATION, INCLUDING ATTACHMENTS AND ENCLOSURES, IS NOT INTENDED OR WRITTEN TO BE USED, AND MAY NOT BE USED, FOR THE PURPOSE OF (i) AVOIDING TAX-RELATED PENALTIES UNDER THE INTERNAL REVENUE CODE OR (ii) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TAX-RELATED MATTERS ADDRESSED HEREIN

=========================================
PRIVILEGED AND CONFIDENTIALITY NOTICE
=========================================
THIS ELECTRONIC TRANSMISSION (AND/OR THE DOCUMENTS ACCOMPANYING IT) MAY CONTAIN CONFIDENTIAL INFORMATION

## AMERICAN ARBITRATION ASSOCIATION

**NEW YORK, NEW YORK**                    **COMMERCIAL ARBITRATION RULES**

| | |
|---|---|
| LA ROSA DEL MONTE EXPRESS, INC.,<br><br>Claimant,<br><br>vs.<br><br>SOFTWARE FOR MOVING, INC., and<br>SHLOMO KOGOS, as an Individual,<br><br>Respondents. | Case No. _____ |

### AFFIDAVIT OF SERVICE
### VIA CERTIFIED MAIL – RETURN RECEIPT REQUESTED

STATE OF NEW YORK              )
                             ) s.s.:
COUNTY OF WESTCHESTER         )

JESSICA J. BARÓN, being duly sworn, deposes and says: deponent is not a party to this action, is over 18 years of age and resides in Westchester County, New York.

On February 12, 2007, deponent mailed the within **DEMAND FOR COMMERCIAL ARBITRATION**, Via Certified Mail - Return Receipt Requested, upon:

SOFTWARE FOR MOVING, INC., *Respondent*
c/o Mr. Shlomo Kogos, President
211 Warren Street, Suite 305
Newark, New Jersey 07103

Mr. Shlomo Kogos, President, *Respondent*
SOFTWARE FOR MOVING, INC.
211 Warren Street, Suite 305
Newark, New Jersey 07103

1

Philip Zukowsky
*Counsel for Respondent(s)*
SOFTWARE FOR MOVING, INC.
Chernesky Heyman & Kress
Suite 1100
10 Courthouse Plaza SW
Dayton, OH 45402
Phone: (937) 449-2800

at the address designated by said party(ies) and/or attorney(s) for that purpose by depositing a true copy of same enclosed in a postpaid, properly addressed envelope, **designating certified mail, return receipt requested service**, in an official depository under the exclusive care and custody of the United States Postal Service within the State of New York at the above-referenced address(es) designated by said party(ies) and/or attorney(s) for that purpose.

*Jessica J. Barón*
JESSICA J. BARÓN

Sworn to before me this
13th day of February, 2007.

*Shirley B. Thornton*
SHIRLEY B. THORNTON
Notary Public, State of New York
No. 01TH6029394
Qualified in Westchester County
Commission Expires August 16, 2009

2

**EXHIBIT "C"**

**Rob S Ocko**

| | |
|---|---|
| **From:** | skogos@earthlink.net |
| **Sent:** | Saturday, December 02, 2006 10:13 AM |
| **To:** | rmedina@larosadelmonte.com |
| **Subject:** | RE: General |

Getting paid for work we have done.

If you like to go over the agreement let me know

-----Original Message-----
From: "Roberto Medina" <rmedina@larosadelmonte.com>
To: 'Martin' <queens2005@earthlink.net>
Cc: skogos@earthlink.net
Sent: 12/2/06 8:55 AM
Subject: RE: General

What ever makes you guys happy. If this is the way you guys want to work
from now on, we will do it.

I was under the impression that support (maintenance) starts when the
program is up and running 100 %.

Thank you,
Roberto




-----Original Message-----
From: Martin [mailto:queens2005@earthlink.net]
Sent: Friday, December 01, 2006 5:20 PM
To: Roberto Medina
Cc: skogos@earthlink.net
Subject: General

Hi Roberto
        As per my conversation with Shlomo, he wants all the e-mails
with
support and phone calls to go to him first.
Sincerely,
Martin

**EXHIBIT "D"**

# Harrington, Ocko & Monk
### A LIMITED LIABILITY PARTNERSHIP
### Attorneys at Law

White Plains Office

81 Main Street – Suite 215
White Plains, NY 10601
Tel:  (914) 686-4800
Fax:  (914) 686-4824

Robert S. Ocko, Partner
e-mail:  rsocko@homlegal.com

New York City Office

52 Duane Street, 7th Floor
New York, NY 10007
Tel:  (212) 227-8004

Reply to White Plains Office

December 11, 2006

VIA E-MAIL - SKOGOS@EARTHLINK.NET
and CERTIFIED MAIL, RET. RCPT. REQ.

Mr. Shlomo Kogos
Software for Moving, Inc.
211 Warren Street, Suite 305
Newark, NJ  07103

Re:    Software Development and Licensing Agreement
       dated March 3, 2005 (The "Agreement")

Dear Mr. Kogos:

Please be advised that this firm represents La Rosa del Monte Express, Inc., ("La Rosa"), the "Client" under the Agreement referred to above.  La Rosa has called to our attention that you, as President of "Developer" under the Agreement, have breached and violated the terms of said Agreement by terminating La Rosa's ability to use the software that it contracted Developer to develop and maintain.

It is our understanding that you have taken this action based on a false belief that La Rosa owes money under the terms of the Agreement.  Be advised that pursuant to Sections 4.2 and 13.11 of the Agreement, if there is any dispute between the parties regarding payments due thereunder, La Rosa is not considered in default under the Agreement, if in good faith, La Rosa disputes the amount due.  Furthermore, under the Agreement, the parties are required to have "good faith negotiations" in an attempt to resolve the dispute.  If such negotiations are unsuccessful, then, pursuant to Section 13.12, the parties are required to submit any unresolved dispute to binding arbitration.  Developer has no right under the Agreement or otherwise to take such actions preventing La Rosa from accessing its software and preventing La Rosa from effectively operating its business.

Furthermore, be advised that Developer has no legal right to unilaterally terminate La Rosa's ability to use all of the software that it has paid you to develop, license and maintain. Developer, therefore, has willfully and maliciously interfered with La Rosa's ability to operate

Mr. Shlomo Kogos
December 11, 2006
Page 2

its business in all respects. Moreover, you have also made threats to put La Rosa "out of business" if you are not paid by tomorrow.

We therefore demand that you immediately cease and desist from your intentional interference with La Rosa's business and restore La Rosa's access to all of its software without further delay. La Rosa will hold you fully responsible for all of its business damages, including but not limited to, lost profits, attorney's fees and other costs arising from your intentional actions in violation of the Agreement.

We expect your immediate response to our demand.

Sincerely yours,

Robert S. Ocko

RSO/cm

cc:     La Rosa del Monte Express, Inc.

**EXHIBIT "E"**

**Rob S Ocko**

| | |
|---|---|
| **From:** | shlomo kogos [skogos@earthlink.net] |
| **Sent:** | Wednesday, December 13, 2006 7:33 AM |
| **To:** | Rob S Ocko |
| **Cc:** | hrodriguez@larosadelmomte.com; rmedina@larosadelmonte.com |
| **Subject:** | Re: La Rosa del Monte |

Dear Mr. Ocko, Your client have been using The Moving Manager Windows Version, and the Dos Version of the Moving manager last about 10 years. Now they are using the ASP version(Internet) version.

The agreement with your client (on the Window and Dos versions) was $58,000 per year in maintenance charge to you.

We got paid $58,000 (late 2004) for the Year 2005.
We got paid $30,000 (around Oct 2006) The balance for the year 2006 is at least $28,000.
If you would like to keep using the Windows and Dos program next year the price is $116,000 (out of contract price, double).
If you do not pay us for the balance of 2006, $28,000 which was due in late 2005.
You are in default of the contract and in breach of the license agreement.
Please stop using the Windows and Dos program, other wise you are in copy write violation.
Again if you use the program in 2007 you violation the copy write agreement and you will owe us for year maintenance.

Your client has about 12 location. Each location is in violation since the program installed in each location.
Please submit to us a list of address where we can serve paper in each location.
If not we will use the web site address or whatever we find.

Again this email is about the old programs.
You are in violation of the agreement, and you are breaking the copy write law.

Mr. Ecko, I am asking you to talk to your client and explain to them the possible loss as a result of copy write violation Copy write court is different then small claim court.
That what the client knows a lot about, but not copy write court.

I had experience in the past with moving companies that did not want to pay maintenance and some who used the program after the contract expired.
We won all those cases.
The last mover paid $42,000 for one location.
If you want me to get you the info, I will do.
Maybe your client can win in small claim court, they will loss in federal court if the subject is copy write.

Again all I am asking is what due to me.

PLEASE ADVICE YOUR CLIENT THAT IF WE SUE HIM ON COPYWRITE VIALATION, HE MIGHT HAVE TO GET A COPYWRITE LAWYER, WHICH I THINK IT IS NOT YOU.

1/3/2007

THE RETAINER FEE WOULD BE HIGH AND HE WILL TELL YOUR CLIENT THAT HE WILL LOSS.
I DO NOT WANT TO WAIST YOUR CLIENT MONEY ON LAWYER FEES.

But if I have to go to court I can assure you that your client will loss by the time it is finished and done over $1,000,000

Shlomo

P.S.

Again this all can get fixed by you paying me what I am sure you people tell you owe me on the new program.
We worked hard in a very difficult environment to get the job done.
And we keeping adding stuff as you ask for them.
There is no one in the industry who can do the job we have done using the latest in technology.

-----Original Message-----
From: Rob S Ocko
Sent: Dec 12, 2006 6:12 PM
To: skogos@earthlink.net
Cc: hrodriguez@larosadelmomte.com, rmedina@larosadelmonte.com
Subject: La Rosa del Monte

 Dear Mr. Kogos, based on our telephone conversation in the past hour, I recommend that you have your legal counsel contact me immediately if you want to resolve the current dispute with my client.  I am no longer in a position to discuss this with you without counsel.

 If I do not hear from your consel, my client will take all legal action to protect its interests.

 ⌧

*81 Main Street, Suite 215*
*White Plains, NY 10601*
*Tel:  (914) 686-4800*
*Fax: (914) 686-4824*

HARRINGTON, OCKO & MONK, LLP - CONFIDENTIALITY NOTICE:  This electronic message is intended to be viewed only by the individual or entity to whom it is addressed.  It may contain information that is privileged,

confidential and exempt from disclosure under applicable law. Any dissemination, distribution or copying of this communication is strictly prohibited without our prior permission. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, or if you have received this communication in error, please notify us immediately by return e-mail and delete the original message and any copies of it from your computer system.

EXHIBIT "F"

**Rob S Ocko**

| | |
|---|---|
| **From:** | shlomo kogos [skogos@earthlink.net] |
| **Sent:** | Wednesday, December 13, 2006 1:51 PM |
| **To:** | Rob S Ocko |
| **Cc:** | hrodriguez@larosadelmonte.com; rmedina@larosadelmonte.com |
| **Subject:** | RE: La Rosa del Monte |

I am notifying you that you are on default on your payment for the new software program.

We are considering what action to take.

So there is no misunderstanding I am also

notifying your client that they are on a license breach of the agreement of the window and dos program.

Also they are in default on the payment on the new software.

I am notifying you out of curtsy.


Shlomo




-----Original Message-----
From: Rob S Ocko
Sent: Dec 13, 2006 1:24 PM
To: shlomo kogos
Cc: hrodriguez@larosadelmonte.com, rmedina@larosadelmonte.com
Subject: RE: La Rosa del Monte

    Dear Mr. Kogos, as I stated in my previous email to you, any discussions to resolve a dispute between you and my client must be done with your counsel. My contact information to provide to your counsel is set forth below. thank you.


    Rob Ocko


Robert S. Ocko
Harrington, Ocko & Monk, LLP
81 Main Street, Suite 215
White Plains, NY 10601
(914) 686-4800
(914) 686-4824 Fax
*********************************

HOM LLP - CONFIDENTIALITY NOTICE: This e-mail and any attachments are intended to be viewed only by the individual or entity to whom it is addressed. It may contain information that is privileged, confidential and exempt from disclosure under applicable law. Any dissemination, distribution or copying of this communication is strictly prohibited without our prior permission. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, or if you have received this communication in error, please notify us immediately by return e-mail and delete the original message and any copies of it from your computer system.

-----Original Message-----
**From:** shlomo kogos [mailto:skogos@earthlink.net]
**Sent:** Wednesday, December 13, 2006 7:33 AM
**To:** Rob S Ocko
**Cc:** hrodriguez@larosadelmomte.com; rmedina@larosadelmonte.com
**Subject:** Re: La Rosa del Monte

Dear Mr. Ocko, Your client have been using The Moving Manager Windows Version, and the Dos Version of the Moving manager last about 10 years. Now they are using the ASP version(Internet) version.

The agreement with your client (on the Window and Dos versions) was $58,000 per year in maintenance charge to you.

We got paid $58,000 (late 2004) for the Year 2005.
We got paid $30,000 (around Oct 2006) The balance for the year 2006 is at least $28,000.
If you would like to keep using the Windows and Dos program next year the price is $116,000 (out of contract price, double).
If you do not pay us for the balance of 2006, $28,000 which was due in late 2005.
You are in default of the contract and in breach of the license agreement.
Please stop using the Windows and Dos program, other wise you are in copy write violation.
Again if you use the program in 2007 you violation the copy write agreement and you will owe us for year maintenance.

Your client has about 12 location. Each location is in violation since the program installed in each location.
Please submit to us a list of address where we can serve paper in each location.
If not we will use the web site address or whatever we find.

Again this email is about the old programs.
You are in violation of the agreement, and you are breaking the copy write law.

Mr. Ecko, I am asking you to talk to your client and explain to them the possible loss as a result of copy write violation Copy write court is different then small claim court.
That what the client knows a lot about, but not copy write court.

I had experience in the past with moving companies that did not want to pay maintenance and some who used the program after the contract expired.
We won all those cases.
The last mover paid $42,000 for one location.
If you want me to get you the info, I will do.
Maybe your client can win in small claim court, they will loss in federal court if the subject is copy write.

Again all I am asking is what due to me.

PLEASE ADVICE YOUR CLIENT THAT IF WE SUE HIM ON COPYWRITE
VIALATION, HE MIGHT HAVE TO GET A COPYWRITE LAWYER, WHICH I
THINK IT IS NOT YOU.
THE RETAINER FEE WOULD BE HIGH AND HE WILL TELL YOUR CLIENT THAT
HE WILL LOSS.
I DO NOT WANT TO WAIST YOUR CLIENT MONEY ON LAWYER FEES.

But if I have to go to court I can assure you that your client will loss by the time it
is finished and done over $1,000,000

Shlomo

P.S.

Again this all can get fixed by you paying me what I am sure you people tell you owe me
on the new program.
We worked hard in a very difficult environment to get the job done.
And we keeping adding stuff as you ask for them.
There is no one in the industry who can do the job we have done using the latest in
technology.

-----Original Message-----
From: Rob S Ocko
Sent: Dec 12, 2006 6:12 PM
To: skogos@earthlink.net
Cc: hrodriguez@larosadelmomte.com, rmedina@larosadelmonte.com
Subject: La Rosa del Monte

    Dear Mr. Kogos, based on our telephone conversation in the past hour, I recommend
that you have your legal counsel contact me immediately if you want to resolve the current
dispute with my client.  I am no longer in a position to discuss this with you without counsel.

    If I do not hear from your consel, my client will take all legal action to protect its
interests.

*81 Main Street, Suite 215*
*White Plains, NY 10601*
*Tel:   (914) 686-4800*
*Fax: (914) 686-4824*

HARRINGTON, OCKO & MONK, LLP - CONFIDENTIALITY NOTICE:  This electronic message is intended to be viewed only by the individual or entity to whom it is addressed.  It may contain information that is privileged, confidential and exempt from disclosure under applicable law. Any dissemination, distribution or copying of this communication is strictly prohibited without our prior permission.  If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, or if you have received this communication in error, please notify us immediately by return e-mail and delete the original message and any copies of it from your computer system.

EXHIBIT "G"

# Harrington, Ocko & Monk

**A LIMITED LIABILITY PARTNERSHIP**
**Attorneys at Law**

White Plains Office

81 Main Street – Suite 215
White Plains, NY 10601
Tel:  (914) 686-4800
Fax:  (914) 686-4824

Robert S. Ocko, Partner
e-mail: rsocko@homlegal.com

New York City Office

52 Duane Street, 7th Floor
New York, NY 10007
Tel:  (212) 227-8004

Reply to White Plains Office

January 9, 2007

VIA E-MAIL - SKOGOS@EARTHLINK.NET
and CERTIFIED MAIL, RET. RCPT. REQ.

Mr. Shlomo Kogos
Software for Moving, Inc.
211 Warren Street, Suite 305
Newark, NJ  07103

Re:    Software Development and Licensing Agreement
dated March 3, 2005 (the "Agreement")

Dear Mr. Kogos:

As you are aware, this firm represents La Rosa del Monte Express, Inc. ("La Rosa"), the "Client" under the Agreement referenced above.

As a follow-up to our letter to you dated December 11, 2006, please be advised that this letter shall serve as formal written notice to you that pursuant to Section 12.2 of the Agreement, La Rosa is terminating the Agreement effective immediately due to your material breach. Pursuant to Section 12.2 of the Agreement, La Rosa demands that you immediately return all monies paid to Developer under the Agreement totaling the amount of $245,250.00.  In addition, La Rosa demands that Developer immediately cease interfering with La Rosa's ability to access all of its software programs currently being hosted by XL Host in Columbus, Ohio.

Developer's material breach under the Agreement includes Developers failure to complete all of the software development pursuant to the terms of the Agreement and Developer's intentional interference with La Rosa's ability to use the software programs that it contracted and paid Developer to develop for La Rosa pursuant to the terms of the Agreement. Moreover, despite the fact that you, as the President of Developer, and your counsel assured La Rosa that they could make arrangements with XL Host, the current hosting company of all the software programs, to either contact and pay them directly for their services, or to have the software transferred to a new hosting company, XL Host through its manager, Saeed, has informed La Rosa on several occasions, including yesterday, that La Rosa can have no access or

Mr. Shlomo Kogos
January 9, 2007
Page 2 of 3

communication with XL Host without the consent of you and Developer. Saeed has also confirmed that the servers have been rendered inaccessible to La Rosa at your express instruction.

Your actions are in direct conflict with both your statements to La Rosa and an e-mail from your counsel, Philip Zukowsky, dated Wednesday, December 27, 2006, wherein Mr. Zukowsky told me that La Rosa could and should contact XL Host in order to avoid having XL Host terminate its hosting of La Rosa's software programs. However, despite your counsel's representations, you have instructed XL Host to deny La Rosa access to any of its software programs. This is intentional tortious interference with La Rosa's ability to operate and conduct its business. La Rosa is suffering thousands of dollars in losses and damages each and every day due to your actions, for which we will hold you and Developer responsible. Furthermore, you have made threats to our client that you will sell their customized software with all of its confidential and proprietary information to La Rosa's competitors. If you or Developer take any such actions, our client will hold you and your company both responsible for all damages resulting therefrom.

Your actions are in no way justified by the fact that you allege that La Rosa has not paid you in full pursuant to the terms of the Agreement. In fact, Developer has not completed the development of the software in accordance with the terms of the Agreement. There are significant problems with the software including, but not limited to, inaccurate information being generated from reports, deficiencies in estimator's work sheet reports, customer service, salesman schedules, screen for charges, printing of contracts, and dates for estimates and bookings. In addition, there are no fields for international, military and commercial operations. These problems apply to the use of the software in all of La Rosa's offices including Puerto Rico. You have been previously made aware of all of these problems and have failed to rectify them, all in breach of the Agreement. You, therefore, had no contractual right under the Agreement to be paid additional monies at this time. Moreover, Section 4.2 of the Agreement specifically states that La Rosa shall not be in default if they, in good faith, dispute the fact that any phase of the development of the software was not complete.

In addition, pursuant to Section 4.2 of the Agreement, prior to Developer being entitled to full payment, La Rosa has the contractual right to test all of the software for a 90-day period after all the software was completed. Then, only after a successful 90-day test period without failure, would the remaining 10% of the fee become due. Your contentions that final payment is due before you complete the work provided in the Agreement and before the 90-day test period under the Agreement are completely incorrect.

Finally, pursuant to Section 9 of the Maintenance Agreement between Client and Developer dated March 3, 2005, this letter shall serve as written notice that Client is terminating that Maintenance Agreement for cause based on Developer's breach thereunder.

Mr. Shlomo Kogos
January 9, 2007
Page 3 of 3

Thus, La Rosa demands that you immediately provide La Rosa access to all of its current software through XL Host and return all monies paid to Developer in accordance with the terms of the Agreement and all maintenance fees previously paid to Developer.

La Rosa hereby expressly reserves all of its legal rights under the Agreement and otherwise to protect all of its legal rights.

Very truly yours,

Robert S. Ocko

RSO/cm

cc:     La Rosa del Monte Express, Inc.
        Philip A. Zukowsky, Esq.

EXHIBIT "H"

–---Original Message–---
From: Philip Zukowsky [mailto:paz@chklaw.com]
Sent: Tuesday, January 09, 2007 4:14 PM
To: Rob S Ocko
Subject: RE: La Rosa del Monte and Software for Moving

I received a copy of your letter to my client dated January 9, 2007. In
the future all correspondence to my client should be sent through me.
Please do not send letters directly to my client, and I shall continue
to follow the same rule with your client.

I would appreciate as well if you would send me a PDF copy of the March
3, 2005 Agreement that is referenced in your letter.

Finally, as I indicated in my prior e-mail dated December 27, 2006, the
amount now due (as of 1/1/07) to SFM from your client for the continuing
use of SFM's DOS and Windows Program is $86,000. The amount now due
from your client for the use of SFM's server based program is now
$219,166. If these past due payments are not addressed presently we
will have to demand that your client henceforth cease, desist and
refrain from using SFM's copyrighted software. Thank you for your
cooperation.


Philip A. Zukowsky
Chernesky, Heyman & Kress P.L.L.
paz@chklaw.com
937-449-2842
937-449-2821 (fax)

EXHIBIT "I"

American Arbitration    21/2007 11.57:13 PM    PAGE    306    Fax Server



Northeast Case Management Center
Catherine Shanks
Vice President
Christopher Fracassa, Yvonne L. Baglini
Assistant Vice Presidents

950 Warren Avenue, East Providence, RI 02914
telephone 866-293-4053 facsimile 401-435-6529
internet http://www.adr.org/

February 21, 2007

VIA
FACSIMILE W/ENCLOUSRES

Kevin J. Harrington, Esq.
Harrington, Ocko & Monk, LLP
81 Main Street, Suite 215
White Plains, NY 10601

Robert S. Ocko, Esq.
Harrington, Ocko & Monk, LLP
81 Main Street, Suite 215
White Plains, NY 10601

Philip A. Zukowsky, Esq.
Chernesky Heyman & Kress
10 Courthouse Plaza SW, Suite 1100
Dayton, OH 45402

Re: 19 117 00027 07
    La Rosa Del Monte Express, Inc.
    and
    Software for Moving, Inc.and Shlomo Kogos

Dear Counsel:

This will acknowledge receipt on February 15, 2007, of a Demand for Arbitration dated February 12, 2007, of a controversy arising out of a contract between the above-captioned parties, containing a clause providing for administration by this Association. We understand that a copy was sent to Respondent. A copy of our Commercial Arbitration Rules and Mediation Procedures, as amended and in effect September 15, 2005, may be obtained from our website at www.adr.org.

If you would like a printed copy of the applicable rules, please contact the undersigned.

In accordance with the Rules, if Respondent does not answer on or before March 8, 2007, we will assume that the claim is denied. If Respondent wishes to counterclaim, file the appropriate number of copies, together with the administrative fee, to the attention of the undersigned. A copy should be directly sent to Claimant.

We note the parties' agreement stipulates the locale as Westchester County, New York.

We note the claim is $383,250. If this amount is incorrect, please advise us on or before March 8, 2007 of the correct amount.

This will confirm an Administrative Conference is scheduled on March 1, 2007 at 10:00 AM ET via conference call. The Association will initiate this call.

American Arbitration    21/2007 11:57:13 PM    PAGE    06    FAX SERVER

The purpose of the administrative conference is to assist the Association in administering your case efficiently and expeditiously. Please be prepared to discuss the following:

a. estimates on the expected duration of the case;
b. number of arbitrators/party-appointed arbitrator provision;
c. method of appointment of arbitrators, if applicable;
d. your views on the qualifications of the arbitrators to be proposed;
e. the possibility of submitting this dispute to mediation;

Enclosed is a Checklist for Conflicts to list those witnesses you expect to present, as well as any persons or entities with an interest in these proceedings. The Conflicts Checklist is due within fifteen days from the date of this letter. The parties are to exchange copies of all correspondence except this checklist and the arbitrator list.

The Association will make maximum use of fax machines when communicating in writing, and request that the parties do the same. If you have not provided us with your fax number, we ask that you do so at this time. If a party does not provide us with their fax number, then that party will have to rely on receiving correspondence via regular mail.

Parties will not send copies of documents being exchanged between the parties to the Association, such as discovery, unless they are being referred to the arbitrator for a determination. These documents will be returned to you if we receive them.

The Association has a strict policy regarding requests for extensions. If you need to extend any deadline during the course of these proceedings, please try to obtain the other party's agreement prior to contacting the AAA. Without the consent of the parties, case managers only have the authority to grant one extension per deadline, provided the request is reasonable and necessary. Untimely filings will not be considered by the Association.

This case will be administered by facilitating the exchange of appropriate written documents through the AAA. To ensure the proper handling of all case-related documents, the parties are asked not to submit correspondence directly to the arbitrator. Correspondence should be submitted to the undersigned for transmittal to the arbitrator, copying the other party.

The Association will require advance deposits once the arbitrator is appointed. These deposits are calculated on the number of days the parties have suggested will be necessary, in addition to the pre and post hearing time that the arbitrator may charge pursuant to the arbitrator's resume.

Additionally, the parties may desire to mediate this case prior to an arbitration hearing. Mediation is a private, non-binding process under which the parties submit their dispute to a third-party neutral. The mediator may suggest ways of resolving the dispute, but may not impose a settlement on the parties; the parties attempt to negotiate their own settlement agreement. Please contact the undersigned for further details regarding mediation.

As a service to our users, you may charge the administrative fee and deposit for arbitrator fees and expenses to your credit card. If you desire to do so, please complete the enclosed charge authorization and return it to us.

We invite the parties to visit our website to learn more about how to file and manage your cases online.

American Arbitration    21/2007 11:57:13 PM    PAGE    06    FAX Server

As part of our administrative service, AAA's WebFile allows parties to perform a variety of case related activities, including:

- File additional claims
- Complete the Checklist for Conflicts form
- View invoices and submit payment
- Share and manage documents
- Strike and rank listed neutrals
- Review case status

AAA WebFile provides flexibility because it allows you to work online as your schedule permits - day or night. Cases originally filed in the traditional offline manner can also be viewed and managed online.

In closing we wish to remind the parties that the AAA has a refund schedule in the administrative fee section of the Rules. After 60 days or the appointment of the arbitrator the filing fees are non-refundable. If the parties enter settlement negotiations at any time after the AAA has opened its file, you should take into consideration the refund schedule in the Rules. In accordance with the administrative fee schedule, the Association charges a Case Service Fee when the hearing on the merits is scheduled. The Case Service Fee is the balance of the filing fee. It is refundable if the hearing on the merits is cancelled and the Association is notified at least 24 hours prior to the hearing. The AAA will only refund filing fees as outlined in the Rules and does not refund neutral costs incurred when parties settle their dispute or withdraw their claims. We encourage parties to resolve their disputes as amicably as possible and this notice is just to alert you to this issue so that it doesn't become a concern in the future.

Please feel free to call if you have any questions. We look forward to assisting you in this matter.

Sincerely,


Kimberly F. Claxton
Case Manager
401 431 4793
ClaxtonK@adr.org

*Supervisor Information: Karen Fontaine, 401 431 4798, fontainek@adr.org*

Encl.

# AMERICAN ARBITRATION ASSOCIATION
## CHECKLIST FOR CONFLICTS

In the Matter of the Arbitration between:

Re: 19 117 00027 07
    La Rosa Del Monte Express, Inc.
    and
    Software for Moving, Inc.and Shlomo Kogos

CASE MANAGER: Kimberly F. Claxton
DATE: February 21, 2007

To avoid the possibility of a last-minute disclosure and/or disqualification of the arbitrator pursuant to the rules, we must advise the arbitrator of the names of all persons, firms, companies or other entities involved in this matter. Please list below all interested parties in this case, including, but not limited to, witnesses, consultants, and attorneys. In order to avoid conflicts of interest, parties are requested to also list subsidiary and other related entities. This form will only be used as a list for conflicts, not a preliminary or final witness list. Please note that the AAA will not divulge this information to the opposing party, and the parties are not required to exchange this list. This form will, however, be submitted to the arbitrator, together with the filing papers. You should be aware that arbitrators will need to divulge any relevant information in order to make appropriate and necessary disclosures in accordance with the applicable arbitration rules.

For the convenience of clients using AAA's WebFile, this form may be completed online and submitted as part of the WebFile case record.

NAME                       AFFILIATION                  ADDRESS

American Arbitration     2/7/2007 11:57:13 PM     PAGE     3/3     Fax Server

DATED: _____     PARTY: _____

Please Print

**EXHIBIT "J"**

## CHERNESKY, HEYMAN & KRESS P.L.L.

### ATTORNEYS AT LAW

10 COURT HOUSE PLAZA SW, SUITE 1100
DAYTON, OHIO 45402
P.O. BOX 3808
DAYTON, OHIO 45401-2808
937/449-2800

WRITER'S DIRECT DIAL
937/449-2842

WRITER'S E-MAIL
paz@chklaw.com

WRITER'S FAX
937/463-4947

WEBSITE
www.chklaw.com

February 27, 2007

**Via U.S. Mail and E-Mail**
Ms. Kimberly F. Claxton
Case Manager
American Arbitration Association
950 Warren Avenue
East Providence, Rhode Island  02914

   Re:  19 117 00027 07
       La Rosa Del Monte Express, Inc.
       and
       Software for Moving, Inc. and
       Shlomo Kogos

Dear Ms. Claxton:

   I am in receipt of your letter of February 21, 2007.  I also received, on February 20, a copy of Mr. Harrington's letter of February 12 and the enclosed "courtesy copy" of his Demand for Arbitration in the captioned matter.  My clients, Mr. Kogos and Software for Moving, Inc., have not received the Demand for Arbitration as of yet and are unlikely to ever receive it, inasmuch as the Newark, New Jersey address to which the Demand was supposedly sent is not one at which my clients are presently located.

   Enclosed with this letter, please find enclosed a copy of my letter today to Mr. Harrington demanding that this Demand for Arbitration be withdrawn.  In the event Mr. Harrington does not comply, I also insist that AAA refuse to proceed with the arbitration of this matter.

   The jurisdiction of the AAA to hear this matter is based on §13.12 of a Software Development & License Agreement attached to the Demand for Arbitration – but the "signature" of Mr. Kogos on that document is an obvious, and clumsy, forgery.  (As you know, from the enclosed letter to Mr. Harrington, we also contend that Mr. Kogos did not sign the Maintenance Agreement either.)  I understand that Rule 7 of the AAA Commercial Arbitration Rules provides a mechanism for the arbitrator "to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."  Clearly, my clients

CHERNESKY, HEYMAN & KRESS P.L.L.

Ms. Kimberly F. Claxton
Page 2
February 27, 2007

are objecting to the jurisdiction of the arbitrator and to the arbitrability of these claims.  We understand, per Rule 7, that these objections must be made within the time for filing an answer to the Demand for Arbitration.

    If AAA will not refuse to proceed with this matter, we will at least want assurances that the arbitrator will first focus on the jurisdiction issue and will not require my client to incur the considerable expense of responding to the 36 page Demand for Arbitration.  We have engaged counsel to prepare an answer and assert counter claims should that prove necessary: Jack Leyhane 1205 West Randolph, Chicago, Illinois 60606, Suite 1320, leyhane329@aol.com. However, I expect that my clients will not be subjected to the expenses attendant to allowing the procedure to develop that far – and, on behalf of my clients, I herewith reserve their rights to seek redress and recompense from any and all entities that permit otherwise.

    Thank you for your immediate attention to this matter.

                            Very truly yours,

                            CHERNESKY, HEYMAN, & KRESS P.L.L.

                            Philip A. Zukowsky

PAZ/ge
Enclosure

cc:    ClaxtonK@adr.org

       Mr. Kevin J. Harrington
       Harrington, Ocko & Monk, LLP
       81 Main Street
       Suite 215
       White Plains, New York  10601

       kharrington@homlegal.com

       Mr. Jack Leyhane
       1205 W. Randolph
       Chicago, Illinois 60606
       Suite 1320

       leyhane329@aol.com

EXHIBIT "K"

# CHERNESKY, HEYMAN & KRESS P.L.L.

## ATTORNEYS AT LAW

10 COURTHOUSE PLAZA SW, SUITE 1100
DAYTON, OHIO 45402
P.O. BOX 3808
DAYTON, OHIO 45401-3808
937/449-2800

WRITER'S DIRECT DIAL
937/449-2842

WRITER'S FAX
937/463-4947

WRITER'S E-MAIL
paz@chklaw.com

WEBSITE
www.chklaw.com

February 26, 2007

**Via U.S. Mail and E-Mail**
Mr. Kevin J. Harrington
Harrington, Ocko & Monk, LLP
81 Main Street
Suite 215
White Plains, New York  10601

        Re:    19 117 00027 07
               La Rosa Del Monte Express, Inc.
               and
               Software for Moving, Inc. and
               Shlomo Kogos

Dear Mr. Harrington:

        I received, on February 20, a copy of your letter and the enclosed "courtesy copy" of your Demand for Arbitration in the captioned matter.  I have since received Ms. Claxton's letter of February 21, 2007 confirming that your Demand for Arbitration has been received by the American Arbitration Association.  My clients, Mr. Kogos and Software for Moving, Inc., have not received the Demand for Arbitration as of yet and are unlikely to ever receive it, inasmuch as the Newark, New Jersey address to which the Demand was supposedly sent is not one at which my clients are presently located.

        Your Demand for Arbitration is premised on the terms of a Software Development & License Agreement and a separate Maintenance Agreement, both supposedly executed on or about March 3, 2005.  However, even though these 'Agreements' describe – in some respects – how our respective clients dealt with each other for a considerable period of time, my client, Mr. Kogos never signed either 'Agreement.'  Mr. Kogos' purported 'signatures' on the 2005 'Agreements' are obvious, and clumsy, forgeries, even to a non-expert.  You will recall my several attempts to get you to provide me with copies of the 'Agreements' on which you were making the various contentions that have now been collected in your Demand for Arbitration. You never provided me with copies, despite my requests.  Had you done so, we could have

**CHERNESKY, HEYMAN & KRESS P.L.L.**

Mr. Kevin J. Harrington
Page 2
February 27, 2007

pointed out the obvious forgeries to you then. Even so, you might have noticed, when you assembled the exhibits to your Demand for Arbitration, how little the purported 'signatures' on the March 3, 2005 'Agreements' resemble Mr. Kogos' signature on other documents that you also included.

Specifically, Mr. Kogos signed the 1999 Software Licensing Agreement (Exhibit A to your Demand for Arbitration) in four separate places:

> At page 10 of 10, at the end of the body of the 1999 Software Licensing Agreement;
>
> at page 7 of 7 of Exhibit "A" to the 1999 Agreement;
>
> at page 3 of 3 of Exhibit "B" to the 1999 Agreement; and
>
> at page 4 of 4 of Exhibit "C" to the Software Maintenance Agreement.

When you review these signatures, you'll note that they (a) resemble each other and (b) provide clear spacing between Mr. Kogos' first and last names. This is not the case, however, with the signature on the supposed March 3, 2005 Software Development & License Agreement (Exhibit B to your Demand for Arbitration), where the first and last name run together. The scrawl at p. 16 of that document bears so little resemblance to the signatures on the 1999 Agreement as to make the forgery painfully obvious. Admittedly, the forgeries on the supposed March 3, 2005 Maintenance Agreement (Exhibit C to your Demand for Arbitration) are more artful, but the signatures there are no more valid than the phony scrawl on the Software Development & License Agreement.

There are other things you must consider in evaluating the validity of these agreements. Those are the "tells" that show that the Agreements could not have been executed on March 3, 2005, when you claim the document was signed. For example, the Notice paragraph of Article XIII of the supposed March 3, 2005 Software Development & License Agreement (§13.5) purports to list Mr. Kogos' email address as skogos@earthlink.net. However, the email address set out in §13.5 *did not exist until 2006*. We have the e-mails from Earthlink that states that skogos@earthlink.net mailbox was opened on 5, 2006.

Whether or not you noticed the discrepancies in the signatures when you put the Demand together, you are on notice now: Mr. Kogos did not execute the Software Development & License Agreement or Maintenance Agreement and my clients have not agreed to arbitration of any dispute between our respective clients.

**CHERNESKY, HEYMAN & KRESS P.L.L.**

Mr. Kevin J. Harrington
Page 3
February 27, 2007

We therefore demand the immediate and unconditional withdrawal of the captioned Demand for Arbitration. If we are not informed that the Demand has been withdrawn by 5:00 pm EST Friday, March 2, 2007, we will take all necessary steps, in any available forum, to protect our clients' interests with respect to this matter. We will not hesitate to seek appropriate relief from any and all parties who may be responsible for the expenses our clients have incurred, and will likely incur, in responding to this fraudulent Demand for Arbitration.

Enclosed with this letter, please also find enclosed a copy of my letter today to Ms. Claxton demanding that AAA refuse to proceed on this Demand for Arbitration.

We must respectfully insist upon your immediate attention to this matter.

Very truly yours,

CHERNESKY, HEYMAN, & KRESS P.L.L.

Philip A. Zukowsky

PAZ/ge
Enclosure

cc:    kharrington@homlegal.com

Ms. Kimberly F. Claxton
Case Manager
American Arbitration Association
950 Warren Avenue
East Providence, Rhode Island  02914

ClaxtonK@adr.org

Mr. Jack Leyhane
1205 W. Randolph
Suite 1320
Chicago, Illinois 60606

Leyhane329@aol.com

**EXHIBIT "L"**

# Harrington, Ocko & Monk
### A LIMITED LIABILITY PARTNERSHIP
**Attorneys at Law**

White Plains Office

81 Main Street – Suite 215
White Plains, NY 10601
Tel: (914) 686-4800
Fax: (914) 686-4824

Kevin J. Harrington, Partner
e-mail: kharrington@homlegal.com

New York City Office

52 Duane Street, 7th Floor
New York, NY 10007
Tel: (212) 227-8004

Reply to White Plains Office

March 2, 2007

**VIA FACSIMILE: (401) 435-6529**
**and FIRST CLASS MAIL**

Kimberly F. Claxton, Case Manager
AMERICAN ARBITRATION ASSOCIATION
950 Warren Avenue
East Providence, RI 02914

Re:    *La Rosa Del Monte Express, Inc., Claimant, vs. Software*
       *For Moving, Inc., and Shlomo Kogos, as an Individual, Respondents.*
       Demand for Commercial Arbitration:
       American Arbitration Association, NY, NY (Case No.: 19 117 00027 07)

Dear Ms. Claxton:

As you may recall, our firm represents Claimant, La Rosa Del Monte Express, Inc. ("La Rosa"), in the above-captioned arbitration. We write to you at this time in response to the letter of February 27, 2007 letter of Mr. Philip A. Zukowsky, counsel for Respondent, Software for Moving, Inc. ("SFM").

As to the allegations of forgery contained in Mr. Zukowsky's February 27th letter, obviously, our client disputes any notion that the signatures of Mr. Kogos, President of SFM, on the operative documents at issue in this Arbitration are forgeries. Contrary to Mr. Zukowsky's allegations, the signatures of Mr. Kogos on these documents (the March 3, 2005 Software Development and License Agreement and the March 3, 2005 Maintenance Agreement) are almost identical to that of Mr. Kogos on the March 24, 1999 Software Licensing Agreement, a signature Mr. Zukowsky acknowledges is that of his client. See Exhibit "A", a true and correct copy of the signatures of Mr. Kogos on the March 24, 1999 Software Licensing Agreement; Exhibit "B", a true and correct copy of Mr. Kogos'

Ms. Kimberly F. Claxton, Case Manager (AAA)
AAA Case No.: 19 11T 00027 07
Re: *La Rosa Del Monte Express, Inc., Claimant, vs. Software*
   *For Moving, Inc., and Shlomo Kogos, as an Individual, Respondents.*
March 2, 2007
Page 2

signatures on the March 3, 2005 Software Development and License Agreement; and Exhibit "C", true and correct copies of Mr. Kogos' signatures on the March 3, 2005 Maintenance Agreement. In addition, the signatures on the 2005 Software Development and Maintenance Agreements match Mr. Kogos' endorsing signature on an August 29, 2006 check for Ten Thousand ($10,000) Dollars made out to SFM and cashed by Mr. Kogos. See Exhibit "D", a true and correct copy of an August 29, 2006 check endorsed by Mr. Kogos on behalf of SFM. Thus, any suggestion that the signatures of Mr. Kogos on these documents are forgeries is easily dispelled by a simple review of the very signatures themselves.

Second, if Respondents persist in advancing the spurious claim that Mr. Kogos' signature was forged on the operative agreements, Claimant is prepared at the hearing in this matter to call a witness who will directly refute the claim. The witness who will establish that Mr. Kogos did indeed sign the Software Development Agreement is Steven Dalzell, the former Chief Operating Officer of Claimant. Mr. Dalzell will testify that he requested that Mr. Kogos supply a duplicate copy of this agreement and that subsequently, during a visit to the office of Claimant, Mr. Kogos hand-delivered a photocopy of the signed agreement to Mr. Dalzell, including the signature page bearing Mr. Kogos' signature. If, as he now claims, Mr. Kogos never signed the agreement, then he would not have personally delivered a signed copy to Mr. Dalzell.

Furthermore, Mr. Kogos, as well as Mr. Zukowsky (on behalf of Mr. Kogos and SFM), have taken actions and made detailed demands for money to La Rosa based on the very same agreements they now contend contain forged signatures, and are not binding on the parties. Their protestations now of forgery thus ring hollow.

As indicated in Claimant's Demand for Arbitration in this matter, the Software Development and License Agreement of March 3, 2005 required that La Rosa pay SFM $58,000 to continue to use the current software (DOS/WINDOWS-based software), pending the completion of the new web-based software by SFM. See Software Development and License Agreement, Section 4.6. Furthermore, the Software Development and License Agreement provides that La Rosa would pay SFM a license fee of $105,000 once the new web-based software was completed, operational, and delivered to La Rosa by SFM in its entirety. Id., at Section 6.5. Under the Agreement, La Rosa was also to pay SFM a development fee of $190,000 for development of this new web-based software. Id., at Section 4.1.

Ms. Kimberly F. Claxton, Case Manager AAA,
AAA Case No. 19 11 0002 07
Re: *La Rosa Del Monte Express, Inc., Claimant, vs. Software*
    *For Moving, Inc., and Shlomo Kogos, as an Individual, Respondents.*
March 2, 2007
Page 3


While Mr. Zukowsky and his client, SFM, contend the signatures on these agreements are forged, and thus, inoperative, Mr. Zukowsky and Mr. Kogos, President of SFM, have both made specific demands of La Rosa, and asked for the specific amounts described in the March 3, 2005 Software License and Development Agreement. Indeed, Mr. Kogos e-mailed to Robert S. Ocko, counsel for La Rosa, on December 13, 2006, and specifically acknowledged a $58,000 per year maintenance charge for La Rosa's use of the DOS/WINDOWS-based software in 2005; exactly the sum required of La Rosa pursuant to Section 4.6 of the Software License and Development Agreement. See Exhibit "E," a true and correct copy of the December 13, 2006 e-mail from Mr. Kogos to Mr. Ocko. Mr. Kogos also acknowledges in this e-mail that SFM was paid precisely that amount by La Rosa in late 2004, again, in accordance with the terms of the 2005 Agreement. Mr. Kogos, in fact, references the Software Development Agreement in this very e-mail. Thus, Mr. Kogos and SFM have, both by their conduct and their writings, acknowledged that the contracts exist, and that SFM is bound by their terms, including the arbitration provisions.

Subsequently, on December 22, 2006, Mr. Zukowsky e-mailed Mr. Ocko, and also demanded the exact amounts described in the 2005 Software Development Agreement. See Exhibit "F", a true and correct copy of the December 22, 2006 e-mail from Mr. Zukowsky to Mr. Ocko. Mr. Zukowsky admits in his e-mail that $58,000 was the agreed-upon amount of the payment for SFM to maintain the DOS/WINDOWS-based software in 2005 under the 2005 Software Development Agreement. Furthermore, Mr. Zukowsky references the exact amount La Rosa would owe to SFM under the Software Development Agreement of $295,000 ($105,000 for the license, and $190,000 for the development of the new web-based software; both due upon completion and satisfactory delivery of the new web-based software). Thus, in his correspondence, Mr. Zukowsky admits that the parties were acting in accordance with the express terms of the Software Development and Maintenance Agreements of 2005, causing SFM to be bound by the arbitration provision of the Agreements. Through the actions of Mr. Kogos and Mr. Zukowsky, SFM is now estopped from arguing to the contrary.

Furthermore, the purported illegitimacy of the contracts disputed by SFM and Mr. Zukowsky is undercut by the presence of specific provisions in the 2005 Software Development Agreement relating to Mr. Zukowsky. In order to ensure that La Rosa had access to the source codes and other information relating to the new web-based software should SFM go out of business, the parties agreed to designate a custodian for such

Ms. Kimberly L. Claxton, Case Manager (AAA)
AAA Case No.: 19 117 00027 07
Re: *La Rosa Del Monte Express, Inc., Claimant, vs. Software*
    *For Moving, Inc., and Shlomo Kogos, as an Individual, Respondents.*
March 2, 2007
Page 4


information. See Exhibit "G", a true and correct copy of the Addendum to the 2005 Software Development and License Agreement. The custodian designated in the Addendum is none other than Mr. Zukowsky. Indeed, not only is Mr. Zukowsky identified by name as the custodian, but the address and telephone number for his law firm are also provided in the Addendum. It stretches all credibility for SFM to now assert the contracts at issue are void, or that Mr. Kogos did not execute them, when the 2005 Software Development Agreement references Mr. Zukowsky by name, and the information in the Agreement regarding the identity and contact information for SFM's counsel, Mr. Zukowsky, could only have one source – Mr. Kogos/SFM.

The past actions of the parties also conclusively demonstrate the idea that La Rosa and SFM would enter into verbal agreements regarding the 2005 Software Development and License Agreement and the Maintenance Agreement is preposterous. As Mr. Zukowsky acknowledges in his letter to Mr. Kevin Harrington of February 26, 2007, the parties did enter into a Software Agreement in March 1999 regarding the DOS/WINDOWS-based software. This 1999 Agreement relates to the development and licensing of the DOS/WINDOWS software by La Rosa from SFM. The 1999 Agreement involves sums far smaller than the amounts involved in the present 2005 Software Development and Maintenance Agreements. The parties then conducted themselves in accordance with the terms of this 1999 Agreement for almost five (5) years.

It goes completely against the parties' prior conduct regarding software development and licensing for SFM to now claim that La Rosa operated for two (2) years and paid hundreds of thousands of dollars to SFM without a written agreement with SFM regarding the new software which SFM was proposing to license to La Rosa. In fact, as described in the e-mails from Mr. Kogos and Mr. Zukowsky, SFM claims numerous intellectual property rights concerning the new software, yet amazingly asserts there exists no written contract establishing and defining such rights. SFM's asserted intellectual property rights in the new software only ring true if the parties had a written agreement about such property rights, an agreement SFM now claims does not exist.

Finally, at this stage of the Arbitration, pursuant to Rule 7 of the AAA Commercial Arbitration Rules, the arbitrator has the exclusive power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or the validity of the arbitration agreement. Indeed, under Rule 7(c), an arbitrator alone has the authority to make a ruling with regard to jurisdiction over the arbitability of a claim. Thus, SFM cannot

Ms. Kimberly F. Claxton, Case Manager / AAA
AAA Case No.: 19 117 00027 07
Re: *La Rosa Del Monte Express, Inc., Claimant, vs. Software*
    *For Moving, Inc., and Shlomo Kogos, as an Individual, Respondents.*
March 2, 2007
Page 5


escape arbitrating the issue of whether or not the arbitration clauses within the March 3, 2005 Agreements are valid.

Thank you in advance for your time and consideration in this matter.

Respectfully submitted,

Kevin J. Harrington

KJH:jjb

cc:    **VIA FACSIMILE AND FIRST CLASS MAIL:**
       Philip A. Zukowsky, Esq.

**EXHIBIT "M"**

 American Arbitration Association

Dispute Resolution Services Worldwide

*Northeast Case Management Center*
*Catherine Shanks*
*Vice President*
*Christopher Pracatta, Yvonne L. Baglini*
*Assistant Vice Presidents*

950 Warren Avenue, East Providence, RI 02914
telephone 866-293-4053 facsimile 401-435-6529
internet http://www.adr.org

# FAX

Date: March 7, 2007

To
Kevin J. Harrington, Esq.
Harrington, Ocko & Monk, LLP
81 Main Street, Suite 215
White Plains, NY 10601

Robert S. Ocko, Esq.
Harrington, Ocko & Monk, LLP
81 Main Street, Suite 215
White Plains, NY 10601

Philip A. Zukowsky, Esq.
Chernesky Heyman & Kress
10 Courthouse Plaza SW, Suite 1100
Dayton, OH 45402

Fax Number: 914 686 4824
937 449 2821

From: Kimberly F. Claxton

Number of Pages: (including cover)  5

Re: 19 117 00027 07
La Rosa Del Monte Express, Inc.
and
Software for Moving, Inc. and Shlomo Kogos

MESSAGE:

THIS FAX TRANSMISSION IS INTENDED ONLY FOR THE USE OF THE PERSON TO WHOM IT IS
ADDRESSED. IT MAY CONTAIN INFORMATION THAT IS CONFIDENTIAL, PRIVILEGED OR
OTHERWISE EXEMPT FROM DISCLOSURE. IF YOU ARE NOT THE INTENDED RECIPIENT OR THE
PERSON AUTHORIZED TO DELIVER THIS FAX TO THE INTENDED RECIPIENT, YOU ARE HEREBY
NOTIFIED THAT ANY DISSEMINATION OF THIS FAX IS PROHIBITED. IF YOU HAVE RECEIVED THIS
FAX IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AT THE NUMBER LISTED
ABOVE AND RETURN THE ORIGINAL FAX TO US BY FIRST CLASS MAIL AT THE ABOVE ADDRESS.



**American Arbitration Association**
*Dispute Resolution Services Worldwide*

*Northeast Case Management Center*
*Catherine Shanks*
*Vice President*
*Christopher Fracassa, Yvonne L. Baglini*
*Assistant Vice Presidents*

*950 Warren Avenue, East Providence, RI 02914*
*telephone: 866-293-4053 facsimile: 401-435-6529*
*internet: http://www.adr.org/*

March 7, 2007

<u>VIA FACSIMILE</u>

Kevin J. Harrington, Esq.
Harrington, Ocko & Monk, LLP
81 Main Street, Suite 215
White Plains, NY 10601

Robert S. Ocko, Esq.
Harrington, Ocko & Monk, LLP
81 Main Street, Suite 215
White Plains, NY 10601

Philip A. Zukowsky, Esq.
Chernesky Heyman & Kress
10 Courthouse Plaza SW, Suite 1100
Dayton, OH 45402

Re: 19 117 00027 07
    La Rosa Del Monte Express, Inc.
    and
    Software for Moving, Inc. and Shlomo Kogos

Dear Counsel:

This will confirm a telephone call on March 6, 2007, with Mr. Harrington, Mr. Zukowsky, and the undersigned, wherein the following matters were discussed:

> This will acknowledge receipt of an email dated March 6, 2007, from Mr. Zukowsky a copy of which we note has been exchanged with Mr. Harrington.

> Inasmuch as the parties are not in agreement to apply the Optional Rules for Emergency Measures of Protection, these Rules will not apply and the Association will proceed with the administration of this matter in accordance with AAA Rules.

- <u>Number of Arbitrators:</u>

  Based on the call and the parties' agreement, the Association will appoint 1 arbitrator to hear and determine this dispute.

- <u>Desired Qualification in an Arbitrator:</u>

- Mr. Harrington has requested an arbitrator with experience in licensing agreements and general commercial arbitration experience.

- Mr. Zukowsky has requested an arbitrator with experience in contract law, development of software, software licensing, intellectual property and copyright law.

The parties have agreed to extend the search for arbitrator to include New York City.

The Association is in the process of compiling a list of arbitrators taking into consideration the aforementioned qualifications to the extent possible.

- **Locale:**  The parties agreed that Westchester County shall be the locale of the hearing in the above referenced matter.

Since the Association does not maintain hearing rooms in Westchester County, the parties have agreed to hold the hearing in the offices of one of the representatives or at the arbitrator's office, if possible. Enclosed is listing of alternative hearing sites for your reference.

- **Number of days of hearing:**  Mr. Harrington estimates that this matter will require approximately 2-3 days of hearing. Mr. Zukowsky estimates that this matter will require approximately 10 days of hearing.

- **Per the agreement of the parties the checklist for conflicts shall be returned by March 16, 2007.**

Per the agreement of the parties Respondent will submit their answering statement on or before March 16, 2007. If Respondent wishes to counterclaim file the appropriate number of copies, together with the administrative fee, to the attention of the undersigned. A copy should be directly sent to Claimant.

The Association will require advance deposits once the arbitrator is appointed. These deposits are calculated on the number of days the parties have suggested will be necessary, in addition to the pre and post hearing time that the arbitrator may charge pursuant to the arbitrator's resume.

Mediation is available to the parties throughout the process of the arbitration. In addition to local mediators, the Association has a select group of mediators that serve on the AAA President's Panel of Mediators. Having already filed for arbitration, there is no additional administrative fee for this service. The compensation of the mediator will be based on the number of hours reported by the mediator. If at any point you would like to mediate please contact the undersigned.

Having already filed for arbitration, there is no additional administrative fee for this service. The compensation of the mediator will be based on the number of hours estimated by the mediator. Deposits will be requested in advance of the mediation.

Please visit our web site at www.adr.org to review our mediation section of the appropriate rules. You may also access "A Guide to Mediation and Arbitration for Business People" at that site. If you would like a printed copy of these procedures, please contact the undersigned.

As a reminder, cases may be viewed and managed online through AAA's WebFile.

In order to expedite administration, please direct all further correspondence to the address listed above.

Please do not hesitate to contact the undersigned should you have a question.

Sincerely,

*Kimberly F. Claxton*

Kimberly F. Claxton
Case Manager
401 431 4793
ClaxtonK@adr.org

*Supervisor Information: Karen Fontaine, 401 431 4798, fontainek@adr.org*

# White Plains

## ALTERNATIVE HEARING SITES

BECK LIEBMAN PETRONE, P.C.
399 Knollwood Road, Suite 311
White Plains, NY 10603
CONTACT: *Denise Feetau*
(914) 285-9500

$75 half day
$125 full day

Availability limited

CROWNE PLAZA
66 Hale Avenue
White Plains, NY 10601
CONTACT: *James Constantino*
(914) 821-1372

$300 per day

Call for further details

DRAKE, SOMMERS, LOEB,
TARSHIS & CATANIA, PLLC
1 Corwin Court
Newburgh, NY 12550
CONTACT: *Joseph Catania*
(845) 565-1100

$75 half day
$125 full day

Availability limited

HILTON – (Pearl River)
500 Veterans Memorial Drive

1

Pearl River, NY 10965
CONTACT: Wesley J. Trunko
(845) 735-9000
(845) 735-9005 - Fax                                                          $300 per day                Call for further details

McCABE & MACK LLP
63 Washington Street
Poughkeepsie, NY 12602-0509
CONTACT: Patty Karcher
(845) 486-6800                                                                $100 per day                Availability limited

MARRIOTT HOTELS
CONTACT: Nathaniel (call for further details regarding all of the below locations)
(212) 589-1305

$125 - $300 per day depending upon location
- COURTYARD BY MARRIOTT (Tarrytown)
- WESTCHESTER MARRIOTT (Tarrytown)
- RENAISSANCE (White Plains)
- COURTYARD BY MARRIOTT (Rye)
- COURTYARD BY MARRIOTT (Fishkill)
- COURTYARD BY MARRIOTT (Poughkeepsie)

WESTCHESTER COUNTY BAR ASSOCIATION
300 Hamilton Avenue, 3rd Floor
White Plains, NY 10601
CONTACT: Bob Bush
(914) 761-3707 ext. 10                                    $70 half day            Call for further details
                                                          $125 full day

EXHIBIT "N"

## AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| LA ROSA DEL MONTE EXPRESS, INC. | Case No. 19 117 00027 07 |
| Claimant, | |
| vs. | |
| SOFTWARE FOR MOVING, INC. and SHLOMO KOGOS, as an Individual, | |
| Respondents. | |

## OBJECTION TO JURISDICTION

1.    LA ROSA DEL MONTE EXPRESS, INC. ("LA ROSA") filed a Demand for Arbitration (the "Demand") with the American Arbitration Association ("AAA") in February 2007 and the Demand was assigned the above Case No.

2.    LA ROSA claims as the basis for the AAA having jurisdiction in this case a certain Software Development and License Agreement (the "Exhibit B Agreement") that is attached as Exhibit "B" to the Demand.

3.    SOFTWARE FOR MOVING, INC. ("SFM") did not enter into the Exhibit B Agreement, nor did it otherwise agree to arbitrate its business transactions with LA ROSA.

4.    Because SFM has never agreed to arbitrate its business transactions with LA ROSA the AAA does not have jurisdiction over SFM or the subject matter of SFM's business transactions with LA ROSA.

5.    For the record, SFM has asked AAA for an immediate hearing on the jurisdiction issue but was refused.  SFM was told by AAA that it could only have an immediate hearing on the jurisdiction issue if LA ROSA agreed.  Thereafter, SFM asked LA ROSA to agree to an

emergency hearing on the jurisdiction issue but was refused. SFM is shocked and appalled by the failure of the AAA to have a system that deals with issues of jurisdiction prior to the time that the party asserting lack of jurisdiction has to file an answer to claims made in a Demand for Arbitration and any pertinent counterclaims such party may have.

6.     For the avoidance of doubt, SFM states for the record that it is never has, and still does not, agree to the assertion of jurisdiction by the AAA with respect to its business transactions with LA ROSA and it will resist such jurisdiction through any legal means available to it.  SFM reserves its right to, and will, pursue its legal rights against LA ROSA in the appropriate courts of competent jurisdiction at the appropriate time.

Respectfully Submitted,

SOFTWARE FOR MOVING, INC.

S. Kogos
Shlomo Kogos, Officer
By Pinly Zukowsky, POA

TO:     Kimberly F. Claxton
        American Arbitration Association
        Claxtonk@adr.org

        Kevin J. Harrington
        Attorney for La Rosa Del Monte Express, Inc.
        kharrington@homelegal.net

{00290611.DOC;3}                    2

**EXHIBIT "O"**

# Harrington, Ocko & Monk

**A LIMITED LIABILITY PARTNERSHIP**
**Attorneys at Law**

White Plains Office

81 Main Street – Suite 215
**White Plains, NY 10601**
Tel:   (914) 686-4800
Fax:   (914) 686-4824

**John T.A. Rosenthal, Esq.**
e-mail: jrosenthal@homlegal.com

New York City Office

**52 Duane Street, 7th**
**Floor**
**New York, NY 10007**
Tel: (212) 227-8004

**Reply to White Plains**
**Office**

March 21, 2007

**VIA E-MAIL @ claxtonk@adr.org**
**and FACSIMILE @ (401) 435-6529**

Kimberly F. Claxton
Case Manager
American Arbitration Association
Northeast Case Management Center
950 Warren Avenue
East Providence, RI 02914

    Re:    Case No. 19 117 00027 07
            La Rosa Del Monte Express, Inc. and
            <u>Software for Moving, Inc. and Shlomo Kogos</u>

Dear Ms. Claxton:

    We write to you at this time with regard to proceeding forward with the arbitration in the above-captioned matter.

    As you indicated in our previous phone conversation with yourself and Mr. Zukowsky, counsel for Respondent Software for Moving, Inc. ("SFM"), SFM had until March 16, 2007 by which to file an Answer and/or Counterclaims in this matter.

    We are now in receipt of SFM's Objection to Jurisdiction. As you indicated in your prior conference call with counsel for the parties in this matter, jurisdiction is an issue for the arbitrator to decide pursuant to the AAA's Commercial Arbitration Rules. *See* AAA Commercial Arbitration Rules R-7(a)-(c). Rule 7(a)-(c) specifically provides that a party is to object to jurisdiction no later than the date it is required to file an Answer. Rule 7(c) also provides that the arbitrator may rule on such jurisdictional objection as a preliminary matter. Thus, we interpret SFM filing its Objection to Jurisdiction with the AAA as its Answer in this matter.

Kimberly F. Claxton - AAA
March 21, 2007
Page 2


Pursuant to your previous instructions, we request that AAA provide each party and its counsel with a list of potential arbitrators from whom we have to choose, and that the parties proceed forward with the arbitration as expeditiously as possible, as provided for by the AAA Commercial Arbitration Rules.

We would also request at this time that counsel for SFM provide us with the current address of SFM as well as the current address of SFM's President, Mr. Kogos. We make this request in order to expedite service of papers in this matter.

Thanking you in advance for your time and consideration to this matter.

Respectfully submitted,

John T.A. Rosenthal

JTR/sg

cc:    Philip A. Zukowsky, Esq.
       VIA E-MAIL @ paz@chk.law and FACSIMILE @ (937) 463-4947

EXHIBIT "P"



**American Arbitration Association**
*Dispute Resolution Services Worldwide*

Northeast Case Management Center
Catherine Shanks
Vice President
Christopher Fracassa, Yvonne L. Baglini
Assistant Vice Presidents

950 Warren Avenue, East Providence, RI 02914
telephone 866-293-4053 facsimile 401-435-6529
internet http://www.adr.org

March 22, 2007

VIA ELECTRONIC MAIL

Kevin J. Harrington, Esq./ Robert S. Ocko, Esq.
Harrington, Ocko & Monk, LLP
81 Main Street, Suite 215
White Plains, NY 10601

Philip A. Zukowsky, Esq.
Chernesky Heyman & Kress
10 Courthouse Plaza SW, Suite 1100
Dayton, OH 45402

Re: 19 117 00027 07
La Rosa Del Monte Express, Inc.
and
Software for Moving, Inc. and Shlomo Kogos

Dear Counsel:

This will acknowledge receipt of a letter dated March 21, 2007, from Mr. Rosenthal, a copy of which we note has been exchanged with the other party.

The Association has carefully reviewed the positions and contentions of the parties as set forth in their correspondence. The claimant has met the filing requirements of the rules by filing a demand for arbitration providing for administration by the American Arbitration Association under its rules.

Accordingly, in the absence of an agreement by the parties or a court order staying this matter, the Association will proceed with administration pursuant to the Rules. The parties may wish to raise this issue, upon appointment of the arbitrator.

The AAA serves as a neutral administrative agency and does not generally appear or participate in judicial proceedings relating to arbitration. The AAA should not be named as a party-defendant. The Rules state that the AAA is not a "necessary party". The AAA will abide by an order issued by the courts and the parties are requested to keep us informed as to the outcome.

In accordance with the Rules, the Association encloses a list of names selected from our roster from which one arbitrator is to be appointed. The parties are encouraged to agree upon an arbitrator and advise the Association of their agreement within 15 days from the date of this letter. Absent an agreement of the parties, each party shall independently strike the names objected to, number the remaining names in order of preference and return the list to the Association on or before April 6, 2007. If the list of arbitrators is not returned by the date specified, the arbitrator will be appointed as authorized in the Rules. Please leave as many names as possible. If the neutral arbitrator cannot be appointed from the list provided, the Association shall administratively appoint the arbitrator as authorized in the Rules without the submission of an additional list. The parties are to exchange copies of all correspondence except the checklist for conflicts and the arbitrator lists.

The list for selection of arbitrators is also available on-line through AAA's WebFile. The parties may strike and rank their preferences, which will be kept confidential.

Please note the arbitrators' rates of compensation indicated on the enclosed resumes. The Association requires advance deposits calculated by the number of days the parties have suggested will be necessary, in addition to the pre-hearing time that the arbitrator may charge pursuant to the arbitrator's resume.

Upon appointment of the arbitrator a preliminary hearing will be set.

Sincerely,


Kimberly F. Claxton
Case Manager
401 431 4793
ClaxtonK@adr.org

*Supervisor Information: Karen Fontaine, 401 431 4798, fontainek@adr.org*

**EXHIBIT "Q"**

# FILED

Our File No: 2341

*JH*

**STATE OF ILLINOIS** )

) SS.

**COUNTY OF COOK** )

APR - 3 2007

APR. 3, 2007

**MICHAEL W. DOBBINS**

**CLERK, U.S. DISTRICT COURT**

## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SOFTWARE FOR MOVING, INC.,
a New York Corporation,

           Plaintiff,

vs.

LA ROSA DEL MONTE EXPRESS,
INC., a New York Corporation, and
LA ROSA DEL MONTE EXPRESS
(CHICAGO), LLC, an Illinois Limited
Liability Company,

           Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

# 07CV1839
# JUDGE ANDERSEN
# MAG. JUDGE COLE

**JURY DEMANDED BY PLAINTIFF**

## COMPLAINT AT LAW

NOW COMES the Plaintiff SOFTWARE FOR MOVING, INC., a New York Corporation (SFM), by and through its attorneys, LEYHANE & ASSOCIATES, LTD., and for its Complaint against Defendants LA ROSA DEL MONTE EXPRESS, INC., a New York Corporation (LA ROSA), and LA ROSA DEL MONTE EXPRESS (CHICAGO), LLC, an Illinois Limited Liability Company (LA ROSA CHICAGO), states as follows:

## JURISDICTION

1.     This court has jurisdiction over the copyright claims asserted in this action pursuant to 28 U.S.C.A. §1338(a) and 28 U.S.C.A. §1331 and supplemental jurisdiction over all related claims pursuant to 28 U.S.C.A. §1367(a).

## THE PARTIES

2.    As its name suggests, SFM develops and licenses software for moving companies. It is the successor in interest to SAFEGUARD COMPUTER SERVICES, INC.

3.    LA ROSA is a moving company, operating at 11 different locations in the United States and internationally.  Its Chicago office is located at 4834 W. Armitage Ave., Chicago, Illinois 60639.

4.    On information and belief, LA ROSA CHICAGO is an entity set up by LA ROSA, is involved in LA ROSA operations based in Chicago, and benefits from the software that SFM developed and licensed to LA ROSA.

## THE RELATIONSHIPS BETWEEN THE PARTIES

5.    LA ROSA is a long-time customer of SFM.  In 1999 LA ROSA entered into a contract with SFM for the licensing of a windows-based program, Moving Manager for Windows.  A true and correct copy of that contract is attached as Exhibit A 1999 Software Licensing Agreement).  On information and belief, LA ROSA continues to use Moving Manager for Windows in its operations.

6.    LA ROSA CHICAGO never had a direct contract with SFM.  It is a subsidiary or sister corporation, affiliated or associated with LA ROSA and included within the definition of Licensee under the 1999 contract attached hereto as Exhibit A.

7.    Before using Moving Manager for Windows, LA ROSA licensed a DOS-based program from SFM.  On information and belief, LA ROSA continues to use the DOS-based program in its operations.

8.    In approximately December 2004 LA ROSA entered into an agreement with SFM to license a web-based version of the Moving Manager Program (Web Program) with certain modifications that suited LA ROSA'S business needs.  Over the next 20 months, SFM worked on completing the Web Program. At various times during this period SFM worked closely with Steven Dalzell, Roberto Rodriguez and Hiram Rodriguez of LA ROSA on completion of the Web Program. On information and belief, Mr. Dalzell was the Chief Operating Officer of LA ROSA, Mr. Roberto Rodriguez was an officer of LA ROSA, and Mr. Hiram Rodriguez was an officer and the owner of LA ROSA. Although SFM understood that LA ROSA would be preparing a written agreement regarding the Web Program, no such agreement was presented to SFM with the exceptions noted hereafter in Paragraph 10.  The oral agreement between SFM and LA ROSA provided that LA ROSA would pay a total of $295,000 for the Web Program, with the final payment due no later than the completion of the program by SFM.

9.    LA ROSA went "live" with the Web Program in or about August 2006, necessarily meaning that it deemed the Web Program complete as of that time.

10.    At around the same time as LA ROSA went "live" with the Web Program, Mr. Dalzell requested that SFM sign a "9/11 Agreement" (a copy of which is attached hereto and incorporated herein as Exhibit B) and a chart listing the maintenance fees that LA ROSA was obligated to pay SFM during the next seven years. A "9/11 Agreement" is an agreement in which the licensor of software agrees to place the source code in escrow and made available to the licensee in the event something happens to the licensor.  The agreement between SFM and LA ROSA regarding the required maintenance fees is set forth on Exhibit C.

11.    In 2006, LA ROSA, through Mr. Dalzell requested that SFM further customize the Web Program with certain additional enhancement features (Enhancement Features) that had

- 3 -

not been available when the parties entered into the agreement for the Web Program. These features were a Google Map feature and address validation feature. LA ROSA agreed to pay an additional $60,000 for this further customization. Under the oral agreement for this set of enhancements (Enhancement Feature Agreement), LA ROSA did have a right to accept or reject the enhancements within a reasonable time. If LA ROSA rejected the Enhancement Features – and did not use them – LA ROSA would not be obliged to pay for this additional $60,000 amount.

## COUNT I

### Copyright Infringement

1. - 6. Paragraphs 1 through 6 of this Complaint are restated as Paragraphs 1 through 6 of Count I.

7.     Paragraph 2 of the 1999 Software Licensing Agreement provides in its entirety as follows:

> 2. <u>TERM OF LICENSE; TERMINATION; CONSIDERATION.</u>
> (a) This license begins on the date that the Software is installed at any of Licensee's sites. This license is perpetual unless its terms are breached by Licensee. (b) This license in its entirety and as to all Software licensed shall terminate immediately if Licensee does not comply with these terms, including but not limited to, non payment of licensing fees or maintenance fees, unauthorized copying or use of the Software, or unauthorized modification of the Software. (c) Upon termination, the license shall cease, and all copies of the Software shall be returned to Licensor or destroyed, at Licensor's option. Use of the Software is not authorized after termination by Licensor and shall be considered by Licensor to be

- 4 -

infringement of its intellectual property w rights, in addition to any
other rights that may accrue to Licensor by such use. Payment of
fees shall be made pursuant to the Schedules attached hereto at
Exhibit "A" and "C."

8.    LA ROSA stopped paying the maintenance fees required by the 1999 Software
Licensing Agreement on or around August 1, 2006.

9.    Thereafter, SFM, through its attorney, demanded payment of the maintenance fees.
LA ROSA did not respond to the demand.

10.    In January 2007 SFM notified LA ROSA that, due to non-payment of the required
maintenance fees it would terminate the License Agreement unless it received payment.  LA
ROSA did not respond to this notification by paying the overdue fees.

11.    SFM then issued a cease and desist letter to LA ROSA on February 12, 2007
telling LA ROSA that its license to use that SFM product was terminated for failure to pay
required maintenance fees and that LA ROSA was required to either return the software or
destroy the software or return it to SFM.  A true and correct copy of this letter is attached as
Exhibit D.

12.    SFM followed up its cease and desist letter with a second letter (attached hereto
as Exhibit E) again informing LA ROSA that it needed to stop using the software and to destroy
or return it to SFM.

13.    On information and belief, LA ROSA continues to use the SFM software that is
the subject of the 1999 Software Licensing Agreement.

14.    Between the time that LA ROSA stopped paying the required maintenance
payments and the date on which SFM told LA ROSA to stop using its software, SFM responded

to all maintenance requests from LA ROSA regarding the Moving Manager for Windows program.

15.    Under 17 U.S.C.A. §504, SFM is entitled to its losses from the infringement on its software and the profits earned by Defendants which are attributable to the use of SFM's copyrighted software products.

16.    Under 17 U.S.C.A. §505, SFM is entitled to reasonable attorney's fees and its full costs in prosecuting this action.

WHEREFORE, Plaintiff SOFTWARE FOR MOVING, INC. respectfully prays that judgment be entered in its favor and against Defendants LA ROSA DEL MONTE EXPRESS, INC. and LA ROSA DEL MONTE EXPRESS (CHICAGO), LLC for profits wrongfully derived from the use of SFM software and for the attorney's fees and costs incurred by SFM in bringing this action.

## COUNT II

### Breach of Contract
### 1999 Software Licensing Agreement

1. - 6.  Paragraphs 1 through 6 of this Complaint are incorporated herein as Paragraphs 1 through 6 of Count II.

7.    Under the 1999 Software Licensing Agreement, LA ROSA was required to pay maintenance fees to SFM during the time it used SFM's software programs.

8.    LA ROSA breached this contract when it stopped paying the maintenance fees required by the 1999 Software Licensing Agreement on or around August 1, 2006.

WHEREFORE, Plaintiff SOFTWARE FOR MOVING, INC. respectfully prays that judgment be entered in its favor and against Defendants LA ROSA DEL MONTE EXPRESS,

INC. and LA ROSA DEL MONTE EXPRESS (CHICAGO), LLC in an amount that will fairly compensate SFM for Defendants' breach of contract. Plaintiff prays for such other or further relief as it may be entitled to including the recovery of its costs incurred in bringing this action.

### COUNT III

*Breach of Contract*
*Web Program Agreement*

1. - 10.    Paragraphs 1 through 10 of this Complaint are incorporated herein as Paragraphs 1 through 10 of Count III.

11.    Even though LA ROSA took the web-based program live in or about August 2006, it has failed to pay SFM $52,500 of the $295,000 due upon completion and deliver of the Web Program.

12.    Once the Web Program was complete, LA ROSA became obliged to pay the monthly maintenance fee heretofore alleged.

13.    LA ROSA has never paid any maintenance fees for the period of time that it used the Web Program despite several demands for payment.

WHEREFORE, Plaintiff SOFTWARE FOR MOVING, INC. respectfully prays that judgment be entered in its favor and against Defendant LA ROSA DEL MONTE EXPRESS, INC. in an amount that will fairly compensate SFM for Defendant's breach of contract. Plaintiff prays for such other or further relief as it may be entitled to including the recovery of its costs incurred in bringing this action.

### COUNT IV

*Breach of Contract*
*Enhancement Features Agreement*

1. - 11        Paragraphs 1 through 11 of this Complaint are incorporated herein as Paragraphs 1 through 11 of Count IV.

13.    On December 22, 2006, after completion and delivery of the Enhancement Features provided for in the separate Enhancement Features Agreement, counsel for SFM sent an email to counsel for LA ROSA offering a fresh opportunity for LA ROSA "to reject these enhancements and not have any payment obligations." A true and correct copy of this email is attached as Exhibit F. LA ROSA did not respond to this offer.

WHEREFORE, Plaintiff SOFTWARE FOR MOVING, INC. respectfully prays that judgment be entered in its favor and against Defendant LA ROSA DEL MONTE EXPRESS, INC. in the amount of $60,000 for the breach of the Enhanced Features Agreement. Plaintiff prays for such other or further relief as it may be entitled to including the recovery of its costs incurred in bringing this action.

## **JURY DEMAND**

Plaintiff demands a trial by jury in this matter.

One of the Attorneys for
SOFTWARE FOR MOVING, INC.

Attorney No. 3127365
FRANCIS J. LEYHANE III
LEYHANE & ASSOCIATES, LTD.
205 West Randolph Street
Suite 1320
Chicago, Illinois 60606
(312) 223-0811

**FILED**

**JUNE 21, 2007**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

Our File No: 2341

STATE OF ILLINOIS          )
                           )  SS.
COUNTY OF COOK             )

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SOFTWARE FOR MOVING, INC.,          )
a New York Corporation,             )
                                    )
               Plaintiff,           )
                                    )
vs.                                 )          No:  07 C 1839
                                    )          Judge Gottschall
LA ROSA DEL MONTE EXPRESS,          )          Magistrate Judge Cole
INC., a New York Corporation, and   )
LA ROSA DEL MONTE EXPRESS           )
(CHICAGO), LLC, an Illinois Limited )
Liability Company,                  )          **Jury Demanded by Plaintiff**
                                    )
               Defendants.          )

**FIRST AMENDED COMPLAINT AT LAW**

NOW COMES the Plaintiff SOFTWARE FOR MOVING, INC., a New York Corporation

(SFM), by and through its attorneys, LEYHANE & ASSOCIATES, LTD., and for its First

Amended Complaint against Defendants LA ROSA DEL MONTE EXPRESS, INC., a New York

Corporation (LA ROSA), and  LA ROSA DEL MONTE EXPRESS (CHICAGO), LLC, an

Illinois Limited Liability Company (LA ROSA CHICAGO), states as follows:

**JURISDICTION**

1.       This court has jurisdiction over the copyright claims asserted in this action pursuant

to 28 U.S.C.A. §1338(a) and 28 U.S.C.A. §1331 and supplemental jurisdiction over all related

claims pursuant to 28 U.S.C.A. §1367(a).  The software which is the subject of this action was

registered under copyright number TX-4-426-709 on April 16, 1997; the software was originally

published on or about October 19, 1990 by SAFEGUARD COMPUTER SERVICES, INC. Plaintiff SFM is the successor in interest of SAFEGUARD COMPUTER SERVICES, INC. and assignee of its contracts and copyrights.

## THE PARTIES

2.     As its name suggests, SFM develops and licenses software for moving companies.

3.     LA ROSA is a moving company, operating at 11 different locations in the United States and internationally.  Its Chicago office is located at 4834 W. Armitage Ave., Chicago, Illinois  60639.

4.     On information and belief, LA ROSA CHICAGO is an entity set up by LA ROSA, is involved in LA ROSA operations based in Chicago, and benefits from the software that SFM developed and licensed to LA ROSA.

## THE RELATIONSHIPS BETWEEN THE PARTIES

5.     LA ROSA is a long-time customer of SFM.  In 1999 LA ROSA entered into a contract with SFM's predecessor, SAFEGUARD COMPUTER SERVICES, INC. for the licensing of a windows-based program, Moving Manager for Windows.  A true and correct copy of that contract is attached as Exhibit A 1999 Software Licensing Agreement).  On information and belief, LA ROSA continues to use Moving Manager for Windows in its operations.

6.     LA ROSA CHICAGO never had a direct contract with SFM or its predecessor. It is a subsidiary or sister corporation, affiliated or associated with LA ROSA and included within the definition of Licensee under the 1999 contract attached hereto as Exhibit A.  On information and belief, as a LA ROSA subsidiary or a sister company to LA ROSA, LA ROSA CHICAGO also continues to use Moving Manager for Windows.

- 2 -

7.      Before using Moving Manager for Windows, LA ROSA licensed a DOS-based program from SFM.  On information and belief, LA ROSA continues to use the DOS-based program in its operations.

8.      In approximately December 2004 LA ROSA entered into an agreement with SFM to license a web-based version of the Moving Manager Program (Web Program) with certain modifications that suited LA ROSA'S business needs.   Over the next 20 months, SFM worked on completing the Web Program. At various times during this period SFM worked closely with Steven Dalzell, Roberto Rodriguez and Hiram Rodriguez of LA ROSA on completion of the Web Program. On information and belief, Mr. Dalzell was the Chief Operating Officer of LA ROSA, Mr. Roberto Rodriguez was an officer of LA ROSA, and Mr. Hiram Rodriguez was an officer and the owner of LA ROSA. Although SFM understood that LA ROSA would be preparing a written agreement regarding the Web Program, no such agreement was presented to SFM with the exceptions noted hereafter in Paragraph 10.  The oral agreement between SFM and LA ROSA provided that LA ROSA would pay a total of $295,000 for the Web Program, with the final payment due no later than the completion of the program by SFM.

9.      LA ROSA went "live" with the Web Program in or about August 2006, necessarily meaning that it deemed the Web Program complete as of that time.

10.     At around the same time as LA ROSA went "live" with the Web Program, Mr. Dalzell requested that SFM sign a "9/11 Agreement" (a copy of which is attached hereto and incorporated herein as Exhibit B) and a chart listing the maintenance fees that LA ROSA was obligated to pay SFM during the next seven years. A "9/11 Agreement" is an agreement in which the licensor of software agrees to place the source code in escrow and made available to the

- 3 -

licensee in the event something happens to the licensor.  The agreement between SFM and LA ROSA regarding the required maintenance fees is set forth on Exhibit C.

11.    In 2006, LA ROSA, through Mr. Dalzell requested that SFM further customize the Web Program with certain additional enhancement features (Enhancement Features) that had not been available when the parties entered into the agreement for the Web Program.  These features were a Google Map feature and address validation feature.  LA ROSA agreed to pay an additional $60,000 for this further customization.  Under the oral agreement for this set of enhancements (Enhancement Feature Agreement), LA ROSA did have a right to accept or reject the enhancements within a reasonable time.  If LA ROSA rejected the Enhancement Features – and did not use them – LA ROSA would not be obliged to pay for this additional $60,000 amount.

## COUNT I

### *Copyright Infringement*

1. - 6.  Paragraphs 1 through 6 of this Complaint are restated as Paragraphs 1 through 6 of Count I.

7.    Paragraph 2 of the 1999 Software Licensing Agreement provides in its entirety as follows:

> 2. TERM OF LICENSE; TERMINATION; CONSIDERATION.
> (a) This license begins on the date that the Software is installed at any of Licensee's sites. This license is perpetual unless its terms are breached by Licensee. (b) This license in its entirety and as to all Software licensed shall terminate immediately if Licensee does not comply with these terms, including but not limited to, non payment of licensing fees or maintenance fees, unauthorized

copying or use of the Software, or unauthorized modification of the Software. (c) Upon termination, the license shall cease, and all copies of the Software shall be returned to Licensor or destroyed, at Licensor's option. Use of the Software is not authorized after termination by Licensor and shall be considered by Licensor to be infringement of its intellectual property w rights, in addition to any other rights that may accrue to Licensor by such use. Payment of fees shall be made pursuant to the Schedules attached hereto at Exhibit "A" and "C."

8.      LA ROSA stopped paying the maintenance fees required by the 1999 Software Licensing Agreement on or around August 1, 2006.

9.      Thereafter, SFM, through its attorney, demanded payment of the maintenance fees. LA ROSA did not respond to the demand.

10.      In January 2007 SFM notified LA ROSA that, due to non-payment of the required maintenance fees it would terminate the License Agreement unless it received payment.  LA ROSA did not respond to this notification by paying the overdue fees.

11.      SFM then issued a cease and desist letter to LA ROSA on February 12, 2007 telling LA ROSA that its license to use that SFM product was terminated for failure to pay required maintenance fees and that LA ROSA was required to either return the software or destroy the software or return it to SFM.  A true and correct copy of this letter is attached as Exhibit D.

12.      SFM followed up its cease and desist letter with a second letter (attached hereto as Exhibit E) again informing LA ROSA that it needed to stop using the software and to destroy or return it to SFM.

13.    On information and belief, LA ROSA and LA ROSA CHICAGO continue to use the SFM software that is the subject of the 1999 Software Licensing Agreement.

14.    Between the time that LA ROSA stopped paying the required maintenance payments and the date on which SFM told LA ROSA to stop using its software, SFM responded to all maintenance requests from LA ROSA regarding the Moving Manager for Windows program.

15.    Under 17 U.S.C.A. §504, SFM is entitled to its losses from the infringement on its software and the profits earned by Defendants which are attributable to the use of SFM's copyrighted software products.

16.    Under 17 U.S.C.A. §505, SFM is entitled to reasonable attorney's fees and its full costs in prosecuting this action.

WHEREFORE, Plaintiff SOFTWARE FOR MOVING, INC. respectfully prays that judgment be entered in its favor and against Defendants LA ROSA DEL MONTE EXPRESS, INC. and LA ROSA DEL MONTE EXPRESS (CHICAGO), LLC for profits wrongfully derived from the use of SFM software and for the attorney's fees and costs incurred by SFM in bringing this action.

### COUNT II

*Breach of Contract*
*1999 Software Licensing Agreement*

1. - 6. Paragraphs 1 through 6 of this Complaint are incorporated herein as Paragraphs 1 through 6 of Count II.

7.    Under the 1999 Software Licensing Agreement, LA ROSA was required to pay maintenance fees to SFM during the time it used SFM's software programs.

- 6 -

8.    LA ROSA breached this contract when it stopped paying the maintenance fees required by the 1999 Software Licensing Agreement on or around August 1, 2006.

WHEREFORE, Plaintiff SOFTWARE FOR MOVING, INC. respectfully prays that judgment be entered in its favor and against Defendants LA ROSA DEL MONTE EXPRESS, INC. and LA ROSA DEL MONTE EXPRESS (CHICAGO), LLC in an amount that will fairly compensate SFM for Defendants' breach of contract. Plaintiff prays for such other or further relief as it may be entitled to including the recovery of its costs incurred in bringing this action.

### COUNT III

*Breach of Contract*
*Web Program Agreement*

1. - 10.    Paragraphs 1 through 10 of this Complaint are incorporated herein as Paragraphs 1 through 10 of Count III.

11.    Even though LA ROSA took the web-based program live in or about August 2006, it has failed to pay SFM $52,500 of the $295,000 due upon completion and deliver of the Web Program.

12.    Once the Web Program was complete, LA ROSA became obliged to pay the monthly maintenance fee heretofore alleged.

13.    LA ROSA has never paid any maintenance fees for the period of time that it used the Web Program despite several demands for payment.

WHEREFORE, Plaintiff SOFTWARE FOR MOVING, INC. respectfully prays that judgment be entered in its favor and against Defendant LA ROSA DEL MONTE EXPRESS, INC. in an amount that will fairly compensate SFM for Defendant's breach of contract. Plaintiff

prays for such other or further relief as it may be entitled to including the recovery of its costs incurred in bringing this action.

## COUNT IV

*Breach of Contract*
*Enhancement Features Agreement*

1. - 11        Paragraphs 1 through 11 of this Complaint are incorporated herein as Paragraphs 1 through 11 of Count IV.

13.    On December 22, 2006, after completion and delivery of the Enhancement Features provided for in the separate Enhancement Features Agreement, counsel for SFM sent an email to counsel for LA ROSA offering a fresh opportunity for LA ROSA "to reject these enhancements and not have any payment obligations." A true and correct copy of this email is attached as Exhibit F. LA ROSA did not respond to this offer.

WHEREFORE, Plaintiff SOFTWARE FOR MOVING, INC. respectfully prays that judgment be entered in its favor and against Defendant LA ROSA DEL MONTE EXPRESS, INC. in the amount of $60,000 for the breach of the Enhanced Features Agreement. Plaintiff prays for such other or further relief as it may be entitled to including the recovery of its costs incurred in bringing this action.

Attorney No. 3127365
FRANCIS J. LEYHANE III
LEYHANE & ASSOCIATES, LTD.
205 West Randolph Street
Suite 1320
Chicago, Illinois 60606
(312) 223-0811

_____s/ Francis J. Leyhane III_____
One of the Attorneys for
SOFTWARE FOR MOVING, INC.

EXHIBIT "R"



American Arbitration Association
*Dispute Resolution Services Worldwide*

*Northeast Case Management Center*
Catherine Shanks
*Vice President*
Christopher Fracassa, Yvonne L. Baglini
*Assistant Vice President*

950 Warren Avenue, East Providence, RI 02914
telephone 866-293-4053 facsimile 401-435-6529
internet http://www.adr.org/

# FAX

Date:  April 16, 2007

To:
Kevin J. Harrington, Esq.
Harrington, Ocko & Monk, LLP
81 Main Street, Suite 215
White Plains, NY 10601

Robert S. Ocko, Esq.
Harrington, Ocko & Monk, LLP
81 Main Street, Suite 215
White Plains, NY 10601

Philip A. Zukowsky, Esq.
Chernesky Heyman & Kress
10 Courthouse Plaza SW, Suite 1100
Dayton, OH 45402

Fax Number:  914 686 4824
             937 449 2521

From:  Kimberly F. Claxton

Number of Pages:  (including cover) 10

Re: 19 117 00027 07
    La Rosa Del Monte Express, Inc.
    and
    Software for Moving, Inc.and Shlomo Kogos

MESSAGE:

THIS FAX TRANSMISSION IS INTENDED ONLY FOR THE USE OF THE PERSON TO WHOM IT IS ADDRESSED. IT MAY CONTAIN INFORMATION THAT IS CONFIDENTIAL, PRIVILEGED OR OTHERWISE EXEMPT FROM DISCLOSURE. IF YOU ARE NOT THE INTENDED RECIPIENT OR THE PERSON AUTHORIZED TO DELIVER THIS FAX TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION OF THIS FAX IS PROHIBITED. IF YOU HAVE RECEIVED THIS FAX IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AT THE NUMBER LISTED ABOVE AND RETURN THE ORIGINAL FAX TO US BY FIRST CLASS MAIL AT THE ABOVE ADDRESS.



**American Arbitration Association**
*Dispute Resolution Services Worldwide*

Northeast Case Management Center
Catherine Shanks
Vice President
Christopher Fracasso, Yvonne L. Baglini
Assistant Vice Presidents

950 Warren Avenue, East Providence, RI 02914
Telephone: 866-293-4053 facsimile: 401-435-6529
internet: http://www.adr.org/

April 16, 2007

<u>VIA</u>
<u>FACSIMILE/W ENCLOSURES</u>

Kevin J. Harrington, Esq.
Harrington, Ocko & Monk, LLP
81 Main Street, Suite 215
White Plains, NY 10601

Robert S. Ocko, Esq.
Harrington, Ocko & Monk, LLP
81 Main Street, Suite 215
White Plains, NY 10601

Philip A. Zukowsky, Esq.
Chernesky Heyman & Kress
10 Courthouse Plaza SW, Suite 1100
Dayton, OH 45402

Re: 19 117 00027 07
La Rosa Del Monte Express, Inc.
and
Software for Moving, Inc. and Shlomo Kogos

Dear Parties:

This will advise the parties the Association has appointed Richard S. Mandel as arbitrator. Enclosed please find the arbitrator's duly executed Notice of Appointment and Notice of Compensation Arrangements.

The arbitrator is available to conduct a preliminary hearing on the following dates:

     May 1, 2007
     May 2, 2007
     May 3, 2007

Please provide your availability by April 20, 2007. If a response is not received by the Association by that date, we will assume all dates and times are acceptable and a preliminary hearing will be set.

Sincerely,

Kimberly Claxton

Kimberly F. Claxton
Case Manager
401 431 4793
ClaxtonK@adr.org

*Supervisor Information: Karen Fontaine, 401 431 4798, fontainek@adr.org*

Encl.

cc:    Richard S. Mandel, Esq.

COHAN LIEBOWITZ & LATMAN

@002

# AMERICAN ARBITRATION ASSOCIATION

In the Matter of Arbitration Between:

Re: 19 117 00027 07
La Rosa Del Monte Express, Inc.
and
Software for Moving, Inc. and Shlomo Kogos

## Notice of Compensation Arrangements

To:    Richard S. Mandel, Esq.

You have been invited to serve as an arbitrator in the above matter. It is important that you understand the terms of your compensation and the role you play in ensuring that you receive payment for fees and expenses that you may incur during your service. This invitation to serve is based on our assumption that unless your panel biography states otherwise, you are willing to comply with the Association's *Billing Guidelines for Commercial, Construction, and Employment Neutrals*, which are enclosed. If you expect to assess charges that fall outside those guidelines and those charges are not detailed on your panel biography, you must notify the Association prior to accepting your appointment so that the parties can determine whether they still seek your services as an arbitrator.

## Your Compensation

This matter is being administered under the (Regular) procedures of the (Commercial) Arbitration Rules. As such, you will be compensated at the following rates, per the rate structure indicated on your biographical record:

Hearing Time:               $380.00 per (hour)
Study Time:                 $380.00 per (hour)

Inasmuch as you are agreeing to serve in this matter at the above rate, any subsequent change to your published rate after your appointment will not apply to this case.

## Your Expenses

On most cases, your expenses should be nominal and will be reimbursed immediately after you submit them. For any single expense over $25, please include a receipt with your request for reimbursement.

If you anticipate that you will incur significant expenses, such as airfare or hotel room costs, please advise your Case Manager in advance so that the parties can be asked to make deposits prior to you incurring the expense.

## Deposits and Payment

Payment for your compensation is the obligation of the parties and it is understood that the American Arbitration Association has no liability, direct or indirect, for such payment. During the course of the proceeding the Case Manager will ask that you provide an estimate of the amounts needed to cover your fees. Generally this occurs immediately after the preliminary hearing, although on longer or more complex cases it can occur immediately upon appointment or after each series of hearings.

Unless you specify otherwise, the parties are advised that deposits are due 30 days prior to the first hearing. No later than two weeks prior to the hearing, the Case Manager will advise you of the total amount on deposit. Should the parties fail to make deposits in a timely manner, you must determine whether to go forward or suspend the proceedings until such time as deposits have been made. If you decide to go forward without full deposits, you may not subsequently delay the rendering of the award for lack of payment of your fees *The time to deal with this issue*

COWAN, LIEBOWITZ & LATMAN

@003

*is prior to the commencement of the hearings.* Should you decide to suspend the proceedings, your Case Manager can assist you in issuing an appropriate order to the parties.

If you realize that you are spending more time on this matter than you originally estimated, it is your obligation to inform the Case Manager *prior to exhausting the current deposit.* The Case Manager will then make arrangements with the parties for additional deposits per your instructions.

In order to receive payment, please submit bills promptly. Your bills should be submitted in a format that is presentable to the parties, should detail the dates on which the charges were incurred and must correspond with the terms of compensation outlined herein. Upon receipt, the AAA will release payment from the amounts deposited by the parties. Should there be insufficient funds on deposit, you will not receive payment until the parties have made additional deposits. Further, we will not use one party's deposit to cover another party's obligation without written permission to do so.

In the event your Award is delivered prior to payment by the parties of the agreed upon compensation, the Association is authorized but not obligated to seek to collect these monies on your behalf by all lawful means to represent you in any action or proceeding for such recovery and to file a claim in any bankruptcy or insolvency proceeding for such monies. The Association may prosecute and receive any recovery on behalf of the undersigned and has full authority to compromise or settle such claims as may be, in its discretion, appropriate. However, under no circumstances whatsoever will the Association be liable for any failure to collect any or all the monies due. The Association is authorized to subtract a reasonable amount for collection and attorney's fees.

## Failure to Disclose and Forfeiting Compensation

As an arbitrator in this matter, you have an ongoing obligation to disclose any direct or indirect relationship with the case participants. Your failure to make disclosures in a timely manner would be a serious transgression and may be grounds for your removal as arbitrator from this case and/or from the AAA's Roster of Neutrals. Should this occur, you may be required to forfeit the compensation for the time you spent on this matter after you should have made such disclosures.

If you are willing to serve on this matter per the compensation terms detailed above, please complete and sign the following section and return it, along with your Notice of Appointment, to your Case Manager.

## ARBITRATOR MUST COMPLETE THE FOLLOWING SECTION

Compensation payments, and the corresponding IRS reporting, will be made to either to you individually (attributed to your Social Security Number) or to your employer (attributed to the Employer Identification Number), based on the preference you indicated and as recorded in your panel record. If you are unsure of your current payment preference, you may contact your Case Manager or the AAA Department of Neutrals' Services. Promptly inform the AAA if this information is incorrect or changes during the case, or if an address correction is necessary.

If the AAA does not have the payee's tax information on record, we must withhold 31% of compensation payments, as required by the IRS. Reimbursements of expenses are not subject to withholding and are not reported to the IRS.

I am willing to accept appointment on this matter under the compensation terms detailed above.

Signed: _____    Date: 4/12/07

COWAN, LIEBOWITZ & LATMAN

Ⓩ004

# AMERICAN ARBITRATION ASSOCIATION

In the Matter of Arbitration Between:

Re: 19 117 00027 07
La Rosa Del Monte Express, Inc.
and
Software for Moving, Inc. and Shlomo Kogos

## NOTICE OF APPOINTMENT

**To:**    Richard S. Mandel, Esq.

> It is most important that the parties have complete confidence in the arbitrator's impartiality. Therefore, please disclose any past or present relationship with the parties, their counsel, or potential witnesses, direct or indirect, whether financial, professional, social or of any other kind. This is a continuing obligation throughout your service on the case and should any additional direct or indirect contact arise during the course of the arbitration or if there is any change at any time in the biographical information that you have provided to the AAA, it must also be disclosed. Any doubts should be resolved in favor of disclosure. If you are aware of direct or indirect contact with such individuals, please describe it below. Failure to make timely disclosures may forfeit your ability to collect compensation. The Association will call the disclosure to the attention of the parties.

You will not be able to serve until a duly executed Notice of Appointment is received and on file with the Association. Please review the attached *Disclosure Guidelines* and, after conducting a conflicts check, answer the following questions and complete the remainder of this Notice of Appointment:

|  | Yes | No |
|---|---|---|
| 1. Do you or your law firm presently represent any person in a proceeding involving any party to the arbitration? | ☐ | ☑ |
| 2. Have you represented any person against any party to the arbitration? | ☐ | ☑ |
| 3. Have you had any professional or social relationship with counsel for any party in this proceeding or the firms for which they work? | ☐ | ☑ |
| 4. Have you had any professional or social relationship with any parties or witnesses identified to date in this proceeding or the entities for which they work? | ☐ | ☑ |
| 5. Have you had any professional or social relationship of which you are aware with any relative of any of the parties to this proceeding, or any relative of counsel to this proceeding, or any of the witnesses identified to date in the proceeding? | ☐ | ☑ |
| 6. Have you, any member of your family, or any close social or business associate ever served as an arbitrator in a proceeding in which any of the identified witnesses or named individual parties gave testimony? | ☐ | ☑ |
| 7. Have you, any member of your family, or any close social or business associate been involved in the last five years in a dispute involving the subject matter contained in the case, which you are assigned? | ☐ | ☑ |
| 8. Have you ever served as an expert witness or consultant to any party, attorney, witness or other arbitrator identified in this case? | ☐ | ☑ |

COWAN LIEBOWITZ & LATMAN

@005

9. Have any of the party representatives, law firms or parties appeared before you in past arbitration cases?

10. Are you a member of any organization that is not listed on your panel biography that may be relevant to this arbitration?

11. Have you ever sued or been sued by either party or its representative?

12. Do you or your spouse own stock in any of the companies involved in this arbitration?

13. If there is more than one arbitrator appointed to this case, have you had any professional or social relationships with any of the other arbitrators?

14. Are there any connections, direct or indirect, with any of the case participants that have not been covered by the above questions?

Should the answer to any question be "Yes", or if you are aware of any other information that may lead to a justifiable doubt as to your impartiality or independence or create an appearance of partiality, then describe the nature of the potential conflict(s) on an attached page.

Please indicate one of the following:

- I have conducted a check for conflicts and have nothing to disclose.

☐ I have conducted a check for conflicts and have made disclosures on an attached sheet.

## THE ARBITRATOR'S OATH

State of New York
County of New York } SS:

I attest that I have reviewed the panel biography which the American Arbitration Association provided to the parties on this case and confirm it is current, accurate and complete.

I attest that I have diligently conducted a conflicts check, including a thorough review of the information provided to me about this case to date, and that I have performed my obligations and duties to disclose in accordance with the Rules of the American Arbitration Association, Code of Ethics for Commercial Arbitrators and/or all applicable statutes pertaining to arbitrator disclosures.

I understand that my obligation to check for conflicts and make disclosures is ongoing for the length of my service as an arbitrator in this matter, and that failing to make appropriate and timely disclosures may result in my removal as arbitrator from the case and/or my removal from the AAA's Roster of Neutrals.

The Arbitrator being duly sworn, hereby accepts this appointment, and will faithfully and fairly hear and decide the matters in controversy between the parties in accordance with their arbitration agreement, the Code of Ethics, and the rules of the American Arbitration Association will make an Award according to the best of the arbitrator's understanding.

Dated: 4/12/08                   Signed:

Sworn before me this 12 day of April        , 2007

SHARON LYNCH
NOTARY PUBLIC, State of New York
No. 30-4749261
Qualified in Nassau County

RECEIVED TIME

APR-16-2007  15:02                                        P. 06

**EXHIBIT "S"**

# Harrington, Ocko & Monk

**A LIMITED LIABILITY PARTNERSHIP**
**Attorneys at Law**

White Plains Office

**81 Main Street – Suite 215**
**White Plains, NY 10601**
**Tel:   (914) 686-4800**
**Fax:   (914) 686-4824**

**John T. Rosenthal, Esq.**
JRosenthal@homlegal.com

New York City Office

**52 Duane Street, 7th Floor**
**New York, NY 10007**
**Tel:   (212) 227-8004**

**Reply to White Plains Office**

June 19, 2007

**VIA E-MAIL @** paz@chklaw.com

Philip A. Zukowsky, Esq.
Chernesky Heyman & Kress, P.L.L.
10 Courthouse Plaza SW
Suite 1100
Dayton, OH 45402

Re:   *La Rosa Del Monte Express, Inc., Claimant, vs. Software*
     *For Moving, Inc., and Shlomo Kogos, as an Individual, Respondents.*

Dear Mr. Zukowsky:

Further to the discussions between the parties and the Arbitrator for this matter, and the Report of Preliminary Hearing and Scheduling Order No. 1 ("Order No. 1") issued by the Arbitrator in this Arbitration, the following are the fact witnesses whom we wish to depose in this matter:

1.    Shlomo Kogos;
2.    David R. Tyler;
3.    The individual with the first name "Martin" who uses an e-mail address queens2005@earthlink.net and whose e-mails are included as exhibits X and Y in the Declaration of Shlomo Kogos filed in the Federal action pending between the parties, Case No. 07C1839;
4.    The individuals at the Ohio-based server company most familiar with hosting the web-based Moving Manager Software on behalf of La Rosa.

We would request at this time that you provide us with the address of Mr. Kogos, as well as the business address of SFM.  In addition, we would request at this time that you provide us the full name and address of the individual by the name of "Martin" who uses an e-mail address queens2005@earthlink.net referenced in the Declaration of Shlomo Kogos, as well as the name and address of the individuals at the Ohio-based web software company with whom SFM and Shlomo Kogos had contact regarding hosting the web-based Moving Manager Software on behalf of La Rosa. Please provide us this information at your earliest convenience, but no later than Monday, June 25, 2007.

Philip A. Zukowsky, Esq.
June 19, 2007
Page 2

La Rosa's submissions of these names in no way waives or precludes La Rosa from submitting additional fact witness names for deposition should the names of additional individuals with information relevant to La Rosa's claims in the Arbitration come to light after production of documents and depositions of witnesses in this matter.

Finally, SFM is tardy in responding to La Rosa's document requests in this matter. As you may be aware, Claimant served SFM with document requests on May 25, 2007 as provided for in Order No. 1. SFM had until June 14, 2007 in which to respond to such requests and produce responsive documents. As of this date, SFM is delinquent. Please inform us immediately as to when we can expect to receive SFM's responses to our document requests as well as the documents requested. Otherwise, we intend on raising this issue with the Arbitrator.

Thank you for your attention to this matter.

Sincerely,

John T. A. Rosenthal

JTR/sg

**EXHIBIT "T"**

# Harrington, Ocko & Monk

### A LIMITED LIABILITY PARTNERSHIP
### Attorneys at Law

White Plains Office

81 Main Street – Suite 215
White Plains, NY 10601
Tel:   (914) 686-4800
Fax:   (914) 686-4824

John T.A. Rosenthal
e-mail:  jrosenthal@homlegal.com

New York City Office

52 Duane Street, 7th Floor
New York, NY 10007
Tel:  (212) 227-8004

Reply to White Plains Office

January 9, 2008

**VIA FACSIMILE @ (646) 349-5888**
**AND REGULAR MAIL**

Timothy Wedeen, Esq.
Wedeen & Kavanagh
137 Fifth Avenue, 10th Floor
New York, NY  10010

> Re:    **Software for Moving, Inc. v. La Rosa Del Monte Express, Inc.**
>        **Index No. 603001-07**

Dear Mr. Wedeen:

Further to our conversation yesterday, Defendant again requests that SFM provide us with current addresses for Plaintiffs, Software for Moving, Inc. and Shlomo Kogos, at your earliest convenience.  As there is no conceivable privilege associated with such information, there are no grounds that could be a basis for not providing us with this information.

Please respond by close of business Friday, January 11, 2008.

Thank you for your prompt attention to the foregoing.

Sincerely,

John T.A. Rosenthal

JTR/sg

```
*************** -COMM. JOURNAL- ******************* DATE JAN-09-2008 ***** TIME 12:24 ********

     MODE = MEMORY TRANSMISSION              START=JAN-09 12:23    END=JAN-09 12:24
        FILE NO.=200

     STN    COMM.   ONE-TOUCH/   STATION NAME/TEL NO.
     NO.            ABBR NO.                                        PAGES    DURATION

     001    OK       s           16463495888-1034                 002/002   00:00:41


                                            -HARRINGTON OCKO MONK      -
     *************************************** -914 686 4824    - ***** -       - ********
```

## Harrington, Ocko & Monk
### A LIMITED LIABILITY PARTNERSHIP
Attorneys at Law

White Plains Office

81 Main Street – Suite 215
White Plains, NY 10601
Tel:   (914) 686-4800
Fax:   (914) 686-4824

John T.A. Rosenthal, Esq.
jrosenthal@homlegal.com

New York City Office

52 Duane Street, 7th Floor
New York, NY 10007
Tel: (212) 227-9004

Reply to White Plains Office

## FACSIMILE TRANSMISSION

**To:**        Timothy Wedeen, Esq.

**Facsimile:**   (646) 349-5888

**Date:**       January 9, 2008

**From:**       John T.A. Rosenthal, Esq.

**No./Pages:**   2 pages, including cover sheet

**MESSAGE:**   ORIGINAL MAILED

## CONFIDENTIALITY NOTICE

This document contains confidential information subject to the attorney client privilege, which is intended to be read only by the person or persons named above.  If you are not the recipient named above, DO NOT READ THE MATERIAL BELOW NOR ANY MATERIAL ATTACHED HERETO, but immediately (a) deliver it to the person or persons named above or (b) notify us by fax or telephone and destroy this document.

**EXHIBIT "U"**

AMERICAN ARBITRATION ASSOCIATION

--------------------------------------------------------------------

**LA ROSA DEL MONTE EXPRESS, INC.,**

**Claimant**

v.

**Case No.**
**19 117 00027 07**

**SOFTWARE FOR MOVING, INC. and**
**SHLOMO KOGOS,**

**Respondents**

-------------------------------------------------------------

## REPORT OF PRELIMINARY HEARING AND SCHEDULING ORDER NO. 1

Pursuant to the Commercial Arbitration Rules of the American Arbitration Association (AAA), a preliminary hearing was held on May 16, 2007 by telephone before the Arbitrator Richard S. Mandel, Esq. Kevin J. Harrington, Esq. and John T.A. Rosenthal, Esq. appeared on behalf of Claimant, and Philip A. Zukowsky appeared on behalf of Respondents.

By Order of the Arbitrator, the following is now in effect, without prejudice to Respondents' continued assertion of the defense that the AAA lacks jurisdiction over this dispute:

1.     The parties will serve requests for production of documents on each other by no later than May 25, 2007.

2.     Responses to the requests for production shall be served on the party propounding the requests within 20 days after service of the requests. The responses shall consist of the documents to be produced, objections to any requested documents that are not produced and a privilege log describing any documents withheld on the grounds of privilege.

3.    The parties shall notify each other in writing of any fact witnesses whom they wish to depose by no later than June 19, 2007.

4.    The parties are directed to meet and confer to resolve any disputed items with respect to the document requests and objections by no later than June 25, 2007. The parties are also directed to meet and confer by no later than June 25, 2007 with respect to the scheduling of the depositions referenced in paragraph 3 above and any objections to any requested depositions.

5.    In the event the parties are in good faith unable to resolve any disputes with respect to the document requests and/or depositions, they shall send letters to the AAA outlining their position on the open discovery items by no later than June 29, 2007.

6.    The parties are directed to enter into an appropriate confidentiality stipulation by no later than June 1, 2007 to govern discovery. The stipulation should be sent to the AAA when complete and will be so ordered by the Arbitrator if the parties wish. In the event the parties are unable in good faith to agree on the terms of a confidentiality stipulation, they shall write to the AAA outlining any issues in dispute by no later than June 5, 2007.

7.    The parties shall notify each other of any expert witnesses upon whom they intend to rely, and serve an accompanying expert report summarizing each such witness' opinions and the grounds for such opinions, by no later than July 16, 2007. The parties shall notify each other of any rebuttal expert witnesses upon whom they intend to rely, and serve an accompanying expert report summarizing each such witness' opinions and the grounds for such opinions, by no later than July 30, 2007. The parties may conduct depositions of any experts designated by the other side, and any such

depositions, along with depositions of any fact witnesses, shall be completed by no later than August 24, 2007.

8.    By agreement of the parties, in the event of any Court order staying the current arbitration proceeding, any discovery that has already been conducted in this arbitration proceeding may be used in any Court action between the parties.

9.    The parties agree that the place of the evidentiary hearings in this proceeding shall be New York City.

10.    The parties have requested a reasoned award.

11.    There will be a transcript of the hearings, and the cost of such transcript shall be borne equally by the parties, subject to the prevailing party's right to seek recovery of its portion of the costs as part of the award in this proceeding.

12.    A conference call with the Arbitrator shall be held on September 5, 2007 at 3:00 p.m. EST to address any issues with respect to the hearings in this matter.

13.    The parties will exchange and file hearing materials, witness lists, document lists and pre-hearing memoranda on September 7, 2007.

14.    Four days of evidentiary hearings are scheduled to be held on September 17-20, 2007, at the offices of the AAA, 1633 Broadway, New York, NY 10176. The hearings will begin promptly at 10:00 a.m. In the event that additional hearing dates are required, they will be scheduled upon the conclusion of the evidentiary hearings on September 20, 2007.

15.    This order shall continue in effect unless and until amended by subsequent order of the Arbitrator.

Dated: May 17, 2007

RICHARD S. MANDEL, ESQ.

**EXHIBIT "V"**

AMERICAN ARBITRATION ASSOCIATION

--------------------------------------------------------------

**LA ROSA DEL MONTE EXPRESS, INC.,**

**Claimant,**

v.

**Case No.**
**19 117 00027 07**

**SOFTWARE FOR MOVING, INC. and**
**SHLOMO KOGOS,**

**Respondents.**

--------------------------------------------------------------

**SCHEDULING ORDER NO. 4**

The Arbitrator having reviewed Respondent's Motion to Stay Arbitration Pending

Decision of the Federal Court of the Existence of an Arbitration Agreement, Claimant's

opposition thereto and Respondent's Reply in further support of its motion, it is

HEREBY ORDERED as follows:

1.    The Arbitrator has requested further briefing on the issues of: (1) whether

the Arbitrator has the authority under existing case law (including in particular the cases

cited in Respondent's Reply papers) to determine the question of whether an agreement

to arbitrate has been made, or whether such a determination must properly be made in the

first instance by the courts; and (2) whether Respondent can legally waive, and if so, has

waived, any right that may otherwise exist to have the courts determine the question of

whether an agreement to arbitrate has been made, by virtue of any or all of the foregoing:

delaying in seeking to stay the arbitration, moving in the wrong forum to stay the

arbitration or requesting that the Arbitrator conduct an initial hearing on the question of

whether an agreement to arbitrate exists.

1

2.    The following briefing schedule shall apply: (1) Claimant shall submit its brief on or before September 20, 2007; and (2) Respondent shall submit any further response on or before September 25, 2007.

3.    This proceeding is hereby stayed pending further order of the Arbitrator. The hearings scheduled for September 17, 18 and 20, 2007 are canceled.

Dated: September 10, 2007

RICHARD S. MANDEL, ESQ.

2

**EXHIBIT "W"**



At IAS Part 52 of the Supreme Court of the State of New York, at the Courthouse thereof, located at 60 Centre Street, New York, New York, on the __7__ day of September, 2007.

PRESENT: Hon. **HON. PAUL G. FEINMAN** _____, J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

----------------------------------------------------------------X    Index No. 60300/-07

SOFTWARE FOR MOVING, INC.,
A New York Corporation,

                          Petitioner,                    **ORDER TO SHOW CAUSE**

        -against-

LA ROSA DEL MONTE EXPRESS, INC.,
A New York Corporation,

                          Respondent.

----------------------------------------------------------------X

Upon the petition of SHLOMO KOGOS, sworn to on the 6th day of September, 2007, annexed hereto, the affirmation of Max Markus Katz, Esq., dated the 6th day of September, 2007, annexed hereto, and upon all the papers and proceedings heretofore had herein, it is:

ORDERED that the Respondent herein, or its attorney, show cause at an IAS Motion Part of this Court, Part __52__, to be held in and for the County of New York at the County Courthouse in the City of New York, located at 60 Centre Street, New York, New York, on the 3 day of October September 2007, at 11:00 9:30 o'clock A.M., in the forenoon of that day or as soon thereafter as counsel can be heard as to why an Order should not be made (1) granting a stay of arbitration until such time that the United States District Court for the Northern District of Illinois, Eastern Division, issues a decision on the "Motion to Stay Arbitration" presently before District Court Judge Gottschall under Case Number 07 C 1839, or in the alternative (2) temporarily staying the arbitration pending the hearing and determination of whether a stay of arbitration should be granted until such time that the United States District Court for the Northern District of Illinois,

Eastern Division, issues a decision on the "Motion to Stay Arbitration" presently before District Court Judge Gottschall under Case Number 07 C 1839; and for such other and further relief as the court may deem just and proper, and it is further

ORDERED that pending the hearing ~~and determination~~ of this application, any and all hearings, conferences, and/or other proceedings relating to the arbitration presently before the American Arbitration Association, under Case Number 19 117 00027 07, are hereby temporarily stayed, and it is further

ORDERED that service of this Order together with the papers upon which it is granted be made by personal delivery, ~~facsimile transmission or electronic means~~ upon (1) the Respondent's counsel at 52 Duane Street, Seventh Floor, New York, New York, 10007; and (2) the American Arbitration Association at 1633 Broadway, Tenth Floor, New York, New York 10019, on or before the 10th day of September, 2007 shall be deemed sufficient service.

~~Signed this _____ day of September 2007, New York.~~

Oral Argument
directed:

_____
J.S.C.

ENTER:

_____
Justice, Supreme Court

HON. PAUL G. FEINMAN

Any opposition to be served and filed by _10/18/07_
Any reply papers to be served and filed by _10/26/07_
Oral argument on _10/31/07_
in Room 289 at 80 Centre St at 11:00 am

FILE ALL ORIGINAL PAPERS & AFFIDAVITS OF SERVICE
WITH THE CLERK OF PARTS 2 in Rm 289 at 80 Centre St.
No courtesy copies.

DO NOT FILE PAPERS
with the Motion or Trial Support Offices or the County Clerk.

So Ordered,

_____
Paul G. Feinman, J.S.C.

EXHIBIT "X"

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X
SOFTWARE FOR MOVING, INC.,
A New York Corporation,

                       Petitioner,

    -against-

LA ROSA DEL MONTE EXPRESS, INC.,
A New York Corporation,

                       Respondent.
-------------------------------------------------------------------X

| | |
|---|---|
| Index No. | |

**PETITION TO
STAY ARBITRATION**

STATE OF NEW YORK    )
                           ) ss.:
COUNTY OF NEW YORK  )

    **SHLOMO KOGOS**, being duly sworn, deposes and says:

    1.  I am the President of the corporate Petitioner in the above captioned action, and as such I am fully familiar with the facts and circumstances of this action and have personal knowledge of all relevant facts.

    2.  Petitioner is, and at all pertinent times has been, a corporation organized and existing under the laws of the State of New York. Petitioner does business and has offices in the City, County, and State of New York.

    3.  Upon information and belief, Respondent is, and at all pertinent times has been, a corporation organized and existing under the laws of the State of New York, and has offices in the City, County, and State of New York.

    4.  I make this petition in support of the annexed Order to Show Cause seeking a stay of the Arbitration until such time that the United States District Court for the Northern District of Illinois, Eastern Division, issues a decision on the "Motion to Stay Arbitration" presently before District Court Judge Gottschall under Case Number 07 C 1839, or in the alternative, temporarily

staying the Arbitration pending the hearing and determination of whether a stay of Arbitration should be granted until such time that the United States District Court for the Northern District of Illinois, Eastern Division, issues a decision on the "Motion to Stay Arbitration" presently before District Court Judge Gottschall under Case Number 07 C 1839.

5.  As further detailed in the accompanying Affirmation of my New York counsel, Max Markus Katz, the Petitioner is entitled to the relief sought herein.

## ARBITRATION CANNOT PROCEED AS THERE ARE IS NO ARBITRATION AGREEMENT BETWEEN THE PARTIES

6.  The basis of the petition herein is that there is no justifiable reason for an arbitration to be had by and between the parties herein.

7.  Respondent' claim that the jurisdiction for the Arbitration pursuant to arbitration provisions contained in a Software Development and License Agreement that I allegedly signed on March 3, 2005 (the "2005 License Agreement"). *Attached hereto as Exhibit "B" is a copy of the 2005 License Agreement as provided by Respondent in its Demand for Arbitration.*

8.  **For the record and under penalties of perjury, I hereby aver that I never signed either of the 2005 License Agreement. Not in March 2005 or at any other time.**

9.  Indeed, I never saw the 2005 License Agreement until February of 2007, when my Ohio Counsel, Mr. Philip A. Zukowsky, sent me a copy of the 2005 License Agreement that was attached to Respondent La Rosa Del Monte Express, Inc.'s Demand for Arbitration. *Attached hereto as Exhibit "C" is a copy of Respondent's Demand for Arbitration.*

10. I categorically deny that the 2005 License Agreement was ever signed by me, and therefore the signatures on the 2005 License Agreement which Respondent purport to be my signature, must be forgeries.

## A.  THE 2005 LICENSE AGREEMENT COULD NOT HAVE EXISTED IN 2005

11. Furthermore, I understand that Respondent claim that the 2005 License Agreement was entered into between the parties on March 3, 2005.

12. Upon being shown the 2005 License Agreement that was attached to Respondent's Demand for Arbitration, I noticed a detail that proves that the 2005 License Agreement could not have been in existence on March 3, 2005, or any other time in 2005.

13. Paragraph 13.5 of the 2005 License Agreement is a notice provision. This paragraph states that notice could be provided to me at an email address of skogos@earthlink.net.

14. **The skogos@earthlink.net email address did not come into existence until January 6, 2006.**

15. Accordingly, the 2005 License Agreement could not have been drafted until January 6, 2006 at the very earliest.

16. Although I cannot be certain as to when the 2005 License Agreement was drafted, I am certain that it was not in existence as of March 3, 2005 or any other time in 2005. *Attached hereto as Exhibit "D" are e-mail transmittals regarding the creation of the skogos@earthlink.net email address.*

17. Based upon this fact alone, it should be evident that the 2005 License Agreement could not have and did not in fact exist in 2005, and ipso facto, the signature thereon must be a forgery.[1]

18. The only reasonable conclusion is that the signature on the 2005 License Agreement that Respondent purports to be my signature, must be a forgery.

---

[1] There are other anomalies about the 2005 License Agreement.  The Agreement appears to be a work in progress, rather than a completed document.  Key operational provisions of the Agreement are missing.  For example, Section 1, Subsection (o) of the 2005 License Agreement refers to "(i) a product design and content summary, as well as a detailed specification for all required features and functionality as specified on Exhibit A attached hereto, and (ii) a complete delivery and production schedule as specified on Exhibit B attached hereto."  Section 2.1 provides that "All New Software shall be created substantially in conformance with the Specifications and Requirements attached hereto as Schedule 'A'."  Section 2.3 refers to a "Plan of Development" to be agreed upon by the parties. **Exhibit A, Exhibit B, Schedule A and the Plan of Development which are referred to in the 2005 License Agreement do not exist.**

19. As the 2005 License Agreement is not a valid agreement which would be enforceable against Petitioner, there is no agreement between the parties which could serve as jurisdiction for the Arbitration.

20. I have been advised by my counsel that the determination of whether an arbitration agreement in fact existed is an issue for a court of law, and is not arbitrable.

21. Accordingly and based upon the above facts, it is respectfully requested that this Court issue an Order staying the Arbitration until such time that the United States District Court for the Northern District of Illinois, Eastern Division, issues a decision on the "Motion to Stay Arbitration" presently before District Court Judge Gottschall under Case Number 07 C 1839.

22. In the alternative, it is respectfully requested that this Court issued an Order temporarily staying the Arbitration pending the hearing and determination of whether a stay of Arbitration should be granted until such time that the United States District Court for the Northern District of Illinois, Eastern Division, issues a decision on the "Motion to Stay Arbitration" presently before District Court Judge Gottschall under Case Number 07 C 1839.

## B. SEQUENCE OF EVENTS RELATING TO THE 2005 LICENSE AGREEMENT

23. In the interests of providing this Court with a full sequence of events relating to the 2005 License Agreement, including how and when the 2005 License Agreement was first received by Petitioner, I hereby offer the following facts:

### 1. Discovery of the Forged 2005 License Agreement

24. The tale of the forged 2005 License Agreement begins, from Petitioner's viewpoint, in December of 2006.

25. It was in that month that I contacted my Ohio counsel, Mr. Philip A. Zukowsky, to represent Petitioner in the legal matter involving Respondent refusal to pay Petitioner for the use of certain DOS and Windows software that Petitioner had licensed to Respondent in 1999 (the

"Old Software") and for a web-based program that Petitioner had tailored for use by Respondent (the "New Software").

26. Mr. Zukowsky commenced discussions regarding these matters with Mr. Robert S. Ocko, an attorney for Respondent. On or about January 9, 2007, Mr. Ocko sent a letter to Petitioner and copied Mr. Zukowsky by e-mail. The January 9, 2007 letter purported to terminate a Software Development and License Agreement, dated March 3, 2005 (the "2005 License Agreement"). *Attached hereto as Exhibit "E" is a copy of the January 9, 2007 letter.*

27. After receiving a copy of the January 9, 2007 letter, I immediately informed Mr. Zukowsky that I had never signed any software and development agreement with Respondent, either in 2005 or thereafter, nor had I ever been presented with a draft of any proposed agreement by Respondent, in 2005 or thereafter.

28. I instructed Mr. Zukowsky to obtain a copy of the 2005 License Agreement from Mr. Ocko. Thereafter, Mr. Zukowsky repeatedly tried to get counsel for Respondent to send a .pdf of the 2005 License Agreement, but counsel for Respondent repeatedly refused to do so.

29. On January 9, 2007, Mr. Zukowsky e-mailed Mr. Ocko and requested a .pdf copy, and again on January 12, 2007. Mr. Zukowsky also informed counsel for Respondent by telephone that the reason he was requesting the .pdf copy was because I insisted that I never signed the so-called 2005 License Agreement, nor had I ever seen a draft of any such agreement. Counsel for Respondent still refused to send a copy of the 2005 License Agreement. *Attached hereto as Exhibit "E" is a copy of the January 9 and January 12, 2007 e-mails.*

30. At this time, Mr. Zukowsky informed counsel for Respondent that he would be sending them a letter to cease and desist from any further use of Petitioner's software and that Petitioner would file a lawsuit for copyright infringement against Respondent and its affiliates if these instructions were ignored.

31. On February 12, 2007, Mr. Zukowsky sent a certified letter to Mr. Hiram Rodriguez, President of the corporate Respondent, demanding that Respondent and its affiliates immediately stop using Petitioner's software due to its failure to make the required payments for the software.

32. The February 12, 2007 letter reiterated that Petitioner would file suit against Respondent in the event that it failed to stop using the software. A second letter was sent on February 26, 2007.

33. On or about February 12, 2007, Respondent filed a Demand for Arbitration (the "Demand") with the American Arbitration Association (hereinafter the "AAA"). The Demand was sent to Petitioner at an address in New Jersey, which was not the current address of Petitioner, such that Petitioner was never served with the Demand (and still has not been served).

34. On February 20, 2007, Mr. Zukowsky received a "courtesy" copy of the Demand at his Dayton, Ohio office, under the cover of a letter that was dated February 12, 2007. A copy of the so-called 2005 License Agreement was attached to the Demand, as well as a second document called the 2005 Maintenance Agreement. Upon receipt of the Demand, eight days after it had been filed with the AAA, Mr. Zukowsky sent a copy of the Demand to me.

## 2. Respondent Was Immediately Informed of the Forgeries

35. I informed Mr. Zukowsky that I had never before seen the 2005 License Agreement and the 2005 Maintenance Agreement that were attached to the Demand and Mr. Zukowsky, in furtherance, immediately informed counsel for Respondent that the documents were forgeries.

36. On February 26, 2007, within six (6) days of his receipt of the Demand, Mr. Zukowsky sent a letter to Mr. Kevin Harrington, also an attorney for Respondent, informing him in no uncertain terms that the signatures on the 2005 License Agreement and the 2005 Maintenance Agreement, which also contained arbitratability language, did not belong to me and were therefore forgeries. *Attached hereto as Exhibit "E" is a copy of the February 26, 2007 letter.*

37. The February 26, 2007 letter concluded with a demand that the Demand be immediately and unconditionally withdrawn from arbitration because Petitioner had never signed an arbitration provision, and cautioned that Petitioner "will not hesitate to seek appropriate relief from any and all parties who may be responsible for the expenses our clients have incurred, and will likely incur, in responding to this fraudulent demand for arbitration."

### 3. Respondent's Response to Forgery Allegations

38. A copy of Mr. Zukowsky's February 26, 2007 letter to Mr. Harrington was sent to Ms. Kimberly Claxton, a case manager at the AAA.

39. Ms. Claxton requested that Mr. Harrington respond to the February 26, 2007 letter. Mr. Harrington responded by a letter dated March 2, 2007. In his letter, Mr. Harrington, for the first time, revealed that Respondent did not have an **original version of either** the 2005 License Agreement or the 2005 Maintenance Agreement; all it was in possession of were photocopies. *Attached hereto as Exhibit "E" is a copy of the March 2, 2007 letter.*

40. Mr. Harrington had not previously informed Petitioner or the AAA of this fact prior to this time. The March 2, 2007 letter also reveals that Respondent were aware of no witnesses to me ever signing the 2005 License Agreement.

41. Mr. Harrington states in the March 2, 2007 letter that the best Respondent can do regarding the 2005 License Agreement is to call a witness, Mr. Steven Dalzell, who will "establish" that I signed the 2005 Software Development Agreement by testifying that he "requested that Mr. Kogos supply a duplicate copy of this agreement and that subsequently, during a visit to the office of claimant (La Rosa), Mr. Kogos hand-delivered a photocopy of the signed agreement to Mr. Dalzell, including the signature page bearing Mr. Kogos' signature."

42. As is explained later on, there is so much less to this statement than meets the eye. Mr. Harrington's letter does not address the fact that the written 2005 License Agreement could not

have been in existence on March 3, 2005 because the e-mail address referred to in the documents had not yet come into existence.

43. By e-mail transmitted on March 6, 2007, Mr. Zukowsky requested additional information from Mr. Harrington regarding what Mr. Dalzell would testify to. The substance of the e-mail is as follows:

> "I would like La Rosa to agree to make Mr. Dalzell available to talk to us, or to let us contact Mr. Dalzell to talk to him about his testimony. Alternatively, I would like La Rosa to fill-in some of the blanks regarding the testimony they say he will give, such as when (on or about what date) he requested that Mr. Kogos supply a duplicate copy of the agreement, when (on or about what date) Mr. Kogos delivered a photocopy back to him, when (on or about what date) the form of the agreement that was allegedly signed by Mr. Kogos came into existence or was completed, and who was involved in the drafting of the agreement. Would Mr. Dalzell be willing to supply this information in an affidavit form so that it is on the record."

Mr. Harrington refused or ignored these requests. *Attached hereto as Exhibit "E" is a copy of the March 6, 2007 email.*

44. Despite the fact that Respondent had no original document, no witness to my allegedly signing the 2005 License Agreement, and it being obvious that the 2005 License Agreement could not have been in existence in 2005, Ms. Claxton said that the Arbitration Case must proceed.

45. Mr. Zukowsky requested a special hearing before the AAA regarding the authenticity of the 2005 License Agreement only, but Ms. Claxton said that AAA rules only allow such a hearing if both sides agreed, which Respondent did not agree to.

46. Thus Respondent was successful in preventing a stay of the hearing based upon the forged documents it had submitted in the Arbitration. A court of law would never allow a case to proceed before it determined the issue of jurisdiction over the parties. However, this is apparently not the case in the AAA.

47. Petitioner has been clear all along that it would not participate in the Arbitration because it did not agree to arbitrate its disputes with Respondent, and accordingly its actions in the Arbitration have been consistent with that position throughout.

48. In lieu of answering the Demand, Petitioner filed an "Objection to Jurisdiction." Paragraph 6 of that Objection of Jurisdiction expressly states as follows:

> "For the avoidance of doubt, SFM states for the record that it never has, and still does not, agree to the assertion of jurisdiction by the American Arbitration Association with respect to its business transactions with La Rosa, and will resist such jurisdiction through any legal means available to it. SFM reserves its right to, and will, pursue its legal rights against La Rosa in the appropriate courts of competent jurisdiction at the appropriate time."

*Attached hereto as Exhibit "F" is a copy of the Objection to Jurisdiction.*

49. Thereafter, Petitioner commenced the Federal Action as is further detailed in the accompanying Affirmation of Max Markus Katz. *Attached hereto as Exhibit "G" is a copy of the Complaint in the Federal Action.*

50. Six (6) months have passed since Respondent first filed its Demand in the Arbitration, and still it has yet to introduce ZERO competent evidence that the 2005 License Agreement are not forgeries.

51. The only evidence regarding the existence of an agreement to arbitrate that Respondent have introduced is not competent evidence, but unabashed, hearsay testimony.  This hearsay testimony generally involves Mr. Steven Dalzell.[2]

52. However, Respondent have yet to introduce any non-hearsay testimony from Mr. Dalzell; there is not even a Declaration from Mr. Dalzell, under penalty of perjury, such as the Declaration

---

[2] See Rodriguez Declaration § 17 (filed by Hiram Rodriguez, owner of Respondent, with the Federal Court on July 23, 2007 (the "Rodriguez Declaration"), which is attached hereto as Exhibit "H"; Second Rosenthal Declaration § 28 (Mr. Rosenthal has filed two Declarations with the Federal Court--one on April 30, 2007 (the "First Rosenthal Declaration") and one on July 23, 2007 (the "Second Rosenthal Declaration"). The First Rosenthal Declaration is attached hereto as Exhibit "I" and the Second Rosenthal Declaration is attached hereto as Exhibit "J".

I filed in Federal Court.[3]  *Attached hereto as Exhibit "K" is a copy of the Kogos Declaration filed in the Federal Action.*

53. Perhaps most telling is what Respondent have not said some six months after it filed its Demand, and after having been given the opportunity on numerous occasions to do so in the Arbitration and in the Federal Action; and that it does not have any probative evidence of anyone giving a copy of the 2005 License Agreement to me; anyone receiving original signed 2005 License Agreement from me on or around the time it claims that I signed the documents; any letters, e-mails or other communications between Petitioner and Respondent regarding those documents or drafts of the documents; any internal letters, e-mails, computer history records or other communications regarding the drafting of those documents; any letters, e-mails or other communications from Respondent to its legal counsel regarding those documents or drafts of those documents.

54. Between "November and/or December" 2004, when Respondent claim that discussions between the parties first began, and "March 3, 2005", when Respondent claim the 2005 License Agreement were signed by me, there apparently is no trace of evidence regarding the negotiating, drafting or finalizing of the documents.

55. Even then, no copies are known to exist, until I allegedly delivered them to the mysterious Mr. Dalzell in September 2006.  And an original version still has not surfaced.

56. There are other elements regarding the issues that have developed since the Demand was made and those issues are covered by Petitioner's New York counsel in his Affirmation.

---

[3]  Indeed, Respondent has implied to the Federal Court that a federal subpoena will be needed to obtain Mr. Dalzell's testimony.

**WHEREFORE,** the Petitioner prays this Court to issue an Order (1) granting a permanent stay of arbitration as a matter of law, or in the alternative (2) temporarily staying the arbitration pending the hearing and determination of whether a permanent stay of arbitration should be granted as a matter of law; and for such other and further relief as the court may deem just and proper.

SHLOMO KOGOS

Sworn to before me this
6th day of September, 2007

Notary Public

ANIL K. PRABHU
Notary Public, State of New York
Reg. No. 02PR6148198
Qualified in Queens County
Commission Expires June 26, 20_10_

EXHIBIT "Y"

AMERICAN ARBITRATION ASSOCIATION

--------------------------------------------------------------

**LA ROSA DEL MONTE EXPRESS, INC.,**

**Claimant,**

v.

**Case No.
19 117 00027 07**

**SOFTWARE FOR MOVING, INC. and
SHLOMO KOGOS,**

**Respondents.**

--------------------------------------------------------------

**ORDER**

After fully considering all of the parties' submissions and supplemental submissions with respect to Respondent's Motion to Stay Arbitration, it is HEREBY ORDERED as follows:

This proceeding is hereby stayed pending further order by a court of competent jurisdiction resolving the issue of whether the parties' dispute is properly subject to arbitration.

Dated: October 1, 2007

RICHARD S. MANDEL, ESQ.

1

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

----------------------------------------------------------:

**SOFTWARE FOR MOVING, INC., and**
**SHLOMO KOGOS, as an Individual,**                    Index No. 603001-07

                                                    :

                                    **Plaintiffs,**        :     **AFFIDAVIT OF SERVICE**

                                                    :

                        **vs.**                            :

**LA ROSA DEL MONTE EXPRESS, INC.,**

                                                    :

                                    **Defendant.**        :

----------------------------------------------------------:


STATE OF NEW YORK                    )
                                     ) s.s.:
COUNTY OF WESTCHESTER                )

SUSAN GLENN, being duly sworn, deposes and says:  deponent is not a party to this action, is over 18 years of age and resides in Dutchess County, New York.

On October 10, 2007, deponent mailed the within **Affirmation of Kevin J. Harrington in Support of Defendant's Opposition to Plaintiffs' Petition to Stay Arbitration, and Defendant's Cross-Motion to Compel Arbitration, or in the Alternative, Obtain Expedited Discovery and a Hearing** upon:

MAX MARKUS KATZ, P.C.
88 University Place, 8th Floor
New York, NY 10003

by depositing a true copy thereof in a post-paid wrapper, in an official depository under the care and custody of the United States Postal Service within the State of New York by first class mail.

*Susan Glenn*
SUSAN GLENN

Sworn to before me this
10th day of October, 2007

*Shirley B. Thornton*
SHIRLEY B. THORNTON
Notary Public, State of New York
No. 01TH6029394
Qualified in Westchester County
Commission Expires August 16, 2009

EXHIBIT "Z"

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------:

SOFTWARE FOR MOVING, INC., and
SHLOMO KOGOS, as an Individual,                    :    Index No. 603001-07

                              Plaintiffs,          :    NOTICE OF CROSS-MOTION

          vs.                                      :

LA ROSA DEL MONTE EXPRESS, INC.,                   :

                              Defendant.           :
------------------------------------------------------------:

S I R S:

    PLEASE TAKE NOTICE, that upon the Affirmation of Kevin J Harrington, sworn to on the 10th day of October, 2007, and the Memorandum of Law in Support, dated the 10th day of October, 2007, and all prior papers and proceedings heretofore had herein, Defendant, La Rosa Del Monte Express, Inc., will cross-move this Court at Part 52, in Room 289 before the Hon. Paul G. Feinman, at the Courthouse located at 80 Centre Street, New York, New York, on the 31st day of October, 2007, at 11:00 o'clock in the forenoon of that day, or as soon thereafter as counsel can be heard, for an Order compelling Plaintiff, Software for Moving, Inc., to arbitrate this dispute with Defendant, La Rosa Del Monte Express, Inc., pursuant to CPLR §7503, or in the alternative, obtain expedited discovery and a hearing; and for such other and further relief as this Court deems just and proper.

Dated: White Plains, New York
      October 10, 2007

                    Respectfully submitted,

                    _____
                    Kevin J. Harrington
                    John T. A. Rosenthal
                    HARRINGTON, OCKO & MONK, LLP
                    *Attorneys for Defendant*

RECEIVED
OCT 1 0 2007
CASE MANAGEMENT
OFFICE

1

LA ROSA DEL MONTE EXPRESS, INC.
81 Main Street, Suite 215
White Plains, New York 10601
Telephone:  (914) 686-4800
Facsimile:  (914) 686-4824

TO:    MAX MARKUS KATZ, P.C.
       *Attorneys for Plaintiff*
       *SOFTWARE FOR MOVING, INC.*
       88 University Place, 8th Floor
       New York, NY 10003
       (212) 727-0777

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

-----------------------------------------------------------:

**SOFTWARE FOR MOVING, INC.,** and          Index No. 603001-07
**SHLOMO KOGOS, as an Individual,**

             :      **AFFIDAVIT OF SERVICE**

          **Plaintiffs,**    :

      **vs.**          :

**LA ROSA DEL MONTE EXPRESS, INC.,**

              :

          **Defendant.**

-----------------------------------------------------------:

STATE OF NEW YORK      )
                      ) s.s.:
COUNTY OF WESTCHESTER   )

     SUSAN GLENN, being duly sworn, deposes and says:  deponent is not a party to this action, is over 18 years of age and resides in Dutchess County, New York.

     On October 10, 2007, deponent mailed the within **Notice of Cross-Motion** upon:

MAX MARKUS KATZ, P.C.
88 University Place, 8th Floor
New York, NY 10003

by depositing a true copy thereof in a post-paid wrapper, in an official depository under the care and custody of the United States Postal Service within the State of New York by first class mail.

                     *Susan Glenn*
                     SUSAN GLENN

Sworn to before me this
10th day of October, 2007

*Shirley B. Thornton*
SHIRLEY B. THORNTON
Notary Public, State of New York
No. 01TH6029394
Qualified in Westchester County
Commission Expires August 16, 2009

**EXHIBIT "AA"**

10/23/2007  22:03   2127277691                    M
10/23/07  10:18 FAX 212 964 5923          UNITED LAWYERS                PAGE  02/03
                                                                           002

10/18/07  THU 10:00 FAX 914 686 4824                                       001

# UNITED LAWYERS

10/18/2007  00:4                                          PAGE  02/02

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X

SOFTWARE FOR MOVING, INC.,

        *Plaintiff,*           Index No. 603001-07

      -against-             **STIPULATION**

LA ROSA DEL MONTE EXPRESS, INC.,

                Hon. Paul G. Feinman

        *Defendant.*
-------------------------------------------------------------------X

    IT IS HEREBY STIPULATED AND AGREED by and between the undersigned

attorneys that (1) the plaintiff's time to serve a reply and opposition to defendant's opposition

and cross-motion be extended to and including November 14, 2007; (2) the defendant shall have

until November 28, 2007 to serve a reply to plaintiff's opposition; and (3) oral argument be

adjourned from October 31, 2007 to December 5, 2007 — 11 AM

    IT IS FURTHER STIPULATED AND AGREED by and between the undersigned

attorneys that fax copies of this stipulation and signatures shall be treated as originals.

Dated: New York, New York
      October 18, 2007

Max Markus Katz, PC

By: _____
    Anil K. Prabhu
Attorneys for Plaintiff
88 University Place, 8th Floor
New York, NY 10003
(212) 727-0777

Harrington, Ocko & Monk, LLP

By: _____
    John T.A. Rosenthal
Attorneys for Defendant
81 Main Street, Suite 215
White Plains, NY 10601
(914) 686-4800

SO ORDERED: **SO ORDERED**

PAUL G. FEINMAN
J.S.C.

OCT-18-2007  12:49          2127277691              98%              P.02

OCT-24-2007  10:07          2127277691              98%              P.02

UNITED LAWYERS

Index No. 603001          Year   2007

# SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

SOFTWARE FOR MOVING. INC.,

Plaintiff,

-against-

LA ROSA DEL MONTE EXPRESS, INC.,

Defendant.

## STIPULATION

### Max Markus Katz, P.C.

ATTORNEY AT LAW

Attorney for   Plaintiff

88 UNIVERSITY PLACE
NEW YORK, NEW YORK 10003
(212) 727-0777

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief and reasonable inquiry, the contentions contained in the annexed document are not frivolous.

Dated: October 19, 2007

Signature: _____

Print Signer's Name: ANIL K. PRABHU

is hereby admitted.

Service of a copy of the within

Dated:

Attorney(s) for

PLEASE TAKE NOTICE

☐ NOTICE OF ENTRY
that the within is a (certified) true copy of a
entered in the office of the clerk of the within named Court on

☐ NOTICE OF SETTLEMENT
that an Order of which the within is a true copy will be presented for settlement to the
one of the judges of the within named Court,
Hon.
at
on

Dated:

### Max Markus Katz, P.C.

ATTORNEY AT LAW

Attorney for   Plaintiff

88 UNIVERSITY PLACE
NEW YORK, NEW YORK 10003

**EXHIBIT "BB"**

# Harrington, Ocko & Monk

**A LIMITED LIABILITY PARTNERSHIP**
**Attorneys at Law**

White Plains Office

81 Main Street – Suite 215
White Plains, NY 10601
Tel: (914) 686-4800
Fax: (914) 686-4824

New York City Office

52 Duane Street, 7th Floor
New York, NY 10007
Tel: (212) 227-8004

John T.A. Rosenthal
e-mail: jrosenthal@homlegal.com

Reply to White Plains Office

November 19, 2007

**VIA FACSIMILE @ (212) 727-7691**

Anil K. Prabhu, Esq.
Max Markus Katz, P.C.
88 University Place, 8th Floor
New York, NY 10003

Re:    **Software for Moving, Inc. v. La Rosa Del Monte Express, Inc.**
       **Index No. 603001-07**

Dear Mr. Prabhu:

As you may recall, our firm represents Defendant, La Rosa Del Monte Express, Inc. ("Defendant" or "La Rosa") in the above-captioned matter. Pursuant to Stipulation of counsel for the parties, Plaintiff, Software for Moving, Inc. ("SFM"), had until November 14, 2007 by which to serve Defendant with an opposition to La Rosa's cross-motion to compel arbitration between the parties pursuant to the 2005 Software Agreements entered into between La Rosa and SFM.

To date, we have not received SFM's opposition papers, and therefore, your client is presently in default of its briefing obligations in this matter. Please indicate whether or not your firm has actually served us with opposition papers to La Rosa's motion to compel arbitration, and if so, the date such papers were served and the method of service. If we do not have a response to this letter today, we will be forced to move to strike Plaintiff's opposition papers in this matter.

I look forward to hearing from you.

Sincerely,

John T.A. Rosenthal

JTR/sg

```
************* -COMM. JOURNAL- **************** DATE NOV-19-2007 **** TIME 13:32 ********

     MODE = MEMORY TRANSMISSION              START=NOV-19 13:31    END=NOV-19 13:32

       FILE NO.=232

  STN   COMM.   ONE-TOUCH/  STATION NAME/TEL NO.                    PAGES    DURATION
  NO.           ABBR NO.

  001   OK      ⌥           12127277691                             002/002  00:00:35


                                            -HARRINGTON OCKO MONK      -

  ******************************** -914 686 4824   - ***** -          - ********
```

# Harrington, Ocko & Monk

**A LIMITED LIABILITY PARTNERSHIP**
Attorneys at Law

White Plains Office

81 Main Street – Suite 215
White Plains, NY 10601
Tel: (914) 686-4800
Fax: (914) 686-4824

John T.A. Rosenthal, Esq.
jrosenthal@homlegal.com

New York City Office

52 Duane Street, 7th Floor
New York, NY 10007
Tel: (212) 227-8004

**Reply to White Plains Office**

## FACSIMILE TRANSMISSION

**To:**         Anil K. Prahbu, Esq.

**Facsimile:**  (212) 727-7691

**Date:**       November 19, 2007

**From:**       John T.A. Rosenthal, Esq.

**No./Pages:**  2 pages, including cover sheet

**MESSAGE:**

## CONFIDENTIALITY NOTICE

This document contains confidential information subject to the attorney client privilege, which is intended to be read only by the person or persons named above. If you are not the recipient named above, DO NOT READ THE MATERIAL BELOW NOR ANY MATERIAL ATTACHED HERETO, but immediately (a) deliver it to the person or persons named above or (b) notify us by fax or telephone and destroy this document.

EXHIBIT "CC"

11/19/2007  12:31    6312650671                    ED GROSSMAN                    PAGE 01/02

# LAW OFFICES OF EDWARD J. GROSSMAN
## 135 WEST MAIN STREET, SUITE 204
## SMITHTOWN, NY 11787

Edward J. Grossman •

     • Licensed in NY & NJ

Tel: 631-265-5864
Fax: 631-656-9833

## FACSIMILE TRANSMISSION

| | |
|---|---|
| **To:**<br>Mr. John Rosenthal | **From:**<br>Edward J. Grossman |
| **Company:**<br>Harrington, Ocko & Monk | **Date:**<br>November 19, 2007 |
| **Fax:**<br>914-686-4824 | **Page(s) (including cover):**<br>2 |
| **Tel:**<br>White Plains: 914-686-4800<br>N.Y.C.: 212-227-8004 | **Our Reference:**<br>Software for Moving, Inc.<br>Schlomo Kogos |
| **Subject:**<br>Change of attorney and request for extension of time to answer OSC | **Your Reference:**<br>La Rosa Del Monte Express, Inc. |

☐   URGENT        ☐   REVIEW ONLY

☐   ORIGINAL WILL FOLLOW BY MAIL

☒   BY FACSIMILE ONLY

MEMO:

NOV-19-2007  16:08            6312650671              97%            P.01

11/19/2007  12:31   6312650671                    ED GROSSMAN                                  PAGE  02/02

# LAW OFFICES OF EDWARD J. GROSSMAN
## 135 WEST MAIN STREET, SUITE 204
## SMITHTOWN, NY 11787

Edward J. Grossman •
Kendra L. Kelly
 • Licensed in NY & NJ

Tel: 631-265-5864
Fax: 631-656-9833
www.ejgrossmanlaw.com
ejglawoffice@optonline.net

November 19, 2007

**VIA FACSIMILE: 914-686-4824**
Harrington, Ocko & Monk, LLP
81 Main Street, Suite 215
White Plains, NY 10601

Re: **Software for Moving, Inc. v. La Rosa Del Monte Express**
   **Index No.: 603001-07**

Dear Mr. Rosenthal:

Please let this letter serve to advise you that we are incoming counsel for Software for Moving, Inc. As such, your letter of November 19, 2007 was forwarded to us. We have not yet received the signed consent to change attorney, nor have we received the file, so we would like to request an extension to answer your Order to Show Cause. I left telephone messages for Mr. Harrington on Friday, and for you today. Please call me at your earliest convenience to discuss this matter.

Very truly yours,

Edward J. Grossman

EJG: kk

**EXHIBIT "DD"**

# Harrington, Ocko & Monk

**A LIMITED LIABILITY PARTNERSHIP**
**Attorneys at Law**

White Plains Office

81 Main Street – Suite 215
White Plains, NY 10601
Tel: (914) 686-4800
Fax: (914) 686-4824

John T.A. Rosenthal
e-mail: jrosenthal@homlegal.com

New York City Office

52 Duane Street, 7th Floor
New York, NY 10007
Tel: (212) 227-8004

**Reply to White Plains Office**

November 21, 2007

**VIA FACSIMILE @ (631) 656-9833**
**AND REGULAR MAIL**

Edward J. Grossman, Esq.
135 West Main Street, Suite 204
Smithtown, NY 11787

> **Re:**   **Software for Moving, Inc. v. La Rosa Del Monte Express, Inc.**
> **Index No. 603001-07**

Dear Mr. Grossman:

As you may be aware, our firm represents Defendant, La Rosa Del Monte Express, Inc. ("La Rosa" or "Defendant") in the above-captioned matter.

I write in response to your letter of November 19, 2007. As you may be aware, our client has been engaged in litigation regarding your client's failure to provide La Rosa with properly functioning software pursuant to the 2005 Software Agreements, refusal to return almost $242,000 of our client's funds, and failure to arbitrate the dispute between the parties pursuant to such 2005 Software Agreements.

After our client brought an arbitration against SFM and Mr. Kogos, SFM brought a forum-shopping Complaint against La Rosa in Federal Court in the Northern District of Illinois (the "Federal Action"). In that litigation, your client refused our client the common courtesy of an extension in which to move or answer. We subsequently filed two motions to dismiss the Federal Action for lack of subject matter jurisdiction and failure to state a cause of action, or in the alternative, to transfer the Federal Action to the Southern District of New York. Such motion is fully briefed and pending before Judge Gottschall.

While the motion to dismiss the Federal Action was pending, your client filed an Emergency Order to Show Cause requesting the arbitration between the parties ongoing in New York before Arbitrator Mandel be stayed. Judge Feinman denied such emergency stay and provided the parties with a briefing schedule in which Defendant had until October 10, 2007 by which to serve an opposition to the Order to Show Cause and Plaintiff had until October 26,

Edward J. Grossman, Esq.
November 21, 2007
Page 2

2007 to serve a reply. Defendant served its opposition on October 10th, as well as a cross-motion to compel arbitration between the parties pursuant to the 2005 Software Agreements.

On or about October 18, 2007, upon request by the office of Max Marcus Katz, P.C. (counsel for SFM), we entered into a Stipulation extending the date by which SFM had to oppose our cross-motion to November 14, 2007, our reply papers to be due on November 28, 2007, with oral argument to take place before Judge Feinman on December 7, 2007. Judge Feinman so ordered, and counsel for SFM made no further request for an extension of the dates indicated in the Stipulation.

Despite your letter of November 19, 2007 requesting an extension of time for SFM to oppose our cross-motion, your client is already in severe default of its briefing obligations pursuant to the Stipulation of the parties and the Order of the Court in this matter. Indeed, neither your firm nor that of Mr. Katz contacted our office about an extension prior to November 14, 2007.

Repeated delay by your client in refusing to arbitrate this dispute, filing a forum-shopping Complaint in an inconvenient, distant forum, as well as having our client appear before three separate tribunals, has caused our client severe prejudice. Furthermore, we have already granted your client one extension of time in which to respond to our cross-motion to compel arbitration; a courtesy your client has refused to extend to our client in other litigation.

Therefore, I am afraid we are unable to consent to an extension of your client's time to oppose our cross-motion to compel arbitration. Moreover, as you have failed to provide us with any documentation indicating that you are now new counsel for SFM in this litigation, it would be inappropriate for us to grant an extension or to consider one.

Sincerely,

John T.A. Rosenthal

JTR/sg

```
************** -COMM. JOURNAL- ****************** DATE NOV-21-2007 **** TIME 14:12 ********

     MODE = MEMORY TRANSMISSION              START=NOV-21 14:11    END=NOV-21 14:12

        FILE NO.=298

     STN    COMM.   ONE-TOUCH/   STATION NAME/TEL NO.                    PAGES    DURATION
     NO.             ABBR NO.

     001    OK      ☎            16316569833                             003/003   00:00:59


                                             -HARRINGTON OCKO MONK     -

     *****************************-914 686 4824  - **** -              - ********
```

# Harrington, Ocko & Monk
### A LIMITED LIABILITY PARTNERSHIP
### Attorneys at Law

White Plains Office

81 Main Street – Suite 215
White Plains, NY 10601
Tel: (914) 686-4800
Fax: (914) 686-4824

John T.A. Rosenthal, Esq.
jrosenthal@homlegal.com

New York City Office

52 Duane Street, 7th Floor
New York, NY 10007
Tel: (212) 227-8004

Reply to White Plains Office

## FACSIMILE TRANSMISSION

**To:**        Edward J. Grossman, Esq.

**Facsimile:**   (631) 656-9833

**Date:**       November 19, 2007

**From:**       John T.A. Rosenthal, Esq.

**No./Pages:**   3 pages, including cover sheet

**MESSAGE:** ORIGINAL MAILED

## CONFIDENTIALITY NOTICE

This document contains confidential information subject to the attorney client privilege, which is
intended to be read only by the person or persons named above. If you are not the recipient named
above, DO NOT READ THE MATERIAL BELOW NOR ANY MATERIAL ATTACHED
HERETO, but immediately (a) deliver it to the person or persons named above or (b) notify us by
fax or telephone and destroy this document.

**EXHIBIT "EE"**

1

1

2  SUPREME COURT OF THE STATE OF NEW YORK
   COUNTY OF NEW YORK - CIVIL TERM - PART: 52
3  ----------------------------------------------------X
   SOFTWARE FOR MOVING, INC.,
4
                                    Plaintiff,
5
                        -against-
6
   LAROSA DEL MONTE EXPRESS,
7
                                    Defendant.
8  ----------------------------------------------------X
   Index No. 603001/07        80 Centre Street
9  ORAL ARGUMENT              New York, N.Y.
                              December 5, 2007
10

11 B E F O R E:

12     HONORABLE PAUL G. FEINMAN,
                              Justice
13

14

   A P P E A R A N C E S:
15
       LAW OFFICE OF EDWARD J. GROSSMAN
16     Attorneys for the Plaintiff
       135 West Main Street
17     Smithtown, N.Y. 11787
            BY:  STEPHEN C. DACHTERA, ESQ.
18

19
       HARRINGTON, OCKO & MONK, LLP
20     Attorneys for the Defendant
       81 Main Street, Suite 215
21     White Plains, N.Y. 10601
            BY:  JOHN T.A. ROSENTHAL, ESQ.
22

23

24                         ALAN F. BOWIN, CSR, RMR, CRR
                           Official Court Reporter
25

26

2

1          Proceedings

2                THE COURT:  Okay, the floor is yours.

3                MR. ROSENTHAL:  This is our cross-motion,

4    so --

5                THE COURT:  Well, they made the original

6    order to show cause --

7                MR. ROSENTHAL:  Okay.

8                THE COURT:  -- and then you cross-moved.

9                MR. DACHTERA:  Okay.

10               Your Honor, first, a couple housecleaning

11   issues:

12               There's been a change of attorneys.  I

13   represent -- I'm from Ed Grossman's office.  He's now

14   representing the plaintiff, Software For Moving, in

15   New York.  Software For Moving has two attorneys;

16   there's one in Chicago and one here.

17               MR. ROSENTHAL:  Actually, your Honor,

18   Software has three attorneys; there's also one

19   in Ohio, who's been representing Software in the

20   New York arbitration that's presently pending.

21               MR. DACHTERA:  Okay.  So there's an issue

22   of --

23               THE COURT:  And poor Miss Watson can't

24   get a single attorney, and Software has three.  All

25   right.  Well, that's the way life goes.

26               MR. DACHTERA:  Yeah.  We don't have a

                ALAN F. BOWIN, CSR, RMR, CRR

3

Proceedings

1
2  consent to change attorney to give to opposition

3  today because Mr. Grossman has not been able to get

4  that consent from the previous attorney.  Now --

5              THE COURT:  Perhaps he didn't get paid.

6              MR. DACHTERA:  Mr. Grossman?

7              THE COURT:  No, the previous attorney.

8              MR. ROSENTHAL:  Actually, your Honor --

9              MR. DACHTERA:  I don't know.

10             MR. ROSENTHAL:  -- there's been at least

11  a month's worth of time, my understanding is, between

12  when they may have changed counsel.  We've never been

13  notified that there's actually been a substitution of

14  counsel, and I'm not sure if it's appropriate that

15  Mr. Grossman's office is even here opposing this

16  motion.  We've gotten no papers on that issue

17  whatsoever.

18             MR. DACHTERA:  Well, the original motion

19  was made by the previous attorney.

20             THE COURT:  Now, he's talking about --

21             Have you done --

22             MR. DACHTERA:  Mr. Grossman was

23  retained --

24             THE COURT:  Have you done anything with

25  either the clerk of Trial Support or with the County

26  Clerk, or with anybody else, to indicate that there's

ALAN F. BOWIN, CSR, RMR, CRR

4

1                      Proceedings

2  been a change of counsel?

3             MR. DACHTERA:  I'm not aware of it.  I

4  don't know.

5             THE COURT:  Okay.  So the only way --

6             I mean, and his point is, the only way

7  to change counsel is either to serve, you know, an

8  order -- you know, the outgoing attorney can move to

9  be relieved, if he's not getting paid or whatever --

10  right? -- or he can do a substitution by consent.  If

11  there's no consent by the outgoing attorney and the

12  client wants to just fire that person and substitute,

13  they can do that, too.

14             There are any number of different ways,

15  but you have to do something that puts the court on

16  notice that there's been a change in counsel, and

17  puts the adversary on notice.

18             MR. DACHTERA:  I don't know if he's done

19  that with the court, but I know it's on consent.

20  He just got retained November 11th.  Here we are,

21  December 5th.

22             THE COURT:  That's a long time.

23             MR. DACHTERA:  It's three weeks.

24             MR. ROSENTHAL:  Your Honor, we've not been

25  privy to any of them.

26             MR. DACHTERA:  Okay.  Granted, that being

5

Proceedings

1
2    an issue --

3            THE COURT:  Well, that's a very big issue,

4    because, you know, the corporation has to appear by

5    counsel and it has to be counsel that is authorized

6    to bind the corporation, and the only way that the

7    corporation can tell the court or the adversary that

8    they have the authority to bind is by filing a Notice

9    of Appearance.

10           MR. DACHTERA:  I know.

11           THE COURT:  And if you don't file a Notice

12   of Appearance, what are you doing here?

13           MR. DACHTERA:  Well, I mean, obviously,

14   the client retained us.  We wouldn't be here for

15   free.  I mean, he did sign a retainer.

16           THE COURT:  Well, people show up for all

17   sorts of reasons.

18           MR. DACHTERA:  He did sign a retainer.

19           THE COURT:  Sometimes they show up and

20   say, "Well, I think I'm going to get retained."

21           MR. DACHTERA:  Well, I have a copy of the

22   retainer.  It's proof that the client did retain us.

23           THE COURT:  Feel free to file a Notice of

24   Appearance.

25           When I was on the criminal side, we had

26   them blank.  I don't know if we have such things on

ALAN F. BOWIN, CSR, RMR, CRR

6

Proceedings

1
2       the civil side.  We actually had them in lower civil;
3       we'd just file them.  But you've got to do that.
4                  All right.  But what do you want to tell
5       me about the case, in your unauthorized capacity?
6                  MR. ROSENTHAL:  I just want to note my
7       objection, your Honor.  I don't think it's proper
8       that he present anything to the Court.  I mean,
9       we've never received any notification whatsoever that
10      they've been officially retained by counsel -- or by
11      SFM -- at all.
12                 THE COURT:  I understand.
13                 MR. ROSENTHAL:  Okay.
14                 THE COURT:  And I'll give it that weight.
15                 MR. ROSENTHAL:  Thank you.  I appreciate
16      that, your Honor.
17                 THE COURT:  Or lack thereof.
18                 MR. DACHTERA:  Okay, your Honor.  This
19      original motion was brought by the previous attorney
20      to stay the arbitration in --
21                 Originally, the case was brought in
22      Illinois federal district court for copyright
23      infringement.
24                 MR. ROSENTHAL:  Actually, that's not true,
25      your Honor.  The original action was brought for
26      arbitration in February of this year.

                  ALAN F. BOWIN, CSR, RMR, CRR

```
1                          Proceedings
2              THE COURT:  All right, I'll tell you what.
3      You have a yellow pad there?  Use it.  Write down
4      what you want to correct.
5              MR. ROSENTHAL:  I just want to make sure
6      that there's nothing glossed over.
7              THE COURT:  And you'll get the chance when
8      he's done.
9              MR. ROSENTHAL:  Thank you, your Honor.
10             MR. DACHTERA:  My understanding was that
11     there was a copyright infringement case filed by
12     Software For Moving in federal court in Illinois --
13     okay? -- and the case -- the defendant then moved
14     to dismiss the complaint or, in the alternative,
15     transfer the case to the Southern District of New
16     York as the proper forum, and also for a motion to
17     compel arbitration.
18             Now, basically, the case is still pending
19     in Illinois right now.  The previous attorney had
20     made the motion here to stay arbitration simply for
21     the fact that he didn't want the client to default
22     in the possible arbitration in Illinois.  Since that
23     time, the American Arbitration Association decided
24     that they were not going to grant arbitration in this
25     case until the court decided whether or not there is
26     actual reason to arbitrate, so that case is still
```

1                              Proceedings

2        pending in the federal court.

3                 Now, we're withdrawing the motion now

4        because we believe it's moot -- okay? -- it's a

5        moot issue at this point.  Let the court in Illinois

6        decide the case and if they decide to transfer it

7        back here, it's all well and good.  There's no reason

8        for us to be in today.

9                 That's basically our position.

10                MR. ROSENTHAL:  My response is, your

11       Honor, first of all, whether or not they withdraw

12       their motion has nothing to do with our cross-motion

13       to compel arbitration.  They have no standing to

14       withdraw that cross-motion.

15                But I want to get some facts before the

16       Court; they're slightly different than the way

17       counsel represented.

18                This matter was started, initiated by

19       arbitration, by our client, LaRosa DelMonte Express,

20       Inc., before a New York arbitrator, through the AAA,

21       in February of 2007.  We served SFM; we served

22       Shlomo Kogos, who is the president of SFM; filed an

23       arbitration demand against both of those entities.

24                Ohio counsel, Mr. Zukowsky, who

25       represented SFM -- I'm not sure he's ever actually

26       represented Mr. Kogos nor has Mr. Kogos ever had

                    ALAN F. BOWIN, CSR, RMR, CRR

9

1          Proceedings

2     counsel appear on his behalf in the arbitration --

3     asked that -- basically said, "Well, we don't think

4     there's an arbitration agreement between the parties

5     and we want to submit the issue of arbitrability

6     before the arbitrator on an expedited basis." This

7     was in April. We said, "Fine as to the arbitrability

8     issue, not fine as to the expedited manner; there's

9     no provision in the AAA regulations that allow for

10    that."

11          Mr. Zukowsky then entered into, in May of

12    that year, a discovery schedule in which he agreed to

13    have depositions take place at certain times, have

14    discovery documents take place [sic] at certain

15    times. SFM and Mr. Kogos then defaulted.

16          While the arbitrator was beginning to

17    ramp up, SFM then went and filed a copyright lawsuit

18    in the Northern District of Illinois, which has

19    absolutely no ties to any of the parties in this

20    action whatsoever. SFM is a New York resident.

21    Mr. Kogos is a New York resident. Our client,

22    LaRosa DelMonte, is a New York resident. All of

23    the software at issue was developed here in New York;

24    it was implemented in our client's offices in New

25    York -- or not implemented, I should say, because the

26    software never actually functioned or worked as it

ALAN F. BOWIN, CSR, RMR, CRR

10

1                           Proceedings

2    was supposed to.   Payments were made from our client

3    in New York.

4              Why we're in the Northern District of

5    Illinois, I have no idea other than, apparently,

6    Mr. Kogos' Ohio counsel, Mr. Zukowsky, has a friend

7    in Illinois who would take it, possibly, without

8    payment.

9              We then filed a motion to dismiss for lack

10   of subject matter jurisdiction.  It turns out, SFM

11   does not own the copyright that it's claiming as the

12   basis of its action in that matter.

13             The court in Illinois --

14             Basically, after we filed a motion

15   to dismiss, a motion to transfer and, in the

16   alternative, a motion to compel arbitration, SFM then

17   filed a motion to stay and the Court in Chicago said:

18   "I don't think I have jurisdiction to issue that

19   motion [sic], SFM, to stay any arbitration because I

20   think you should have filed it in New York.  Isn't

21   the arbitration in New York?"  "Oh, yes, your Honor."

22             So that motion is presently fully briefed

23   and pending before the Court in the Northern District

24   of Illinois.

25             In the meantime, SFM defaulted on all

26   its discovery obligations.  The arbitrator gave SFM

                ALAN F. BOWIN, CSR, RMR, CRR

11

Proceedings

1
2       multiple opportunities to cure their defaults and
3       they simply refused to abide.
4               They then -- SFM now -- submitted a
5       request for the arbitrator to stay the arbitration,
6       basically conceding that they've engaged in
7       the arbitration, they're participating in the
8       arbitration.
9               They then filed this present motion to
10      stay the arbitration.
11              So now we have three tribunals involved,
12      in three different forums, all to the prejudice of
13      our client.  We just want to get to the merits of
14      this thing.
15              Then we file a cross-motion to compel
16      arbitration; we grant previous counsel -- I guess,
17      still counsel -- an extension and hear nothing from
18      them.  I then send them a courtesy letter on November
19      19th.  Their papers, opposition, were due on November
20      14th.  I sent a courtesy letter to the previous
21      counsel saying, "Hey, I haven't got your opposition
22      papers; where are they?"
23              I then get a letter from Mr. Grossman's
24      office saying, "Well, I think we've been retained."
25      I asked for a Notice of Change of Counsel, got
26      nothing from them.  That was over two weeks ago.

ALAN F. BOWIN, CSR, RMR, CRR

12

Proceedings

1

2    I then called Max Katz' office and they said, "Well,

3    we were told by the client to stop working on this."

4    But there's been no change-of-counsel letter.

5              What I'm trying to get at, your Honor, is,

6    basically, they haven't opposed our motion to compel

7    arbitration.  There are not one but two arbitration

8    agreements signed by SFM and their president,

9    Mr. Kogos.  So the idea that we can litigate this

10   thing anywhere but before an arbitrator is simply

11   improper.

12             I want to correct counsel: The arbitrator

13   did not say this shouldn't be arbitrated.  What

14   Arbitrator Mandel said was: "You know what?  Until I

15   get an order from a court allowing me to go forward,

16   I'm not going to go forward."  But he didn't dismiss

17   the case.  He didn't say, "It's over; there's no

18   arbitration agreement."  He simply said, "I'm going

19   to wait until a court authorizes me to go forward,"

20   and he did so because SFM (indicating) brought this

21   motion before your Honor.

22             Well, now, your Honor ruled that, A,

23   their motion was untimely in the first instance and

24   you didn't grant the TRO.  You then allowed us time

25   to oppose.  We cross-moved to compel and we've had

26   no opposition, and now we have counsel who we're

ALAN F. BOWIN, CSR, RMR, CRR

13

1
2  not sure is counsel because we've gotten no
3  change-of-counsel letter.
4         So I'm at a loss, your Honor.  I mean, we
5  should be back before Arbitrator Mandel.  There's a
6  plethora before the Court of arbitration agreements,
7  participation in the arbitration; judicial estoppel
8  where SFM, on the one hand, says, "Oh, I never signed
9  the agreements" and then goes before the Chicago
10  court and says: "Oh, but wait.  I did sign two of
11  the agreements.  Sorry.  I didn't mean there was a
12  forgery on those two agreements, because now I'm
13  going to file a claim based on those two agreements
14  that I'm now claiming aren't forged."
15         And then he comes back before the
16  arbitrator and says, "Oh, I don't think we should go
17  forward because I don't recognize your authority,"
18  but then says, "Well, I recognize your authority
19  enough that you should stay your own arbitration."
20         So I'm kind of at a loss, your Honor.
21  I think we ought to get to the merits of this case.
22  The gamesmanship is done.  Our client has been
23  waiting for over a year to simply get to the merits
24  of this case.  Get us back before Arbitrator Mandel
25  and we'll do this.
26         MR. DACHTERA:  Your Honor, we agree that

14

Proceedings

2  we want to get to the merits of this case, but our

3  point is that there's a case pending in Illinois and

4  they should reach their decision before anything

5  should be done in this jurisdiction.

6           MR. ROSENTHAL:  And I'm --

7           MR. DACHTERA:  Also, what counsel fails to

8  mention is that this arbitration proceeding --

9           Our client contests the fact that he

10  ever signed any agreements that would compel him to

11  arbitration in the first place.  So that's an issue

12  of fact which still has to be decided.  So it's not

13  just, you know, automatic, as he makes it sound like,

14  that arbitration's going to happen, because there

15  still is a question of fact as to whether Software

16  For Moving actually signed these documents or

17  agreements that he's claiming compel our client to

18  arbitration, which is still before the court in

19  Illinois.

20           MR. ROSENTHAL:  Two things, your Honor:

21  First of all, that issue, while, as counsel mentions,

22  it's somewhat before the court in Illinois, the fact

23  of the matter is, they brought an action in Illinois

24  with no mention whatsoever of the arbitration.  They

25  simply brought a copyright action there, in an

26  inconvenient forum with no ties to these parties or

ALAN F. BOWIN, CSR, RMR, CRR

1              Proceedings

2    this case whatsoever.

3              The court there told them, specifically,

4    "I don't have jurisdiction to stay this arbitration,

5    in my opinion." You know? I mean, if that's not an

6    indication: "Listen, you need to go forward or find

7    relief in an appropriate venue; you really should."

8    They did; they're before your Honor, and then they

9    filed no opposition to our cross-motion.

10             So, staying this while some court in

11   Chicago has already indicated they don't think they

12   have the authority or the jurisdiction to stay this

13   arbitration is simply preposterous.

14             The other thing is, there is a motion to

15   dismiss, which -- your Honor has the papers on this.

16   They've already waived the issue of arbitrability,

17   first before the -- arguing it before this Court and,

18   second, by participating in the arbitration. They

19   delayed over --

20             THE COURT: A motion to dismiss this or --

21             MR. ROSENTHAL: No, the issue of whether

22   or not there's an arbitration agreement. They've

23   waived that issue, A, by participating in the

24   arbitration extensively, agreeing to a discovery

25   schedule, agreeing to execute a confidentiality stip

26   with regard to the arbitration.

                    ALAN F. BOWIN, CSR, RMR, CRR

16

1    Proceedings

2         It's just four or five months later

3    when they decide, "Wow, we really don't want to be

4    deposed"; suddenly, "We don't want to go forward with

5    our agreements."

6         Counsel -- Mr. Zukowsky -- for SFM, in

7    the arbitration, actually asked the arbitrator for a

8    ten-day hearing and extensive discovery, because he

9    propounded that he was going to have to depose about

10   ten people in places as far off as Puerto Rico in

11   order to defend this case.  When it became apparent

12   that it wasn't going to go their way, they suddenly

13   said, "Oh, I don't think we want to abide by that

14   agreement."  But they've already waived, your Honor.

15        Second of all, they waived through filing

16   a complaint in the Northern District of Illinois,

17   which is based upon the arbitration agreement which

18   they claim they never signed.

19        There were two arbitration agreements,

20   your Honor.  There was a maintenance agreement and a

21   development agreement, both executed in March of '05,

22   both signed by both parties.  There was then an

23   addendum to each agreement --

24        THE COURT:  All right.

25        MR. ROSENTHAL:  Okay.  I think it's clear,

26   your Honor.  Even above all that, there's no

ALAN F. BOWIN, CSR, RMR, CRR

17

1                        Proceedings

2    opposition.

3                THE COURT:   The petition is permitted

4    to be withdrawn.   The cross-motion is deemed a

5    cross-petition that was properly noticed, and there

6    is no opposition to it other than what you've said

7    here on the record.

8                MR. DACHTERA:   I have some opposition

9    papers.

10               THE COURT:   I'm sorry?

11               MR. DACHTERA:   I have some opposition

12   papers, which basically reiterates the same arguments

13   that I mentioned to you in this conference.

14               THE COURT:   There were no opposition

15   papers filed with the Court.

16               MR. DACHTERA:   They should have been.

17               THE COURT:   No.

18               MR. DACHTERA:   I only have one copy that I

19   was given.

20               MR. ROSENTHAL:   Your Honor, their

21   opposition papers were due three weeks ago.

22               THE COURT:   There was no opposition filed

23   with the Court.

24               My understanding is that there was a

25   stip --

26               MR. ROSENTHAL:   Yes, your Honor.

ALAN F. BOWIN, CSR, RMR, CRR

18

1                    Proceedings

2              THE COURT:   -- that was entered into.

3              See, when I signed the original order to

4    show cause, I set a very specific schedule for the

5    filing of papers.

6              MR. ROSENTHAL:  You did, your Honor.

7              THE COURT:  All right?  And I do that as a

8    matter of course.  And the whole purpose of that is

9    so that everything can be read, considered and, you

10   know, researched, if necessary.  You know, and I did

11   that whole schedule with the parties present or --

12             I don't know if you were actually

13   physically present or --

14             MR. ROSENTHAL:  We were, by phone, your

15   Honor.

16             THE COURT:  By phone.

17             But that was the whole point of having

18   that conference at the signing of that order to show

19   cause.

20             The parties then entered into a

21   stipulation, subsequent to that --

22             MR. ROSENTHAL:  Which was --

23             THE COURT:  -- which is fine, but

24   you're bound by that.  And that stipulation reads as

25   follows: that any opposition and cross-motion should

26   be filed by 11/14 and that --

                 ALAN F. BOWIN, CSR, RMR, CRR

19

1               Proceedings

2               MR. ROSENTHAL:  That was their opposition,

3      your Honor.

4               THE COURT:  Sorry.

5               -- the plaintiff's time to serve a reply

6      in opposition to the defendant's opposition is

7      extended to 11/14.  I don't know about you, but I

8      didn't get anything by 11/14.

9               MR. ROSENTHAL:  They didn't, your Honor.

10     I have letters to that effect.

11              THE COURT:  So, you know, you charted your

12     own course.  You can't unilaterally change the terms

13     of either the Court's order to show cause -- you can

14     do it by stipulation to the extent that you did

15     because I so ordered that, but that becomes the

16     controlling order for the scheduling of papers.

17     Now we're, you know, three weeks later.

18              MR. DACHTERA:  You don't have them yet.

19              THE COURT:  The Court doesn't have them

20     because they weren't filed.

21              Were they served on you?

22              MR. ROSENTHAL:  No.

23              MR. DACHTERA:  I have to talk to my

24     office.

25              THE COURT:  Perhaps it's with the missing

26     Notice of Appearance.

ALAN F. BOWIN, CSR, RMR, CRR

20

Proceedings

1

2      MR. ROSENTHAL:  Your Honor, my

3  understanding was, there were no opposition papers

4  filed in a timely manner, because I took it upon

5  myself to write a courtesy letter to previous

6  counsel -- well, same counsel -- saying, "Where are

7  your opposition papers?"  I was subsequently told by

8  them, "We were told by the client not to do any more

9  work."

10      THE COURT:  You're repeating what you've

11  said already.

12      MR. ROSENTHAL:  Sorry, your Honor.

13      THE COURT:  So I'm assuming it's a default

14  vis-a-vis the cross-motion.

15      So the petition is permitted to be

16  withdrawn; you know, the petition for the stay

17  is permitted to be withdrawn, based on your oral

18  representations on the record.  And if they're not

19  withdrawn, the Court would have denied it on its

20  merits.  I think I made that pretty clear when I

21  refused to grant the TRO in the first place.

22      The cross-motion is deemed a petition

23  to compel arbitration, and the parties are directed

24  to proceed forthwith with the arbitration before

25  Arbitrator Richard Mandel.  And it is ordered that

26  the parties shall proceed with the arbitration before

21

1                           Proceedings

2      Arbitrator Mandel forthwith.  So --

3                  MR. ROSENTHAL:  Thank you, your Honor.

4                  Is the Court going to issue a written

5      order?

6                  THE COURT:  It's right here (indicating).

7      I already did it.

8                  And so that we're clear, because this came

9      up recently: You have a transcript here, but this

10     gray piece of paper (indicating) is your order and

11     your judgment for the purposes of proceeding to the

12     next step, which would be, of course, to serve a copy

13     of the order and judgment with notice of entry.

14                 MR. ROSENTHAL:  Yes, your Honor.

15                 MR. DACHTERA:  I'm unclear as to what the

16     Court's ruling is here.

17                 THE COURT:  You lost.  You've got to go

18     arbitrate in front of Arbitrator Mandel.  I don't

19     know how I can be any clearer.

20                 MR. DACHTERA:  Well, the point is that

21     there's a dispute as to whether or not arbitration is

22     even necessary, so -- and that we don't have a case

23     filed.

24                 THE COURT:  There's no dispute because you

25     didn't dispute anything.  You conceded everything

26     that they put in their cross-motion.  You didn't

                     ALAN F. BOWIN, CSR, RMR, CRR

22

|     |     |
|-----|-----|
| 1   | Proceedings |
| 2   | oppose it. |
| 3   | MR. DACHTERA:  Well, my answer to that is |
| 4   | that -- is that we're -- we're -- our position is |
| 5   | that the Court should be -- |
| 6   | THE COURT:  You have all these arbitration |
| 7   | agreements; you have all these documents; you have |
| 8   | all these -- you know. |
| 9   | MR. DACHTERA:  It's our position, we |
| 10  | should wait for the court to issue its decision in |
| 11  | Illinois.  That's a proper forum. |
| 12  | THE COURT:  I know that's what you're |
| 13  | saying.  I don't agree. |
| 14  | MR. DACHTERA:  The Court's ruling is to -- |
| 15  | THE COURT:  Is, go arbitrate in front |
| 16  | of the arbitrator pursuant to the arbitration |
| 17  | agreements. |
| 18  | The record is closed. |
| 19  | MR. ROSENTHAL:  Thank you, your Honor. |
| 20  | *     *     * |
| 21  | CERTIFIED to be a true and accurate transcript |
| 22  | of the proceedings. |
| 23  | |
| 24  | ALAN F. BOWIN, CSR, RMR, CRR |
| 25  | Official Court Reporter |
| 26  | |

ALAN F. BOWIN, CSR, RMR, CRR

EXHIBIT "FF"

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| SOFTWARE FOR MOVING, INC., A New York Corporation | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) )    Case No. 07 C 1839 ) |
| LA ROSA DEL MONTE EXPRESS, INC., a New York corporation, and LA ROSA DEL MONTE EXPRESS (CHICAGO) LLC, an Illinois Limited Liability Company | )    Judge Joan B. Gottschall )    ) )    Magistrate Judge Jeffrey Cole ) ) ) |
| Defendants. | ) ) |

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendants La Rosa Del Monte Express, Inc. ("La Rosa New York") and La Rosa Del Monte Express (Chicago) LLC ("La Rosa Chicago," and collectively "La Rosa"), have filed an omnibus motion with this court to dismiss plaintiff Software for Moving, Inc.'s ("SFM") first amended complaint or, in the alternative, to transfer the action to the Southern District of New York. The motion further opposes SFM's motion to stay arbitration and opposes SFM's motion to strike the declaration of John T. A. Rosenthal. The motion also includes La Rosa's cross-motion to stay this action and/or to compel arbitration. For the reasons set forth below, La Rosa's motion to dismiss is denied, SFM's motion to stay arbitration is granted, and La Rosa's cross-motion to stay this action and/or to compel arbitration is denied. SFM's motion to strike the declaration of John T. A. Rosenthal is denied as moot. Finally, La Rosa's motion to transfer the action to the Southern District of New York is granted.

1

## I. BACKGROUND

At the heart of this case is an alleged written contract between SFM and La Rosa that is either authentic or fraudulent. SFM is a software company that, as its name implies, develops and licenses software for moving companies. SFM's predecessor was a company called Safeguard Computer Services, Inc. ("Safeguard"). La Rosa is a moving company, incorporated in New York, operating at 11 locations within the United States and internationally. La Rosa Chicago is a subsidiary or sister corporation established in Chicago by La Rosa.

In 1999, La Rosa entered into a contract with Safeguard for the licensing of a Windows™-based program, Moving Manager for Windows ("the 1999 Agreement"). Prior to 1999, La Rosa allegedly also licensed a DOS-based version of Moving Manager from Safeguard. In December 2004, La Rosa and SFM allegedly entered into an agreement by which La Rosa would license a new, Web-based version of Moving Manager from SFM, incorporating several modifications suited to La Rosa's needs. According to SFM, although it spent 20 months developing the Web-based software for La Rosa, no written agreement memorializing the contract was ever presented to, or signed by, SFM, with the exceptions described below. SFM alleges that, based solely on an oral agreement, the contract price for developing the Web-based program was $295,000, payable upon completion of the working program.

La Rosa allegedly went "live" with the Web-based program in August 2006, at which time it requested that SFM sign a 9/11 agreement[1] as well as a chart listing La Rosa's maintenance fee payment obligations over the ensuing seven years. In 2006, La

---

[1] A "9/11" agreement is one in which a software licensor places the source code of the licensed software in escrow, to be made available to the licensee should some mishap befall the licensor.

Rosa requested modification of the Web-based program; again, this was allegedly based on an oral agreement that La Rosa would pay SFM an additional $60,000 if the modifications were acceptable.

La Rosa hotly disputes SFM's contention that there was no written agreement between the two parties for the Web-based program. La Rosa alleges that there was indeed a written development and license agreement between SFM and La Rosa (the "2005 Agreement") for the Web-based program that was signed by SFM's president, Shlomo Kogos ("Kogos") on March 3, 2005. SFM has dismissed the agreement as a fraud and Kogos' alleged signature on the document as a forgery.

According to SFM, La Rosa stopped paying the maintenance fees required under the 1999 Agreement in August, 2006. When La Rosa ignored SFM's demands that it continue to pay the maintenance fees, SFM filed suit in this court, alleging that La Rosa had infringed SFM's copyright by continuing to use the software covered by the 1999 Agreement and seeking damages under 17 U.S.C. §§ 504 and 505 (count I). SFM also claims that La Rosa breached the 1999 Agreement by failing to pay the licensing fees specified in the 1999 Agreement (count II). SFM further alleges that La Rosa breached the oral contract it made with SFM concerning the Web-based program when it failed to pay $52,500 of the agreed-upon price of $295,000 for the development and licensing of the Web-based program and by failing to pay the maintenance fees according to the schedule signed in 2006 (count III). Finally, SFM claims that La Rosa also breached the subsequent oral contract by failing to pay $60,000 for the modifications to the program allegedly requested by La Rosa.

## II. ANALYSIS

### A. La Rosa's Motion to Dismiss for Lack of Subject Matter Jurisdiction

La Rosa has moved to dismiss SFM's complaint under Federal Rule of Civil Procedure 12(b)(1), claiming that this court lacks subject matter jurisdiction to hear the case. FED R. CIV. P. 12(b)(1). When deciding a motion to dismiss under Rule 12(b)(1), the court construes the complaint liberally and is not bound to accept as true allegations of jurisdiction where a party properly raises factual questions of subject matter jurisdiction. *Bab Systems, Inc. v. Pilatus Inv. Group, Inc.*, No. 05 C 3038, 2005 WL 2850119, at *2 (N.D. Ill. October 27, 2005). Furthermore, the court may look beyond the jurisdictional allegations to examine any evidence submitted to determine if subject matter jurisdiction in fact exists. *Id.*

Specifically, La Rosa claims that it was Safeguard, not SFM, which registered the copyright of the software that was the subject of the 1999 Agreement. Kogos, the president of both Safeguard and SFM, has alleged that SFM is the successor in interest to Safeguard, and that Safeguard's ownership of the allegedly infringed copyright was transferred to SFM. Decl. of Shlomo Kogos ¶ 8. La Rosa claims that Safeguard did not properly assign its copyright to SFM, because SFM allegedly cannot produce a writing memorializing the transfer of the copyright from Safeguard to SFM as required by 17 U.S.C. § 204(a). Therefore, contends La Rosa, since SFM cannot, absent a written transfer agreement, properly allege ownership of the copyright, it must necessarily lack standing to bring a case of copyright infringement. Finally, according to La Rosa, since SFM cannot meet its burden of demonstrating that it has standing in this case, its

complaint should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1).

*Althin CD Medical, Inc. v. West Suburban Kidney Center*, 874 F. Supp. 837, 843 (N.D.
Ill. 1994).

La Rosa invokes § 204(a) in claiming that since SFM has not produced (and
presumably cannot produce) a copy of a written instrument of conveyance, or note or
memorandum of the transfer, of the copyright from Safeguard to SFM, then SFM cannot
be recognized as owner of the copyright with standing to bring suit. Section 204(a) of the
Copyright Act states that: "A transfer of copyright ownership, other than by operation of
law, is not valid unless an instrument of conveyance, or a note or memorandum of the
transfer, is in writing and signed by the owner of the rights conveyed or such owner's
duly authorized agent." 17 U.S.C § 204(a). The "operation of law" clause of § 204(a)
has generally been limited to well-defined circumstances, including transfers of
ownership pursuant to proceedings in bankruptcy and mortgage foreclosures; transfer of
ownership rights from employee to employer in a "for hire" situation; or by transfer of
assets from a dissolving corporation to its shareholders pursuant to the laws of the state of
incorporation. *Brooks v. Bates*, 781 F. Supp. 202, 205-06 (S.D.N.Y. 1991). None of
these limited circumstances by which copyright ownership may be transferred via
operation of law is applicable to the instant case.

Nevertheless, La Rosa's motion to dismiss based on the above argument is fatally
flawed. The Seventh Circuit has held explicitly that alleged third-party infringers, like La
Rosa, may not invoke § 204(a) to avoid suit for copyright infringement. *Billy-Bob Teeth,
Inc. v. Novelty, Inc.*, 329 F.3d 586, 592-93 (7th Cir. 2003). According to the court, § 204
is in the nature of the Statute of Frauds and is specifically designed to resolve disputes

5

between copyright owners and transferees. *Billy-Bob Teeth*, 329 F.3d at 592. Where

there is no dispute between the copyright owner and the transferee over the status of the

copyright, "it would be unusual and unwarranted to allow a third party infringer to invoke

[§] 204(a) to avoid suit for copyright infringement." *Id.* at 592-93 (quoting *Imperial*

*Residential Design, Inc. v. The Palms Development Group, Inc.*, 70 F.3d 96, 99 (11th Cir.

1995)).

It is undisputed that there is no quarrel whatever between Safeguard and SFM

over the assignment of the software copyright from the former to the latter. La Rosa, as

an alleged third party infringer, simply lacks standing to invoke § 204(a) as the basis for

its motion to dismiss under Rule 12(b)(1). *Billy-Bob Teeth*, 329 F.3d at 592. La Rosa's

motion to dismiss is consequently denied.

B. SFM's Motion to Stay Arbitration and La Rosa's cross-motion to stay this proceeding

and/or to compel SFM to arbitrate.

In February 2007, La Rosa initiated arbitration proceedings with the American

Arbitration Association under the contested 2005 Agreement. SFM has resisted

arbitration, claiming that there was no valid written agreement to arbitrate with La Rosa

(and indeed that the 2005 Agreement is invalid) and has moved for a stay of arbitration

proceedings.

Section 4 of the Federal Arbitration Act (9 U.S.C. § 4) states in part:

A party aggrieved by the alleged failure, neglect, or refusal of another to
arbitrate under a written agreement for arbitration may petition any United
States district court which, save for such agreement, would have
jurisdiction under Title 28, in a civil action or in admiralty of the subject
matter of a suit arising out of the controversy between the parties, for an
order directing that such arbitration proceed in the manner provided for in
such agreement .... If the making of the arbitration agreement or the

failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.

9 U.S.C § 4. La Rosa claims that the 2005 agreement, and the arbitration agreement contained therein, is valid and binding and contends that this court should therefore deny SFM's motion to stay arbitration and compel SFM to proceed with the arbitration initiated by La Rosa. SFM claims that it had never seen the 2005 Agreement (with its arbitration agreement) prior to La Rosa's February 2007 demand for arbitration and that Kogos' alleged signature on the 2005 Agreement is a forgery. SFM denies having any knowledge of, or intent to enter into, any arbitration agreement with La Rosa.

There is, therefore, a serious disagreement between the parties with respect to a significant issue of material fact, *viz.*, the authenticity of the 2005 Agreement and its alleged agreement to arbitrate. Since there is a dispute concerning the making of the agreement, 9 U.S.C. § 4 is squarely in play, directing this court to proceed summarily to trial.

La Rosa cites *God's Battalion of Prayer Pentacostal Church, Inc. v. Miele Associates LLP* in support of its opposition to SFM's movement to stay arbitration. 85 N.E.2d 1265 (S.D.N.Y. 2006). However *God's Battalion* is distinguishable from the instant case. In *God's Battalion*, the party moving to stay arbitration was in possession of an unsigned copy of the contract containing the arbitration agreement prior to the arising of the dispute. 85 N.E.2d at 1266. The court held that retention of the unsigned copy, as well as its proceeding with the terms of the contract prior to the arisal of the dispute, evinced both parties' willingness to be bound by the terms of the contract, despite the fact that one party had failed to sign it. *Id.* at 1267.

7

La Rosa correctly argues that an arbitration clause in an unsigned agreement, is enforceable if the other party's conduct evinced an intent to be bound by the agreement. *See Rudolph & Beer, LLP v. Roberts,* 260 A.D.2d 274, 276 (N.Y. Sup. Ct. 1999); *Maxit Designs, Inc. v. Coville, Inc.,* No. CIV. S-05-1040 WBS DAD, 2006 WL 2734366, at *4 (E.D. Cal. 2006); *Liberty Management & Const. Ltd. v. Fifth Ave. & Sixty-Sixth Street,* 208 A.D.2d 73, 73 (N.Y. Sup. Ct. 1995). But in each of these cases cited by La Rosa, a written agreement was present and in the possession of both parties prior to the dispute, even though unsigned by one party.

In the instant case, however, SFM alleges that it did not have possession of the 2005 Agreement until La Rosa produced it in demanding arbitration and that, furthermore, the contract is fraudulent. SFM alleges that it never saw or signed the 2005 Agreement at the time it developed and delivered the Web-based Moving Manager software to La Rosa, and that the contract between SFM and La Rosa was strictly oral, with no mention of an arbitration agreement. And even had there been an oral agreement to arbitrate between SFM and La Rosa, such an agreement would have been unenforceable, because all such agreements are required to be in writing. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 400 (1967). SFM claims that it cannot be bound to arbitration because it never agreed to be bound, or acted as if it agreed to be bound, to an arbitration agreement of which it claims it was entirely ignorant.

SFM disputes that there was ever a valid arbitration agreement with La Rosa, and disputes even the validity of the 2005 Agreement which contains the agreement to arbitrate. Since the existence of an agreement to arbitrate is in issue, 9 U.S.C § 4 commands that the court to proceed summarily to trial to determine whether the 2005

Agreement, and its constituent arbitration agreement, is valid. *Prima Paint Corp.*, 388

U.S. at 403-04; *see also Great American Trading Corp. v. I.C.P. Cocoa, Inc.*, 629 F.2d

1282, 1288 (7th Cir. 1980). SFM's motion to stay arbitration pending trial is therefore

granted. For the same reasons, La Rosa's cross-motion to stay this proceeding and/or to

compel SFM to arbitrate is denied.

C. SFM's Motion to Strike the Declaration of John T. A. Rosenthal

The declaration of John T. A. Rosenthal ("Rosenthal") has been adduced by La

Rosa in support of its motion to dismiss and in opposition to SFM's motion to stay

arbitration. The purpose of the declaration is purportedly to demonstrate that SFM and

La Rosa had entered into arbitration, a contention that SFM contests. SFM particularly

objects to Rosenthal's allegations concerning the authenticity of the 2005 Agreement and

SFM's alleged agreement to arbitrate. Rosenthal Decl. ¶¶ 3, 10. As stated above, the

question of the authenticity of the 2005 Agreement and its agreement to arbitrate are to

be decided by the court at trial subsequent to the directive of 9 U.S.C. § 4. Since this

court has denied La Rosa's motion to dismiss and has granted SFM's motion to stay

arbitration, SFM's motion to strike Rosenthal's declaration is denied as moot.

D. La Rosa's Motion to Transfer the Action to the Southern District of New York

Its motion to dismiss having been denied, La Rosa has moved in the alternative to

transfer this action to the Southern District of New York. A transfer is appropriate if

venue is proper in both districts, if transfer promotes the convenience of the parties and

witnesses, and if transfer is in the interests of justice. *Solaia Technology, Inc. v.*

*Rockwell Automation, Inc.*, No. 03 C 566, 2003 WL 22057092, at *2 (N.D. Ill. Sept. 2,

2003). La Rosa has not moved to dismiss for improper venue so the court assumes without deciding that venue is proper in both districts.

The court evaluates the convenience of the parties and witnesses by considering: (1) the plaintiff's choice of forum; (2) the situs of material events; (3) the relative ease of access to sources of proof; (4) the convenience of the witnesses; and (5) the convenience to the parties. *See, e.g., Washington Nat. Life Ins. Co. v. Calcasieu Parish School Bd.*, No. 05 C 2551, 2006 WL 1215413, at *8 (N.D. Ill. May 2, 2006).

### 1. Plaintiff's Chosen Forum

SFM's choice of forum is Illinois, which is entitled to some weight. *See Solaia Technology, Inc.*, 2003 WL 22057092, at *2 ("One factor relevant to the convenience analysis is the plaintiff's choice of forum, which is entitled to substantial deference, particularly when the chosen forum is the plaintiff's home state."). This factor is not necessarily conclusive. *See, e.g., Von Holdt v. Husky Injection Molding Systems, Ltd.*, 887 F. Supp. 185, 188 (N.D. Ill. 1995) (Although plaintiff's choice of forum has been given substantial weight in some cases, it is not the only factor a court must consider in determining whether to transfer venue). Illinois is not SFM's home state (SFM is a New York corporation) and that diminishes somewhat the weight that this court accords to its choice of forum. However, although this factor is in SFM's favor, the other factors in this case tip the balance in favor of La Rosa's motion to transfer.

### 2. Situs of Material Events

The principal material event in this action is the alleged 2005 Agreement governing the relationship between the parties. The alleged 2005 Agreement was (or was not) the result of dealings between SFM and La Rosa New York which took place in New

York.  The disagreement over the authenticity of the 2005 Agreement is the font from

which the other alleged wrongs (breach of contract and copyright infringement) flow in

this case.  It is true that La Rosa Chicago, La Rosa New York's sister or subsidiary

organization, is also alleged to be infringing SFM's copyright, but the fact remains that

the contractual relationship at the heart of this case was conceived in New York between

SFM and La Rosa New York.  This factor thus weighs in favor of transferring the action.

    *3.  Access to Sources of Proof and Convenience of Witnesses*

Both of the principal parties (SFM and La Rosa New York) to the alleged 2005

Agreement are New York corporations.  Moreover, the adoption of the 2005 Agreement,

or lack thereof, apparently took place in New York between actors for both parties who

reside in New York.  Indeed, the only connection with Illinois is La Rosa New York's

sister or subsidiary company, La Rosa Chicago, which is allegedly infringing SFM's

copyright at its Chicago office.  However, the copyright is also allegedly being infringed

at La Rosa's other locations, and nothing has been alleged to suggest that La Rosa

Chicago was a party to the 2005 Agreement which is at the heart of this controversy.

Because the 2005 Agreement was (or was not) drafted, signed, and adopted in New York,

between actors who are citizens of New York, it can be presumed that the factors of

access to sources of proof, including discovery and the convenience of the witnesses

likely to be called, including present and past actors for the New York corporations

involved, are better served by transferring this action to the Southern District of New

York.

*4. Transfer is in the Interests of Justice*

When evaluating the interest of justice (often referred to as the "public interest" factors), the court focuses on the efficient administration of the court system. *Washington Nat. Life Ins. Co. v. Calcasieu Parish School Bd.*, 2006 WL 1215413, at *8. Relevant considerations here include: (1) the court's familiarity with the applicable law; (2) the speed at which the case will proceed to trial, and; (3) the desirability of resolving controversies in their locale. *Id.* The movant has the burden of establishing, by reference to particular circumstances, that the transferee forum is clearly more convenient. *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219-220 (7th Cir. 1986). "The weighing of factors for and against transfer necessarily involves a large degree of subtlety and latitude, and, therefore, is committed to the sound discretion of the trial judge." *Id.*

Once again, these factors weigh in favor of granting La Rosa's motion to transfer. With the exception of count I (copyright infringement), all of the other counts comprise actions at common law. Were the court to hear this case, it would likely apply New York state law to the common law counts II through IV. This argues in favor of transfer to the Southern District of New York, which is likely more familiar with New York common law than is this court.

Generally, for federal claims based on pendant state claims, federal district courts follow the choice of law rules of the state in which the district sits. *Gramercy Mills, Inc. v. Wolens,* 63 F.3d 569, 572 (7th Cir. 1995). Illinois has adopted the tests from the Restatement (Second) of Conflicts to serve as its choice of law rules in contract cases. RESTATEMENT (SECOND) OF CONFLICTS § 188 (1971); *Asser v. McIntyre,* 661 N.E.2d 1138, 1141 (Ill. 1996). Illinois applies the Restatement's "most significant relationship"

test for choosing the appropriate law. *Gramercy Mills*, 63 F.3d at 572. In determining which state's law should apply, the court considers: "(a) the place of contracting, (b) the place of negotiation, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, place of incorporation, and place of business of the parties." *Id.*; RESTATEMENT (SECOND) OF CONFLICTS § 188 (1971). The Restatement further indicates that the factors "are to be evaluated according to their relative importance with respect to the particular issue." RESTATEMENT (SECOND) OF CONFLICTS § 188.

Applying these factors, the court observes that the contract was allegedly negotiated and signed in New York by entities that are incorporated in New York. Although La Rosa Chicago is an Illinois limited liability company, it was La Rosa New York that negotiated the disputed contract with SFM. The location of the subject matter of the contract (the development and licensing of the Web-based Moving Manager software) was primarily in New York (where SFM is located), although all of La Rosa's subsidiaries presumably shared the license. Likewise, the place of performance (with respect to development of the software at least) took place in New York. Thus, the alleged 2005 Agreement was negotiated and signed in New York by parties incorporated in New York, with performance (with respect to development and delivery of the software) and subject matter located in New York.[2] Given these facts, it is evident that New York has a more significant relationship with the occurrence and parties than Illinois, and thus the Illinois choice of law rule favors application of New York state law.

---

[2] The court notes that SFM has also filed an action in the New York State Supreme Court against La Rosa seeking a stay of the arbitration proceedings. *See Software for Moving, Inc. v. Del Monte Express, Inc.*, Case no. 603001-07 (N.Y. Sup. Ct. 2007).

Since New York law likely applies to the common law counts of SFM's complaint, the "familiarity factor" weighs in favor of transfer.

Both the Southern District of New York and the Northern District of Illinois contain large urban metropolitan areas with consequently heavy dockets for their district courts. It is therefore unlikely that a change of venue will significantly impede or accelerate the course of this action. Thus the second public interest factor is probably evenly balanced between the two districts.

Finally, the public policy factor in favor of resolving controversies in their locale militates in favor of transfer. The 2005 Agreement was allegedly made in New York between New York corporations. That is where the center of this case originated, and public policy favors resolving it there.

Because New York state law likely governs the common law counts of this action, and since public policy favors resolution of conflicts in the locale in which they originated, the public policy factors weigh in favor of La Rosa's motion to transfer this action.

Since venue is proper in both districts, and since transfer promotes the convenience of the parties and witnesses and is in the interests of justice, La Rosa's alternative motion to transfer this action to the Southern District of New York is granted.

## III. CONCLUSION

For the reasons set forth below, La Rosa's motion to dismiss is denied, SFM's motion to stay arbitration is granted, and La Rosa's cross-motion to stay this action and/or to compel arbitration is denied. SFM's motion to strike the declaration of John T.

14

A. Rosenthal is denied as moot.  Finally, La Rosa's motion to transfer the action to the

Southern District of New York is granted.


                                        ENTER:


                                        _____/s/_____
                                        JOAN B. GOTTSCHALL
                                        United States District Judge

DATED: December 7, 2007


                                        15

**EXHIBIT "GG"**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
-----------------------------------------------------------:

SOFTWARE FOR MOVING, INC., a New        Index No. 603001-07
York corporation,

                             **ORDER WITH**
             **Petitioner,**    :   **NOTICE OF ENTRY**

        **vs.**            :

**LA ROSA DEL MONTE EXPRESS, INC.**, a
**New York corporation,**

                       :

             **Respondent.**
-----------------------------------------------------------:

C O U N S E L L O R S :

    **PLEASE TAKE NOTICE,** that the within is a true copy of an Order and Judgment duly

filed and entered on December 13, 2007, in the Office of the New York County Clerk.

Dated: White Plains, New York
       December 19, 2007

                       Respectfully submitted,

                       _____
                       Kevin J. Harrington
                       John T. A. Rosenthal
                       HARRINGTON, OCKO & MONK, LLP
                       *Attorneys for Respondent*
                       81 Main Street, Suite 215
                       White Plains, New York 10601
                       Telephone: (914) 686-4800
                       Facsimile: (914) 686-4824

TO:    EDWARD J. GROSSMAN, ESQ.
       *Attorney for Petitioner*
       135 West Main Street, Suite 204
       Smithtown, NY 11787
       (631) 265-5864

MAX MARKUS KATZ, P.C.
*Attorneys for Petitioner*
88 University Place, 8th Floor
New York, NY 10003
(212) 727-0777

SUPREME COURT OF THE STATE OF NEW YORK · NEW YORK COUNTY

PRESENT: _____ *FEINMAN* _____                          PART **52**

Justice

*Software for Moving, Inc.*                    INDEX NO. **603001/07**

MOTION DATE _____

· v ·

*La Rosa del Monte Express, Inc*              MOTION SEQ. NO. **01**

CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ...  | **PAPERS NUMBERED** **1, 2**
Answering Affidavits — Exhibits *Cross Motion*                     | **3, 4, 5**
Replying Affidavits _____ *Stipulation of 10/18/07*             | **6**

**Cross-Motion:**   ☑ **Yes**   ☐ **No**

Upon the foregoing papers, it is ordered that this ~~motion~~ *petition is permitted to by petitioner on the record in open court on 12/5/07 (Ct Reporter Al Bowen) to be withdrawn.*

*The cross motion is deemed a petition to compel arbitration & granted on default. The parties are directed to proceed with the arbitration before Arbitrator Richard Mandel forthwith.*

*It is ORDERED & ADJUDGED that the parties shall proceed with the arbitration before Arbitrator Richard Mandel forthwith. This is the order & judgment of the court. Judgment of CPLR 5512*

Dated: **12/5/07**                          _____ J.S.C.

*Norman Goodman clerk*

Check one: ☑ **FINAL DISPOSITION**   ☐ **NON-FINAL DISPOSITION**

Check if appropriate: ☐ **DO NOT POST**   ☐ **REFERENCE**   *CASE DISP*

RECEIVED OCT 17 2007 MOTION SUPPORT OFFICE

FILED DEC 13 2007 COUNTY CLERKS OFFICE NEW YORK

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

----------------------------------------------------------:

SOFTWARE FOR MOVING, INC., and
SHLOMO KOGOS, as an Individual,                    :

                        Plaintiffs,                :

            vs.                                    :

LA ROSA DEL MONTE EXPRESS, INC.,
                                                   :

                        Defendant.                 :

----------------------------------------------------------:

Index No. 603001-07

AFFIDAVIT OF SERVICE

STATE OF NEW YORK          )
                           ) s.s.:
COUNTY OF WESTCHESTER      )

        SUSAN GLENN, being duly sworn, deposes and says:  deponent is not a party to this
action, is over 18 years of age and resides in Dutchess County, New York.

        On December 19, 2007, deponent mailed the within **Order with Notice of Entry** upon:

MAX MARKUS KATZ, P.C.              EDWARD J. GROSSMAN, ESQ.
88 University Place, 8th Floor     135 West Main Street, Suite 204
New York, NY 10003                 Smithtown, NY 11787

by depositing a true copy thereof in a post-paid wrapper, in an official depository under the care
and custody of the United States Postal Service within the State of New York by first class mail.

                                        _____
                                        SUSAN GLENN

Sworn to before me this
19th day of December, 2007

_____
SHIRLEY B. THORNTON
Notary Public, State of New York
No. 01TH6029394
Qualified in Westchester County
Commission Expires August 16, 2009