```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```
------------------------------------

SOFTWARE FOR MOVING, INC.,

                 Plaintiff,        08 Civ. 986 (JGK)

      - against -             OPINION AND ORDER

LA ROSA DEL MONTE EXPRESS, INC.,
ET AL.,

                 Defendants.

------------------------------------

JOHN G. KOELTL, District Judge:

    Plaintiff Software for Moving, Inc. ("SFM" or the "plaintiff") moves for an Order permanently staying the pending arbitration between itself and defendants La Rosa Del Monte Express, Inc. ("La Rosa") and La Rosa Del Monte Express (Chicago), LLC (collectively, the "defendants").

    This dispute arose when La Rosa, a moving company and a longtime software customer of SFM's, stopped making payments to SFM for a web-based moving software package, allegedly because SFM was behind schedule in completing the web-based version. (Tr. 45, 126-27, 144-45; Defs.' Ex. Z.) On February 12, 2007, La Rosa initiated arbitration proceedings against SFM pursuant to an arbitration agreement contained in a written software licensing agreement (the "License Agremeent") allegedly signed by the parties, which includes an arbitration agreement. On April 3, 2007, SFM filed this action against La Rosa in the Northern District of Illinois. La Rosa filed a motion to

dismiss based on lack of subject matter jurisdiction or, in the alternative, to transfer the action to the Southern District of New York.  SFM moved to stay arbitration, claiming that the signature of SFM's president on the License Agreement is a forgery and that there is therefore no valid agreement to arbitrate.  La Rosa cross-moved to stay this action and/or to compel arbitration.

In a Memorandum Opinion and Order dated December 7, 2007, Judge Gottschall denied La Rosa's motion to dismiss but granted La Rosa's motion to transfer.  Noting that the parties had raised issues of fact as to whether the parties had entered into a valid agreement to arbitrate, Judge Gottschall ruled that the case should proceed summarily to trial to determine whether the License Agreement is valid.  Accordingly, Judge Gottschall granted SFM's motion to stay arbitration pending trial and denied La Rosa's cross-motion to stay this action and/or to compel arbitration.

After the action was transferred to this District, this Court held a non-jury trial on March 17, April 1, and April 13, 2009 to resolve the parties' dispute over whether the parties entered into a valid arbitration agreement.  At the hearing, five witnesses testified:  Steven Dalzell ("Dalzell"), the former vice president of operations for La Rosa (Tr. 36); Roberto Medina ("Medina"), the controller of La Rosa (Tr. 126);

2

Hiram Rodriguez ("Rodriguez"), the founder and president of La Rosa (Tr. 140); Martin Wojtowicz ("Wojtowicz"), a technical consultant for SFM (Tr. 172-73); and Shlomo Kogos ("Kogos"), the owner and president of SFM (Tr. 221).  The Court now makes the following findings of fact and reaches the following conclusions of law.

## Findings of Facts

SFM is a company in the business of providing software and software services to moving companies.  (Tr. 42, 250.)  Safeguard Computer Services, Inc. ("Safeguard") is also a company in the business of providing software and software services to moving companies.  (Tr. 36, 250.)  Kogos is the president of both SFM and Safeguard.  (Tr. 36-37, 221; Defs.' Ex. B.)

La Rosa is a New York corporation in the business of providing customers with moving and storage services, with its principal place of business in the Bronx.  (Tr. 140-41.)  La Rosa Del Monte Express (Chicago) LLC ("La Rosa Chicago") is an Illinois corporation in the business of providing customers with moving and storage services, with its principal place of business located in Chicago, Illinois.  (Defs.' Ex. 53.)

The registered copyright for the software at issue in this case is owned by Safeguard, not by SFM.  (Defs.' Exs. 46, 50, 53.)  There is no written agreement between Safeguard and SFM

3

transferring ownership of the copyright for the software at issue in this case. (Tr. 255-56, 259; Defs.' Ex. 50.)

La Rosa first became a client of Safeguard in 1994, when it purchased the DOS version of Moving Manager. (Tr. 222.) La Rosa orally agreed to license Moving Manager from Safeguard, and Safeguard's counsel prepared a draft license agreement between La Rosa and Safeguard which was sent to La Rosa. (Defs.' Ex. P.) However, no written agreement was executed.

Safeguard eventually developed a Windows version of Moving Manager, which La Rosa agreed to license pursuant to a written "Software Licencing [sic] Agreement" (the "1999 Agreement"), dated March 24, 1999 and signed by Kogos and Rodriguez. (Tr. 143-44, 288-89; Defs.' Ex. B.) Kogos testified that they executed the written agreement either during the middle or at the conclusion of the project. (Tr. 224, 293.)

In 2003, SFM informed La Rosa that it would no longer support the Windows-based version of Moving Manager and proposed migrating La Rosa to a web-based version of the software. (Tr. 40-42, 234-35; Defs.' Ex. GG.) La Rosa did not agree to the proposal until November 2004, at which time Dalzell and Kogos orally agreed to go forward with the project. (Tr. 234-35.) Both Dalzell and Kogos testified that they had an understanding at the time that the agreement would be reduced to writing. (Tr. 42, 236.) In November 2004, La Rosa made an initial

deposit of $22,500 for the software development project. (Defs.' Ex. G.)  La Rosa made further payments of $50,250 and $58,000 on December 13, 2004; $26,250 on April 26, 2005; $23,750 on May 6, 2005; and $23,750 on May 23, 2005.  (Defs.' Ex. E-2, L, M.)

In February 2005, La Rosa's law firm drafted a sixteen-page "Software Development & License Agreement" (the "License Agreement") and a five-page "Maintenance Agreement" between La Rosa and SFM.  (Tr. 43; Defs.' Ex. H.)  An attorney at the firm emailed drafts of the agreements to Dalzell on February 15, 2005.  (Defs.' Ex. H.)  Section 13.12 of the License Agreement states:

> Except as specifically provided in this Agreement, the parties agree that any dispute or controversy arising out of, relating to or in connection with the interpretation, validity, construction, performance, breach or termination of this Agreement shall be submitted to binding arbitration to be held in Westchester County, New York in accordance with the rules of the American Arbitration Association.

(Defs.' Ex. H, I.)  Dalzell testified that when he gave copies of the draft agreements to Kogos, Kogos told Dalzell that "he wanted someone to look at it" and asked "if there was anything in there that could hurt him."  (Tr. 43-44.)  Dalzell did not recall what happened after giving Kogos the draft agreements, although he testified that he believed that there was some back and forth between the two parties to finalize the drafts.  (Tr. 72, 79, 119.)  The draft License Agreement and the final License

5

Agreement do in fact reflect several changes, principally the filling in of blanks with price terms and contact information. (Tr. 72-78; Defs.' Ex. H, I.)  Dalzell testified that Kogos returned signed copies of the agreements to him, which he believes he then signed.  (Tr. 45, 80.)  Dalzell then either placed the signed agreements in his file or gave them to the accounting department for filing.  (Tr. 45.)  Rodriguez also testified that he saw the original, signed copy of the License Agreement, although he could not recall when he saw it.  (Tr. 149.)  Kogos testified that he had never seen a copy of the draft License Agreement until it was produced to SFM in this litigation.  (Tr. 225-26.)

The License Agreement states that the Agreement was made and entered into "as of" March 3, 2005.  (Defs.' Ex. I.)  Page fourteen of the License Agreement lists the parties' addresses to which notices would be sent.  (Defs.' Ex. I.)  This contrasts with page fourteen of the draft License Agreement, which contained blank lines for contact names and information for SFM. (Defs.' Ex. H.)  In that section, Kogos's email address is listed as "skogos@earthlink.net."  (Defs.' Ex. I.)  Wojtowicz testified that he did not create the skogos@earthlink.net email address until January 5, 2006, although Kogos and Wojtowicz discussed the opening of the account in October or November 2005.  (Tr. 189-91, 247.)  The last page of the Agreement, page

6

sixteen, bears Kogos's purported signature and Dalzell's signature. (Defs.' Ex. I.) The Maintenance Agreement also indicates that it was entered into "as of" March 3, 2005. (Defs.' Ex. J.) It also contains Kogos's purported signature and Dalzell's signature. (Defs.' Ex. J.)

In August or September 2006, the parties agreed upon the terms of an "Addendum to Software Development and License Agreement" ("Addendum"), a "9/11" contingency plan for providing La Rosa with the source code for Moving Manager in the event that SFM went out of business. (Tr. 57-58, 103; Defs.' Ex. 3, O.) The one-page Addendum bears the signatures of both Kogos and Dalzell and is numbered page seventeen, and it uses the terms "Developer," "Software X," and "Client," that are not defined in the Addendum. (Defs.' Ex. O.) These three terms are defined, however, in the sixteen-page License Agreement. (Defs.' Ex. I.) The parties also negotiated and agreed upon a maintenance schedule, as set out in "Maintenance Schedule A." (Defs.' Ex. 40.) The one-page Maintenance Schedule A bears the signatures of both Kogos and Dalzell and is numbered page six. (Defs.' Ex. 40.)

In late August or early September 2006, La Rosa attempted to find the original signed copies of the License Agreement, the Addendum, the Maintenance Agreement, and Maintenance Schedule A, but it could not locate them. (Tr. 46, 127, 132-33, 146.) At

7

Rodriguez's request, Dalzell asked Kogos if Kogos had a copy. (Tr. 46-47.)  Kogos went to La Rosa's office in the Bronx and gave Dalzell copies of the signed License Agreement, Addendum, Maintenance Agreement, and Maintenance Schedule A.  (Tr. 46-47.) Medina testified that after Kogos gave the copies of the agreements to Dalzell, Kogos stopped by Medina's office and told Medina that he had given copies of the agreements to Dalzell. (Tr. 127-30.)  Dalzell then provided Medina with copies of the agreements.  (Tr. 127-30.)  Kogos denied ever having brought copies of the agreements to La Rosa's office and testified that Dalzell's and Medina's testimony were lies.  (Tr. 244-45.) Sometime in September 2006, Dalzell was fired.  (Tr. 242.)

In November or December 2006, relations between La Rosa and SFM began to sour.  SFM demanded additional payment to continue work on the software project, and La Rosa disputed that it owed SFM any additional money.  (Tr. 129, 131, 136, 145.)  On December 11, 2006, La Rosa's attorney sent Kogos two emails, both with the subject header "Software Development and License Agreement," which is verified by an email log produced from Kogos's email account.  (Defs.' Ex. EE.)  One of the emails attached a Microsoft Word version of a letter, the other email attached a PDF version of the same letter.  (Defs.' Ex. EE.) The letter explicitly refers to the existence of a written agreement between SFM and La Rosa and even mentions specific

provisions of the License Agreement. (Defs.' Ex. BB.) On December 13, 2006, Kogos sent emails to La Rosa's attorney, and nothing in these emails contest the assertion that SFM and La Rosa had entered into a written agreement. (Defs.' Ex. EE.) Kogos testified that he did not receive the letters from La Rosa's attorney either because he did not get them, or if he did get them, he could not open the attachments on his pocket PC and may not have had a computer at that time. (Tr. 384-92, 396.) In an email sent by SFM's attorney to La Rosa's attorney, dated December 22, 2006, SFM's attorney refers to specific terms of an "agreement" between La Rosa and SFM. (Defs.' Ex. DD.)

On February 12, 2007, La Rosa filed a Demand for Arbitration with the American Arbitration Association. (Defs.' Ex. Z.) The Demand for Arbitration attached the License Agreement, including the Addendum, and the Maintenance Agreement, including Maintenance Schedule A. (Defs.' Ex. Z.) On February 26, 2007, SFM's attorney wrote a letter to La Rosa's attorney claiming that Kogos's signatures on both agreements were forged. (Defs.' Ex. FF.) On April 3, 2007, however, SFM filed the Complaint in this action in the Northern District of Illinois, attaching copies of the Addendum and Maintenance Schedule A to the Complaint. (Defs.' Ex. 53.) The Complaint relies on these documents as evidence of an agreement between La Rosa and SFM, implying that Kogos's signatures on both of these

9

documents are authentic. (Defs.' Ex. 53.) Kogos admitted that he stated in his June 8, 2007 affidavit that he did in fact sign a 9/11 plan and a maintenance schedule. (Tr. 428.)

At his September 10, 2008 deposition, however, Kogos backtracked from his earlier representation that he had in fact signed the Addendum and Maintenance Schedule A. According to Kogos, at his deposition when he saw page seventeen and page six on the documents, "it occurred to [him] that [he] might have signed something similar to it, but not exactly the same." (Tr. 428.) Again at the April 1, 2009 hearing, Kogos speculated that the copies of the Addendum and Maintenance Schedule A entered into evidence were not the same documents that he had signed. (Tr. 231, 233.) Finally, in its post-trial brief, SFM now takes the position that both the License Agreement and the Addendum are fraudulent. (See Pl.'s Primary Br. 23 n. 20 & 21.)

However, virtually all of the direct and circumstantial evidence presented at trial supports the conclusion that Kogos signed all four of the agreements at issue here: the License Agreement, Addendum, Maintenance Agreement, and Maintenance Schedule A. La Rosa and SFM had entered into a similar agreement in 1999, which was also executed in the middle or near the end of the project. Both Dalzell and Kogos testified that they had an understanding that the agreement they had been negotiating would be reduced to writing. La Rosa's attorney

also circulated to La Rosa an earlier draft of the License Agreement and Maintenance Agreement.  Dalzell and Rodriguez both testified that they saw the original signed copy of the agreements.  While Rodriguez is an interested witness, Dalzell has not worked for La Rosa since 2006 and does not appear to have any financial interest in the case.

   The consistency between the License Agreement and the Addendum and between the Maintenance Agreement and Maintenance Schedule A also weigh in favor of finding a valid agreement to arbitrate.  The terms "Addendum" and "Schedule" imply that they are attachments to another agreement, and the page numbers on the bottom of those two agreements follow precisely after the page numbering of the License Agreement and the Maintenance Agreement.  Moreover, the Addendum uses defined terms that are defined in the License Agreement, but not in the Addendum itself.  At the April 1, 2009 hearing, Kogos claimed that he realized at his deposition that he would not have signed a document on its own if it was labeled page six, and that the Addendum "didn't look right."  (Tr. 231, 233.)  He again testified at the April 13, 2009 hearing that he would have questioned a document titled "Addendum."  (Tr. 428.)  However, SFM attached the exact same copies of the Addendum and Maintenance Schedule A to its initial Complaint in this case, and Kogos verified in his June 8, 2007 declaration that he

11

signed those two documents. (Tr. 324-26, 330-31; Defs.' Ex. 53.) SFM also admitted in its response to La Rosa's requests for admission that Kogos signed the Addendum. (Tr. 346-47; Defs.' Ex. 46, 48.) Kogos's change of position between SFM's commencement of litigation against La Rosa and the time of his deposition weighs against the credibility of his testimony.

Lastly, SFM's conduct during arbitration and litigation also lends some support the conclusion that Kogos signed the License Agreement and the Maintenance Agreement. While Kogos disputes ever having seen the letters sent by La Rosa's attorney on December 11, 2006, the evidence plainly indicates that the email was sent to Kogos at his email address, and that the email subject heading read: "Software Development & License Agreement." Kogos asserts that he either did not receive the emails or could not open the attachments. The first claim is contradicted by the email log produced from his email account, and the second claim is implausible, considering that Kogos is the owner and founder of a software company. At the least, assuming Kogos received the emails, he would have seen that he had received emails from La Rosa's attorney with the subject headers referring to the License Agreement. Kogos's emails to La Rosa's attorney two days later, however, do not dispute the existence of a signed License Agreement, nor do they mention his inability to open the attachments. Kogos's behavior after

12

receiving the December 11, 2006 emails is at the very least consistent with La Rosa's assertion that, at that time, Kogos believed that a signed License Agreement existed.

The only evidence that weighs in favor of SFM's implausible position that Kogos's purported signatures on the License Agreement and the Maintenance Agreement are forged is the appearance of Kogos's Earthlink email address in the License Agreement. The evidence establishes that this email address was not created until January 5, 2006, and that Kogos and Wojtowicz did not contemplate the creation of the email address until late 2005. Therefore, the Agreement could not have been prepared until at least late 2005 and could not have been signed on March 3, 2005. However, the "March 3, 2005" dates on the agreements do not state that the agreements were signed on that date but only that the agreements were dated "as of" that date. It was wholly reasonable for the parties to have chosen a date during the performance of the contracts which was earlier than the date on which the contracts were actually signed. It is certainly possible that the parties actually signed the documents in late 2005 or sometime in 2006. That does not mean that Kogos's signature was forged. The overwhelming evidence indicates that Kogos did in fact sign the License Agreement, as well as the Addendum, Maintenance Agreement, and Maintenance Schedule A, and that there is therefore a valid agreement to arbitrate.

13

## Conclusions of Law

In her Memorandum Opinion and Order, Judge Gottschall granted SFM's motion to stay arbitration pending a bench trial on whether the parties agreed to arbitrate and denied La Rosa's cross-motion to stay this action and/or to compel arbitration. In its papers, La Rosa refers to the SFM's "Motion to Permanently Stay the Pending Arbitration," and argues that the burden of demonstrating that there is no agreement to arbitrate rests on SFM as the party bringing the motion to stay. However, in its papers, La Rosa asks the Court to vacate Judge Gottschall's stay order and to issue an order compelling SFM to arbitrate. SFM maintains that La Rosa, as the proponent of the arbitration agreement, bears the burden of proving that it is valid.

Federal courts, in ruling on a petition to compel arbitration under the Federal Arbitration Act ("FAA"), are to determine "two issues: i) whether a valid agreement or obligation to arbitrate exists, and ii) whether one party to the agreement has failed, neglected, or refused to arbitrate." PaineWebber, Inc. v. Bybyk, 81 F.3d 1193, 1198 (2d Cir. 1996). It has long been settled that arbitration is a matter of contract and that, therefore, a party cannot be compelled to submit to arbitration any matter that party has not agreed to arbitrate. See, e.g., First Options of Chicago, Inc. v. Kaplan,

14

514 U.S. 938, 943 (1995); Shaw Group, Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 120 (2d Cir. 2003).  Whether a valid agreement exists to submit certain issues to binding arbitration is determined by state law principles governing the formation of contracts.  Shaw Group, 322 F.3d at 120 (citing First Options, 514 U.S. at 944); see also Bell v. Cendant Corp., 293 F.3d 563, 566 (2d Cir. 2002).

The License Agreement states that it shall be governed by New York law, the parties allegedly entered into the License Agreement in New York, and the parties both cite to New York law on the issue of contract formation.  The Court therefore applies New York law to the question of whether the parties entered into the License Agreement.  Under New York law, the party seeking arbitration bears the burden of proving that a valid arbitration agreement exists.  Am. Centennial Ins. Co. v. Williams, 649 N.Y.S.2d 190, 191 (App. Div. 1996).  While New York law requires the party seeking arbitration to show "an express, unequivocal agreement" to arbitrate, a higher standard than for nonarbitration agreements, the Court of Appeals for the Second Circuit has held that this rule is preempted by the FAA because it discriminates between arbitration agreements and other contracts.  See Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional, 991 F.2d 42, 46 (2d Cir. 1993).  Accordingly, the Court of Appeals has held that a party seeking arbitration need

15

only prove the existence of a valid arbitration agreement by a preponderance of the evidence. See id. at 46; Dreyfuss v. eTelecare Global Solutions-US, Inc., No. 08 Civ. 1115, 2008 WL 4974864, at *3 (S.D.N.Y. Nov. 19, 2008).

Even though La Rosa's cross-motion to compel arbitration was denied by Judge Gottschall, it is plain that the trial on whether the parties signed the License Agreement was conducted pursuant to 9 U.S.C. § 4 in response to the defendant's prior motion to compel arbitration. In any event, La Rosa clearly seeks an order compelling arbitration. Therefore, La Rosa must prove by a preponderance of the evidence that Kogos in fact signed the License Agreement. As explained above, La Rosa has met this burden. Moreover, the fact that Dalzell did not sign the License Agreement in March 2005 and may not have signed it until as late as August 2006 is irrelevant to the validity of the arbitration agreement. See Earthtrade, Inc. v. General Brands Int'l Corp., No. 95 Civ. 8913, 1996 WL 63067, at *4-5 (S.D.N.Y. Feb. 14, 1996) (holding that proof that party resisting arbitration signed arbitration agreement is sufficient to establish the agreement's validity even if party seeking arbitration did not countersign agreement until a later date). To find that Kogos agreed to arbitration, the evidence need only show that Kogos assented to the License Agreement, and that there was a written agreement to arbitrate. See id.

La Rosa raises additional arguments why SFM should be compelled to arbitrate, but the Court need not reach these arguments given its conclusion that La Rosa and SFM entered into a valid arbitration agreement.  La Rosa also argues that the action must be dismissed for lack of subject matter jurisdiction.  La Rosa contends that SFM does not have standing to bring a copyright infringement against La Rosa because Safeguard, and not SFM, is the owner of the copyrighted software.

As an initial matter, the fact that Judge Gottschall already considered and rejected this argument weighs against La Rosa's argument here.  See United States v. Quintieri, 306 F.3d 1217, 1225 (2d Cir. 2002) ("[W]hen a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case . . . ." (quoting United States v. Uccio, 940 F.2d 753, 758 (2d Cir. 1991))).  Judge Gottschall relied upon established case law in the Seventh Circuit that "[w]here there is no dispute between the copyright owner and the transferee over the status of the copyright, 'it would be unusual and unwarranted to allow a third party infringer to invoke [17 U.S.C. §] 204(a) to avoid suit for copyright infringement.'"  Software for Moving, Inc. v. La Rosa Del Monte Express, Inc., No. 07 Civ. 1839, 2007 WL 4365363, at

17

*3 (N.D. Ill. Dec. 7, 2007) (quoting Billy-Bob Teeth, Inc. v. Novelty, Inc., 329 F.3d 586, 592-93 (7th Cir. 2003)).

It is also well-established in this Circuit that where a transferor and transferee of a copyright do not dispute that the transfer was valid, an alleged third party infringer may not avoid liability by invoking the § 204(a)'s requirement that the transfer agreement have been made in writing. See Eden Toys, Inc. v. Florelee Undergarment Co., 697 F.2d 27, 36 (2d Cir. 1982), superseded on other grounds as stated in Weissman v. Freeman, 868 F.2d 1313 (2d Cir. 1989); AMC Film Holdings LLC v. Rosenberg, No. 03 Civ. 3835, 2005 WL 2105792, at *5 (E.D.N.Y. Aug. 31, 2005); Arthur A. Kaplan Co. v. Panaria Int'l, Inc., No. 96 Civ. 7973, 1998 WL 603225, at *2 (S.D.N.Y. Sept. 11, 1998). As Judge Gottschall noted, there is no dispute between Safeguard and SFM over the assignment of the copyright from Safeguard to SFM. Accordingly, the absence of a written transfer agreement between Safeguard and SFM does not deprive this Court of subject matter jurisdiction over SFM's copyright infringement claim. In any event, La Rosa's argument is moot because the Court grants the defendant's motion to compel arbitration.

## CONCLUSION

The foregoing constitutes this Court's Findings of Fact and Conclusions of Law. SFM and La Rosa are ordered to proceed to arbitration in accordance with the arbitration agreement in the

License Agreement.  The Clerk is directed to enter Judgment in favor of the defendant and to close this case.[1]

**SO ORDERED.**

**Dated: New York, New York**
**June 22, 2009**

_____
John G. Koeltl
United States District Judge

---

[1] See Oppenheimer & Co., Inc. v. Neidhardt, 56 F.3d 352, 358 (2d Cir. 1995); Fidelity and Guar. Ins. Co. v. West Point Realty, Inc., No. 02 Civ. 1951, 2002 WL 1933780, at *5 (S.D.N.Y. Aug. 21, 2002).